THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA, *et al.*,

                Plaintiff,
                *ex rel.*

JAMIE SIEGEL, M.D.,

                Plaintiff-Relator,

    v.

NOVO NORDISK INC.,

                Defendant.

No. 3:23-cv-05459-BHS

**DECLARATION OF MATTHEW BERGS IN SUPPORT OF DEFENDANT'S CONSOLIDATED MOTIONS *IN LIMINE***

I, Matthew C. Bergs, declare as follows:

1.    I am an attorney at Sidley Austin LLP, and I represent Defendant Novo Nordisk Inc. ("NNI") in the above-captioned matter. I am admitted pro hac vice to practice law in the United States District Court for the Western District of Washington.

2.    I submit this declaration in support of Defendant's Consolidated Motions *in Limine* filed herewith, and, if called to do so, could competently testify as to the matters set forth in this Declaration.

3.    A true and correct copy of excerpts from the transcript of the August 5, 2024 deposition of Dr. David Cooper, are attached as **Exhibit 1.**

4.    A true and correct copy of excerpts from the transcript of the January 10, 2025 deposition of Michael Tarantino, are attached as **Exhibit 2.**

5.    A true and correct copy of excerpts from the transcript of the December 19, 2024 deposition of Dr. Marilyn Manco-Johnson, are attached as **Exhibit 3.**

BERGS DECLARATION IN SUPPORT
OF DEFENDANT'S CONSOLIDATED
MOTIONS *IN LIMINE*
Case No. 3:23-cv-05459-BHS

1

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000

6.      A true and correct copy of excerpts from the transcript of the April 9, 2024 deposition of Luke Hemming, are attached as **Exhibit 4.**

7.      A true and correct copy of excerpts from the transcript of the April 24, 2024 deposition of Stacy O'Donnell, are attached as **Exhibit 5.**

8.      A true and correct copy of the emails between T. Hill, J. Snider, G. Staudt, M. Ferrara, R. Halpern re aPCC Conversion, dated July 17, 2011, bearing production number NNICID-0253005-06, is attached as **Exhibit 6.**

9.      A true and correct copy of Washington's  Responses and Objections to Defendant Novo Nordisk Inc.'s Fourth Set of Interrogatories, dated October 21, 2024, is attached as **Exhibit 7.**

10.      A true and correct copy of Relator's Supplemental Responses and Objections to Defendant's Second Set of Interrogatories, dated October 21, 2024, is attached as **Exhibit 8.**

11.      A true and correct copy of the National Hemophilia Foundation, 2011 Inhibitor Education Summits Evaluation Summary, bearing production numbers NNICID-0209868-959, is attached as **Exhibit 9.**

12.      A true and correct copy of the email between L. Mastrapa, S. O'Donnell re Lily Mastrapa coming to work in Southern California, dated May 13, 2014, bearing production numbers NNICID-0008704-05, is attached as **Exhibit 10.**

13.      A true and correct copy of emails between M. Ferrara, G. Staudt re SevenSecure enrollment, dated February 27, 2014, bearing production number NNICID-0032009, is attached as **Exhibit 11.**

14.      A true and correct copy of emails between L. Hemming, S. O'Donnell re customer complaint – case # 264067, dated December 9, 2013, bearing production numbers NNICID-0106177-78, is attached as **Exhibit 12.**

15.      A true and correct copy of the email between S. O'Donnell, M. Ferrara, M. Leichter, M. Gonzalez re NovoSecure QA Draft 2-6-2015, dated February 9, 2015, bearing production number NNICID-0027562, is attached as **Exhibit 13.**

BERGS DECLARATION IN SUPPORT
OF DEFENDANT'S CONSOLIDATED
MOTIONS *IN LIMINE*
Case No. 3:23-cv-05459-BHS

2

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000

16.     A true and correct copy of excerpts from the transcript of the November 20, 2024 deposition of Dr. Judy Zerzan-Thul, are attached as **Exhibit 14.**

17.     A true and correct copy of excerpts from the transcript of the May 13, 2024 deposition of Relator Jamie Siegel, are attached as **Exhibit 15.**

18.     A true and correct copy of the email between J. Hanson, M. Shaw, P. Helbo, N. Fitzpatrick re Novo Nordisk BioPharm Field Coaching Report of J. Hanson, bearing production number NNICID-1122454-57, is attached as **Exhibit 16.**

19.     A true and correct copy of excerpts from the transcript of the May 1, 2024 deposition of Jerry Hanson, are attached as **Exhibit 17.**

20.     A true and correct copy of excerpts of Plaintiffs' Pre-Trial Statement, dated August 27, 2025, is attached as **Exhibit 18.**

21.     A true and correct copy of Plaintiffs' Rule 26(a)(1) Disclosures, dated August 27, 2025, is attached as **Exhibit 19.**

22.     A true and correct copy of Plaintiffs' Supplement to Their Rule 26(a)(1) Disclosures, dated October 31, 2024, is attached as **Exhibit 20.**

23.     A true and correct copy of the emails between T. Hill, J. Snider, S. O'Donnell re new SevenSecure enrollment # 2271576, dated May 1, 2013, bearing production number NNICID-0012807-08, is attached as **Exhibit 21.**


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: September 12, 2025

                                        /s/ *Matthew C. Bergs*
                                        Matthew C. Bergs (*pro hac vice*)

BERGS DECLARATION IN SUPPORT
OF DEFENDANT'S CONSOLIDATED
MOTIONS *IN LIMINE*
Case No. 3:23-cv-05459-BHS

3

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000

# Exhibit 1

Dr. David Cooper
August 05, 2024

---

**Page 1**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

Case No. C23-5459 BHS

------------------------------------------------
UNITED STATES OF AMERICA, et al.,

    Plaintiff,

    ex rel.

JAMIE SIEGEL M.D.,

    Plaintiff-Relator,

    v.

NOVO NORDISK, INC.,

    Defendant.
------------------------------------------------

TRANSCRIPT OF VIDEOTAPED DEPOSITION

OF

DR. DAVID COOPER

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified LiveNote Reporter, Certified Shorthand Reporter and Notary Public, with all parties present via Zoom or at K&L Gates, One Newark Center, Tenth Floor, Newark, New Jersey 07102, on Monday, August 5, 2024, commencing at 9:20 a.m. Eastern time.

---

**Page 2**

```
 1
 2     A P P E A R A N C E S:
 3
 4        K&L GATES, LLP
 5        BY:  JOHN H. LAWRENCE, ESQ.
 6             JARED M. BURTNER, ESQ.
 7        501 Commerce Street, Suite 1500
 8        Nashville, Tennessee  37203
 9        Phone No. 1 615-780-6700
10        Mr. Burtner at Research Triangle Park Office
11        Attorneys for Dr. David Cooper
12        john.lawrence@klgates.com
13        jared.burtner@klgates.com
14        Present in person
15
16
17
18        ORRICK
19        BY:  JOHN WOLFE, ESQ.
20        401 Union Street, Suite 3300
21        Seattle, Washington  98101
22        Phone No. 1-206-839-4324
23        wolfe@orrick.com
24        Present via Zoom
25
```

---

**Page 3**

```
 1
 2        SIDLEY AUSTIN
 3        BY:  MARK P. GUERRERA, ESQ.
 4        1501 K Street, N.W.
 5        Washington, DC  20005
 6        Phone No. 1-202-736-8580
 7        mguerrera@sidley.com
 8        Attorneys for Novo Nordisk
 9        Present in person
10
11
12        SIDLEY AUSTIN
13        BY:  JAIME L.M. JONES, ESQ.
14             MATT BERGS, ESQ.
15        One South Dearborn
16        Chicago, Illinois  60603
17        Phone No. 1-312-853-0751
18        jaime.jones@sidley.com
19        mbergs@sidley.com
20        Attorneys for Novo Nordisk
21        Ms. Jones present via Zoom
22        Mr. Bergs present in person
23
24
25
```

---

**Page 4**

```
 1
 2
 3
 4
 5        GUTTMAN, BUSCHNER & BROOKS PLLC
 6        BY:  REUBEN GUTTMAN, ESQ.
 7             TRACI L. BUSCHNER, ESQ.
 8        1509 22nd Street, NW
 9        Washington, DC  20037
10        Phone No. 1-202-800-3001
11        rguttman@gbblegal.com
12        tbuschner@gbblegal.com
13        Attorneys for Dr. Jamie Siegel and Plaintiffs
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Dr. David Cooper
August 05, 2024

Page 25

1              Dr. David Cooper
2      A    The chairman of the department is
3  Charles J. Hodge, H-o-d-g-e.
4      Q    And he was a neurosurgeon?
5      A    Yes.
6      Q    And he still practices?
7      A    I don't think so.
8      Q    When is the last time you talked to
9  Charles J. Hodge?
10     A    Probably two decades ago.
11     Q    Does Charles J. Hodge give you good
12 references?
13          MR. LAWRENCE:  Objection to the form.
14          MR. GUERRERA:  Objection to the form.
15     Q    Has he given you references -- let me
16 rephrase the question, terrible question.
17          Have you used Charles J. Hodge as a
18 reference for any employment that you sought after
19 leaving Upstate Medical Center?
20          MR. LAWRENCE:  Same objection.
21     A    I have not used him, but he has
22 provided references.
23     Q    He has provided references to you?
24     A    He has provided references to people
25 who have asked him.

Page 26

1              Dr. David Cooper
2      Q    Were those good references?
3          MR. LAWRENCE:  Objection to form.
4          MR. GUERRERA:  Objection to form.
5      A    No.
6      Q    Why were they not good references?
7      A    I can't tell you why Dr. Hodge decided
8  to say what he decided to say.  I was in competition
9  with him and taking 150, 200 cases a year from his
10 department by being in competitive practice passed
11 down to him.  And for some reason he decided to say
12 things that weren't true.
13     Q    What did he say about you?
14     A    It's subject to a defamation suit,
15 which has subsequently settled, so I am not sure I
16 am at liberty to say.
17     Q    So you brought a suit against
18 Dr. Hodge for saying bad things about you, right?
19     A    Yes.
20     Q    And those bad things had to do with
21 the quality of your medical care; is that a fair
22 statement?
23          MR. LAWRENCE:  Objection to form.
24     A    No.
25          MR. GUERRERA:  Objection to form.

Page 27

1              Dr. David Cooper
2      Q    What did they have to do with?  What
3  did you accuse Dr. Hodge of saying?
4      A    He was accused of tortious
5  interference and of defamation.
6      Q    That's a legal answer.  What was he
7  accused of saying -- what did he say specifically?
8      A    He was -- made comments about supposed
9  disciplinary actions that were related to
10 interactions with other people that didn't actually
11 happen.
12     Q    What disciplinary actions?
13     A    I don't even remember the details of
14 it, but there were instances that he reported that
15 were not factually correct and were never documented
16 as any actions.
17     Q    Well, what specifically did you accuse
18 him of saying about you?
19          MR. LAWRENCE:  Objection to form.
20 Asked and answered.
21          MR. GUERRERA:  Objection to form.
22     A    This is 20 years ago.  I don't
23 remember the details.
24     Q    You said the lawsuit was settled?
25     A    Yes.

Page 28

1              Dr. David Cooper
2      Q    Did he pay you money?
3      A    No.
4      Q    Did you pay him money?
5      A    No.
6      Q    Did he agree not to say what he was
7  saying?
8      A    My understanding was he has not
9  provided any references to those events ever since.
10     Q    In fact, it's true, is it not, that
11 the lawsuit brought by you against Dr. Hodge was
12 dismissed because the court found among other things
13 that what he said was true?
14          MR. LAWRENCE:  Objection to form.
15          MR. GUERRERA:  Objection to form.
16     A    That's not the case.
17     Q    Have you read the court's opinion,
18 sir?
19     A    I have not looked at this in 20 years.
20     Q    When you -- when you sought employment
21 at Quintiles --
22          (Reporter clarification.)
23     Q    When you sought employment at
24 Quintiles, did you disclose to Quintiles the lawsuit
25 that you had filed and the resolution of the

7  (Pages 25 to 28)

Dr. David Cooper
August 05, 2024

Page 29

1           Dr. David Cooper
2    lawsuit?
3           MR. LAWRENCE:  Objection to form.
4       A    I'm -- I'm not sure I was asked about
5    anything like that.
6       Q    When you sought employment at
7    Novo Nordisk, did you disclose to Novo Nordisk the
8    existence of the lawsuit and the disposition of the
9    lawsuit?
10          MR. LAWRENCE:  Objection to form.
11          MR. GUERRERA:  Objection to form.
12      Q    Excuse me.
13      A    I don't recall being asked about that.
14      Q    Can you tell me, Dr. Cooper, when you
15   decided to put together Exhibit 449, why it is that
16   you left out from that exhibit your solo practice of
17   medicine in Upstate New York?
18      A    Because this is a limited business
19   resumé after I finished business school.
20      Q    And can you tell me why it as you left
21   out your residency at Upstate Medical Center?
22      A    That's post-graduate training.  It's
23   not employment experience in a company, which is the
24   focus of LinkedIn.
25      Q    During your tenure as a solo

Page 30

1           Dr. David Cooper
2    practitioner, were you ever sued for malpractice?
3       A    Yes.
4       Q    How many times were you sued for
5    malpractice?
6       A    My recollection, one.
7       Q    What were the facts that were alleged
8    in that case?
9       A    The patient had bleeding after a
10   lumbar discectomy.
11      Q    And where was the lawsuit brought?
12      A    In Onondaga County, New York, from my
13   recollection.
14      Q    Did the lawsuit go to trial?
15      A    It went to trial, and it was settled.
16      Q    Who was representing you in that case?
17      A    The attorneys via the Medical Society,
18   State of New York, as the insurance carrier.
19      Q    How much was the plaintiff paid?
20      A    I don't recall at all.
21      Q    Was it more than $100,000?
22      A    Honestly, I don't remember at all.
23      Q    More than $200,000?
24          MR. LAWRENCE:  Objection to form.
25      Asked and answered.

Page 31

1           Dr. David Cooper
2           MR. GUERRERA:  Objection to form.
3       Q    Were there ever any disciplinary --
4           THE REPORTER:  I didn't get an answer.
5       A    I don't recall.
6       Q    Have there ever been any disciplinary
7    complaints made against you with regard to your
8    practice of medicine?
9       A    Not as far as I'm aware of.
10      Q    Have there been any inquiries with
11   regard to your practice of medicine by any medical
12   boards?
13          MR. LAWRENCE:  Objection to form.
14      A    Not that I'm aware of.
15      Q    Now, you said that -- I think you said
16   that in 1996 -- excuse me -- just so I understand
17   it:
18          After you ceased your practice of
19   medicine, you immediately went to Cornell -- Cornell
20   Johnson Graduate School at Cornell; is that what you
21   are telling me?
22      A    Yes.
23      Q    And at the time you decided to go to
24   graduate school to get a business degree, had you
25   made the decision that you were not going to

Page 32

1           Dr. David Cooper
2    practice medicine anymore?
3       A    Yes.
4       Q    And why did you make that decision?
5       A    For the reasons I have already stated.
6       Q    Now, in your practice, your solo
7    practice in Syracuse, New York, did you treat
8    hemophilia patients?
9       A    No.
10      Q    In your solo practice in Syracuse,
11   New York, did you ever have a patient who had
12   hemophilia?
13      A    I probably had one patient
14   retrospectively that had acquired hemophilia.
15      Q    Okay.  Do you remember the name of the
16   patient?
17      A    No.
18      Q    During your solo practice in Syracuse,
19   New York, did you gain any experience understanding
20   hemophilia, the disease state?
21      A    No.
22      Q    Now, when you were a resident at
23   Upstate Medical Center in Syracuse, New York, did
24   you -- did you treat disease patients who had
25   hemophilia?

8  (Pages 29 to 32)

Dr. David Cooper
August 05, 2024

Page 353

1          Dr. David Cooper
2  sales chains, 340B, I am not aware that we had any
3  information on specific doses to be able to create a
4  different incentive scheme.
5          I know we had discussed that many
6  times internally to say:
7          Is there any way of knowing exactly
8  what the dosing regimens are to be able to influence
9  how we compensate people?
10         But I had no -- I had no oversight of
11  how salespeople were compensated, where they were
12  travelling patients, or anything else.
13     Q    Well, you have been to meetings with
14  Jerry Hanson; have you not?
15         MR. GUERRERA:  Object to form.
16     A    I don't specifically recall.
17     Q    You know Jerry Hanson?
18     A    I don't recall the name.
19     Q    You have been to meetings with sales
20  representatives who service the state of Washington;
21  isn't that a fact, sir?
22     A    I have been annual sales meetings
23  where the sales reps from across the company were
24  there.
25     Q    Forget what internal guidance

Page 354

1          Dr. David Cooper
2  Novo Nordisk may or may not have.
3          As a doctor, as a physician, who's
4  obligated to do no harm, when you saw a patient
5  taking this much product, you didn't think you had
6  an obligation to call Dr. Louie and say:
7          "Hey, you may kill this kid; or this
8  kid may be killed if he takes this much product"?
9          MR. GUERRERA:  Objection to form.
10         MR. LAWRENCE:  Object to form.
11         Argumentative.  Stop raising your voice with
12  the witness.
13     A    It is ultimately Dr. Louie's
14  obligation to his patient and the patient's family
15  to make treatment decisions.  I am not a physician
16  treating that patient.  As you've established, I am
17  not a hematologist.  It's his obligations as a
18  prescribing physician to do what he thinks is best.
19         I do not know whether the patient was
20  bleeding, wasn't bleeding, what happened before he
21  was taking all of this medicine.
22         But, ultimately, bleeding to death is
23  the leading cause of death in patients with
24  hemophilia, not thrombosis.  So bleeding to death is
25  what patients are trying to avoid and what their

Page 355

1          Dr. David Cooper
2  doctors are trying to avoid.
3          Whatever his circumstances are and his
4  decision to off-label -- use this dosing, that's not
5  something that we as the company influence.
6     Q    But it's something you as the company
7  were ready to make money off of; isn't that a fair
8  statement, Doctor?
9          MR. GUERRERA:  Objection to form.
10         Argumentative.
11         MR. LAWRENCE:  Objection to form.
12     A    My compensation was largely unrelated
13  to whether the company hit its goals or not.
14     Q    I am not asking about your
15  compensation.
16         This young man, 14 years old, was
17  being pumped with millions of dollars' worth of a
18  product that was going to kill him; and that money
19  was going into the coffers of your company and help
20  pay your salary.
21         And it didn't bother you an ounce that
22  you were making money off selling a product at doses
23  that were going to potentially kill this kid?
24         MR. LAWRENCE:  Objection to form.
25         MR. GUERRERA:  Objection to form.

Page 356

1          Dr. David Cooper
2          Argumentative.  Assumes facts not in evidence.
3     A    I am not aware that the doses he was
4  using would kill him to -- to -- I am not sure what
5  the mechanism mom that you described -- that would
6  do that is.
7     Q    You said multiple standard deviations
8  off the chain -- off the normal use?
9          MR. GUERRERA:  Objection to form.
10         MR. GUERRERA:  Objection to form.
11     A    But the doses he would take -- were
12  taking -- if -- in -- in the case of a bleeding
13  episode, would be a labeled dose.
14         The product is approved to be used
15  every two to three hours at a dose of approximately
16  90.  He was using 90 every two hours.
17         So from a half life and
18  pharmacokinetic perspective -- I don't know why his
19  physician was dosing him that way; that's his
20  physician's discussion.
21         But, I mean, NovoSeven is a short half
22  life product.  I do not know that we have any safety
23  data that suggests that dose that he was taking
24  at the frequency he was taking it -- which he
25  apparently was taking for quite sometime -- would

89  (Pages 353 to 356)

# Exhibit 2

Michael Tarantino, M.D.
January 10, 2025

```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF WASHINGTON
                     AT TACOMA

UNITED STATES OF AMERICA, et al., )
                                  )
           Plaintiffs,            )
           Ex rel.                )
JAMIE SIEGEL, M.D.,               )
        Plaintiff-Relator         )
      vs.                         ) No.
                                  ) 2:23-CV-045459 BHS
                                  )
NOVO NORDISK, INC.,               )
                                  )
           Defendant.             )
```

The VIDEOTAPED DEPOSITION of MICHAEL

TARANTINO, M.D., called for examination pursuant to

notice and pursuant to the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken before Barbara

Perkovich, CSR, Certified Shorthand Reporter, at

SIDLEY AUSTIN, LLP, One South Dearborn, Chicago,

Illinois on the 10th day of January, 2025 at 9:10

a.m.

Michael Tarantino, M.D.
January 10, 2025

Page 10

1  plaintiff or the defendant in these cases?
2      A.    Defendant both times.
3      Q.    And who was the defendant in each case?
4      A.    Johns Hopkins Hospital and a physician.
5  I don't remember his name.
6      Q.    Were they malpractice cases?
7      A.    No.  Oh, well, on behalf of the
8  physician, it was not a malpractice case.  On
9  behalf of Johns Hopkins Hospital, it was an
10 accusation of abuse against one of the nurses of
11 the hospital.
12     Q.    You understand that you've been
13 identified in this case as an expert by Novo
14 Nordisk; is that your understanding, sir?
15     A.    Yes.
16     Q.    And you have provided a report that
17 bears your name; is that correct?
18     A.    That's correct.
19     Q.    And do you understand that an expert is
20 supposed to be independent, that is give an
21 independent opinion?  Is that your understanding,
22 sir?
23     A.    Do you mean in general the word
24 "expert," or do you mean in this context?

Page 11

1      Q.    In this context.
2      A.    I don't know.  I don't know that I
3  heard that directly out of anyone's mouth, but I
4  assumed it.
5      Q.    In other words, when you testify,
6  you're supposed to -- or do you understand that
7  you are supposed to provide an independent
8  opinion?
9      A.    Yes.
10     Q.    And do you understand that when you
11 testify in court, you are supposed to tell the
12 truth?
13     A.    Do I understand that?  Is that the
14 question?
15     Q.    Yes.
16     A.    Yes.
17     Q.    Yes.  And do you understand that when
18 you testify in a deposition, you are supposed to
19 tell the truth?
20     A.    Yes.
21     Q.    Do you understand that when you testify
22 in court and in a deposition, you're not supposed
23 to testify to false information; is that right?
24     A.    I don't know what that means, testify

Page 12

1  to false information?
2      Q.    In other words, make false statements.
3      A.    Oh, yes, I understand that.
4      Q.    It is a fact, is it not, that a jury
5  has found that you have, in the course of your
6  career, made false statements, right?
7          MS. JONES:  Objection.
8          THE WITNESS:  I don't know that to be
9  true.
10 BY MR. GUTTMAN:
11     Q.    Okay.  Have you ever been accused of
12 making false statements?
13     A.    Yes.
14     Q.    Who accused you of making false
15 statements?
16     A.    A person by the name of Osvaldo Wesly.
17     Q.    And what did Mr. Wesly specifically
18 accuse you of saying that was false?
19     A.    Well, he asserted that I defamed his
20 character, but I disagreed with that.
21     Q.    Did Mr. Wesly file a lawsuit against
22 you, sir?
23     A.    And many others, yes.
24     Q.    Who else did he sue besides you?

Page 13

1      A.    The National Hemophilia Foundation; Val
2  Bias, then current CEO of the National Hemophilia
3  Foundation; Craig Kessler, at the time of the
4  accusation the chairman of MASAC, an organization
5  of National Hemophilia Foundation; Bob Robinson
6  the executive director of the Bleeding Disorders
7  Alliance, Illinois; the Bleeding Disorders
8  Alliance of Illinois; the Great Lakes Hemophilia
9  Foundation; and Kollet Koulianos.  I think that --
10 I think that covers it.
11     Q.    Now, did the case that Dr. Wesly
12 brought against you and the others you mentioned
13 go to trial?
14     A.    Yes.
15     Q.    And was there a verdict by a jury?
16     A.    Yes.
17     Q.    And did the jury find that you made
18 false statements?
19     A.    I don't recall hearing that
20 declaration.  They judged in favor of the
21 plaintiff, but I never heard anyone say that I
22 made false statements, and I still don't believe I
23 made false statements.
24     Q.    Did the jury issue an award of damages

Michael Tarantino, M.D.
January 10, 2025

Page 14

1  in favor of Dr. Wesly and against you?
2      A.    $2 million was sought, and the jury
3  awarded $10,000.
4      Q.    And how much did the jury award to
5  Dr. Wesly from the hemophilia foundation, sir?
6      A.    $1 million.
7      Q.    Now, did you sit through the jury
8  trial?
9      A.    I did.
10     Q.    And what did Dr. Wesly specifically say
11 that you said was -- that you said about him that
12 was false?
13     A.    I asserted that he hadn't -- in his
14 past before being employed by the Comprehensive
15 Bleeding Disorders Center was inexperienced in
16 seeing patients with hemophilia.
17     Q.    And what else did you say about him?
18     A.    That he wasn't formally trained in
19 classical hematology.
20     Q.    And what else did you say about him?
21     A.    Well, in the original form, I said that
22 he had said disparaging things about me.
23     Q.    Okay.
24           MR. GUTTMAN:  Let's bring it up,

Page 15

1      Jordan, Exhibit 411, our 411.  And we'll mark
2      as 666.
3      (Tarantino Deposition Exhibit No. 666 was
4       marked for identification.)
5  BY MR. GUTTMAN:
6      Q.    Got it?
7      A.    Yes.
8      Q.    Okay.  So you're looking at Exhibit
9  666, which is a complaint filed in the Circuit
10 Court of the Tenth Judicial District, Peoria
11 County, by Osvaldo Wesly, M.D., against a number
12 of folks or people, including yourself.
13           Do you see that?
14     A.    I see the face page, yes.
15     Q.    Have you seen this complaint before?
16     A.    Yes.
17     Q.    And if I turn your attention to -- and
18 if I direct your attention to Paragraph 15 of the
19 complaint on Page 4, do you see that, sir?
20     A.    Yes.
21     Q.    It says that Dr. Osvaldo Wesly accused
22 you, in Paragraph 15, of making a number of false
23 statements, which are delineated in the bullets on
24 Page 5.

Page 16

1           Do you see that?
2      A.    Yes.
3      Q.    And you understand that he was suing
4  you for defamation, right?
5           MS. JONES:  Objection, asked and
6      answered.
7           THE WITNESS:  Yes.
8  BY MR. GUTTMAN:
9      Q.    And defamation means that you were, in
10 fact, being accused of making false statements,
11 right?
12           MS. JONES:  Objection, calls for a
13     legal conclusion.
14           THE WITNESS:  Yeah, I don't know.  I
15     don't know.  That's -- I'm not a lawyer.
16 BY MR. GUTTMAN:
17           MR. GUTTMAN:  Right.
18     A.    I don't know if that's the definition
19 or not.
20     Q.    Well, what's -- did you sit through any
21 of the trial at all, sir?
22           MS. JONES:  Objection, asked and
23     answered.
24           THE WITNESS:  Yes.

Page 17

1           MR. GUTTMAN:  Okay.  Well, let's bring
2      up 417, Jordan, and make this 667.
3      (Tarantino Deposition Exhibit No. 667 was
4       marked for identification.)
5           THE WITNESS:  So what do I do with this
6      document?  Do I just minimize it or close it?
7           MR. GUTTMAN:  Yeah.
8  BY MR. GUTTMAN:
9      Q.    Do you have 667, sir?
10     A.    Yes, I see it.
11     Q.    And -- and 667 is a document that says
12 "Verdict Form," and it says, "We, the jury, find
13 for Plaintiff Osvaldo H. Wesly against the
14 following defendants," and then it says National
15 Hemophilia Foundation, yes, Michael Tarantino,
16 M.D., yes.
17           Do you see that?
18     A.    Yes.
19     Q.    And so, in fact, you were found by a
20 jury to have disseminated false statements, right?
21           MS. JONES:  Objection to form, asked
22     and answered and calls for a legal
23     conclusion.
24           THE WITNESS:  Do I answer?

Michael Tarantino, M.D.
January 10, 2025

Page 18

1          MS. JONES:  You can answer, if you can.
2          THE WITNESS:  I understand what the
3      jury decided, but I was not making false
4      statements.
5  BY MR. GUTTMAN:
6      Q.    Okay.  So you understand fully what the
7  jury found, which is that you had made false
8  statements about Dr. Wesly, but you don't agree
9  with the jury.
10          Is that what you're telling me?
11          MS. JONES:  Objection to form,
12      mischaracterizes the testimony.
13  BY MR. GUTTMAN:
14      Q.    Is that what you're telling me?
15      A.    I'm telling you I was telling the truth
16  and the jury disagreed.
17      Q.    And why -- why -- why do you disagree
18  with the jury's -- jury's verdict?  In other
19  words, tell me why it is you think you were
20  telling the truth.
21      A.    Because I was.  And in addition to
22  that, after the verdict was given, the counsel
23  that I had interviewed the jury and 10 of the 12
24  jurors agreed that I was telling the truth and 2

Page 19

1  did not.  And the 10 others that did agree with
2  what I had testified acquiesced to the 2 that --
3  that did not and compromised by having the
4  settlement reduced from $2 million to $10,000.
5      Q.    Did you file an appeal in this case?
6      A.    No.
7      Q.    In fact, you settled the case, right?
8          MS. JONES:  Objection to form.
9          THE WITNESS:  That -- that was advice
10      of our -- of our counsel.  Myself and BCDI,
11      we took counsel's advice.
12  BY MR. GUTTMAN:
13      Q.    Now, as part of the settlement, are you
14  allowed to repeat the same statements that you had
15  made about Dr. Wesly that got you sued in the
16  first place?
17      A.    I wasn't told any restrictions on what
18  I could or couldn't say.
19          MR. GUTTMAN:  Now, Jordan, if we can
20      bring up 441 and make it into 668.
21      (Tarantino Deposition Exhibit No. 668 was
22      marked for identification.)
23  BY MR. GUTTMAN:
24      Q.    And before we do that, let me ask this

Page 20

1  question:  Do you regret making the statements you
2  made about Dr. Wesly?
3      A.    I held then and I hold now those
4  statements were true, so I do not regret making
5  the statements.
6      Q.    Now, it's a fact, is it not, that you
7  disseminated statements to the National Hemophilia
8  Foundation that were negative about Dr. Wesly
9  after he was given an award by the National
10  Hemophilia Foundation, right?
11      A.    The National Hemophilia Foundation
12  requested an interview with me after that award
13  was being challenged based on someone else's
14  assertion, and I granted them the interview.
15      Q.    Well, didn't you sit at a meeting of
16  the MASAC board where it was disclosed that
17  Dr. Wesly was getting an award, and that you later
18  wrote to Dr. Kessler and others that you disagreed
19  with the award because you had negative
20  perceptions about Dr. Wesly?
21          MS. JONES:  Objection to form.
22          THE WITNESS:  I was at the MASAC
23      meeting when Dr. Kessler, chair of the MASAC
24      committee at the time, made the announcement.

Page 21

1      I was then asked to render an opinion about
2      Dr. Wesly's candidacy.  It wasn't
3      unsolicited.
4  BY MR. GUTTMAN:
5      Q.    Well, in fact, the announcement was
6  that he had already received the award, and you
7  brought it to Dr. Kessler's attention that it
8  bothered you that he received the award, right?
9          MS. JONES:  Objection to form.
10          THE WITNESS:  That's not correct.
11  BY MR. GUTTMAN:
12      Q.    Okay.  We'll get to that.
13          Now, do you have in front of you
14  Exhibit 668?  Do you see that?
15          MS. JONES:  No.  He needs to open it.
16      You asked him to stop doing that, so give him
17      a minute.
18          THE WITNESS:  Okay.  I have 668 showing
19      on the screen.
20  BY MR. GUTTMAN:
21      Q.    668 is a document that we pulled off
22  the internet which has the bio of Dr. Wesly.  And
23  I think if you turn to the page with the picture,
24  you will see that it is indeed Dr. Wesly; is that

Michael Tarantino, M.D.
January 10, 2025

Page 22

1  right?
2      A.    I don't know.  It's a picture that
3  looks like what he might have looked like years
4  ago, but I don't know him very well.
5      Q.    You're telling me you don't know
6  Dr. Wesly very well, but you were ready to make
7  all kinds of comments about him?  Is that what you
8  are telling me, Dr. Tarantino?
9          MS. JONES:  Objection to form and tone,
10     Rueben.  Be respectful.
11         MR. GUTTMAN:  I'm respectful.
12 BY MR. GUTTMAN:
13     Q.    You -- you can't identify this
14 individual on this Exhibit 668 as Dr. Wesly?
15     A.    I saw him during the trial, and he
16 looks like a much older man, so I don't know if
17 that's him or if that's just a picture of him from
18 many years ago.  I don't know.
19     Q.    Well, before you made the comments that
20 you made about Dr. Wesly, had you worked with
21 Dr. Wesly at all?
22     A.    What does that mean?  What does that
23 mean, did I work with him?
24     Q.    In other words, had you -- had you been

Page 23

1  in -- been in the same -- well, do you not
2  understand the phrase "worked with"?
3      A.    It could mean -- it could mean a lot of
4  things.  What do you mean by it?
5      Q.    Well, let's work off your definition of
6  the phrase "worked with."  How do you define
7  "worked with"?
8      A.    It could mean a variety of things.  I
9  know who he is.  I wasn't a partner in his
10 practice.  I -- I didn't live in the same city as
11 him.  I've never gone out to lunch with him.  I
12 don't know what you mean, "worked with."
13     Q.    Well, tell me.  You didn't work in his
14 practice.  You didn't live in the same city as he
15 did.  Did you ever work in the same hospital or
16 building with him?
17     A.    Okay.  In retrospect, I learned that he
18 was a laboratory, something, worker, in the
19 laboratory of my residency -- or my fellowship
20 mentor at the University of Wisconsin in Madison,
21 I learned that.  But I never worked with him or
22 met him or exchanged words with him during that
23 period of time.
24     Q.    Okay.  Up until the time of the trial,

Page 24

1  did you ever meet with him or exchange words with
2  Dr. Wesly?
3      A.    One time, yes.
4      Q.    When was that?
5      A.    It was in 2010.  I was giving a
6  Pediatric Grand Rounds at the University of
7  Illinois College of Medicine in St. Francis
8  Hospital.  At the conclusion of my Grand Round, he
9  walked up and introduced himself.  We shook hands,
10 exchanged words for about a minute, and that was
11 it.
12     Q.    So you really didn't know Dr. Wesly
13 well at all; is that a fair statement?
14         MS. JONES:  Objection to form.
15         THE WITNESS:  I don't know what you
16     mean by "know."  I -- I knew about him.  I
17     read about him.
18 BY MR. GUTTMAN:
19     Q.    Okay.  Well, you knew about him, you
20 said.  How did you know about Dr. Wesly?
21     A.    I read what his new employer had posted
22 about him.  He had a LinkedIn membership,
23 apparently, so I looked at his LinkedIn site.
24 There might have been other social media outlets

Page 25

1  that had something to do with him that I looked
2  at.
3      Q.    Well, what else?  What else did you do
4  to learn about Dr. Wesly?
5      A.    What frame of time are you talking
6  about?
7      Q.    Well, at any time before Dr. Wesly
8  brought a lawsuit against you and a few others?
9      A.    I did look into his background.  I did
10 check to see where he went to medical school and
11 where he trained.
12     Q.    Did Dr. Wesly misrepresent where he
13 went to medical school?
14         MS. JONES:  Objection to form,
15     foundation.
16         THE WITNESS:  Where and when?  When are
17     you talking?  Ever?
18 BY MR. GUTTMAN:
19     Q.    Well, what did you say about Dr. Wesly
20 that was false, that Dr. Wesly said was false?
21     A.    Nothing about his medical school.
22         MR. GUTTMAN:  Well, let's do this.
23     Let's go to 669, which is 413, Jordan.
24

Michael Tarantino, M.D.
January 10, 2025

Page 26

1    (Tarantino Deposition Exhibit No. 669 was
2        marked for identification.)
3  BY MR. GUTTMAN:
4    Q.    You got it, Doctor?
5    A.    I do.
6    Q.    I want to turn your attention to 0004.
7        MS. JONES:  Take your time to review
8    the document.  Let him know when you're
9    ready.
10 BY MR. GUTTMAN:
11   Q.    Are you ready, Doctor?
12   A.    No.  Okay.  I'm ready.
13   Q.    Now, I want to direct your attention to
14 what appears to e-mail you wrote on September 21,
15 2014, at 6:54 p.m. to Craig Kessler; and you blind
16 copied, bcc'd, Kollet Koulianos or Koulianos
17 Kollet.  Do you see that?
18   A.    I see.
19   Q.    First of all, who is Koulianos Kollet?
20   A.    It's Kollet Koulianos, and at the time
21 in 2014, she was the executive director of the
22 Bleeding and Clotting Disorders Institute.
23   Q.    Before seeing this e-mail
24 correspondence that I'm showing you now, when was

Page 27

1  the last time you reviewed this e-mail
2  correspondence?
3    A.    Before the trial.
4    Q.    And with regard to the complaint that I
5  showed you a while ago against you and a few
6  others, when was the last time you reviewed that
7  complaint?
8    A.    Right before the trial.
9    Q.    The trial that occurred where Dr. Wesly
10 sued you and the National Hemophilia Foundation
11 for dissemination, is it that what you're talking
12 about?  For defamation.  Excuse me.
13   A.    That's correct.
14   Q.    Now, in this e-mail -- and it's a long
15 one.  It's one, two, three, four, five, six --
16 seven paragraphs.  Do you see -- and it ends on
17 Page 0005.  Do you see that?  Do you see that?
18   A.    I'm scrolling through it.  You know
19 that the e-mail was sent twice.  I don't know if
20 that came up in your review of the proceedings,
21 but I wasn't sure if the first one went through,
22 so I retyped it and sent it.  So that's why it
23 appears long, longer than it should be.
24   Q.    So you write, Thanks for the e-mail and

Page 28

1  voice of support and concern.  Needless to say, I
2  was shocked to hear your announcement at the MASAC
3  meeting regarding the Physician of the Year Award.
4  Thinking about the history of the POTY -- I assume
5  that's physician of the year -- recipients, myself
6  excluded, I cannot fathom how Dr. Wesly was
7  selected.  Do you see that?
8    A.    I see it.
9    Q.    What prompted you to write this e-mail
10 about Dr. Wesly, accusing him of lying about his
11 qualifications?
12       MS. JONES:  Objection to form.
13   Mischaracterizes the document.
14       THE WITNESS:  Well, I was asked to
15   render an opinion about him, so that's what
16   prompted me.
17 BY MR. GUTTMAN:
18   Q.    Now, you wrote this seven-paragraph
19 e-mail about a physician that you had only met
20 once in passing and through a handshake exchange.
21 Is that what you are telling me, Dr. Tarantino?
22   A.    The information in the e-mail has
23 nothing to do with the exchange in passing and the
24 handshake.  It has to do with his background.

Page 29

1    Q.    Right.  But this is an e-mail you wrote
2  about a physician that you never personally
3  practiced with, right?
4    A.    That's correct.
5    Q.    Right.  It's not a physician that you
6  went to dinner with or lunch with or had even a
7  long conversation with; is that a fair statement?
8        MS. JONES:  Objection to form, asked
9    and answered.  Rueben, we're getting real far
10   afield from any possible connection to
11   relevance or anything else.
12 BY MR. GUTTMAN:
13   Q.    You can answer the question.
14   A.    Could you repeat the question, please?
15   Q.    Yeah.  You wrote this e-mail attacking
16 the integrity of a physician that you had never
17 met with for more than a few minutes.  Is that a
18 fair statement, Dr. Tarantino?
19   A.    No.
20       MS. JONES:  Objection to form, asked
21   and answered.
22       THE WITNESS:  No, I didn't feel it was
23   an attack.  I felt it was just conveying
24   information to an interested party.

Michael Tarantino, M.D.
January 10, 2025

Page 30

BY MR. GUTTMAN:

1    Q.    And was your goal to get the National
2  Hemophilia Foundation to rescind the Physician of
3  the Year Award for this minority physician in
4  Peoria, Illinois, sir?
5        MS. JONES:  Objection to form.
6        THE WITNESS:  No.
7  BY MR. GUTTMAN:
8    Q.    You can answer the question.
9    A.    No.
10   Q.    You understood, in fact, that he was or
11 is a minority, right?
12   A.    Excuse me?
13   Q.    You understand that he is a minority,
14 right?
15   A.    What do you mean when you say minority?
16   Q.    He is from another country.
17   A.    Oh, that makes him a minority?  Are you
18 talking about his race?
19   Q.    Yes.
20   A.    Are you asking about his race?
21   Q.    Yes.
22   A.    Oh, I understand that, sure.
23   Q.    Now, let's talk about your background

Page 31

1  for a moment.  Where do you currently work?
2    A.    I am employed by the Bleeding and
3  Clotting Disorders Institute, and I am the
4  president of a private medical practice also in
5  Peoria, Illinois.
6    Q.    How long have you been employed by the
7  Bleeding and Clotting Disorders Institute?
8    A.    Since April 2010.
9    Q.    Where were you employed prior to April
10 2010?
11   A.    At the Comprehensive Bleeding Disorders
12 Center in Peoria, Illinois.
13   Q.    Why did you leave the Comprehensive
14 Bleeding Disorders Center in Peoria, Illinois?
15   A.    At the time it was my opinion that the
16 administration of the organization was not aligned
17 with its mission of helping patients, so I left
18 and started a new organization.
19   Q.    You were terminated, were you not?
20   A.    No, I resigned.
21   Q.    And when you resigned, then you started
22 your own bleeding disorders center; is that right?
23   A.    After I resigned, yes.
24   Q.    And who took over the leadership of the

Page 32

1  Comprehensive Bleeding Disorders Center in Peoria,
2  Illinois, that you had left?
3    A.    What do you mean by took over?
4    Q.    Like who took your position when you
5  left?
6    A.    Oh, my position as medical director?
7  Osvaldo Wesly.
8    Q.    Right.  Well, was Dr. Wesly working at
9  the Comprehensive Bleeding Disorders Center during
10 your tenure there?  In other words, did you
11 overlap employment?
12   A.    No.
13   Q.    He was hired to replace you; is that
14 right?
15   A.    I know he was hired.  I'm not sure what
16 the intention was.
17   Q.    And how long after you left that center
18 was Dr. Wesly hired?  In other words, when was he
19 hired?  Month after?
20       MS. JONES:  Objection to form.  Lack of
21     foundation.
22       THE WITNESS:  I don't know his hire
23     date.

Page 33

1  BY MR. GUTTMAN:
2    Q.    Now, as I understand it, patients from
3  that center went with you to your new facility; is
4  that right?
5    A.    Nearly all of them did, yes.
6    Q.    And so your new facility, to some
7  degree, was competing with that old facility that
8  you had left; is that right?
9    A.    I'm not sure what competing means,
10 but -- in this context, but they existed at the
11 same time we existed, until March of 2016.
12   Q.    So it wasn't just that you were
13 spreading false information about Dr. Wesly.  You
14 were spreading false information about a person
15 who actually took the position that you had left
16 at a center that was competing with your new
17 facility; is that right?
18   A.    No.
19       MS. JONES:  Objection to form.  The
20     witness has already testified he was not
21     disseminating false information.  Rueben, you
22     are badgering him.  You are going to have to
23     move on.
24       MR. GUTTMAN:  Yeah, a jury has found

# Exhibit 3

Page 1

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                       AT TACOMA

3   Civil Action Number 2:23-CV-05459-BHS

4   UNITED STATES OF AMERICA, et al.,
            Plaintiffs,
5           Ex rel.

6   JAMIE SIEGEL, M.D.,
            Plaintiff-Relator,
7
    vs.
8
    NOVO NORDISK, INC.,
9           Defendant.

10  -------------------------------------------------------

11      VIDEO DEPOSITION OF MARILYN MANCO-JOHNSON, M.D.

12                   December 19, 2024

13  -------------------------------------------------------

14

15

16

17

18

19

20

21

22

23

24

25

Marilyn Manco-Johnson, M.D.
December 19, 2024                                    6 to 9

Page 6

1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  We are on the record
3    at 9:07 a.m. on December 19, 2024.  This is the
4    video-recorded deposition of Dr. Marilyn
5    Manco-Johnson, in the matter of the United States of
6    America, et al., versus Novo Nordisk.
7              This deposition is being held at
8    1601 Wewatta Street, Denver, Colorado.
9              My name is Michael Banks.  I'm the
10   videographer on behalf of U.S. Legal Support.  The
11   court reporter is Kirsten Thorngate on behalf of U.S.
12   Legal Support.
13             Appearances will be entered on the
14   stenographic record.
15             Will the court reporter please swear in
16   the witness.
17             MARILYN MANCO-JOHNSON, M.D.,
18   having been first duly sworn to state the whole truth,
19   was examined and testified as follows:
20                  EXAMINATION
21   BY MR. GUTTMAN:
22        Q.   Good morning, Dr. Manco-Johnson.  I
23   assume Manco-Johnson is the full name.  It's not just
24   Dr. Johnson; is that right?
25        A.   Correct.

Page 7

1         Q.   Okay.  Well, thank you for being here
2    this morning.  And I know that I asked to reschedule
3    the deposition.  You gave us a date.  And I know that
4    you're busy, and I just want to thank you for
5    accommodating me, and I do appreciate that.
6              I'll be asking you a series of questions
7    this morning.  And although we're not in a court of
8    law, this proceeding will be occurring as if it were
9    in a court of law.  And what I mean by that is the
10   questions that I ask and answers that you give will be
11   used or could be used for all purposes in court,
12   including motions and trial and so forth.  I assume
13   you understand that?
14        A.   I do.
15        Q.   Okay.  And I assume, but I'll ask, that
16   this is not your first rodeo -- and I'll say rodeo
17   because it's Denver; it makes me think of rodeos --
18   with regard to depositions.  You've been in
19   depositions before?
20        A.   Yes.
21        Q.   Okay.  How many depositions have you been
22   the deponent in?  When I say "deponent," you're the
23   person who answers the questions.
24        A.   I would say three or four over the past
25   50 years.

Page 8

1         Q.   Three to four.
2              And have you ever testified in a court of
3    law?
4         A.   Yes.
5         Q.   Okay.  And how many times have you given
6    testimony in a court of law?
7         A.   Once.
8         Q.   Okay.  And how long ago was that?
9         A.   That was about 1975.
10        Q.   That was about the time you graduated
11   from medical school, I gather?
12        A.   I was a resident then.
13        Q.   Okay.  And what kind of proceeding was
14   that that you testified in?
15        A.   It was a question of child abuse, and I
16   was the hospital pediatrician who cared for an infant.
17        Q.   And was that testimony given in Colorado?
18        A.   Yes.
19        Q.   You went to medical school in
20   Philadelphia; is that right?
21        A.   I'm from -- I grew up in Philadelphia.
22   Yes.
23        Q.   I used to live there.  Which part?
24        A.   I grew up in Germantown.
25        Q.   Okay.  I lived in Chestnut Hill.

Page 9

1         A.   Oh.
2         Q.   Germantown Avenue, in, actually,
3    technically Mount Airy.  Do you know where that is?
4         A.   Yes, I do.  My sister and brother-in-law
5    raised their children in Chestnut Hill.  You might
6    know my brother-in-law.  Kenneth Powell.
7         Q.   Who is it?
8         A.   Kenneth Powell, P-o-w-e-l-l.  He's a
9    municipal judge.
10        Q.   Okay.  Well, the one great thing about
11   the area is I was a member of the Wissahickon skiing
12   club, and I played ice hockey to my heart's content.
13   I don't know if you know about that, that club.
14             Well, this is not about me, so I'll move
15   on.
16             Okay.  So other than that testimony that
17   you gave in 1975 in open court, that's the only time
18   you've testified in open court?
19        A.   Yes.
20        Q.   Okay.  And you said that you've been
21   deposed on three to four occasions.  When was the last
22   time that you gave deposition testimony?
23        A.   It was over 15 years ago.  Oh, no, no,
24   no, it was -- well, it could be.  It was like 2006.
25   Yeah, that's almost 20 years.  Yeah.

Marilyn Manco-Johnson, M.D.
December 19, 2024                                    10 to 13

Page 10

1      Q.   Okay.  Time flies, right?  I'm beginning
2   to understand how it does.
3           And what kind of proceeding was that?
4      A.   That was a federal court deposition.
5      Q.   What court was it in?  What federal
6   court?  What state?
7      A.   Whichever one Denver is in.
8      Q.   Colorado?  That would be a good guess.
9      A.   Colorado.  Yeah.
10     Q.   Okay.  And what kind of proceeding was
11  that?  Was it criminal?  Was it civil?
12     A.   It was civil.
13     Q.   Okay.  And were you a party to that case?
14  In other words, were you a plaintiff or defendant?
15     A.   I was the defendant.
16     Q.   And what kind of case was it?  What were
17  you being sued for?
18     A.   Well, an employee of a program of which I
19  was the director had been hired and later fired.  And
20  although I had neither hired nor fired him, I was
21  named in the suit as the director of the program.  It
22  was a First Amendment case.
23     Q.   Was that employee suing for retaliation?
24     A.   Excuse me?
25     Q.   Was he suing for retaliation?

Page 11

1      A.   Yes.  Specifically, he said -- although
2   his speech was never restricted, nor was he ever in
3   any way spoken to about restricting his speech --
4   individuals at the program knew or had reason to know
5   that in the future he would criticize people, and this
6   was a preemptive retaliation by firing him.  It was
7   thrown out of court, but I had to give a deposition
8   first.
9      Q.   Was that employee's name Miller?
10     A.   Yes, it was.  Brian Miller.
11     Q.   Brian Miller.  And Brian Miller, was he a
12  doctor?
13     A.   No.  He had a PhD in statistics from
14  Hoffman University.
15     Q.   From what university?
16     A.   Hoffman, H-o-f-f-m-a-n, New York, I
17  believe it is.  You don't know that?  It's an old
18  school.
19          I'm sorry.  No, Hofstra.  What am I
20  saying?  No, Hofstra.
21     Q.   Yes.  I do know Hofstra.  Hoffman, I knew
22  as a caterer when I was a kid, and he did events.  I
23  don't know -- Hofstra --
24     A.   I haven't finished my coffee yet.
25     Q.   I understand.

Page 12

1          Okay.  Now, Mr. Miller -- Dr. Miller made
2   some allegations in that complaint about research that
3   he was doing with you; is that a fair statement?
4      A.   Yes.
5      Q.   And do you recall the allegations that
6   Dr. Miller made with regard to the research that he
7   was doing with you?
8      A.   I'm sorry.  Could you repeat the
9   question?
10     Q.   Yes.  Do you recall Dr. Miller's
11  allegations with regard to the research that he was
12  doing with you?
13     A.   Well, he submitted two suits.  The first
14  one was simply that his First Amendment rights were
15  abridged.  And the second one, I believe, related to
16  the research.  Yes.
17     Q.   And he made allegations with regard to
18  the integrity of the research that was being conducted
19  by you?
20          MR. GUERRERA:  Object to form.
21     Q.   (BY MR. GUTTMAN)  You can answer the
22  question.
23     A.   Oh.  There was one word I didn't hear.
24  The intent of the research?
25     Q.   The integrity of the research.  Did he

Page 13

1   make allegations with regard to the integrity of the
2   research that you were supervising?
3          MR. GUERRERA:  Same objection.
4      A.   Could -- I don't know.  Could you speak
5   louder or closer to the mic?
6      Q.   (BY MR. GUTTMAN)  Yeah.  Did Dr. Miller
7   make allegations with regard to the integrity of the
8   research that you were conducting?
9      A.   Yes.  He did.
10     Q.   Okay.  And what specifically were his
11  allegations?
12     A.   So his allegation was based on -- sorry,
13  I don't know the legal terms -- that the quality of
14  research did not meet what was expected so that, as a
15  whistleblower, he could reclaim the cost of the
16  research at three times damages.  And -- yes.
17          And specifically, the funder of the
18  research was the federal government, the CDC.  And the
19  CDC had asked me for some information, which I sent
20  them, because they were -- and he was claiming that it
21  was inappropriate that I gave them that information.
22     Q.   Now, he, I think you said, was a
23  statistician; is that right?
24     A.   Yes.
25     Q.   What kind of statistician was he?  Just a

Marilyn Manco-Johnson, M.D.
December 19, 2024                                    14 to 17

Page 14

1  regular ol' statistician, or a specific kind of
2  statistician?
3       A.   Regular.
4       Q.   Right.  Well, are there different kinds
5  of statisticians?
6       A.   Well, yes.  Today, many statisticians in
7  medical centers work in what they would call mega
8  data, you know, from like processes like proteinomics
9  and metabolomics, they generate massive amounts of
10 data that you need very powerful computers to analyze.
11 And this was a randomized clinical trial that only
12 comprised 65 children over five years.  So it was
13 regular statistics, not specialized.
14      Q.   Now, are you a statistician?
15      A.   Me?  No.
16      Q.   Okay.  Did you take statistics in
17 college?
18      A.   Yes.
19      Q.   Like one class in statistics or more than
20 one class in statistics?
21      A.   Okay.  I went through college and medical
22 school in five years, so I only went to college for
23 one year.  So I don't remember all the courses I took.
24 But I took 90 credits in one year, and I don't think I
25 probably had more than one course in statistics.  Most

Page 15

1  of my statistical education was on-the-job learning
2  from the clinical research center statisticians at the
3  University of Colorado.
4       Q.   Okay.  But you don't -- would you
5  consider that you have an expertise in statistics?
6       A.   In simple statistics, yes.
7       Q.   Like when I think of simple statistics, I
8  think about batting averages in baseball.  Is that
9  simple statistics, or is it more than that?
10           MR. GUERRERA:  Object to form.
11      A.   I would say yes.  It's that simple.
12      Q.   (BY MR. GUTTMAN)  Okay.  So, for example,
13 if I were to ask you about, you know, multiple
14 regression analysis and standard deviations, that's
15 something you would say you need to talk to somebody
16 else about that?
17      A.   That -- that would be just standard.  I
18 wouldn't consider that fancy.  I would say that's
19 performed in most of my research papers.
20      Q.   Okay.  You said that Mr. Miller brought
21 two suits.  One suit, you said, was a First Amendment
22 suit.  And what was the other suit?
23      A.   Whistleblower suit.  They were both
24 federal suits.
25      Q.   Okay.  And you said they were both

Page 16

1  dismissed?
2       A.   Yes.
3       Q.   Now, you said you were deposed three
4  times, right?  And one of the times that you were
5  deposed was in the matter that Mr. Miller brought
6  against you and the University of Colorado.
7            Tell me about the other two times.
8       A.   So one other time was a child in the back
9  seat of a family car going on vacation when a
10 commercial large truck fell over and crushed the
11 family car.  And the child suffered a pulmonary
12 embolism, and it was subsequently determined by me
13 that he had an autoantibody called an antiphospholipid
14 antibody.
15           And the trucking company alleged that the
16 antibody caused his pulmonary embolus, not the truck
17 crushing him, his ribs.  And I gave a deposition that
18 he was perfectly well before he was crushed by the
19 truck and developed a pulmonary embolus the day after
20 he was crushed.  And the company withdrew their suit
21 after that deposition.  That was another one.
22           The third one was a child who went to an
23 emergency room for a broken arm, and while there, had
24 a routine urinalysis.  And I think there was something
25 like trace protein or trace red cells, something, in

Page 17

1  the urinalysis that was not dealt with that day.  And
2  sometime later he developed evidence of a kidney
3  issue.  And I don't know who it was, whether it was
4  the insurance company or who was suing the emergency
5  room that they should have picked up on that abnormal
6  urinalysis, that trivial finding, when he was there
7  for trauma.  And I testified for the emergency room.
8       Q.   Okay.  Were you testifying as a treating
9  physician?
10      A.   No.  I was not a treating physician then.
11 I was just asked to review the chart and give an
12 opinion as to whether the emergency room should have
13 picked up and evaluated that trace protein on a
14 routine urinalysis in a child who is being evaluated
15 for trauma.
16      Q.   Okay.  Well, let me ask it this way.  Do
17 you know what it means to be an expert witness in a
18 case?
19      A.   Yes.
20      Q.   What does it mean to be an expert witness
21 in a case?
22           MR. GUERRERA:  Objection.
23           You can answer.
24      Q.   (BY MR. GUTTMAN)  What's your
25 understanding?

# Exhibit 4

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CASE NO. 3:23-cv-05459-BHS


UNITED STATES OF AMERICA, et
al.,

      Plaintiffs,
          Ex rel.

JAMIE SIEGEL, M.D.,

      Plaintiff-Relator,

   vs.

NOVO NORDISK, INC.,

      Defendant.
_____/


*** CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY ***


VIDEOTAPED DEPOSITION OF LAWRENCE HEMMING

Tuesday, April 9th, 2024
9:07 a.m. - 4:55 p.m.

Trenam Law
101 East Kennedy Boulevard, Suite 2700
Tampa, Florida 33602

---------------------------------------------




REPORTED BY:
Susan Potts, RPR, CRR, CSR-IL
Job Number:  6559360

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

Page 10

1  offices of Greenberg Traurig, PA, located at
2  101 East Kennedy Boulevard, Suite 1900, Tampa,
3  Florida 33602.
4          My name is Rick Specter.  I am the
5  videographer on behalf of U.S. Legal Support
6  located at 16825 North Chase Drive, Suite 900,
7  Houston, Texas 77060.  The court reporter is
8  Sue Potts on behalf of U.S. Legal Support.  I
9  am not related to any party in this action nor
10 am I financially interested in the outcome.
11         Counsel will please state their
12 appearances for the record after which the
13 court reporter will swear in the witness.
14         MR. GUTTMAN:  Reuben Guttman, Guttman
15 Buschner & Brooks for relator-plaintiff Jamie
16 Siegel, and to my left with Guttman, Buschner &
17 Brooks is Tara Stanton for Jamie Siegel.  And
18 we have on the screen our legal assistant from
19 Guttman Bushnell & Brooks Sophie Bionelli and
20 our client whose initials on the screen are
21 j-e-s or Jamie E. Siegel.
22         And I'll leave it to counsel for the
23 Attorney's General office of the State of
24 Washington and my co-counsel in the State of
25 Washington.

Page 11

1          MR. SLOAN:  Karl Sloan, assistant
2  attorney general for the State of Washington.
3          MR. KUEHN:  Matthew Kuehn, K-u-e-h-n,
4  assistant attorney general for the State of
5  Washington.
6          MR. GUTTMAN:  And Doug?
7          MR. McDERMOTT:  Doug McDermott on
8  behalf of the plaintiff-relator.
9          MS. JONES:  For defendants Jaime Jones
10 from Sidley Austin.  With me is Matt Bergs,
11 Sidley Austin, and our counsel John Wolf from
12 Orrick is on by Zoom.
13         THE VIDEOGRAPHER:  At this time I'll
14 ask the court reporter to please swear the
15 witness.
16         THE COURT REPORTER:  Can you raise your
17 right hand to be sworn?
18         Do you solemnly swear or affirm the
19 testimony you're about to give shall be the
20 truth, the whole truth, and nothing but the
21 truth?
22         THE WITNESS:  I do.
23
24
25

Page 12

1          LAWRENCE HEMMING,
2  a witness, having been duly sworn to tell the
3  truth, the whole truth and nothing but the
4  truth, was examined and testified as follows:
5          EXAMINATION
6  BY MR. GUTTMAN:
7      Q.   Okay.  Can you please state your name
8  for the record, sir?
9      A.   Yes.  Lawrence Hemming.
10     Q.   And do you go by Lawrence or Luke?
11     A.   Luke.
12     Q.   Okay.  Mr. Hemming, my name is Reuben
13 Guttman.  I represent, as I said before, the
14 plaintiff-relator in this case Jamie Siegel.
15         And you've been subpoenaed to be
16 deposed here.  And the testimony you give will
17 be transcribed and a record will be created and
18 of course there's a videographer who's taking
19 the video of this.  And the testimony that
20 you're giving may be used for all purposes in
21 court including at trial of this proceeding.
22         If there's a question, sir, that I ask
23 you that you do not understand, can you please
24 be so kind as to let me know so I can rephrase
25 the question?

Page 13

1      A.   Yes.
2      Q.   Is this the first time you've been
3  deposed before, sir?
4      A.   Yes.
5      Q.   Have you been party to any legal
6  proceedings, a plaintiff, defendant, party in
7  any way in any legal proceedings?
8      A.   A long time ago.
9      Q.   And what kind of proceeding was that?
10     A.   It was a criminal charge.
11     Q.   A criminal charge against you?
12     A.   Yes, against me.
13     Q.   And what was the charge for?
14     A.   The charge was for domestic assault.
15 That was in 2003.
16     Q.   What was the disposition of that
17 charge, sir?
18     A.   Guilty plea.
19     Q.   And were you sentenced?
20     A.   Yes.
21     Q.   And what was the sentence?
22     A.   90 days incarceration followed by two
23 years probation.
24     Q.   Did you finish the sentence?
25     A.   Yes.

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

Page 14

1    Q.   Have there been any other criminal
2  charges against you?
3    A.   No.
4    Q.   At the time that you were found guilty
5  of domestic assault, whom were you working for?
6    A.   I was working for Jefferson Circuit
7  Court in Louisville, Kentucky.
8    Q.   And what did you do for the court?
9    A.   I was the staff attorney.
10   Q.   Are you a lawyer by training?
11   A.   Not anymore.
12   Q.   Did you go to law school?
13   A.   Yes, I did.
14   Q.   Where did you go to law school?
15   A.   I'm sorry?
16   Q.   Where did you go to law school?
17   A.   Lewis & Clark, Northwestern School of
18  Law of Lewis & Clark College in Portland.
19       MR. GUTTMAN:  Can we mark these as 1,
20  2?
21            (Deposition Exhibit Nos. 1-2
22              marked for identification.)
23  BY MR. GUTTMAN:
24   Q.   Okay.  Mr. Hemming, you have in front
25  of you what we've marked as Deposition Exhibits

Page 15

1  1 and 2.  And Exhibit 1 appears to be your
2  Facebook page.
3       That is indeed your Facebook page, is
4  it not, sir?
5    A.   It is.
6    Q.   And you put the words on this Facebook
7  page that appear on Exhibit 1?
8    A.   Yes.
9    Q.   And when did you do that?
10           (Discussion off the record.)
11  BY MR. GUTTMAN:
12   Q.   And when did you do that, sir?
13   A.   Probably 2021 or 2022.
14   Q.   Okay.  And on Exhibit No. 2 or Exhibit
15  No. 2, that appears to be your Linked In page.
16       That is indeed your Linked In page, is
17  it not, sir?
18   A.   Yes.
19   Q.   And these are words that you put on
20  this page, that is to say you created this
21  page, Exhibit No. 2; is that right, sir?
22   A.   Yes.
23   Q.   And when did you do that, sir?
24   A.   Probably 2023.
25   Q.   Okay.  And I notice on both of these

Page 16

1  Exhibits 1 and 2 that Lewis & Clark, the law
2  school that you went to, is missing from your
3  educational background at least on these
4  Exhibits 1 and 2.
5       Is that a fair statement?
6    A.   Yes.
7    Q.   And can you tell me, sir, in creating
8  these pages why you chose not to list your law
9  school background on this?
10   A.   With respect to the Linked In page, I
11  was applying for -- or when I was -- when I
12  would be applying for jobs, it would be outside
13  the legal field, and I didn't feel that having
14  the legal training would help me to get a
15  position outside the legal field.
16   Q.   Now, when you were found guilty of
17  domestic assault, was it assault or violence?
18       What was the --
19   A.   Assault.
20   Q.   When you were found guilty of domestic
21  assault, did you continue to maintain your
22  license to practice law?
23   A.   I did not.
24       MS. JONES:  Objection to form.
25

Page 17

1  BY MR. GUTTMAN:
2    Q.   That is to say you were disbarred?
3    A.   I was not disbarred.  My license to
4  practice law was suspended.
5    Q.   And where were you licensed to practice
6  law?
7    A.   Kentucky.
8    Q.   And what year was that suspended in,
9  sir?
10   A.   2004 or maybe 2005.
11   Q.   And did there come a time when you
12  reapplied to be a practicing attorney in the
13  state of Kentucky?
14   A.   No.
15   Q.   And why is that?
16   A.   So one of the things that I learned
17  after returning to Louisville from studying in
18  Portland was that while a degree from Lewis &
19  Clark is of great value on the west coast,
20  Louisville is a very parochial town.
21       I worked as a staff attorney -- let's
22  see.  I want to say I had been living -- it was
23  two months after I returned to Louisville that
24  I started working as a staff attorney.  I
25  worked for two years.  During that time I was

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

Page 18

1  applying for positions at law firms and not --
2  and didn't receive any offers.
3      Q.  And that was because you had the
4  criminal record?
5          MS. JONES:  Objection to form.
6          THE WITNESS:  This was even before.
7  BY MR. GUTTMAN:
8      Q.  I want to focus your attention on
9  Deposition Exhibit No. 2.  And on Deposition
10  Exhibit No. 2, you list a position as program
11  manager for a company called RxCrossroads
12  between 2007 and 2015.
13         Do you see that, sir?
14     A.  Yes.
15     Q.  Okay.  And can you fill in your work
16  history and tell me where, if at all, you
17  worked prior to 2007, sir?
18     A.  Let's see.  Prior to working for
19  RxCrossroads -- let's see.  From 2005 until
20  2007 I worked for Neurosurgical Institute of
21  Kentucky, a neurosurgical practice in
22  Louisville, Kentucky.
23     Q.  Okay.
24     A.  And from 2004 to -- let's see.  That
25  was -- that was -- so from 2006 through 2008, I

Page 19

1  worked for the Neurosurgical Institute of
2  Kentucky.  From -- in -- from 2005 to 2006, I
3  worked for a video monitoring service or VMS.
4  And from 2004 to 2005, I worked for Kroger.
5      Q.  Why did you leave the Neurological
6  Institute as an employee, sir?
7      A.  I was married to the practice
8  administrator, and she wasn't comfortable with
9  the appearance, potential appearance of
10  favoritism or nepotism.  And also Rx --
11  RxCrossroads was a better position.
12     Q.  Are you still married to her?
13     A.  No.
14     Q.  And when did you cease being married?
15     A.  2008.
16     Q.  And why did you leave Kroger?
17     A.  It was a horrible job.
18     Q.  What did you do?
19     A.  I don't remember what -- I was just a
20  general worker there.  I started working there
21  after -- after I left incarceration because I
22  needed money.
23     Q.  What prison were you incarcerated in
24  Kentucky, sir?
25         MS. JONES:  Objection to form.

Page 20

1  BY MR. GUTTMAN:
2      Q.  Excuse me?
3      A.  It was not a prison.  It was the
4  Jefferson County jail.
5      Q.  Now, how is it that you came to be
6  employed by RxCrossroads?
7          And to be clear, did you see a notice
8  of a job opening in the newspaper or did
9  somebody tell you about the job?
10         MS. JONES:  Objection to form.
11         THE WITNESS:  There was a job
12  advertisement online.
13  BY MR. GUTTMAN:
14     Q.  And when you assumed your position at
15  RxCrossroads, what were you hired in at?
16         Was there a job title that was given to
17  you, sir?
18     A.  I don't remember the initial job title.
19     Q.  Do you remember your responsibilities
20  when you were first hired?
21     A.  Yes.  When I -- so RxCrossroads
22  administers patient support programs for
23  pharmaceutical companies.  Initially I was
24  working on a patient assistance program
25  providing medication for -- for Merck and then

Page 21

1  eventually transitioned -- so initially I was
2  spending part of my time working on the program
3  for Merck and part of the time working on the
4  program for Novo Nordisk.  And then after a
5  number of months, I began working exclusively
6  on the Novo Nordisk support program.
7      Q.  When you say you began working on the
8  program for Novo Nordisk, what do you mean by
9  that?
10     A.  So the -- so Novo Nordisk had a couple
11  of support programs that RxCrossroads
12  administered.  Let's see.  There was the
13  SevenSTART free trial program.  There was a
14  product replacement program.
15         There was the SevenASSIST product
16  assistance program that provided free product.
17  And then there was also at least -- at least
18  ostensibly there was a reimbursement support
19  program where we would answer questions from
20  providers, but that -- but we didn't do very
21  much of that.
22     Q.  Okay.  And when did you begin working
23  on these programs for Novo Nordisk?
24         Approximately what time frame?
25     A.  August of -- or August of 2007.

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

Page 30

1    What kind of medical expenses
2  specifically, sir?
3      A.   Let's see.  So originally it was only
4  things like medical equipment, medical devices.
5  Eventually it was expanded, and it was only for
6  expenses that were related to the eligible
7  diagnosis.  It was eventually expanded because
8  it simply wasn't being used.  It was eventually
9  expanded to also provide funding for fitness
10  activities.
11     Q.   When you say fitness activities, what
12  do you mean by that?
13     A.   Gym memberships, swimming memberships,
14  fitness equipment.
15     Q.   Health club memberships?
16     A.   Yes.
17     Q.   YMCA memberships?
18     A.   Yes.
19     Q.   YM -- YWCA memberships?
20     A.   I really don't recall specifically
21  which -- which -- which facilities people were
22  using.
23     Q.   Now, with regard to the medical expense
24  program, was there an administrator who
25  parcelled out the reimbursements for these

Page 31

1  programs?
2      A.   So as far as determining whether a
3  particular expense qualified, we did that at
4  RxCrossroads.
5      Q.   And when you say we, who is the we?
6      A.   Primarily it was me.
7      Q.   You.  You are the we.
8           How did you determine whether an
9  expense qualified?
10     A.   There were guidelines which were
11  actually -- there were documented guidelines.
12  I don't remember exactly what those are.  So we
13  would receive documentation from people
14  applying for the grants.  And if the
15  documentation -- so that the expense was
16  consistent with the guidelines, then we would
17  approve the grant request.
18     Q.   And who put those guidelines together?
19     A.   Novo Nordisk.
20     Q.   And the medical expenses, they were
21  funded by Novo Nordisk?
22     A.   Yes.
23     Q.   What was your role with regard to these
24  areas that we just talked about:  Scholarships,
25  educational grants, and medical expenses in

Page 32

1  terms of parceling out that money to patients
2  and caregivers?
3           What was your role?
4           MS. JONES:  Objection to form.
5           THE WITNESS:  So as far as educational
6  grants, we would receive the grant applications
7  and forward them to SMI.  As far as -- as far
8  as medical expense grants, if we determined
9  that a particular request met the requirements,
10  then we would approve the grant request and we
11  would instruct a separate vendor.
12  BY MR. GUTTMAN:
13     Q.   Separate vendor meaning whom?
14     A.   I'm trying to remember.  I can remember
15  the name of one person who worked there:  Laura
16  Blair.  She was my primary point of contact,
17  but I can't remember the name of the company.
18     Q.   Now, in order to determine whether
19  somebody should get a grant, a scholarship, or
20  medical expenses reimbursed, did you determine
21  what kind of insurance the person was on?
22           MS. JONES:  Objection to form.
23           THE WITNESS:  No.
24  BY MR. GUTTMAN:
25     Q.   Did you ever look at the person's

Page 33

1  insurance?
2      A.   No.
3      Q.   In other words, if the person was on
4  private insurance versus Medicare or Medicaid?
5      A.   Not that I can recall.
6      Q.   So you gave or you green lighted or
7  Novo Nordisk green lighted these medical
8  expenses, grants, and scholarships without
9  regard to whether the person was having their
10  coverage reimbursed by a public payer or a
11  private payer?
12           MS. JONES:  Objection to form.
13           THE WITNESS:  Well, we didn't -- when
14  you say having their coverage reimbursed, do
15  you mean -- so medical expense grants were not
16  available for premiums.  It was only actual
17  medical expenses, out-of-pocket costs other
18  than premiums.
19  BY MR. GUTTMAN:
20     Q.   Okay.  But to -- just to be clear,
21  educational grants were available to patients
22  who were on Medicaid?
23           MS. JONES:  Objection to form,
24  foundation.
25           THE WITNESS:  Yes.

Lawrence Hemming  Confidential - Attorneys' Eyes Only
April 09, 2024

Page 202

1  is approving funding, full funding for an iPad
2  if the person has not reached their expenditure
3  limit for expenses for a patient who's a
4  Medicaid patient, right?
5      A.   So she's telling us that -- and then
6  she goes on to say that they're going to
7  restructure the SOPs.  So she is telling us
8  that she does not want us to apply a $300 limit
9  to this -- to this grant request for an
10  enrollee.
11     Q.   And so she's willing to go up to the
12  full price of the iPad for this Medicaid
13  patient, right?
14     A.   It appears that way, yes.
15     Q.   Then Stacy writes to you, I just
16  e-mailed the de-identified call recording.
17  Please let us know if you do not receive.  The
18  file was 20.3 MB, and we may need to devise a
19  different way to send if e-mail transition is
20  impossible.
21          Do you see that?
22     A.   Yes.
23     Q.   Now, did you understand that Novo
24  Nordisk personnel when they talked to patients
25  were also recording them?

Page 203

1          MS. JONES:  Objection to form.
2          THE WITNESS:  I would have no way of
3  knowing that.
4  BY MR. GUTTMAN:
5      Q.   Well, she says I just e-mailed the
6  de-identified call recording.
7          MS. JONES:  No, no.  This e-mail is to
8  Stacy.
9          MR. GUTTMAN:  Luke to Stacy.  I
10  apologize.  I withdraw the question.  I do
11  apologize.  Thank you for correcting me.
12  BY MR. GUTTMAN:
13     Q.   So from you -- you wrote to Stacy I
14  just de-identified the call recording.  Please
15  let us know if you do not receive.  The file is
16  20.3 MB, and we may need to devise a different
17  way to send if e-mail transmission is
18  improbable.
19          So when you write I just e-mailed the
20  de-identified call recording, were you sending
21  Stacy O'Donnell a recording of a conversation
22  with a patient in such a way that allowed Novo
23  Nordisk to know who that patient was?
24     A.   No.  That's what the de-identified
25  portion means.

Page 204

1      Q.   I see.  Okay.  So it's not identified.
2      A.   Any information that would identify the
3  person was removed from the recording.
4      Q.   Got it.  Understood.  Okay.  And,
5  again, sir, a final question of this document.
6          Does all this refresh your recollection
7  as to who this patient might be?
8      A.   We've got a short list of people who
9  were on the consumer council.  So this is
10  Exhibit 23.  It was definitely a mother.  If I
11  had to guess, I would say Jen Guerrero, but I'm
12  nowhere near certain, and I'm not sure -- not
13  really sure where -- well, no, I think she was
14  the one from Massachusetts.
15          (Deposition Exhibit No. 25
16           marked for identification.)
17  BY MR. GUTTMAN:
18     Q.   Okay.  You're looking at Exhibit No. 25
19  which is NNICID-35739.
20          Do you see this?
21     A.   Yes.
22     Q.   And the first e-mail which begins at
23  the bottom of the page is an e-mail from you to
24  Stacy.
25          We received an appeal from an HCP on

Page 205

1  denied transportation request for a Medicaid
2  patient for urgent unplanned
3  nonlife-threatening visit, bleeding episode.
4          The provider states that Medicaid
5  requires transportation to be arranged two days
6  in advance and that if the family were to call
7  an ambulance, the ambulance would take them to
8  the nearest emergency room rather than to the
9  HC -- HTC.  Am I correct in assuming that we
10  cannot approve this?
11          HTC is what?  What does that mean?
12     A.   Hemophilia treatment center.  It's a
13  federally designated facility that specializes
14  in treating patients with hemophilia.
15     Q.   Okay.  And then we received an appeal
16  from HCP.
17          What is HCP?
18     A.   Healthcare provider.
19     Q.   I see.  So this is a request from a
20  provider.  And then it says from Stacy
21  O'Donnell writes you, after speaking with
22  legal, this is an approvable expense.  Although
23  transportation is covered by Medicaid, the
24  required two-day lead time would not have made
25  it possible in the scenario.

Lawrence Hemming   Confidential - Attorneys' Eyes Only
April 09, 2024

Page 258

1  correct?
2      A.   Correct.
3      Q.   And none of the criteria that you
4  considered when deciding whether to approve a
5  medical expense grant related to a patient's
6  treatment regimen, correct?
7      A.   Correct.
8      Q.   So all of the decisions that were made
9  by RxCrossroads related to whether a patient
10  was going to receive reimbursement for a
11  medical expense were product agnostic?
12      A.   Correct.
13      Q.   And we talked earlier -- you talked
14  earlier with Mr. Guttman about how there could
15  be situations where a patient would want to
16  appeal a decision that was made denying them
17  benefits, correct?
18      A.   Correct.
19      Q.   And if they wanted to do that, you
20  would make a decision about whether that appeal
21  would be escalated to Novo Nordisk, correct?
22      A.   No.  So the process that was put in
23  place as a result of the episode that we
24  discussed earlier was that in the event that
25  someone disagreed with the determination that

Page 259

1  the person who originally reviewed the request
2  had made, then it would be escalated to --
3  to -- actually to the program manager who at
4  that time was Nicholas Lesher.
5      Q.   Who was an RxCrossroads employee?
6      A.   Yes.  RxCrossroads.
7      Q.   I see.  And Mr. Lesher would make a
8  decision on the basis of that information?
9      A.   Correct, correct.  The -- it was my
10  understanding that what they were wanting to
11  put in place was -- Novo Nordisk didn't want to
12  be involved in the actual individual decisions,
13  but they wanted to make sure that people felt
14  that they had the right to a next level
15  decisionmaker.
16      Q.   Okay.  And if Mr. Lesher agreed with
17  the denial of the request, was there an
18  opportunity to -- for the appeal to be
19  escalated to Novo Nordisk?
20      A.   I don't recall there being an
21  opportunity to do that.
22      Q.   Okay.  There were times, though, when
23  you and Ms. O'Donnell would communicate about
24  decisions that needed to be made about whether
25  a grant request fell within the parameters of

Page 260

1  the program, correct?
2      A.   Correct.  There were a handful of
3  situations where -- it wasn't asking for
4  approval of a request, but it was really more
5  as in the request that we've read today asking
6  for clarification on the guidelines.
7      Q.   Okay.  So I want to look at a couple of
8  those examples if we can.  Can I have 16,
9  please?
10          MS. JONES:  Can you mark that as I
11  think we're on 37?
12          (Deposition Exhibit No. 37
13           marked for identification.)
14  BY MS. JONES:
15      Q.   So, Mr. Hemming, what's been marked as
16  Exhibit 37 is an e-mail exchange dated
17  August 15th, 2011, between you and Stacy
18  O'Donnell copying Rich Myers and Rich Halpern.
19  Do you see that?
20      A.   Yes.
21      Q.   Okay.  And in the bottom e-mail, the
22  original e-mail in the chain, you write, Stacy,
23  in the past week we've had two separate
24  patients ask if the medical expense grant can
25  pay for them to be seen by Marilyn

Page 261

1  Manco-Johnson at UC Denver.
2          Both patients have Medicaid in their
3  respective states, Arizona and New Mexico, and
4  both are unsatisfied with the care that they've
5  been receiving at their instate HTC.
6  Unfortunately Dr. Manco-Johnson and UC Denver
7  do not appear to be Medicaid participating
8  providers for these states so that Medicaid
9  will not pay for her to see these patients.  Is
10  this something that we can do?
11          Was this an example of what you just
12  described where there was some gray in the
13  policy and so you needed to go to Novo Nordisk
14  to get guidance on whether the grant could be
15  applied here?
16      A.   Correct.  The incidental medical
17  expense grant was intended to cover the
18  incidental effects.  So it wasn't -- it wasn't
19  supposed to be covering like -- as it says in
20  the reply, it wasn't supposed to be covering
21  actual treatment at least -- so in this
22  particular case, it was a novel request.
23          It didn't seem to fit within the
24  parameters that were existing, but it was not a
25  question that we had been asked before.  And so

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AT TACOMA

- - -

| | | |
|---|---|---|
| UNITED STATES OF | : | CIVIL ACTION |
| AMERICA, et al., | : | |
| Plaintiffs, | : | |
| Ex rel. | : | |
| JAMIE SIEGEL, M.D., | : | |
| Plaintiff- | : | |
| Relator, | : | |
| | : | |
| V. | : | |
| | : | |
| NOVO NORDISK, INC., | : | NO. |
| Defendant | : | 2:23-CV-05459-BHS |

- - -

April 24, 2024

- - -

Videotaped deposition of STACY
O'DONNELL, held in the offices of Morgan
Lewis & Bockius LLP, 2222 Market Street,
Philadelphia, Pennsylvania 19103, commencing
at 8:46 a.m. on the above date, before Teresa
M. Beaver, a Professional Court Reporter and
Notary Public.

- - -

US LEGAL SUPPORT
(877) 479-2484

Stacy O'Donnell
April 24, 2024

Page 122

1      A.      All this is stating is when asked
2  the question, do you have an example of how
3  you were treated extraordinarily by
4  SevenSECURE, Luke's name was mentioned.  This
5  is a word cloud.
6      Q.      In the word cloud sitting in the
7  middle of the U is the word family.
8              Do you see that?
9      A.      What word?
10     Q.      Family.
11     A.      Yeah, uh-huh.
12     Q.      What does that mean?
13             MS. JONES:  Objection to form.
14  BY MR. GUTTMAN:
15     Q.      What is that a reference to?
16             MR. McCARTHY:  Where --
17             THE WITNESS:  Right in the U.
18             MR. McCARTHY:  Sorry.
19             THE WITNESS:  All of these words
20  were words that were mentioned when asked this
21  question.
22  BY MR. GUTTMAN:
23     Q.      Did anybody ever tell you that
24  the man that was tasked to communicate

Page 123

1  directly with these patients had been
2  convicted of domestic assault and spent time
3  in prison?
4      A.      No.
5      Q.      Did anybody tell you that the man
6  who was directed to communicate with these
7  patients and was deemed to be trusted was
8  convicted of theft?
9      A.      No.
10     Q.      Did anybody endeavor to do any
11  investigation of his, Mr. Hemming's background
12  before he was put in direct contact with this
13  vulnerable patient population?
14             MS. JONES:  Objection to form.
15  Lack of foundation.
16             THE WITNESS:  As stated, the
17  responsibility of hiring adequate individuals
18  was with RxCrossroads.
19  BY MR. GUTTMAN:
20     Q.      And Novo Nordisk, at least from
21  your position, didn't have any responsibility
22  to make sure that the individuals who are
23  communicating directly with this vulnerable
24  patient population were not convicted

Page 124

1  criminals?
2              MS. JONES:  Objection to form.
3              THE WITNESS:  That wasn't even
4  a -- that wouldn't even have been in our --
5  no.
6  BY MR. GUTTMAN:
7      Q.      Never did a background check?
8      A.      I'm sure --
9              MS. JONES:  Objection to form.
10  Foundation.
11             THE WITNESS:  I'm sure
12  RxCrossroads did, but I'm not knowledgeable of
13  that.  That's out of my scope.
14  BY MR. GUTTMAN:
15     Q.      Next page says, Local chapter
16  events are a meaningful way to extend our
17  reach to interact with our patients.
18             What is a local chapter event?
19     A.      So, there are program -- events
20  that are led by the National Hemophilia
21  Foundation or Hemophilia Federation of
22  America.  They are listed here, local chapter
23  events or walks, a lot of them are walks.
24  Inhibitor summit meetings are the annual

Page 125

1  meeting of the National Hemophilia Foundation.
2      Q.      Did Novo Nordisk provide
3  financial support to the National Hemophilia
4  Foundation?
5              MS. JONES:  Objection to form.
6  Lack of foundation.
7              THE WITNESS:  I -- that was
8  outside of my scope.
9  BY MR. GUTTMAN:
10     Q.      You have no knowledge one way or
11  the other as to whether Novo Nordisk provided
12  financial support to these two entities you
13  mentioned?
14     A.      They were sponsors of these
15  events at some level.
16     Q.      So, sponsors, as you understand
17  it, means that they gave these entities NHF
18  and HFA money; right?
19     A.      I don't know what that grant
20  application process was.  It was not part of
21  my job.
22     Q.      I assume when you got a grant,
23  that means there's an exchange of dollars,
24  there's an exchange of money.  Is that a fair

# Exhibit 6

**From:** TYHI (Tanya Hill)
**Sent:** Sunday, July 17, 2011 2:27 PM
**To:** JSDR (Jim Snider); GYST (Gary Staudt); MHFE (Michael Ferrara); RHLP (Rich Halpern); NNI BioPharm Southeast BSMs
**CC:** SCOD (Stacy O'Donnell)
**Subject:** RE: aPCC Conversion

Great news and congratulations on this win! Also, for sharing such great feedback with the brand team on what tools were found to be most helpful! That really helps us continue to focus on the right tactics and tools!

**From:**    JSDR (Jim Snider)
**Sent:**    Wednesday, July 13, 2011 7:57 AM
**To:**    GYST (Gary Staudt); MHFE (Michael Ferrara); RHLP (Rich Halpern); TYHI (Tanya Hill); NNI BioPharm Southeast BSMs
**Subject:**    RE: aPCC Conversion

Outstanding!!!!!

**From:** GYST (Gary Staudt)
**Sent:** Tuesday, July 12, 2011 8:03 PM
**To:** JSDR (Jim Snider); MHFE (Michael Ferrara); RHLP (Rich Halpern); TYHI (Tanya Hill); NNI BioPharm Southeast BSMs
**Subject:** aPCC Conversion

Great success and use of resources by Sonya!

Gary,

As you know this account is a challenging account for us, but I believe we are seeing light at the end of this tunnel!!!

UAB aPCC Conversion – FINALLY!!!

Marketing Tools used to convert this patient:

SevenSecure – this patient has many challenges, and utilized this program countless times during his time on PAP SevenAssist – this patient initially went on PAP – He was on Baxter's program, and they were about to cut him off – this program was a key factor to converting this patient Rapid Bleed Resolution Brand Messaging Rapid Reconstitution & Administration Low volume Safety/Recombinant/Efficacy

The HTC nurse and state program buyer expressed many times their gratitude to Novo Nordisk for being there when the patient needed them the most.

All of the above played a role in this conversion. I am so grateful for all the resources we offer to patients and their

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0253005

caregivers.  These resources validate our commitment to the hemophilia community, and treating healthcare professionals.

Thanks for your continued support!

Sonya

**Gary Staudt**

Novo Nordisk, Inc.
100 College Road West
Princeton, New Jersey 08540
USA
407-421-0488 (direct)
gyst@novonordisk.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0253006

# Exhibit 7

The Honorable Benjamin J. Settle

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* | NO.    3:23-cv-05459-BHS |
| Plaintiffs, | |
| *Ex rel.,* | **DEFENDANT NOVO NORDISK** |
| JAMIE SIEGEL, M.D., | **INC.'S FOURTH SET OF** |
| Plaintiff-Relator | **INTERROGATORIES** |
| v. | **DIRECTED TO THE STATE OF** |
| | **WSHINGTON** |
| NOVO NORDISK, INC., | |
| | **AND STATE'S OBJECTIONS** |
| Defendant. | **AND ANSWERS THERETO** |

<u>**DEFENDANT NOVO NORDISK INC.'S FOURTH SET OF**</u>
<u>**INTERROGATORIES DIRECTED TO THE STATE OF WASHINGTON**</u>

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Novo Nordisk Inc. requests that the State of Washington respond to the following interrogatories under oath and fully in writing within thirty (30) days of service.

## <u>DEFINITIONS</u>

1.    Except as otherwise stated herein, these interrogatories incorporate the same Definitions set forth in NNI's First Set of Requests for Production to the State of Washington dated February 15, 2023.

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

1

2.      The term "Interaction" shall mean any in-person, telephonic, video-communication, correspondence, and/or other means of communication whether oral or written between two or more persons.

3.      The term "Patient A" refers to the Washington Patient identified as "Patient A" in the Complaint.

4.      The term "Remuneration" refers to the term defined at 42 U.S.C. §1320a-7a(i)(6).

5.      The term "Washington Patient" refers to any patient listed in the Washington Medicaid claims data produced by the State of Washington at WA_NNI_116440.

6.      The term "Washington Provider" refers to any healthcare provider listed in the Washington Medical claims data produced by the State of Washington at WA_NNI_116440 and Drs. Miguel Escobar, Craig Kessler, Barbara Konkle, Steven Pipe, Amy Shapiro, Leonard Valentino, and Guy Young.

7.      The terms "You" and "Your," shall, notwithstanding the definition set forth in Novo's First Set of Requests for Production to the State of Washington, dated February 15, 2023, refer to the Washington State Attorney General's Office, including the Medicaid Fraud Control Unit and/or any employees, agents, contractors, and/or any other persons acting on its behalf.

## **INSTRUCTIONS**

1.      These interrogatories are governed by the same Instructions set forth in NNI's First Set of Interrogatories to the State of Washington, dated February 15, 2023.

2.      The word "Identify" means to state the document(s), person(s), event(s), and/or communication(s) that represent the relevant facts. For any such document(s), please also state the document's author(s) and describe the document's contents. For any such event(s), please also state the date the event occurred. For any such communication(s), please also state the time, place, manner of the communication, setting, format, and/or state the individuals involved who were party to the communication.

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

2

**GENERAL OBJECTIONS**

1.      Plaintiff State ("State" or "Plaintiff") objects to Defendants introductory comments, definitions and instructions to the extent they attempt to impose obligations on the defendant in excess of those set forth in the Federal Rules of Civil Procedure. Without waiving this general objection, the State will object, answer and respond in accordance with its discovery obligations as set forth in the FRCP.

2.      The State objects to Defendant's discovery requests to the extent the requests seek disclosure of privileged work product or attorney-client privileged communications.

3.      Open-ended requests seeking "any and all," "every," "each and every," "any" or "all" piece of information or document are a trap and can easily result in claims that Plaintiff did not completely respond to a request.  Accordingly, and to the extent production of "any and all," "every," "each and every," "any" or "all" pieces of information or document seeks a certification from Plaintiff that no supplemental discovery will be produced, Plaintiff objects to such requests.  If and to the extent responsive documents exist, Plaintiff reserves the right to supplement its responses following further discovery.

4.      Plaintiff neither agrees nor stipulates to the Defendant's definitions or procedure.  These interrogatories will be answered and supplemented in accordance with Federal Rules of Civil Procedure, statutes and the common law.

5.      Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation. Within the parameters and limitations of these objections, Plaintiff responds to Defendant's requests as follows:

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

3

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

1

## **INTERROGATORIES**

2      1.      Identify each and every Interaction You had with Dr. Ronald Louie regarding

3    Patient A's use of NovoSeven®, and state the nature and substance of any such Interaction.

4

5    **RESPONSE:**

6    **Objection. Vague, ambiguous and calls for improper speculation. Bushman v. New**

7    **Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974). Plaintiff adopts by reference the**

8    **applicable general objections, *supra*. Without waving these objections:**

9

10   **Dr. Louie provided documents in response to CID in the years 2014 and in 2020.**

11   **Additionally, Dr. Louie was deposed by attorney Walter M. Smith on July 22, 2016.**

12   **Documents and correspondence related to these interactions were produced on March 14,**

13   **2023 as part of WA AGO Production 1. Additionally, Dr. Jeffrey Thompson**

14   **communicated via email with Dr. Ronald Louie, as stated by Dr. Thompson during his**

15   **deposition on June 24, 2024. Those emails have been previously produced.**

16

17   **Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets**

18   **forth all party's duty for supplementation.**

19

20      2.      Identify each and every Interaction You had with Dr. Dana Matthews regarding

21   any Washington Patient's use of NovoSeven®, and state the nature and substance of any such

22   Interaction.

23   \\\

24   \\\

25   \\\

26

DEFENDANT NOVO NORDISK INC.'S                    4          ATTORNEY GENERAL OF WASHINGTON
FOURTH SET OF INTERROGATORIES                               Medicaid Fraud Control Division
DIRECTED TO THE STATE OF                                    PO Box 40114
WSHINGTON AND STATE'S                                       Olympia, WA 98504-0114
OBJECTIONS AND ANSWERS                                      (360) 586-8888
THERETO - NO. 3:23-CV-05459-BHS

**RESPONSE:**

**Objection. Vague, ambiguous and cannot be answered without further clarification, calls for improper speculation. Bushman v. New Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974). Plaintiff adopts by reference the applicable general objections, *supra*. Without waving these objections:**

**Dr. Jeffrey Thompson communicated via email with Dr. Matthews. Those emails have been previously produced.**

**On September 10, 2024, AAG Naomi Smith, from the WA State MFCU, contacted Dr. Dana Matthews via phone, asked if Dr. Matthews recalled anything about treating patient AMG, and about Dr. Matthews personal policy of not meeting with pharmaceutical sales representatives.**

**Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation.**

3.     Identify all facts that You believe support the contention in Paragraph 134 of the Complaint that "the caretaker of PATIENT A . . . was on the Steering Committee of the NHF 2009 Summit."

**RESPONSE:**

**Objection. This interrogatory is overly broad and unduly burdensome in its request for "all facts" which supports an allegation. Weber v. Biddle, 72 Wn.2d 22, 431 P.2d 705 (1967). This question also calls for the mental impressions and legal theories of defense**

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

5

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

41

counsel.  This information is work product and not discoverable.  Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation.

4.    Identify all Novo-sponsored and/or Novo-affiliated events or meetings— including but not limited to every Advisory Board, Consumer Council, Hemophilia Camp, and Inhibitor Summit (as those terms are used in the Complaint)—at which you believe any Washington Patient received promotion from Novo regarding off-label use of NovoSeven®. For each such event or meeting identified, state the form and substance of the promotion.

**RESPONSE:**

Objection.  Vague, ambiguous and cannot be answered without further clarification, calls for improper speculation. Bushman v. New Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974). Plaintiff adopts by reference the applicable general objections, *supra*.  Without waving these objections:

Novo-sponsored and/or Novo-affiliated events or meetings:
- **2007 San Diego Summit**
- **2007 NHF Annual in Orlando**
- **2009 LA and DC Summits**
- **2010 Boston Summit**
- **2010 NHF Annual in New Orleans**
- **2011 Francisco Summit**
- **2012 Annual in Orlando**

Form and Substance of the promotion:  Presentations on prophylaxis and high dose, to include posters.

Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation.

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

6

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

5.      Identify all Novo-sponsored and/or Novo-affiliated events or meetings—including but not limited to every Advisory Board, Consumer Council, Hemophilia Camp, and Inhibitor Summit (as those terms are used in the Complaint)—at which you believe any Washington Provider received promotion from Novo regarding off-label use of NovoSeven®. For each such event or meeting identified, state the form and substance of the promotion.

**RESPONSE:**

**Objection.  Vague, ambiguous and cannot be answered without further clarification, calls for improper speculation. Bushman v. New Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974). Plaintiff adopts by reference the applicable general objections, *supra*.  Without waving these objections:**

**Novo-sponsored and/or Novo-affiliated events or meetings where Washington Provider received promotion from Novo regarding off-label use of NovoSeven®.**

**2007 San Diego Summit**
**2007 NHF Annual in Orlando**
**2009 LA and DC Summits**
**2010 Boston Summit**
**2010 NHF Annual in New Orleans**
**2011 Francisco Summit**
**2012 Annual in Orlando**

**Form and Substance of the promotion: Presentations on prophylaxis and high dose, to include posters.**

**Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation.**

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

7

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

1      6.     Identify all Remuneration that You believe any Washington Patient received from

2  Novo.

3  **RESPONSE:**

4  **Objection.  Vague, ambiguous and cannot be answered without further clarification, calls**

5  **for improper speculation. Bushman v. New Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974).**

6  **Without waiving any objections, and in an effort to cooperate in discovery, defendant**

7  **believes the documents listed below, and already produced, may be relevant to issues**

8  **raised in this lawsuit.  In addition, if Defendant knows of specific documents or types of**

9  **documents sought, please identify them so that Plaintiff[s] can understand the documents**

10  **you want and respond directly. Plaintiff adopts by reference the applicable general**

11  **objections, *supra*.**

12  **Without waving these objections:**

13

14

15  **WA_NNI_049153**

16  **NNICID-00880042**

17  **NNISiegel_00035422**

18  **NNICID-1551058**

19  **NOVO-0005165**

20  **NOVO-0005065**

21  **WA_NNI_048584**

22  **RXC-SIEGEL0018091**

23  **NNISiegel_00035423**

24  **NNICID-0157071**

25  **Joanie Gonzalez's Deposition transcript**

26

DEFENDANT NOVO NORDISK INC.'S       8       ATTORNEY GENERAL OF WASHINGTON
FOURTH SET OF INTERROGATORIES                  Medicaid Fraud Control Division
DIRECTED TO THE STATE OF                      PO Box 40114
WSHINGTON AND STATE'S                        Olympia, WA 98504-0114
OBJECTIONS AND ANSWERS                      (360) 586-8888
THERETO - NO. 3:23-CV-05459-BHS

1  **Jerry Hanson's 2015 CID deposition and 2024 deposition transcripts**

2  **Dr. Barbara Konkle Deposition**

3  **Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets**

4  **forth all party's duty for supplementation.**

5

6       7.    Identify all Remuneration that You believe any Washington Provider received

7  from Novo.

8  **RESPONSE:**

9  **Objection. Vague, ambiguous and cannot be answered without further clarification, calls**

10  **for improper speculation. Bushman v. New Holland, 83 Wn.2d 429, 518 P.2d 1078 (1974).**

11  **Without waiving any objections, and in an effort to cooperate in discovery, defendant**

12  **believes the documents listed below, and already produced, may be relevant to issues raised**

13  **in this lawsuit. In addition, if Defendant knows of specific documents or types of**

14  **documents sought, please identify them so that Plaintiff[s] can understand the documents**

15  **you want and respond directly. Plaintiff adopts by reference the applicable general**

16  **objections, *supra*.**

17

18  **Without waving these objections:**

19  **Dr. Barbara Konkle Deposition**

20  **NNISiegel_00062331**

21  **NNISiegel_00062330**

22  **Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets**

23  **forth all party's duty for supplementation.**

24

25

26

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

9

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

45

8.     Identify all articles, clinical trials, literature reviews, studies, and/or any other forms of medical literature or scholarship that You contend were used by Novo to promote off-label uses of NovoSeven® to Washington Patients and/or Washington Providers.

**RESPONSE:**

**Objection. The interrogatory is vague and unduly burdensome in that it seeks information readily available to Defendant. This information is work product and not discoverable. Plaintiff adopts by reference the applicable general objections, *supra*. Discovery is ongoing and will be supplemented in accordance with FRCP 26, which sets forth all party's duty for supplementation.**

DATED this 21st day of October, 2024.

ROBERT W. FERGUSON
Attorney General

*s/Matthew T. Kuehn*
MATTHEW T. KUEHN, WSBA #30419
Senior Counsel
KARL F. SLOAN, WSBA #27217
NAOMI SMITH, WSBA # 49995
FERDINAND LUGO ORTIZ, WSBA #56806
Assistant Attorneys General
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA  98502
Telephone: 360-586-8888
Facsimile: 360-586-8877
Matthew.Kuehn@atg.wa.gov
Karl.Sloan@atg.wa.gov
Naomi.Smith@atg.wa.gov
Ferdinand.LugoOrtiz@atg.wa.gov

Counsel for Plaintiff State of Washington

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

10

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

46

**<u>CERTIFICATE OF SERVICE</u>**

1

2          I hereby certify that on October 21, 2024, a true and correct copy of the DEFENDANT

3     NOVO NORDISK INC.'S FOURTH SET OF INTERROGATORIES DIRECTED TO THE

4     STATE OF WSHINGTON AND STATE'S OBJECTIONS AND ANSWERS THERETO was

5     served on the following via E-mail.

6          DATED this 21st day of October, 2024.

7

8                                        s/*Jacob Giem*_____
                                         JACOB GIEM
9                                        Paralegal 2

10

Douglas C. McDermott, WSBA #31500
11    McDermott Asan, PLLC
Logan Building
12    500 Union Street, Suite 909
Seattle, Washington 98101
13    Telephone: 206-949-3252
doug@mcdermottasan.com
14

15    Reuben A. Guttman (*pro hac vice*)
Traci L. Buschner (*pro hac vice*)
16    Justin S. Brooks (*pro hac vice*)
Nancy Gertner (*pro hac vice*)
17    Elizabeth H. Shofner (*pro hac vice*)
Guttman, Buschner & Brooks
18    1509 22nd St., NW
Telephone: 202-800-3001
19    Facsimile: 202-827-0041
rguttman@gbblegal.com
20    tbuschner@gbblegal.com
jbrooks@gbblegal.com
21    ngertner@gbblegal.com
lshofner@gbblegal.com
22

23    Michael Burrage (*pro hac vice*)
24    Patricia Sawyer, (*pro hac vice*)
Whitten Burrage Law Firm
25    512 North Broadway Ave., Suite 300
Oklahoma City, OK 73102
26

DEFENDANT NOVO NORDISK INC.'S
FOURTH SET OF INTERROGATORIES
DIRECTED TO THE STATE OF
WSHINGTON AND STATE'S
OBJECTIONS AND ANSWERS
THERETO - NO. 3:23-CV-05459-BHS

                    11

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
(360) 586-8888

1   Telephone: 405-516-7800
2   Facsimile: 405-516-7859
    mburrage@whittenburragelaw.com
3   psawyer@whittenburragelaw.com

4   *Counsel for Relator*

5   Jaime L.M. Jones *(pro hac vice)*
6   Matthew Bergs *(pro hac vice)*
    Sidley Austin LLP
7   One South Dearborn Street
    Chicago, IL 60603
8   Telephone: 312-853-7000
    Facsimile: 312-853-7036
9   jaime.jones@sidley.com
10  mbergs@sidley.com

11  Mark P. Guerrera *(pro hac vice)*
    Sidley Austin LLP
12  1501 K Street, N.W.
    Washington, DC 20005
13  Telephone: 202-736-8000
    Facsimile: 202-736-8711
14  mguerrera@sidley.com

15
    John Wolfe, WSBA# 8028
16  Aaron Brecher, WSBA# 47212
    Orrick, Herrington & Sutcliffe LLP
17  401 Union Street, Suite 3300
    Seattle, WA 98104-7097
18  Telephone: 206-839-4332
    Facsimile: 206-839-4301
19  wolfe@orrick.com
20  abrecher@orrick.com

21  *Attorneys for Defendant Novo Nordisk Inc.*

22

23

24

25

26
    DEFENDANT NOVO NORDISK INC.'S          12          ATTORNEY GENERAL OF WASHINGTON
    FOURTH SET OF INTERROGATORIES                          Medicaid Fraud Control Division
    DIRECTED TO THE STATE OF                                        PO Box 40114
    WSHINGTON AND STATE'S                                     Olympia, WA 98504-0114
    OBJECTIONS AND ANSWERS                                         (360) 586-8888
    THERETO - NO. 3:23-CV-05459-BHS

# Exhibit 8

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# TACOMA DIVISION

UNITED STATES OF AMERICA *et al.*

                Plaintiffs,

                *ex rel.*

JAMIE SIEGEL, M.D.,

                Plaintiff-Relator,

      v.

NOVO NORDISK, INC.,

                Defendant.

Case No. 3:23-cv-05459-BHS

## RELATOR'S SUPPLEMENT TO HER RESPONSES AND OBJECTIONS TO DEFENDANT'S SECOND SET OF INTERROGATORIES DIRECTED TO RELATOR JAMIE SIEGEL

Plaintiff-Relator Jamie Siegel, M.D. ("Relator"), by and through her undersigned counsel and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby provides the following Supplement to her Responses ("Responses") and Objections to Defendants' Second Set of Interrogatories (the "Interrogatories"), dated September 6, 2024 as follows:

## PRELIMINARY STATEMENT

Relator's responses to the Interrogatories are based on information known to Relator at this time, and are set forth without prejudice to her right to supplement the responses or

to assert additional objections should she discover additional information or grounds for objection at any time before trial. Relator's responses are made without in any way waiving or intending to waive her right subsequently to add, modify, or otherwise change or amend her responses. Relator reserves the right to make any use of, or to introduce at any hearing, and at trial, information and/or documents responsive to the Interrogatories but discovered subsequent to the date of this response. Relator also reserves (a) any objections as to the relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any response provided to the Interrogatories and any document or thing identified or provided in response to the Interrogatories; (b) the right to object on any ground to the use of the responses provided herein or any document or thing identified or provided in response to the Interrogatories at any hearing or trial; and (c) the right to object on any ground at any time to a demand for further responses to the Interrogatories. The service of these responses and objections does not constitute a waiver of the attorney-client privilege, the work product doctrine, the joint prosecution privilege, physician confidentiality, or any other privilege, law, or immunity from discovery that may be applicable to any information provided, to any document identified, or to information contained in any such document. Relator has responded to the Interrogatories as she interprets and understands them. If Defendants assert an interpretation of any Interrogatory that differs from how Relator understand those Interrogatories, Relator reserves the right to supplement her objections and/or responses.

## **GENERAL OBJECTIONS**

2

Relator's responses to the Interrogatories are made subject to the following objections, which apply to each Interrogatory as if incorporated and set out in full in response to each:

a) Relator objects to the Interrogatories to the extent that they seek information beyond the scope of discovery allowed by the Federal Rules of Civil Procedure, including without limitation, information that is not reasonably calculated to lead to the discovery of admissible evidence.

b) Relator objects to the Interrogatories to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the work-product doctrine, the joint-prosecution privilege, the common interest doctrine, physician confidentiality, or any other applicable privilege, protection, rule, or duty of confidentiality that precludes or limits the production of documents or disclosure of information. Any information disclosed is subject to the reservation that the disclosure of any privileged or otherwise protected information is not intended to be, and should not be construed as, a waiver of any privilege or protection that otherwise would be afforded such information.

c) Relator objects to the Interrogatories to the extent they are vague, ambiguous, or do not describe the information, item, or category of information sought with reasonable particularity.

d) Relator objects to the "Instructions" to the extent they seek to impose upon Defendants any obligation or duty different from or beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules.

e)  Relator objects to the Interrogatories to the extent that they consist of multiple questions or subparts when Federal Rule of Civil Procedure 33(a)(1) permits parties only 25 interrogatories absent leave of court.

f)    Relator objects to the extent the Interrogatory seeks information subject to patient/physician confidentiality (i.e., communications or information b/w Dr. Siegel and her patients).

Relator's responses to the Interrogatories are not intended, nor should they be construed, as an acceptance of or agreement with any of the instructions, definitions, characterizations, or descriptions contained in the Interrogatories.

The provision of any response, in whole or in part, is not intended to and does not waive any of these General Objections or any specific objection with respect to any Interrogatory.

## SPECIFIC OBJECTIONS AND RESPONSES

## INTERROGATORY NO. 1

**Identify all facts that You believe support the contention in Paragraph 134 of the Complaint that "the caretaker of PATIENT A . . . was on the Steering Committee of the NHF 2009 Summit."**

## RESPONSE:

Subject to and without waiver of the foregoing objections and the General Objections, Relator states: Paragraph 134 of the Third Consolidated Complaint contains a scrivener's error. Matt Compton was on the Steering Committee of the NHF 2009 Summit. *See*, Original Complaint at Dkt. 133.

4

**INTERROGATORY NO. 2**

**Identify all Novo-sponsored and/or Novo affiliated events or meetings – including but not limited to every Advisory Board, Consumer Council, Hemophilia Camp, and Inhibitor Summit (as those terms are used in the Complaint) – at which you believe any Washington Patient received promotion from Novo regarding off-label use of NovoSeven®. For each such event or meeting identified, state the form and substance of the promotion.**

**RESPONSE:**

Relator objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires Relator to provide an exhaustive list of promotional efforts by the Defendant at "all Novo-sponsored and/or Novo affiliated events or meetings – including but not limited to every Advisory Board, Consumer Council, Hemophilia Camp, and Inhibitor Summit[s]." Moreover, Relator objects as discovery has not concluded, including but not limited to, the FRCP 30(b)(6) Deposition of Novo, including Topics 3 and 9. Relator objects to the extent that Novo has failed to produce in discovery the following information pertaining to each of these events – (1) the identities of the patients (and their addresses) attending these events; (2) attendance records; (3) brochures, agendas, and materials presented at these events either by the Defendant or Defendant's employees, paid consultants or other agents and contractors; and (4) videos or transcripts of these events. Subject to and without waiver of the foregoing objections and the General Objections, Relator states:

Novo used patient events, including hemophilia camps and inhibitor summits, to distribute information about NovoSeven, including the off-label use of NovoSeven. According to Novo's "medical education strategy," patients and caregivers were among the "top 5" in "audience ranking" along with     health care professionals including "Hematologists (Coagulation

5

Specialists/Young Specialist);" "HTC, Hem/Onc Nurses;" and "Hematologists/Oncologists."[1] Among the messaging Novo sought to impart on patients and their caregivers were "[m]odern strategies to optimize use in patients with CHwI," even though the dosing strategy for on demand bleeds in NovoSeven's package insert had not changed since it was first approved by FDA for use in this population.[2]    Novo's Medical Affairs division, apparently in conjunction with patient organizations like NHF and "promotional medical education" vendors including Cadent Medical Communications (Cadent) and Center for Biomedical Continuing Education (CBCE) *inter alia*, developed content for patients and caregivers (1) attending live Inhibitor Summits and hemophilia camps and (2) utilizing web-based/DVD and print materials.[3] Among Novo's promotional messages were "Modern strategies to optimize use of prophylaxis in patients with CHwI," "Challenges to preserve joint health and options for treatment including rapid bleed resolution and elective orthopedic surgery," and "Modern strategies to optimize use of bypassing agents for bleeding episodes in patients with CHwI."[4] These messages are consistent with Novo's marketing messages for NovoSeven, according to an Expert Report by Dr. Adriane Fugh-Berman.[5]

---

[1] Medical Education 2015 Update by Liz O'Neil, Senior Medical Manager, Medical Affairs November 2, 2015("2015 Medical Education Update") NNICID-0962374 at NNICID-0962426.
[2] *Id.* at NNICID-0962425.
[3] *See* 2010 Biopharm Independent Medical Education Update, March 23, 2010 ("2010 Biopharm Update") NNICID-1669838 at slides 2-3; 2015 Medical Education Update at NNICID-0962374 at NNICID-0962395-2401; Proposal for Patient Education Symposium and Enduring Materia: Inhibitor Education Summits Presented to Natalia Holot, MD, Phd, Novo Nordisk, Presented by: Shawn Shinn, Senior Vice President, CBCE ("CBCE Proposal") at NNICID-06446373 at NNICID-06446375-6379 ("learning objective" includes "Prophylaxis of bleeding in patients who have hemophilia with inhibitors, and discuss its potential impact on reducing joint damage and improving quality of life"), NNICID-0646383 ("Proposed Agenda" includes "Prophylaxis … Management of Joint Disease), NNICID-0646385 ("Barbara Konkle, MD" to present "Prophylaxis."), NNICID-0646396 (CBCE to conduct "content review of faculty presentations.").
[4] 2010 Biopharm Update NNICID-1669838 at slide 3.
[5] *See* Expert Report of Dr. Adriane Fugh-Berman at p. 7-13.

6

For example, a patient brochure for the 2009 Inhibitor Summit[6] indicates that these messages were presented including "Prophylaxis with Bypassing Agents" designated as "Track 1: Hemophilia with Inhibitors 101."[7]   The agenda for "Track 3:  Young Men – Hemophilia with Inhibitors" was a discussion about "Early Treatment of Bleeding and the Prevention of Joint Disease."[8]  The terms "early treatment" and "prevention" were – and still are – used by Novo as promotional terms to enhance their message to self-infuse more often, at higher doses, and as prophylaxis.[9]  This off-label information was widely disseminated to patients and their families. In 2009, Novo supported 9 patient education activities including two inhibitor summits, one online-archive from the inhibitor summits, two articles (a review article and journal supplement) from the summits and an inhibitor summit in Puerto Rico.[10]  That year, the Los Angeles (Hollywood) Summit included 295 attendees from 36 states, of which 84 were inhibitor patients and the Washington, D.C. Summit included 282 attendees from 33 states, of which were 79 inhibitor patients.[11]  Four families from Washington State attended the 2009 Hollywood Inhibitor Summit and three Washington State families attended to the Washington, D.C. Inhibitor Summit.[12]

---

[6] The 2009 Inhibitor Summit brochure features Novo's logo, prominently displayed on the first page, with words indicating that the event was "supported by an educational grant from Novo Nordisk." Third Consolidated Complaint ("TCC")  ¶131; *See also*  NNICID-0787116-118. Novo KOLs Dr. Guy Young and Dr. Leonard Valentino are on the National Steering Committee for the 2009 Inhibitor Summits.  Relator0001737 at Relator0001744.

[7] TCC at ¶130; Relator0001737-1744 at p. Relator0001742.

[8] Relator0001737-1744 at p. Relator0001742; *See also* Relator 0002542 a patient brochure for a an event discussing prevention of joint disease. Drs. Young and Valentino are also on the Steering Committee for this Inhibitor Summit.  Relator0002541.

[9] TCC at ¶130.

[10] Medical Education Update Oct. 13, 2009, Princeton, New Jersey ("2009 Medical Education Update") NNICID-1114955 at slide entitled "2009 Patient Activity Support."

[11] *Id.* slide "Summit I" and "Summit II."

[12] CBCE Education Evaluation Summary Report, "2009 Inhibitor Education Summit I" August 27-30, 2009. Hollywood, CA ("2009 Hollywood Summit Evaluation Summary"), NNICID-

7

Allenmykael Gonzalez and his mother Joanie Gonzalez testified in their declarations that they attended to the Los Angeles or Hollywood California Summit.[13]   In 2010, Novo supported four live programs where 603 patients/caregivers attended summits and camps and two other "web-based/DVD" and "print" programs where the company tracked 11,890 patients/caregivers.[14] By 2015, Novo's programs included 31 live programs, attended by 2,972 patients and caregivers, and one web-based program, attended by 133 patients and caregivers.[15]   Through the Inhibitor Summits, Novo was able to reach a substantial number of the approximately 800-900 inhibitor patients in the US it noted in its 2009 press release regarding the Inhibitor Summits.[16]

Novo's vendors including CBCE and later the National Hemophilia Federation (NHF) collected and analyzed information about patients and caregivers attending these Inhibitor Summits via participant evaluation forms,[17] which were shared with employees from  Novo's marketing, sales and medical affairs departments.[18] Specifically, NHF collected information about patients' medical conditions (type of congenital hemophilia and the level of titers), use of

---

0610754 at NNICID-0610758; CBCE Education Evaluation Summary Report, "2009 Inhibitor Education Summit II" September 17-20. Washington, DC ("2009 Wahington, D.C. Summit Evaluation Summary"), NNICID-0610834 at NNICID-0610839.

[13] Declaration of A. Gonzalez at ¶22, NNISiegel_00071740 at NNISiegel_00071746; Declaration of J. Gonzalez at ¶24, NNISiegel_00071731 at NNISiegel_00071738.

[14] 2010 Biopharm Update, NNICID-1669838 at slide 2.

[15] Medical Education 2015 Update, NNICID-0962375 at slide 2.

[16] Novo Nordisk Press Release August 27, 2009 NNICID-0787116 (since 2005 "hundreds of families" have attended summits).

[17] *See* 2011 Inhibitor Education Summits Evaluation Summary from activity held June 16-19, 2011 in Miami, Florida ("2011 Miami Evaluation Summary"), NNICID-0626066 *et seq*.

[18] See e.g., September 21, 2009 email from Natalia Holot to Neal Fitzpatrick, Michelle Watson, Eddie Williams, Tanya Hill and Laurent Veilex re: Washington, D.C. Summit preliminary report. NNICID-0640586.

8

bypassing agents (including prophylaxis and episodic prophylaxis), treatment regimens (ITI,) and intentions to change their treatment of bleeds based upon information received at the event.[19] Except for a few years, from 2009 to 2015 nearly half or more of the patients attending the summits reported that they would change their treatment of bleeds based upon information received at the summit.[20]  The participant evaluations sought permission from patients completing the evaluations "for NHF or a designated third party" to contact him/her in "approximately 4-6 weeks" to determine whether the patient had in fact changed the way he/she managed his/her bleeding disorder as a result of this activity.[21]  The evaluation also asks the patient to explain in writing "[w]hat topics will you discuss with your physician after the summit?"[22]

Summaries of the information collected from the Inhibitor Summits indicate that off-label promotional messages were received by patients and their caregivers, including those from the State of Washington.

As stated above, four Washington families, including the Gonzalez's, attended the Hollywood, California Inhibitor Summit from August 27-30, 2009 where prophylaxis messages were conveyed to patients and their caregivers.  A patient or caregiver's evaluations, shared with Novo Nordisk,   indicated that "new information" gathered at the summit included "ITT, prophylaxis."[23] Moreover, patients and/or caregivers indicated in their evaluations that they would discuss with their physician "[c]ontinuing prophylaxis," "[p]rophylaxis and immunotherapy start

---

[19] 2015 Medical Education Update at NNICID-0962374 at NNICID-0962411-2419 (comparing patient responses from participant evaluations in 2009-2015); 2011 Inhibitor Education Summits Evaluation Summary form activity held July 14-17, 2011 in San Francisco, CA ("2011 San Francisco Evaluation Summary"), NNICID-0229525 at NNICID-0229533
[20] 2015 Medical Education Update, NNICID-0962374 at NNICID-0962417.
[21] 2011 San Francisco Evaluation Summary, NNICID-0229525 at 9536.
[22] *Id*. NNICID-0229535.
[23] 2009 Hollywood Summit Evaluation Summary, at NNICID-0610754 at NNICID-00610825.

up as soon as possible," and "[p]ossible prophylaxis or ITC work."[24] Thirty-eight percent of the patients at the Hollywood Inhibitor Summit indicated they would change the way they treated bleeds based upon information learned at the event.[25]

Likewise, at a Washington, D.C. Inhibitor Summit held September 17-20, 2009, three families from Washington State were in attendance.[26]  Patients and caregivers indicated in their evaluations that they would discuss with their physician "[p]rophylaxis," "How to prevent damage to joints," "[i]mmune tolerance and prophylaxis," and "[p]rophylaxis and port," based upon information learned at the summit.[27]  Thirty-six percent of the patients at the Washington, D.C. Inhibitor Summit indicated they would change the way they treated bleeds based upon information learned at the event.[28]

Similarly, at least one family from Washington State attended an Inhibitor Summit in Boston, Massachusetts from August 19-22, 2010.[29]  According to records produced by Novo the Gonzalez's attended this event.[30]  On the agenda was "Track 2:  Ask the Expert:  ITI and Prophylaxis."[31] Patients and/or caregivers at the Boston Summit responded that they received "new information" about "prophylaxis."[32] Moreover, patients and caregivers indicated in their evaluations that after the summit they would discuss with their physician "[o]ur prophy/ITT

---

[24] *Id.* at NNICID-0610826.

[25] *Id.* at NNICID-0610817.

[26] 2009 Washington, D.C. Evaluation Summary at NNICID-0610834 at 0839.

[27] *Id.* at NNICID-0610907 to 0908.

[28] *Id.* at NNICID-0610899.

[29] National Hemophilia Foundation 2010 Inhibitor Education Summits, Evaluation Summary from activity held August 19-22, 2010, in Boston, MA ("2010 Boston Evaluation Summary") at NNICID-0308154 at NNICID-0308157.

[30] J. Gonzalez Decl. at ¶ 24; Decl. of A. Gonzalez at ¶22.

[31] 2010 Boston Evaluation Summary at NNICID-0308154 at NNICID-0308161.

[32] *Id. at* NNICID-0308217.

10

requirement" and "[p]rophylaxis, PT, ITT."[33]

The 2011 San Francisco Evaluation Summary indicates that at least one Washington family (of 99 families) participated in the Inhibit Summit.[34] Nearly half of those responding to the participant evaluation for the San Francisco Summit indicated he/she would change the way he/she treated bleeds based upon information learned at the summit.[35] One patient reported he/she would "look for a prophylaxis treatment that better fits my budget and health."[36] Several patients and/or caregivers responded that they learned "new information" including about "[p]rophylaxis" (1 respondent), "[e]xperimental drugs" (1 respondent), "[e]arly treatment of bleeding and Prevention of Joint Disease" (4 respondent), "[b]ypassing prophylaxis" (1 respondent), "[p]rophylaxis with Bypassing Agents" (3 respondent), "[c]ombination use of FEIBA and NovoSeven," (2 respondents) "prevention of joint disease" (1 respondent).[37] Moreover, patients and caregivers indicated in their evaluations that after the summit they would discuss with their physician "[p]rophylaxis with NovoSeven" (2 respondents), "[p]rophylaxis" (1 respondent), "[p]rophylaxis with bypassing agent[s]," (5 respondents), "prophylaxis regimen" (1 respondent), "combo therapy" (1 respondent), "experimental drugs" (1 respondent), "[p]rophyaxis with FEIBA if ITI doesn't work," (1 respondent).[38]

A Summit in San Diego, California from July 19-22, 2012 included at least one family

---

[33] *Id.* at NNICID-0308220 and 8222.
[34] 2011 San Francisco Evaluation Summary at NNICID-0229528.
[35] NNICID-0229577.
[36] *Id.* at NNICID-0229558.
[37] *Id.* at NNICID-0229587-9596.
[38] *Id.* at NNICID-0229596-9600.

11

from the State of Washington.[39] According to Novo's records the Gonzalez family attended this summit.[40] At least three patients and/or caregivers reported in their evaluations that learned "new information" at the summit about "[p]rophylaxis with bypassing agents."[41] Forty-six percent of the patients attending said they would change the way they treated their bleeds based upon information gained at the summit.[42]

Likewise, two families from Washington State attended to the Albuquerque, NM Inhibitor Summit held on July 10-13, 2014.[43] Several patients and/or caregivers reported in their evaluations that learned "new information" at the summit about "[p]rophylaxis" (3 respondents); "[p]rophylaxis with bypassing agent" (2 respondents).[44] Moreover, patients and caregivers indicated in their evaluations that after the summit they would discuss with their physician "[p]rophy with bypassing" and "ITI with prophylaxis."[45] Forty-nine percent of respondents indicated that they would change the way they treat their bleeds based upon information received at the Inhibitor Summit.[46] Apparently, Dr. Rebecca Kruse-Jarres, a paid Novo consultant and Washington-based hemophilia physician, also presented at the Summit.[47]

In 2008, Dr. Cindy Lessinger presented on prophylaxis at a Birmingham, AL Inhibitor

---

[39] National Hemophilia Foundation 2012 Inhibitor Education Summits, Evaluation Summary from activity held August 2-5, 2012, in San Diego, CA ("2012 San Diego Evaluation Summary") at NNICID-0608907 at NNICID-0608910.

[40] Decl. of J. Gonzalez at ¶24; Decl. of A. Gonzalez at ¶22.

[41] *Id*. at NNICID-0608957-8959.

[42] *Id*. at NNICID-0609348.

[43] National Hemophilia Foundation 2014 Inhibitor Education Summits, Evaluation Summary from activity held July 10-13, 2014, in Albuquerque, NMNNICID-0594097 at NNICID-0594100, ("2014 Albuquerque Evaluation Summary") at NNICD-0594097.

[44] *Id*. at NNICID-0594154 and 4159.

[45] *Id*. at NNICID-0594163.

[46] *Id*. at NNICID-0594142.

[47] *Id*. at NNICID-0594102.

12

Summit where two Washington State patients were in attendance.[48]

Evaluation summaries provided to Novo from other Inhibitor Summits indicate off-label presentations by the faculty.  For example, at a Houston, Texas Inhibitor Summit on August 5-8, 2010, Dr. Prassad Matthew, a hemophilia treater that met with Mr. Gonzalez at Dr. Ronald Louie's office, presented on Track 2 "Ask the Expert: ITI and Prophylaxis."[49]   Among the "new information" gathered by patients and caregivers at the Summit was  "ITT and prophylaxis, venous access, and sports and inhibitors" and "[t]he Future of Treating Bleeds, ITI and Prophylaxis, Immune Tolerance Induction."[50] One patient or caregiver reported that he/she would discuss with his/her doctor "[p]rophylaxis with bypassing agents, high dose ITT."[51]   Forty-seven percent of respondents indicated they would change the way they treated bleeds based upon information learned at the Inhibitor Summit.[52]

At a Denver, Colorado Inhibitor Summit on July 25-27, 2008. Dr. Barbara Konkle, a Washington based hemophilia treater, Novo KOL and Novo paid consultant,  presented on prophylaxis.[53]

At the same conference,  NovoSeven KOL Dr. Guy Young -- also paid by Novo to chair or co-chair the Inhibitor Summits –presented off-label information to patients and caregivers according to Tanya Hill, a Novo Marketing Director. On July 29, 2008, Gerard Boehm, International Product

---

[48] Activity Evaluation, NNICID-0642437 at 2440.

[49]  National Hemophilia Foundation 2010 Inhibitor Education Summits, Evaluation Summary from activity held August 5-8, 2010, in Houston, TX ("2010 Houston Evaluation Summary") at NNICID-0250673 at 0705.

[50] *Id.* at NNICID-0250720-0721.

[51] *Id.* at NNICID-0250722.

[52] *Id.* at NNICID-0250712.

[53] *See* email from Liz O'Neil to Natalia O'Neil, February 3, 2009 NNICID-0642407, attaching, Activity evaluations for Inhibitor Education Summit Denver, Colorado July 25-27, 2008 at NNICID-0642422, at NNICID-0642425.

13

Manager for NovSeven Haemophilia, sent an email to Ms. Hill stating, that he heard Dr. Young presented on NovoSeven prophylaxis at the 2008 Denver Inhibitor Summit and asked "[h]ow favourable was his presentation? Did he present good patient cases on rFVIIa?"  Ms. Hill responds that she attended the summit and Dr. Young was "very pro-NovoSeven for single dose and prophylaxis" and that he spoke "on his usual cases for prophy (the 3 and 15 year old) but only covered NovoSeven data (aPCC was not mentioned – his exact quote was "I would talk about aPCC prophy, but I'm out of time")."[54]

Likewise, at Miami Inhibitor Summit in 2011, Dr. Sanjay Ahuja presented information on using NovoSeven for prophylaxis, which patients noted in their evaluations of the "teaching effectiveness," of the presenters.[55]  The 2011 Miami Evaluation summary notes that caregivers planned to make the following changes on behalf of their patients: "using Novo 7 more," "[w]e slam to use Novo 7 more on a prophy level," "[h]aving a discussion with our doctor about using Novo 7 whenever he has a major bleed," "[p]ossibly start prophy with bypassing agents."[56] Approximately seven patients or caregivers indicated that "new information" gathered at the 2011 Miami Summit included prophylaxis others discussed using FEIBA and NovoSeven together off-label.[57]  Some patients responded that they would discuss with their physicians prophylaxis, including prophylaxis with NovoSeven and "[u]sing bypassing agents w/ our daily regiment [sic.] to prevent bleeds in the joints."[58]

---

[54] Exhibit 336, Deposition of Dr. Guy Young, NNICID-0159035.
[55] National Hemophilia Foundation 2011 Inhibitor Education Summits, Evaluation Summary from activity held June 16-19, 2011, in Miami, FL ("2011 Miami Evaluation Summary") NNICID-0626066 at NNICID-0626097.
[56] 2011 Miami Evaluation Summary at NNICID-0626090-6091
[57] *Id.* at NNICID-0626116-6120.
[58] *Id.* at NNICID-0626120-6121.

14

Dr. Rebecca Kruse Jarres, a Washington State hemophilia treater and Novo paid consultant, was apparently speaking at Inhibitor Summits where off-label information was provided.[59] Representatives from Oregon Health Science University were also present at Inhibitor Summits where off-label information was provided.[60]

Off-label messages delivered at the Inhibitor Summits were received by Joanie Gonzalez, mother of patient Allenmykael Gonzalez (a Washington Medicaid inhibitor patient) who testified that she learned about different treatment protocols including prophylaxis at the Inhibitor Summits. Deposition of J. Gonzalez at p. 108. The goal for Ms. Gonzalez at the summits was to learn how physicians, presenting at the Inhibitor Summits, were treating "patients like my son" and then "take it to my doctor." p. 108, lines 15-18.  She brought information from the summits to Dr. Ronald Louie, Mr. Gonzalez's hemophilia treater, who then paid a social worker and his nurse to attend a summit.  J. Gonzalez at p. 108-109. Dr. Ronald Louie testified that Mr. Gonzalez came back from a "meeting" claiming that "high dose seems to work better."  CID Deposition of Dr. Ronald Louie at p. 31.

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

## INTERROGATORY NO. 3

**Identify all Novo-sponsored and/or Novo-affiliated events or meetings – including but not limited to every Advisory Board, Consumer Council,**

---

[59] National Hemophilia Foundation 2015 Inhibitor Education Summits, Evaluation Summary from activity held June 16-19, 2015, in Atlanta, GA ("2015 Atlanta Evaluation Summary") (NNICID-0592409 at NNICID-0592416); Baltimore, Maryland Summit July 24-27, 2014 (NNICID-0594176 at NNICID-0594182).

[60] Atlanta, Georgia Summit July 16-19, 2015 (NNICID-0592409 at NNICID-0592414); Baltimore, Maryland Summit July 24-27, 2014 (NNICID-0594176 at NNICID-0594180); Miami, Florida Summit July 19-22, 2012 (NNICID-0609308 at NNICID-0609312).

Hemophilia Camp, and Inhibitor Summit (as those terms are used in the Complaint) – at which you believe any Washington Provider received promotion from Novo regarding off-label use of NovoSeven®. For each such event or meeting identified, state the form and substance of the promotion.

 **RESPONSE:**

Relator objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires Relator to provide an exhaustive list of promotional efforts by the Defendant at "all Novo-sponsored and/or Novo affiliated events or meetings – including but not limited to every Advisory Board, Consumer Council, Hemophilia Camp, and Inhibitor Summit[s]." Moreover, Relator objects as discovery has not concluded, including but not limited to, the FRCP 30(b)(6) Deposition of Novo.  Relator also objects to the extent that Novo has failed to produce in discovery the following information pertaining to each of these events – (1) the identities of the Washington Providers attending these events; (2) attendance records of such events; (3) brochures, agendas, and materials presented at these events either by the Defendant or Defendant's employees, paid consultants or other agents and contractors; and (4) videos or transcripts of these events.  Subject to and without waiver of the foregoing objections and the General Objections, Relator states:

Novo's efforts to select Washington Providers as KOLs and invite them to participate in meetings where Novo presented off-label was designed to increase utilization of NovSeven®. *See* Expert Report of Adriane Fugh-Berman at pp. 5 ("covert promotion") and p. 29-34 ("Key Opinion Leaders (KOLs)"). Some examples of this are as follows:  A number of Washington Providers[61] were included as KOLS in Novo Nordisk's Global 2015 Midyear Hemophilia and RBD KOL and Society Planning Update Meeting: Barbara Konkle MD (National),  Michael Recht, MD PhD

_____

[61] As defined by the Second Set of Interrogatories directed at Relator.

16

(Regional), and Kruse-Jarres, MD (Regional).[62]  Dr. Recht led the list of National and Regional

KOLs in number of engagements completed in 2015 (11) compared to Konkle (2) and Kruse-Jarres

(1); and overall in comparison to others on the list including Dr. Craig Kessler (10) and Dr. Guy

Young (5).[63]

Dr. Recht, along with Doctors Young and Valentino, participated in a Novoseven Market

Insights Advisory Board Meeting in Chicago, IL on April 11, 2007 while he was still the

Director of the Hemophilia Center at Phoenix Children's Hospital but moved to Oregon August

2007 according to his LinkedIn account.  This advisory board meeting focused on topics

including "Overview of NovoSeven High Dose Regimen" and "Proposed Recombinant Safety

Messages – How does this differentiate NovoSeven from FEIBA."[64]

Dr. Kruse-Jarres participated in a Translational Hemophilia Advisory Board meeting

November 5, 2009 during which the board discussed the "evolution of prophylaxis care;

prophylaxis is becoming more common in inhibitor patients."[65] The summary indicates that

"reduced bleed frequency is surrogate from lessons learned from non-inhibitor patients, but not

well documented in it's the long term correlation of outcomes – if reduction of 90%, does that

mean arthropathy won't progress?"[66]

---

[62] NNICID-1109459 (June 15, 2015 email from Natailia Holot to Isabel Cuoto and Sheba
Matthew) and NNICID-1109460 (2015 Midyear Hemophilia and RBD KOL and Society
Planning Update by Isabel Couto, Biopharm Medical, June 17, 2015)
[63] *Id.*
[64] NNICID-0168314 (March 2, 2007 Email from Jennifer Kempes to Tonya Hill and others re:
Revised Commercial Ad Board Proposal); NNICID-0168315 at NNICID-0168320 (CDM,
NovoSeven Commercial Advisory Board, Proposal for the Development and Implementation of
a Commercial Advisory Board Meeting in Support of NovoSeven®);  and NNICID-0168185
(NovoSeven Market Insights Advisory Board Meeting -- Chicago, IL – April 11, 2007
transcript).
[65] Advisory Board 2009 Individual Meeting Summary, NNICID-0219542.
[66] *Id.*

Doctors Recht, Kruse-Jarres and Steven Pipe attended a Translational Advisory Board Meeting October 27-28, 2010 in Washington D.C. facilitated by David Cooper and Tanya Hill. The objectives of the meeting were to "[g]ain valuable insight into current and evolving standards of care including Hemophilia with inhibitor treatment."[67]  The meeting started with a recap from the previous Translational Advisory Board meeting regarding "evolution of prophylaxis care; prophylaxis is becoming more common in inhibitor patient."[68]  One of the other participants presented "Current Trends in Pediatric Inhibitors" including "high-dose rFVIIa" with "[e]qual efficacy" and "[e]asier administration."[69]  A presentation given by another member on adolescents discussed prophylaxis with APCC and use of high dose rFVIIa for breakthrough bleeding.[70]

*See also*, Interrogatory No. 2 describing off-label messaging at Inhibitor Summits by Novo KOLs Konkle and Young as well as physicians in attendance such as Rebecca Kruse-Jarres and representatives from the Oregon Health Science University.

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

## INTERROGATORY NO. 4

**Identify all Remuneration that You believe any Washington Patient received from Novo.**

**RESPONSE:**

Relator objects as discovery has not concluded, including but not limited to, the FRCP

---

[67] Agenda, Translational Advisory Board, The Hay-Adams – Washington, D.C., NNICID-0742730 at 0742733.
[68]  *Id*. at 0742735
[69]  *Id*. at 0742739
[70] *Id*. at 0742740-44.

30(b)(6) Deposition of Novo, including Topic 2.  Relator objects to the extent that Novo has failed to produce in discovery all of the information regarding remuneration to Washington Patients, as defined by its Second Set of Interrogatories.  Subject to and without waiver of the foregoing objections and the General Objections, Relator states:

Remuneration was provided to any and all Washington patients, as defined by Novo's Second Set of Interrogatories Directed to Relator, who were enrolled in the SevenSecure, SevenAssist, and SevenStart (whether the patient received benefits) because it was a concierge service for patients, providing services at no charge.  *See*, Dr. Adriane Fugh-Berman Expert Report at pp. 37-41.

Remuneration to Washington patients is also described in the following documents: NNISiegel_00035422.xlsx; NNISiegel_00035423.xlsx; NNISiegel_00035424.xlsx; and Novo-0005208.  See also, the following:

**<u>Allenmykael Gonzalez</u>**

| | | |
|---|---|---|
| 8/10/2008- | $1500 laptop from BestBuy | #291.1 |
| 12/11/2009- | $1420.62 Scooter Lift | #475.1 |
| 1/20/2011- | $108.23 Repair on lift | #889.1 |
| 10/4/2012- | $494.26 Adapted wheelchair | #889.1 |
| 8/18/2014- | $87.52 Copay tire repair | #889.1 |

Airfare/Travel

| | | |
|---|---|---|
| 10/22/2010- | $821.08- 4-night hotel NHF | #475.1 |
| 11/5/2010- | $110.00- Airport Shuttle | #475.1 |
| 4/1/2010 | $500 Tutoring Grant | #475.1 |
| 8/24/2010 | $500 SevenSecure video | NNICID-0292143 |

Paid to participate in the DOSE study          Expert Report of Adriane Fugh-Berman at p. 37

19

**Volodymyr Verlan**

| 3/5/2011 | $1500 | RXC-Siegel00018097 |
| 3/16/2012 | $1500. Etc. | NNISiegel_0035422 |
| 1/25/2013- | $267 | NNISiegel_0035422; RXC-Siegel0021503 |
| 2/14/2014 | $126 | NNISiegel_0035423 |
| 3/4/2014 | $136.77 | #3149.1; NNISiegel_0035422 |
| 10/23/2014 | $122.22 | RXC-Siegel0021451 |
| 5/6/2015 | $267 | NNISiegel_0035423 |
| 12/1/2015 | $126 | NNISiegel_0035423 |

Scholarship Managers Awards $4000.00

| 2011 | $2500 Ulla Hednar | #475.1; NNISiegel_0035422; NNISiegel_0035423; RXC-Siegel0021434 |
| 2011 | $1500 Med Reimb. Grant | #475.1; NNISiegel_0035422; NNISiegel_0035423; RXC-Siegel0021430 |

**Victor Osuna**

| 8/21/2009 | $1040.24 Laptop | NNISiegel_0035422; NNISiegel_0035423 |

**Stephen Harper**

| 2011 | $175 Tutoring Grant | #471.1 |

**Kenneth Herradura**

| 4/21/2009 | $267.40 | NNISiegel_0035422 |
| 6/8/2009 | $244.20 | NNISiegel_0035422 |
| 7/31/2009 | $374.20 | NNISiegel_0035422 |
| 10/5/2009 | $614.20 | NNISiegel_0035422 |

**Michael Dansie**

| 2011 | $1272.25 | #293.1 |
| 2012 | $3407.97 | #293.1 |

20

| 2013 | $1004.00 | #293.1 |
| 2014 | $2923.50 | #293.1 |
| 2015 | $1850.10 | #293.1 |

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

**OCTOBER 21, 2024 SUPPLEMENT**:

Relator incorporates all objections included in her original response to Interrogatory No. 4 above.  Subject to and without waiver of those foregoing objections in her original response to Interrogatory No. 4 and the General Objections, Relator substitutes her original response with the following:

Remuneration was provided to any and all Washington patients, as defined by Novo's Second Set of Interrogatories Directed to Relator, who were enrolled in the SevenSecure, SevenAssist, and SevenStart (whether the patient received benefits) because it was a concierge service for patients, providing services at no charge.  *See*, Dr. Adriane Fugh-Berman Expert Report at pp. 37-41.

Remuneration to Washington patients is also described in the following documents: NNISiegel_00035422.xlsx;  NNISiegel_00035423.xlsx;  NNISiegel_00035424.xlsx;  and Novo-0005208.  See also, the following:

**Allenmykael Gonzalez**

| 8/10/2008 | $1500 laptop from BestBuy | WA_NNI_002597 at 002620 |
| 12/11/2009 | $1420.62 Wheelchair ramp | NNISiegel_00035422 |
| 1/20/2011 | $109.23 Repair- Wheelchair Lift | NNISiegel_00035422 |
| 10/4/2012 | $494.26 Wheelchair Lift | NNISiegel_00035422 |
| 8/18/2014 | $87.52  Wheelchair Repair | NNISiegel_00035422 |
| 10/22/2010 | $821.08- 4-night hotel NHF | WA_NNI_049153, also NNISiegel_00035422 |

21

| 11/5/2010 | $110.00- Airport Shuttle | WA_NNI_049153; also NNISiegel_00035422 |
| 11/5/2010 | $557.26 – Airfare | WA_NNI_049153; also NNIsiegel_00035422 |
| 4/1/2010 | $500.00 – Tutoring Grant | WA_NNI_049153 |
| 8/24/2010 | $500 SevenSecure video | NNICID-0292143 |
| 1/22/11 | $109.23 | RXC-Siegel0018097 |

Paid to participate in the DOSE study.  *See* Expert Report of Adriane Fugh-Berman at p. 37

**Volodymyr Verlan**

| 3/5/2011 | $1500 | RXC-Siegel00018097 |
|---|---|---|
| 3/16/2012 | $1500 (several entries) | NNISiegel_0035422 |
| 1/25/2013 | $267 | NNISiegel_0035422; RXC-Siegel0021503 |
| 12/23/2014 | $126 | NNISiegel_0035422 |
| 3/13/2014 | 136.77 | NNISiegel_0035422 |
| 10/27/2014 | $122.22 | NNISiegel_0035422 |
| 5/6/2015 | $267 | NNISiegel_0035422 |
| 12/1/2015 | $126 | NNISiegel_0035422 |
| 2011 | $2500 Ulla Hednar | WA_NNI_049153 at 9154; NNISiegel_0035422; RXC-Siegel0021434-5 |
| 2011 | $1500 Med Reimb. Grant | WA_NNI_049153 at 9154; NNISiegel_0035422; RXC-Siegel0021430 |

**Victor Osuna**

| 8/18/2009 | $1040.24 Laptop | NNISiegel_0035422 |

**Stephen Harper**

| 2011 | $175 Tutoring Grant | WA_NNI_049153 |

**Kenneth Herradura**

22

| 4/21/2009 | $267.40 | NNISiegel_0035422 |
| 6/8/2009 | $244.20 | NNISiegel_0035422 |
| 8/3/2009 | $374.20 | NNISiegel_0035422 |
| 10/5/2009 | $614.20 | NNISiegel_0035422 |

**Michael Dansie**

| 2011 | $1272.25 | WA_NNI_002550 at 2562 |
| 2012 | $3407.97 | WA_NNI_002550 at 2562 |
| 2013 | $1004.00 | WA_NNI_002550 at 2562 |
| 2014 | $2923.50 | WA_NNI_002550 at 2562 |
| 2015 | $1850.10 | WA_NNI_002550 at 2562 |
| 10/24/11 | $479.36 | RXC-Siegel0018097 |

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

## INTERROGATORY NO. 5

**Identify all Remuneration that You believe any Washington Provider received from Novo.**

## RESPONSE:

Relator objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires Relator to provide an exhaustive list of "all Remuneration" that Relator believes any Washington Provider, as defined by the Second Set of Interrogatories. Moreover, Relator objects as discovery has not concluded. Additionally, Relator objects to the extent that Novo has failed to produce in discovery all of the information known about remuneration to Washington Providers, as defined by its Second Set of Interrogatories, including some documents prior to 2010, which apparently are no longer in its possession. Subject to and without waiver of the foregoing objections and the General Objections, Relator states:

23

The number and types of remuneration provided to Washington Providers[71] in this case is vast and includes Novo's purchases of Dr. Kessler's book and reprints from *Haemophilia* resulting in over $64,000.00 in salary to Dr. Kessler. *See* Expert Report of Dr. Adriane Fugh-Berman at pp. 19-20, 24. Novo selected other physicians to author manuscripts and studies, such as Dr. Amy Shapiro, Dr. Len Valentino, Dr. Barbara Konkle, Dr. Miguel Escobar, and Dr. Guy Young, which justified academic positions at university's where authorship was required for tenure and raises. *See* Journal Articles, Response to No. 6 below. In addition to the foregoing remuneration, which is not an exhaustive list, Relator also points to the following documents:

NNISiegel_00062329.xls; NNISiegel_00062330.xls;

NNISiegel_00062331.xls;NNISiegel_00062332.xls; NNISiegel_0006233.xls;

NNISiegel_00062334.xls.

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

## INTERROGATORY NO. 6

**Identify all articles, clinical trials, literature reviews, studies, and/or any other forms of medical literature or scholarship that You contend were used by Novo to promote off-label uses of NovoSeven® to Washington Patients and/or Washington Providers.**

## RESPONSE:

Relator objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires Relator to provide an exhaustive list of "all articles, clinical trials, literature reviews, studies and/or any forms of medical literature or scholarship" she contends were used by Novo to promote off-label uses of NovoSeven® to Washington Patients and/or Washington Providers, as

---

[71] As defined by the Second Set of Interrogatories directed at Relator.

they are defined by its Second Set of Interrogatories directed at Relator.  Relator also objects as discovery has not concluded, including the FRCP 30(b)(6) Deposition of Novo, including Topics 10-13 and 16.  Additionally, Relator objects to the extent that Novo has failed to supply in discovery "all articles, clinical trials, literature reviews and/or other forms of medical literature or scholarship" it provided to Washington Patients and/or Washington Providers, as they are defined by its Second Set of Interrogatories directed at Relator.  Subject to and without waiver of the foregoing objections and the General Objections, Relator identifies the following:

## I.    Journal Articles

| |
|---|
| AD Shapiro, *Recombinant factor VIIa in the treatment of bleeding in hemophilic children with inhibitors*, Semin Thromb Hemost, 2000, at 26(4):413-19. |
| A Shapiro, *Inhibitor treatment; state of the art*, Semin Hematol, Oct. 2001, 38(4 Suppl2):26-34 |
| S Seremetis, *Dose optimization of recombinant factor VIIa in the treatment of acute bleeding in haemophilia-associated inhibitors*, Blood Coagul Fibrinolysis, June 2003, at 14 Suppl 1: S29-30 |
| G Kenet, A Lubetsky, J Luboshitz, and U Martinowitz, *A new approach to treatment of bleeding episodes in young hemophilia patients: a single bolus megadose of recombinant activated factor VII (NovoSeven®)*, Journal of Thrombosis and Haemostasis, 2003, 1:450-455. |
| Abshire, T., & Kenet, G. (2004). *Recombinant factor VIIa: review of efficacy, dosing regimens and safety in patients with congenital and acquired factor VIII or IX inhibitors*. Journal of Thrombosis and Haemostasis, 2(6), 899-909. |
| TC Abshire, *Dose optimization of recombinant factor VIIa for control of mild to moderate bleeds in inhibitor patients: Improved efficacy with higher dosing*, Semin Hematol, Jan. 2004, at 41(1 Suppl 1:3-7) |
| R Parameswaran, AD Shapiro, JC Gill, CM Kessler and HTRS Registry Investigators, *Dose effect and efficacy of rFVIIa in the treatment of haemophilia patients with inhibitors: analysis from the Hemophilia and Thrombosis Research Society Registry*, Haemophilia, Mar. (2005), 11(2):100-6 |
| R Mehta, R Parameswaran, and AD Shapiro, *An overview of the history, clinical practice concerns, comparative studies and strategies to optimize therapy of bypassing agents*, Haemophilia (2006), 12 (Suppl. 6), 54–61 |
| E Santagostino, ME Mancuso, A Rocino, G Mancuso, F Scaraggi, and PM Mannucci, *A prospective randomized trial of high and standard dosages of recombinant factor VIIa for treatment of hemarthroses in hemophiliacs with inhibitors*. Journal of Thrombosis and Haemostasis, 2006, 4: 367-371 |
| G Kenet, *High-dose recombinant factor VIIa therapy in hemophilia patients with inhibitors*, Semin Hematol, Jan. 2006, at 43(1 Suppl 1):S108-10. |

25

Kavakli, K., Makris, M., Zulfikar, B., Erhardtsen, E., Abrams, Z. S., & Kenet, G. (2006). *Home treatment of haemarthroses using a single dose regimen of recombinant activated factor VII in patients with haemophilia and inhibitors*. Thrombosis and haemostasis, 95(04), 600-605.

Young, G. (2006). New approaches in the management of inhibitor patients. Acta haematologica, 115(3-4), 172-179.

Young, G., Blain, R., Nakagawa, P., & Nugent, D. J. (2006). Individualization of bypassing agent treatment for haemophilic patients with inhibitors utilizing thromboelastography. Haemophilia, 12(6), 598-604.

Schneiderman, J., Rubin, E., Nugent, D. J., & Young, G. (2007). Sequential therapy with activated prothrombin complex concentrates and recombinant FVIIa in patients with severe haemophilia and inhibitors: update of our previous experience. Haemophilia, 13(3), 244-248.

BA Konkle, LS Ebbesen, E Eehardtson, RP Bianco, T Lissitchkov, L Rusen and MA Serban, *Randomized, prospective clinical trial of recombinant factor VIIa for secondary prophylaxis in hemophilia patients with inhibitors*, Journal of Thrombosis and Hemostasis, 2007, 5:1904-1913

Morfini, M., Auerswald, G., Kobelt, R. A., Rivolta, G. F., Rodriguez-Martorell, J., Scaraggi, F. A., ... & Rossi, V. (2007). Prophylactic treatment of haemophilia patients with inhibitors: clinical experience with recombinant factor VIIa in European Haemophilia Centres. Haemophilia, 13(5), 502-507.

Young, G., Ebbesen, L. S., Viuff, D., Di Paola, J., Konkle, B. A., Negrier, C., ... & Ingerslev, J. (2008). Evaluation of thromboelastography for monitoring recombinant activated factor VII ex vivo in haemophilia A and B patients with inhibitors: a multicentre trial. Blood coagulation & fibrinolysis, 19(4), 276-282.

G. Kenet and U. Martinowitz, *Single-dose recombinant activated factor VII therapy in hemophilia patients with inhibitors*, Semin Hematol, Apr.2008, at 45(2Suppl1):S38-41

WK Hoots, LS Ebbesen, BA Konkle, GK Auerswald, HR Roberts, J. Weatherall, JM Ferran, RC Ljung and Novoseven (F7HAEM-1505) Investigators, *Secondary prophylaxis with recombinant activated factor VII improves health-related quality of life of haemophilia patients with inhibitors*, Haemophilia, May 2008, at 14(3):466-75

AD Shapiro, *Single-dose recombinant activated factor VII for the treatment of joint bleeds in hemophilia patients with inhibitors*, CLIN ADV Hematol Oncol, Aug. 2008 at 6(8):579-86

T Abshire and G Kenet, *Safety update on the use of recombinant factor VIIa and the treatment of congenital and acquired deficiency of factor VIII or IX with inhibitors*, Haemophilia, Sept. 2008, at 14(5):898-902.

Rodriguez-Merchan, E. C., Hedner, U., Heijnen, L., Jimenez-Yuste, V., Lee, C. A., Morfini, M., ... & Solimeno, L. P. (2008). *Prevention of haemophilic arthropathy during childhood. May common orthopaedic management be extrapolated from patients without inhibitors to patients with inhibitors?*. Haemophilia, 14, 68-81.

Blatny J, Kohlerova S, Zapletal O, et al. Prophylaxis with recombinant factor VIIa for the management of bleeding episodes during immune tolerance treatment in a boy with severe haemophilia A and high-response inhibitors.
Haemophilia. 2008:14;1140-1142.

Goldstein, B., Geldziler, B., Bjerre, J., & Seremetis, S. (2008). Evidence-based use of recombinant FVIIa (NovoSeven®, NiaStase®) for the treatment of hemophilia with inhibitors in children and adolescents. Transfusion and Apheresis Science, 38(1), 25-32.

26

Mannucci, P. M., & Palhares de Miranda, P. A. (2009). *International survey of attitudes towards secondary prophylaxis with recombinant factor VIIa in haemophilia A patients with inhibitors.* Haemophilia: the Official Journal of the World Federation of Hemophilia, 15(1), 345-347.

C Nakar, DL Cooper and D DiMichele *Recombinant activated factor VII safety and efficacy in the treatment of cranial haemorrhage in patients with congenital haemophilia with inhibitors: an analysis of the Hemophilia and Thrombosis Research Society Registry (2004-2008),* Haemophilia, July 1, 2010, at 16(4):625-31

Auerswald, G., & Morfini, M. (2010). *Prophylaxis with Recombinant Activated Factor VII in Hemophilia Patients with Inhibitors.* Journal of Coagulation Disorders, 2(1).

Chuansumrit, A., Angchaisuksiri, P., & Sirachainan, N. (2010). *Critical appraisal of the role of recombinant activated factor VII in the treatment of hemophilia patients with inhibitors.* Journal of Blood Medicine, 37-48.

Butros, L., Boayue, K., & Mathew, P. (2011). *Current difficulties and recent advances in bypass therapy for the management of hemophilia with inhibitors: a new and practical formulation of recombinant factor VIIa.* Drug Design, Development and Therapy, 275-282.

McCarthy, J., & Mathew, P. (2011). *Treatment of hemophilia with inhibitors: an advance in options for pediatric patients.* Journal of Emergency Nursing, 37(5), 474-476.

Shapiro, A. D., & Hedner, U. (2011). *Advances in bypassing agent therapy for hemophilia patients with inhibitors to close care gaps and improve outcomes.* Therapeutic advances in drug safety, 2(5), 213-225.

Hedner, U., & Lee, C. A. (2011). *First 20 years with recombinant FVIIa (NovoSeven).* Haemophilia, 17(1), e172-e182.

RODRIGUEZ-MERCHAN, E. 1., Jimenez-Yuste, V., Aznar, J. A., Hedner, U., Knobe, K., Lee, C. A., ... & Caffarini, A. (2011). *Joint protection in haemophilia.* Haemophilia, 17, 1-23.

Valentino, L. A., & Young, G. (2011). Prophylaxis in Hemophilia a Patients with Inhibitors. Current and Future Issues in Hemophilia Care, 97-101.

EJ Neufeld, CM Kessler, JC Gill, CT Wilke, DL Cooper and HTRS Investigators, *Exposure and safety of higher doses of recombinant factor VIIa ≥250 µg kg(-1) in individuals with congenital haemophilia complicated by alloantibody inhibitors: the Haemophilia and Thrombosis Research Society Registry experience (2004-2008,)* Haemophilia, Jul. 2011, at 17(4):650-6

G Young, G Auerswald, V Jimenez-Yuste, BA Konkle, T Lambert, M. Morfini, E Santagostino and V Blanchette, *When should prophylaxis therapy in inhibitor patients be considered?*, Haemophilia, Sept. 2011, at 17(5):e849-57

Leissinger, C., Cooper, D. L., Solem, C. T., & HTRS Investigators. (2011). *Assessing the impact of age, race, ethnicity and inhibitor status on functional limitations of patients with severe and moderately severe haemophilia A.* Haemophilia, 17(6), 884-889.

Valentino, L. A., Walsh, C. E., Reding, M. T., Young, G. A., Levendoglu-Tugal, O., & Cooper, D. L. (2012). *Patient-and caregiver-reported bleeding symptoms and reasons for starting and stopping treatment with recombinant factor VIIa: analysis of the Dosing Observational Study in Haemophilia (DOSE).* Haemophilia, 18(4), 554-560.

Hoffman, M., & Dargaud, Y. (2012). *Mechanisms and monitoring of bypassing agent therapy.* Journal of Thrombosis and Haemostasis, 10(8), 1478-1485.

Saba, H. I., & Tran Jr, D. Q. (2012). *Challenges and successes in the treatment of hemophilia: the story of a patient with severe hemophilia A and high-titer inhibitors.* Journal of blood medicine, 17-23.

27

F.R.M.Y. Cassis, F Querol, A Forsyth and A Iorios on Behalf of the Hero International Advisory Board, *Psychosocial aspects of haemophilia: a systematic review of methodologies and findings*, Haemophilia, (2012), 18, el0l-el 14

AL Forsyth, et al., *Difficult clinical challenges in haemophilia: international experiential perspectives*, Haemophilia (2012), 18 (Suppl. 5), 39-45

Young, G., Shapiro, A. D., Walsh, C. E., Gruppo, R. A., Gut, R. Z., & Cooper, D. L. (2012). *Patient/caregiver-reported recombinant factor VIIa (rFVIIa) dosing: home treatment of acute bleeds in the Dosing Observational Study in Hemophilia (DOSE)*. Haemophilia, 18(3), 392-399.

G Young, DL Cooper, RZ Gut and HTRS Investigators, *Dosing and effectiveness of recombinant activated factor VII (rFVIIA) in congenital haemophilia with inhibitors by bleed type and location: the experience of the Haemophilia and Thrombosis Research Society (HTRS) Registry (2004-2008)*, Haemophilia, Nov. 2012, at 18(6):990-6

Young, G., Solem, C. T., Hoffman, K., Kabawat, J., Pickard, A. S., Gut, R. Z., & Cooper, D. L. (2012). *Capturing daily assessments and home treatment of congenital hemophilia with inhibitors: design, disposition, and implications of the Dosing Observational Study in Hemophilia (DOSE)*. Journal of Blood Medicine, 131-138.

G Young, G Auerswald, V Jimenez-Yuste, T Lambert, M Morfini, E Santagostino and V Blanchette, PRO-PACT: retrospective observational study on the prophylactic use of recombinant factor VIIa in hemophilia patients with inhibitors, Thromb Res., Dec. 2012, at 130(6):864-70

Young, G. (2012). *From boy to man: recommendations for the transition process in haemophilia*. Haemophilia, 18, 27-32.

Neufeld, E. J., Recht, M., Sabio, H., Saxena, K., Solem, C. T., Pickard, A. S., ... & Cooper, D. L. (2012). *Effect of acute bleeding on daily quality of life assessments in patients with congenital hemophilia with inhibitors and their families: observations from the dosing observational study in hemophilia*. Value in Health, 15(6), 916-925.

Saxena, K. (2013). Barriers and perceived limitations to early treatment of hemophilia. Journal of blood medicine, 49-56.

RA Gruppo, CM Kessler, EJ Neufeld and DL Cooper, *Assessment of individual dose utilization vs. physician prescribing recommendations for recombinant activated factor VII (rFVIIa) in paediatric and adult patients with congenital haemophilia and alloantibody inhibitors (CHwI): the Dosing Observational Study in Hemophilia (DOSE)*, Haemophilia, Jul. 2013, at 19(4):524-32

EJ Neufeld, K. Saxena, CM Kessler, DL Cooper & HTRS Investigators, *Dosing, efficacy, and safety of recombinant factor VIIa (rFVI!a) in pediatric versus adult patients: the experience of the Hemostasis and Thrombosis Research Society (HTRS) Registry (2004-2008)*, Pediatr Blood Cancer, Jul. 2013, at 60(7):1178-83

AD Shapiro, EJ Neufeld, V Blanchette, P Salaj, RZ Gut and DL Cooper, *Safety of recombinant activated factor VII (rFVIIa) in patients with congenital haemophilia with inhibitors: overall rFVIIa exposure and intervals following high (>240 µg kg$^{-1}$) rFVIIa doses across clinical trials and registries*, Haemophilia, Jan. 2014, at 20(1): e23-31

Young, G., Tachdjian, R., Baumann, K., & Panopoulos, G. (2014). *Comprehensive management of chronic pain in haemophilia*. Haemophilia, 20(2), e113-e120.

duTreil, S. (2014). *Physical and psychosocial challenges in adult hemophilia patients with inhibitors*. Journal of blood medicine, 115-122.

Gomez, K., Klamroth, R., Mahlangu, J., Mancuso, M. E., Mingot, M. E., & Ozelo, M. C. (2014). Key issues in inhibitor management in patients with haemophilia. Blood Transfusion, 12(Suppl 1), s319.

28

SR Lentz, A Tandra, RZ Gut and DL Cooper, *A novel supplemental approach to capturing post-marketing safety information on recombinant factor VIIa in acquired hemophilia: the Acquired Hemophilia Surveillance project*, J. of Blood Med., Jan 2014

J Maahs, J Donkin, M Recht and DL Cooper, *Mixing and administration times of bypassing agents: observations from the Dosing Observational Study in Hemophilia (DOSE)*, J Blood Med, Aug. 20, 2014, at 5:153-6

M Recht, EJ Neufeld, VR Sharma, CT Soloem, AS Pickard, RZ Gut and DL Cooper, *Impact of acute bleeding on daily activities of patients with congenital hemophilia with inhibitors and their caregivers and families: Observations from the Dosing Observational Study in Hemophilia (DOSE)*, Value Health, Sept. 17, 2014, at (6):744-8

Forsyth, A. L., Gregory, M., Nugent, D., Garrido, C., Pilgaard, T., Cooper, D. L., & Iorio, A. (2014). *Haemophilia Experiences, Results and Opportunities (HERO) Study: survey methodology and population demographics*. Haemophilia, 20(1), 44-51.

Cassis, F. R. M. Y., Buzzi, A., Forsyth, A., Gregory, M., Nugent, D., Garrido, C., ... & Iorio, A. (2014). *Haemophilia Experiences, Results and Opportunities (HERO) Study: influence of haemophilia on interpersonal relationships as reported by adults with haemophilia and parents of children with haemophilia*. Haemophilia, 20(4), e287-e295.

Neufeld, E. J., Négrier, C., Arkhammar, P., el Fegoun, S. B., Simonsen, M. D., Rosholm, A., & Seremetis, S. (2015). *Safety update on the use of recombinant activated factor VII in approved indications*. Blood Reviews, 29, S34-S41.

Nugent, D., Kalnins, W., Querol, F., Gregory, M., Pilgaard, T., Cooper, D. L., & Iorio, A. (2015). *Haemophilia Experiences, Results and Opportunities (HERO) study: treatment-related characteristics of the population*. Haemophilia, 21(1), e26-e38.

Forsyth, A. L., Witkop, M., Lambing, A., Garrido, C., Dunn, S., Cooper, D. L., & Nugent, D. J. (2015). *Associations of quality of life, pain, and self-reported arthritis with age, employment, bleed rate, and utilization of hemophilia treatment center and health care provider services: results in adults with hemophilia in the HERO study*. Patient preference and adherence, 1549-1560.

Croteau, S. E., Nakar, C., Neufeld, E. J., Shapiro, A., & Cooper, D. L. (2016). *Safety and efficacy of recombinant factor VIIa by pediatric age cohort: reassessment of compassionate use and trial data supporting US label*. Pediatric blood & cancer, 63(10), 1822-1828.

Young, G., Escobar, M. A., Pipe, S. W., & Cooper, D. L. (2017). *Safety and efficacy of recombinant activated coagulation factor VII in congenital hemophilia with inhibitors in the home treatment setting: A review of clinical studies and registries*. American Journal of Hematology, 92(9), 940-945.

Neufeld, E. J., Négrier, C., Benchikh El Fegoun, S., Cooper, D. L., Rojas-Rios, A., & Seremetis, S. (2018). *Recombinant activated factor VII in approved indications: Update on safety*. Haemophilia, 24(4).

Kessler, C. M., Benchikh El Fegoun, S., & Worster, A. (2018). *Methodologies for data collection in congenital haemophilia with inhibitors (CHwI): critical assessment of the literature and lessons learned from recombinant factor VIIa*. Haemophilia, 24(4), 536-547.

Young, G. (2019). *How I treat children with haemophilia and inhibitors*. British Journal of Haematology, 186(3), 400-408.

Rajpurkar, M., Croteau, S. E., Boggio, L., & Cooper, D. L. (2019). Thrombotic events with recombinant factor VIIa (rFVIIa) in approved indications are rare and associated with older age, cardiovascular disease, and concomitant use of activated prothrombin complex concentrates (aPCC). Journal of Blood Medicine, 335-340.

29

## II.    Journal Supplements

| |
|---|
| Proceedings of the 9th Novo Nordisk Symposium on Haemostasis Management, November 15-16, 2007, Barcelona, Spain. Semin Hematol. 2008. PMID: 18705072 |
| Arthropathy Supplement - Journée Monothématique. Haemophilic arthropathy, from A to Z. Haemophilia. 2008;14(suppl 4):127. PMID: 18494686 |
| Haemophilia. 2008 Nov;14 Suppl 6:1-3. PMID: 19134025 |

## III.    Clinical Trials

| ClinicalTrials.gov ID | Study Title | |
|---|---|---|
| NCT00882778 | PROPACT: Retrospective Prophylaxis Patient Case Collection (PROPACT) | Doctors Michael Recht and Ronald M. Louie were noted to be investigators in this trial. NNICID-2198820.xls, NNICID-2198832.xls |
| NCT00710619 | Observational Patient Diary Study of Treatment Doses for Patients With Haemophilia With Inhibitors to Factors VIII and IX (DOSE) | Doctors Michael Recht and Ronald M. Louie were noted to be investigators in this trial. NNICID-2198820.xls; NNICID-2198832.xls |
| NA | HTRS | |

## IV.    Dr. Adriane Fugh-Berman Expert Report

*See* off-label journal articles, supplements, reprints and other materials addressed by the Expert Report of Dr. Fugh-Berman.

## V.    LA Kelley Book

LA Kelley's Book, "Managing Your Child's Inhibitor," 2010 LA Kelley Communications, Inc. was produced and distributed by LA Kelley Communications, Inc., with an unrestricted educational grant from Novo Nordisk Inc.[72]  The book contains a forward by paid Novo consultant Dr. Prasad Matthew.  It contains the following off-label messaging:

---

[72] Kelley-000090 *et seq*.

30

(1) Megadosing with NovoSeven at pp. 49-50;

(2) Higher doses at p. 218;

(3) Prophylaxis at pp. 54, 102, 192; and

(4) After ITI: Prophylaxis -- refers to returning to FVIII prophylaxis: at pp. 66 – 67

The book also contains messaging about the risk of FEIBA, referring to the anamnestic reaction occurring in patients with FVIII inhibitors. *Id.* p. 78. Moreover, it discusses Novo's Inhibitor Education Summits (pp. 178 – 179, 266), 2005 Consumer Council (pp. 265-266) and SevenSECURE programs (pp. 204, 208).

## VI.    MASAC Guidelines

MASAC Document #220 – MASAC Recommendation Regarding Prophylaxis with Bypassing Agents in Patients with Hemophilia and High Titer Inhibitors.

Relator reserves the right to supplement this Interrogatory should further information become available or learned in discovery.

Dated: October 21, 2024    Respectfully submitted,

*s/ Traci L. Buschner*
Reuben A. Guttman (*pro hac vice*)
Traci L. Buschner (*pro hac vice*)
Justin S. Brooks (*pro hac vice*)
Nancy Gertner (*pro hac vice*)
Elizabeth H. Shofner (*pro hac vice*)
Guttman, Buschner & Brooks PLLC
1509 22nd Street, N.W.
Washington, DC 20037
Tel.: (202) 800-3001
Fax: (202) 827-0041
rguttman@gbblegal.com
tbuschner@gbblegal.com
jbrooks@gbblegal.com
ngertner@gbblegal.com

31

lshofner@gbblegal.com

Douglas C. McDermott, WSBA #31500
McDermott Asan, PLLC
Logan Building
500 Union Street, Suite 909
Seattle, WA 98101
Telephone: 206-949-3252
doug@mcdermottasan.com

Michael Burrage, (*pro hac vice*)
Patricia Sawyer, (*pro hac vice*)
Whitten Burrage Law Firm
512 North Broadway Ave
Suite 300
Oklahoma City, OK 73102
Tel.: (405) 516-7800
Fax: (405) 516-7859
mburrage@whittenburrage.com
psawyer@whittenburrage.com

**Attorneys for Relator Jamie Siegel, M.D.**

32

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 21, 2024 a true and correct copy of the Relator's Supplement to Her Responses And Objections To Defendants' Second Set Of Interrogatories Directed To Relator Jamie Siegel was served on the following by E-mail attachment.


<u>/s/ *Traci L. Buschner*</u>
Traci Buschner

| | |
|---|---|
| Jaime L.M. Jones (*pro hac vice*)<br>Matthew Bergs (*pro hac vice*)<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>Telephone: (312) 853-7000<br>jaime.jones@sidley.com<br>mbergs@sidley.com | John Wolfe<br>Aaron Brecher<br>Orrick, Herrington & Sutcliffe LLP<br>401 Union Street, Suite 330<br>Seattle, WA 98104-7094<br>Telephone:  206-839-4332<br>wolfe@orrick.com<br>abrecher@orrick.com |
| Mark P. Guerrera (*pro hac vice*)<br>Benna E. Jenny (*pro hac vice*)<br>Sidley Austin LLP<br>1501 K Street, N.W.<br>Washington, D.C. 20005<br>Telephone: 202-736-8000<br>mguerrera@sidley.com<br>bjenny@sidley.com | Matthew T. Kuehn<br>Karl F. Sloan<br>Naomi Smith<br>Assistant Attorneys General<br>Medicaid Fraud Control Division<br>PO Box 40114<br>Olympia, WA 98502<br>Telephone:  360-586-8888<br>Matthew.Kuehn@atg.wa.gov<br>Karl.Sloan@atg.wa.gov<br>Naomi.Smith@atg.wa.gov |

## VERIFICATION

I, Jamie Siegel, M.D., hereby declare under penalty of perjury that, subject to the objections stated therein, and to the best of my knowledge, information, or belief, the foregoing Relator's Supplement to Her Responses and Objections to the Defendant's Second Set of Interrogatories Directed to Relator Jamie Siegel are true and correct.

Date:   October 25, 2024

Jamie Siegel, M.D.

# Exhibit 9



**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

# *2011 Inhibitor Education Summits*

Evaluation Summary from activity held
July 14-17, 2011 in San Francisco, CA

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209868



**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

## Contents

Executive Summary ............................................................................. Section I

Program Summary ............................................................................. Section I

Evaluation Tool ............................................................................. Section II

Patient Demographics and History ............................................................ Section III

Faculty ............................................................................. Section IV

Summit Expectations ............................................................................. Section V

Summit Effectiveness ............................................................................. Section VI

Future Educational Topics ............................................................ Section VII

Comments ............................................................................. Section VIII

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE          NNICID-0209869

**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

## Executive Summary

The National Hemophilia Foundation (NHF) presented the second of two Inhibitor Education Summits people with hemophilia A or B with inhibitors and their families/support network on July 14-17, 2011, in San Francisco, CA.

99 families attended the San Francisco Summit – this reflected 322 total family participants. Evaluation surveys were received from 153 participants.

To assist NHF in evaluating the effectiveness of this activity and to make recommendations for future educational offerings, participants were asked to reflect carefully and complete the evaluation form for this activity.

**Target Audience**: The intended learners for the Inhibitor Education Summits are people with hemophilia with inhibitors and members of their support network interested in the comprehensive management of hemophilia with inhibitors. Patients must deal with the emotional and physical impact of this disease, integrating it into the fabric of every stage of their life. Families and members of a patient's support network must be educated on the issues before facing these patients these patients in order to facilitate acceptance and encourage proper management of their bleeding disorder.

## Program Summary

**Registration Information:** There were 104 families pre-registered for the activity.

- Final attendance: 312 participants (families and support people)

    o 99 families attended

        ▪ 5 families cancelled due to illness or no-shows

    o 23 families had never attended a Summit before, representing 23% of the audience

    o 76 families previously attended a Summit (2005-2010)

    o 8 professionals attended (NNI, healthcare professionals, NHF chapter representatives)

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209870



**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

  o   19 faculty members

**The families in attendance were from the following locations** (# of families from each state):

| | | |
|---|---|---|
| AL (3) | KY (3) | NV |
| AR (3) | MA (3) | NY (5) |
| AZ (4) | MD | OH |
| CA (23) | MI (3) | OK (2) |
| CO (4) | MN (3) | PA (3) |
| CT | MO (2) | TN |
| FL (2) | MS (5) | TX (3) |
| GA (2) | NC (2) | UT |
| IA | NE | VA (2) |
| ID | NH | WA |
| IL (3) | NJ (4) | WI (3) |
| IN | NM (2) | |

**Hemophilia Treatment Centers represented included** (PLEASE NOTE: HTC information taken verbatim from registration information entered by participant. Duplicates could exist):

- Children's Hospital Birmingham, AL HTC
- Vanderbilt Medical Center Nashville, Tn
- Children's Rehabilitation Services
- Arkansas Bleeding Disorders Treatment Center
- UT Southwester Medical Center in Dallas, TX
- Arkansas Children's Hospital, Little Rock, AR
- Phoenix Children's Hospital
- Phoenix Children Hospital
- University Medical Center
- Arizona Hemophilia and Thrombosis Center Tucson, AZ
- children hospital los angeles
- Children hospital Los Angeles
- UCSF Hemophilia Treatment Center
- Stanford Hematology: Lucille Packards Childrens Hospital
- UCD California
- CHOC
- Childrens Hospital of Orange County
- CHLA
- CHLA
- UCSD Hemophilia Treatment Center
- Childrens Hospital Los Angeles
- ucla medical clinic
- Kaiser Permanente, Fontana, CA
- Randy's Childern Hospital San Deigo
- City of Hope in Duarte, California
- Los Angeles Children Hospital
- Children's Hospital
- Children's Hospital Orange County
- Universidad de Puerto Rico Recinto de Ciencias Medicas Escuela de Medicina Rio Piedras P.R.
- UCD Hemophilia Treatment Center, Sacramento, Ca.
- U.C Davis
- UCSF - San Francisco
- HEMOPHILIA & THROMBOSIS CENTER. UNIVERSITY OF COLORADO

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE            NNICID-0209871



**NATIONAL HEMOPHILIA FOUNDATION**

*for all bleeding and clotting disorders*

- University of Colorado Denver Hemophilia and Thrombosis Center
- Mountain State Hemophilia and Thrombosis Center
- Rocky Mountain Heophilila and Thambosis Center
- NY Pres - Cornell Weil
- Jackson Memorial
- Baptist Hospital
- Medical College of Georgia Augusta, Georgia
- Aflac Cancer Center and Blood Disorder
- Mayo HTC in Rochester, MN
- Sacred Heart Spokane, Wa.
- RUSH HTC
- childrens hospital
- Rush in Chicagom IL
- Indiana Hemophilia and thrombosis center
- Bleeding and Clotting Disorders Institute Peoria, IL
- University of Kentucky
- Louisville Pediatric Hematologists
- Boston childrens Hospital
- Boston Hemophilia Center
- Children's National Medical Center
- DeVos Children's Hospital, Grand Raids, Michigan
- Children's Hospital of Michigan
- Henry Ford Hospital Detroit
- Children's Hospital MPLS., MN
- Fairview University Mpls. Minnesota
- Rochester
- Cardinal Glennon
- Cardinal Glennon
- St Jude
- St. Jude Children's Research Hospital
- U.T. University of Tennessee
- University of Tennessee
- St. Jude Memphis,TN
- Brenner Children's HospitalWake Forest Univ. Baptist Medical Center
- University of North Carolina at Chapel Hill
- Rocky Mountain Hemophilia and Thrombosis Center
- Darthmouth Hitchcock Medical Center
- Newark Beth Israel
- Newark Beth Israel
- New York Presibitarian
- robert wood johnson new brunswick nj dr. susan murphy
- Ted R. Montoya HTC, Albuquerque, NM
- Ted R. Montoya
- n/a
- Long Island Jewish
- Mount Siani Hospital
- HTC at Columbia Presbyterian
- Long Island Jewish Medical Center
- Mary M. Gooley Hemophilia Center
- University of Cincinnati
- Oklahoma/OU Childrens Hospital Jimmy Everest Center for cancer and blood disorders
- Oklahoma Center for Bleeding and Clotting Disorders
- Jefferson
- vanderbilt childrens hospital
- Cook Childrens Hospital, Fort Worth, TX
- Dell Children Hospital Austin Texas Specially for children
- Specialty Clinic at Cook Children Medical Center
- Utah
- mvc richmond va
- Children's Hospital of the King's Daughters, Norfolk, VA
- New York Hospital
- Wisconsin Blood Center

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209872



**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

- Children's Hospital of Milwaukee
- Blood Center of Milwaukee/Children's Hospital of Milwaukee WI

**Youth Camp/Child Care**

The Youth Camp program this year was provided by Creative Kids Events, with workshops provided by Summit faculty throughout the weekend, including physical therapists and a nurse. In San Francisco, there were more than 100 children who participated in the Youth Camp program.

**Onsite Exhibitors**

There were three Exhibitors onsite at the San Francisco Summit: NHF, The Changing Possibilities Coalition, sponsored by Novo Nordisk, and SevenSecure.

**Participant Communication Materials**

The following outlines the communication materials distributed to participants:

- *Travel Confirmation Packet* (mailed via express mail 2 weeks prior to the meeting): confirmation letter, breakout descriptions, childcare information, flight and ground transportation confirmation, TSA guidelines for travel with medication, Summit Travel Check List, reimbursement guidelines

- *Program Book* (distributed onsite): Name badge, confidentiality form, program evaluation, childcare information, hotel map, program agenda, reimbursement guidelines, session descriptions, and speaker presentations available at the time of printing

**Faculty for the San Francisco Summit included:**

Jennifer Donkin, RN CPNP
Childrens Hospital Los Angeles
Los Angeles, CA

Angela Forsyth, PT, DPT
Penn Comprehensive Hemophilia &
Thrombosis Program, University of
Pennsylvania
Philadelphia, PA

Sue Geraghty, RN, MBA
Mountain States Regional Hemophilia and
Thrombosis Center
Aurora, CO

Charles P. Gilbert II, ACSW
Hemophilia Center of Central Pennsylvania
Hershey Medical Center
Hershey, PA

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE          NNICID-0209873

**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

**Chris Guelcher, MS, PNP-BC**
Children's National Medical Center
Washington, DC

**Heather Huszti, PhD**
Children's Hospital of Orange County
Orange, CA

**Janna M. Journeycake, MD, MSCS**
Bleeding Disorders and Thrombosis
Program, Children's Medical Center
Dallas, TX

**Susan Knight, PT**
Children's Hospital Los Angeles
Los Angeles, CA

**Marion Koerper, MD**
National Hemophilia Foundation
New York, NY

**Heidi Lane, PT, DPT, PCS**
Mountain States Regional Hemophilia
Treatment Center
Salt Lake City, UT

**Alice Ma, MD**
University of North Carolina at Chapel Hill
Chapel Hill, NC

**Samir Mehta, MD**
Hospital of the University of Pennsylvania
Philadelphia, PA

**Georgia Panopoulos, PhD**
Fairview Pain Management Center
Minneapolis, MN

**Michelle Rice**
National Hemophilia Foundation
New York, NY

**Cathy Tiggs-Johnson, MSSA, LSW**
UH Case Medical Center, Rainbow Babies &
Children's Hospital
Cleveland, OH

**Leonard Valentino, MD**
Rush Hemophilia and Thrombophilia Center
Chicago, IL

**Silvia Vega, BA, ACCW**
Childrens Hospital Los Angeles
Los Angeles, CA

**Guy Young, MD**
Childrens Hospital of Los Angeles
Los Angeles, CA

**Nick Zourikian, PT**
St. Justine University Hospital
Montreal, Quebec

**Educational Session Attendance**

NHF implemented an incentive program to encourage attendance at educational
sessions. The incentive program provided for entry into a raffle for an iPad for those
participants who attended a minimum of 70 percent of the educational sessions. At this
Summit, **179 adults** (age 13 and older) participated in the raffle by attending a minimum
of 8 of the 11 educational sessions.

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209874



**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

## Evaluation Tool

The Evaluation Tool can be found in the pages that follow.

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                    NNICID-0209875

**2011 INHIBITOR EDUCATION SUMMIT**
San Francisco, CA  ·  July 14–17, 2011
**Participant Evaluation Form**

**Participant Demographics**

| | |
|---|---|
| **What is the patient's age range?** ☐ 0-3    ☐ 4-12    ☐ 13-17    ☐ 18-22    ☐ 23-39    ☐ 40+ | |

**What is the patient's age range?**
☐ 0-3    ☐ 4-12    ☐ 13-17    ☐ 18-22    ☐ 23-39    ☐ 40+

**What type of congenital hemophilia does the patient have?**        ☐ A        ☐ B

**The patient's titer is:**  ☐ Under 5 BU        ☐ 5 BU and over        ☐ Inhibitor has been tolerized

**Has the patient tried Immune Tolerance Induction (ITI)?**        ☐ Yes        ☐ No
**If yes, how many times? _____    If yes, what was the outcome?** ☐ Successfully Tolerized        ☐Failure

**The patient uses bypass therapy:**

☐ To treat bleeds        ☐ For prophylaxis        ☐ For episodic prophylaxis        ☐ Not using

**Please answer the following questions if you are a caregiver and/or support person:**

**What caregiver/support person role do you hold?**

☐ Father        ☐ Mother        ☐ Spouse        ☐ Sibling        ☐ Other (please specify): _____

**What is your age range?**

☐ 13-17        ☐ 18-22        ☐ 23-39        ☐ 40+

**Please list the challenges you face as a caregiver and/or support person:**

**Please list all the personal changes in your caregiver and/or support person responsibilities that you are planning to make as a result of this summit:**

**Please answer the following questions if you are a person with hemophilia with inhibitors:**

**What is your age range?**

☐ 13-17        ☐ 18-22        ☐ 23-39        ☐ 40+

**Please list the challenges you face as a person with hemophilia with inhibitors:**

**Please list all the personal changes that you are planning to make as a result of this summit:**

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209876

**Which summits have you previously attended:**

❑ First time attendee

| **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
|---|---|---|---|---|---|
| ❑ Philadelphia, PA | ❑ Baltimore, MD | ❑ Dallas, TX | ❑ Denver, CO | ❑ Hollywood, CA | ❑ Houston, TX |
| | ❑ Dallas, TX | ❑ Nashville, TN | ❑ Birmingham, AL | ❑ Washington, DC | ❑ Boston, MA |
| | ❑ Chicago, IL | ❑ San Diego, CA | ❑ Philadelphia, PA* | ❑ Indianapolis, IN* | ❑ Miami◊ |
| | ❑ Anaheim, CA | | ❑ Chicago, IL* | ❑ Portland, OR* | |
| | | | ❑ Dallas, TX* | ❑ Atlanta, GA* | |

*Adult summits        ◊Spanish Summit

**How did you hear about the summits?**

❑ HTC or Healthcare Professional     ❑ NHF Website     ❑ NHF     ❑ NHF email     ❑ Summit Website

❑ Summit Flyer          ❑ Other (please specify): _____

**I am interested in learning through:**
**Please rank the following using a scale of 1 to 5: 1=Least Preferred and 5=Most Preferred. Circle your response.**

| | | | | | |
|---|---|---|---|---|---|
| Conference/workshop | 1 | 2 | 3 | 4 | 5 |
| Online | 1 | 2 | 3 | 4 | 5 |
| CD-ROM/DVD | 1 | 2 | 3 | 4 | 5 |
| Magazine/journal supplement | 1 | 2 | 3 | 4 | 5 |
| Podcast | 1 | 2 | 3 | 4 | 5 |

**Teaching Effectiveness**

**Please use the following codes to evaluate: 1=Poor 2=Fair 3=Good 4=Very Good 5=Excellent. Circle your response.**

| Faculty | Appropriateness of Presentation Format | | | | | Comments: |
|---|---|---|---|---|---|---|
| Sherill Diller, PhD | 1 | 2 | 3 | 4 | 5 | _____ |
| Jennifer Donkin, RN CPNP | 1 | 2 | 3 | 4 | 5 | _____ |
| Angela Forsyth, PT, DPT | 1 | 2 | 3 | 4 | 5 | _____ |
| Sue Geraghty, RN, MBA | 1 | 2 | 3 | 4 | 5 | _____ |
| Charles P. Gilbert, II, ACSW | 1 | 2 | 3 | 4 | 5 | _____ |
| Chris Guelcher, MS, PNP-BC | 1 | 2 | 3 | 4 | 5 | _____ |
| Heather Huszti, PhD | 1 | 2 | 3 | 4 | 5 | _____ |
| Janna M. Journeycake, MD, MSCS | 1 | 2 | 3 | 4 | 5 | _____ |
| Susan Knight, PT | 1 | 2 | 3 | 4 | 5 | _____ |
| Marion Koerper, MD | 1 | 2 | 3 | 4 | 5 | _____ |
| Heidi Lane, PT, DPT, PCS | 1 | 2 | 3 | 4 | 5 | _____ |
| Alice Ma, MD | 1 | 2 | 3 | 4 | 5 | _____ |
| Samir Mehta, MD | 1 | 2 | 3 | 4 | 5 | _____ |
| Georgia Panopoulos, PhD | 1 | 2 | 3 | 4 | 5 | _____ |
| Michelle Rice | 1 | 2 | 3 | 4 | 5 | _____ |
| Cathy Tiggs-Johnson, MSSA, LSW | 1 | 2 | 3 | 4 | 5 | _____ |
| Leonard Valentino, MD | 1 | 2 | 3 | 4 | 5 | _____ |
| Silvia Vega, BA, ACCW | 1 | 2 | 3 | 4 | 5 | _____ |
| Guy Young, MD | 1 | 2 | 3 | 4 | 5 | _____ |
| Nick Zourikian, PT | 1 | 2 | 3 | 4 | 5 | _____ |

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209877

**Summit Expectations**

**Indicate on a scale from 1 to 5 the extent to which this summit met your expectations. Circle your response.**
**Please use the following codes to evaluate: 1=Strongly Disagree 2=Disagree 3=Neutral 4=Agree 5=Strongly Agree**

| | | | | | | |
|---|---|---|---|---|---|---|
| I liked the schedule format. | 1 | 2 | 3 | 4 | 5 |
| I liked the location of the summit. | 1 | 2 | 3 | 4 | 5 |
| The summit included opportunities to learn interactively from faculty and participants. | 1 | 2 | 3 | 4 | 5 |
| Making my travel arrangements was easy. | 1 | 2 | 3 | 4 | 5 |
| I used the Summit Travel Checklist and thought it was helpful in planning my trip. | 1 | 2 | 3 | 4 | 5 |

**Summit Effectiveness**

I will change the way I treat my bleeds.                                ❑ Yes   ❑ No

What I liked most about the summit:

What I liked least about the summit:

What percentage of the information of this summit was new to you?

❑ 0-20%      ❑ 21-40%      ❑ 41-60%      ❑ 61-80%      ❑ 81-100%

Please list 1-3 topics that provided new information to you:

What topics will you discuss with your physician after the summit?

**Future Educational Topics**

Please list any other topics you would like to see in future educational activities:

_____

_____

_____

Do you have any suggestions for improving this or future activities?

_____

_____

_____

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                              NNICID-0209878

Additional comments:

_____

_____

_____

_____

_____

| You have permission for NHF or a designated third party to contact me in approximately 4-6 weeks to determine if I have changed the way I manage my bleeding disorder as a result of this activity.  ❑ Yes  ❑ No |
|---|
| Please contact me by:    ❑ Email    ❑ Fax    ❑ Phone    ❑ Mail |

| Name: | Email: |
|---|---|
| Street Address: | City:          State:          Zip Code: |
| Phone: | Fax: |

**Please return this completed form to the NHF Registration Desk. Thank you.**

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209879

**NATIONAL HEMOPHILIA FOUNDATION**

*for all bleeding and clotting disorders*

## Patient Demographics and History

Of the patients in attendance, the patients experience living with inhibitors ranged from 0-3 years to 40+ years. There were 92 patients with hemophilia A, and 9 patients with hemophilia B represented within the 97 families in attendance.

The following pages provide a graphic representation of the patient demographics and history.

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209880



NNICID-0209881

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209882

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209883

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

## Has the patient tried ITT?

95 — Yes

41 — No

NNICID-0209884

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



**If the patient has tried ITT, how many times?**

NNICID-0209885

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



If the patient has tried ITT, what was the outcome?

NNICID-0209886

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209887

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



**What caregiver/support role do you hold?**

■ Father ■ Mother ■ Spouse ■ Sibling ■ Other

52%

27%

10%

5%

6%

NNICID-0209888

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209889

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

**Caregiver and or Support Person**

**Please list the challenges you face as a caregiver and/or support person**

- Knowing how to handle pain
- Keeping him slowed down
- Venous access
- Emotional challenges
- Keeping a normal lifestyle
- Venous access
- Emotional challenges
- Keeping a normal lifestyle
- Not always understanding the hemophilia terms/lingo
- Stamina
- Aging
- Parent/caregiver
- Aging parent
- Sometimes just letting go of the situation and understanding his pain
- Time – work/family
- Daily injections
- Bleeding
- Live with a sibling with hemophilia
- I'm a carrier as well
- Live with a sibling with hemophilia
- The challenges I face in being a support person is I hate seeing people having to go through it
- Fear of the unknown, stress, worry, retrovirus inhibitor
- Fear of serious bleeds – ICH
- Hospitalizations
- ITI – length of process
- Immunosupression
- Marital stress, financial stress, guilt, balancing work and home life
- Mental fatigue/time loss/strain on relationships
- Physical abilities to handle all of his needs
- Time off work to care for bleeds
- Dealing with difficult behavior from son in a lot of areas, not just treatment
- Sibling rivalry or issues with siblings without hemophilia
- My son is having problems with withdrawal symptoms – using pain killers
- To stop bleeds at the knee area (target point [sic])
- Providing insurance
- Inhibitor coming back and making sure he maintains good veins

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209890

- The pressure of time for infusion and always on the lookout for injuries when he is playing sports
- Employment-related issues (time off to go to the hospital, conferences ...)
- No knowing how my son feels (unable to relate)
- Discipline limitations
- Time management, work schedule
- Dealing with children and siblings' emotions about hemophilia
- Getting his physician on board to new treatments and surgeries
- Overwhelmed
- Underinformed
- My lack of phlebotomy skills
- Insurance fears restricting employment changes or waiting or to go back to school
- Not have time for myself sometimes and doing things not by schedule
- I've had to take many days off from work and am struggling with bills. But I love my son and wouldn't trade him for the world
- Lack of sleep, lack of time
- Some communication skills are lacking
- Self-discipline, more knowledgeable, more focused
- Hitting the vein each time
- Balancing attention to my daughter and son
- Not being close enough to help my sister when she goes into the hospital with my nephew and being able to be more mobile as a support person
- Teaching my son to infuse himself
- Infuse my son as soon as the bleeding starts
- Worry about my son's physical condition getting worse
- His pain – I wish it could  be all my pain
- Balancing family
- When a "unique" situation comes up – no one really knows answers. I understand why, but I don't want to make the choices
- I don't know as much as I probably should
- Being able to treat bleeds
- As the wife of a man with hemophilia, it can be a challenge to let him treat himself the way he best sees fit. I want him to do things one way and he may choose another. Also, not being able to do all things as a family with our kids.
- Time to infuse
- Pain of my son
- Cost of treatment
- Prevent joint damage
- Trying to prepare myself for teaching son independence
- Inhibitor for two years – treat at home, but [it] is getting difficult

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209891

- My son faces the challenge of not being able to play sports, etc.
- Son is now 18 and community less about hemophilia
- Staying organized and on top of responsibilities
- Financial
- Remain positive
- Cost
- Infusing on a daily basis is difficult, may have to switch to twice daily
- Immune tolerance is not working as hoped
- Not knowing how/when to treat
- Travel expenses to/from HTC – distances
- Support people for time off – infusions, appointments, etc
- Lack of a dedicated hemophilia doctor at the HTC
- Ability to connect to other parents on a real time basis
- Stress
- Feeling alone
- No support system
- Time and sudden schedule changes
- When it's serious or not. Sometimes he's faking how bad it is (a bleed) or deciding to stay home from work because of a bleed
- It's always a challenge to maintain a balance between being "supportive" and overbearing/intrusive. Accepting limitations on physical activities is always a challenge but part of the "rich tapestry" of our life together
- Listen to him
- Being able to let him go
- Let him own his disease (continue to encourage)
- Be on top of my 14 year old to factor.
- Caring as a single parent with my daughter and son when injuries occur
- Making sure I'm doing everything that is necessary to be there for my son when things occur
- Educating my son at best to my knowledge for him to be the best in situations with his condition
- I have two sons with hemophilia A severe and one without. I also have one son with inhibitors and one without so balancing family life is challenging
- Isolation from friends/family which leads to a poor support system
- Emotionally frustrating giving meds
- Getting medical personnel to listen to evidence presented
- Doing most the heavy lifting
- [Patient] doesn't always communicate the details of how bad it is or how bad the pain is
- Hematologist (lead) from HTC has left – no direction
- Living 2 hours from HTC, rural relationship
- Monthly bleeds and being in the hospital
- As a caregiver it is hard to see my son in pain

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209892

- Our son has allergic reactions to Factor 9
- Scheduling, work
- Exhaustion – NovoSeven 3 hour life
- Understanding options when bleeding
- Balancing work, motherhood, bleeds, life
- My only challenge is my two sons are the only ones in my family who have hemophilia and I am the only one who learned to infuse. The kids did learn to infuse themselves at camp
- Infusion as soon as possible on bleeding occurrence
- Transition
- Insurance changes
- College issues
- Surgeries with hemophilia with inhibitors
- Seeing my son in pain!
- Time to treat
- Cost to insurance
- Life changes due to medical conditions
- I'm getting older
- Too many responsibilities
- Finding balance
- Giving up control
- Anxiety and fear of future brain bleeds or joint bleeds
- Feeling like all care falls on me
- Balancing imposed limitations and freedom to explore
- More information at each meeting
- The responsibility of dosing factor on time
- Discipline
- Being a male and the preconceived notions
- Talking to my kids about things they can't do
- Need to remind him to self-infuse as he neglects to do it at times
- Need to personally follow up with HTC to understand his progress even though he is 19 years old because we do not receive feedback about his visits from him
- Time
- Financial
- Sharing
- Understanding
- Dealing with the siblings that I care for when one is the hospital
- 2 grandsons have hemophilia, one has inhibitor
- No one else understands!
- Managing bleeds and attempting to limit
- Just him having to deal with having hemophilia

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209893

- Infuse more often
- Bleed more often
- Pain management
- Taking time off work when my son has a bleed or port infection
- Financially supporting a family with the high medical bills
- Exercise
- Nutrition
- Exhaustion
- Difficult decision making
- I do not know how to infuse my nephew if I needed to
- Living in a rural community is an issue – we live currently two hours from a treatment center
- Just trying to stay on top of things
- A lot of responsibility stress and disciplining them, maintaining my sanity at home
- I have no other family or friend support to help treat our sons. My husband will not participate or learn
- Rambunctious toddler
- Sullen teen
- Clueless young adult
- Timely infusion within minimum time of the bleeding occurrence
- Letting go
- For me being a mom is challenging enough, but learning what to do for your hemophilia child with an inhibitor adds to the worry and concerns
- Just trying to keep life a normal as possible
- Feel overwhelmed and not knowing when to stop treating – am I treating enough? Does he need other things like physical therapy?
- My challenges are no support systems for me as the caregiver – there are only two hemophiliacs within our area
- Keeping up with the infusion schedule
- Limited information
- Take time off work to take him to his clinic which is two hours away
- Economical support of the family
- Extensive time at the hospital
- Time away from our older son
- People understanding what hemophilia is and knowing that our son is not going to die just because he falls
- Communication
- How to support and show I care.
- How to understand the pain
- When I am enabling self-pity vs. encouraging success
- Having my child take care of himself

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                          NNICID-0209894

- Responsibilities – finding a balance
- Missing work – having my son come into my classroom
- Not knowing how to infuse
- Trying to keep hemophilia from overwhelming our family
- Maintaining health insurance and paying monthly premium
- Being able to tell when my child is hurt before he is limping
- Communicating with doctors
- Making others understand the challenges and risks my son faces
- Insurance
- My son often asks about future and hemophilia
- Questions about other kids activities
- Infuse him more often

**Please list all the personal changes in your caregiver and/or support person responsibilities that you are planning to make as result of this summit:**

- Be more observant and treat immediately
- Different discipline
- Be more empowered and not be afraid of things because of hemophilia
- Be more empowered and not be afraid of things because of hemophilia
- Make joint health and maintaining weight [a] top priority
- Determined to learn more and become more involved in advocating for my grandchildren
- Learning different techniques in caring and applying them
- Learning different techniques in treating bleeds
- Pain and what is new out there
- Continue to encourage him and be there for him
- Encourage him to exercise more and eat better – stay healthier
- Control the stuff I can control
- Investigate orthopedic surgery sites
- Investigate new treatment options
- More immune tolerance
- Experimental medication
- I'm better informed and can assist him better in the future. Plus I'll be a bit a more prepared in the case if I have any future children with hemophilia.
- I'm better informed and can assist him better
- To be a better sister and be the strongest person I can to try and help my brothers
- Try to control or limit fear (be proactive)
- Tolerize the inhibitor!
- Be more proactive with my child's school
- Be more organized and ready for an emergency situation

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE        NNICID-0209895

- Try to minimize stress, by taking care of myself as well
- Check into IEP plan and disability
- Realize that someone other than me can care for him just as well as I can and try to take more time for myself
- Talk to them about half-life study and what the treatment plan is if ITI is unsuccessful
- [Ask] what is my son's correction? Can we please have a fistula?
- Learned to manage time better
- Eat healthier and exercise
- Reduce the meal sizes, more exercise and more careful on meal choices
- Going to talk with HTC about other treatments, get more proactive in advocacy in getting my sons involved, as well
- Time management
- Deal with change better
- Speak with Dr. about other treatments
- Get boys more involved in the community
- Allowing him to become his own advocate and asking his physician about possible treating bleeds differently
- More careful about aseptic techniques (after other patients' horror stories)
- Applying pressure longer after infusing through port
- Eating healthier and making sure they stay active throughout their lives
- Keeping better logs
- Seeing what clinical trials are going on
- To get a hold of my chapter when we need help
- Continue to tolerize my son daily and treat bleeds with NovoSeven
- Take more time to care for myself
- Share more of what I feel and know
- Involve my son more in his factor preparation
- More effective discipline
- This was such a helpful seminar with so much great information for families to learn to be more present and tolerant. I will use the tools to become a better support person
- To put more responsibilities to my son about his health
- Get together with the entire treatment center and get an authorization from my insurance company to go back to visit CHLA treatment center
- Networking
- Ask many questions about my son's upcoming surgeries
- I plan to be more involved in order to help out more
- I want to get more involved with my sons, being able to do more
- Look at alternative IV access like a fistula, do a venogram to look at port function
- Change ITI regimen
- Getting son hooked up with a PT on a regular basis

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209896

- Getting son to be more involved with his treatment
- To be more compassionate and to try harder to get the ER personnel to include me re: decisions for my son
- I plan to change the way I approach situations
- I am going to introduce the Dalleotrain (sp?) ankle brace to help my son when at work and standing, elbow brace for target joint
- Getting my personal factor level checked
- Emphasize safer travel always in car, plane, etc by having emergency plan in place and always carry factor
- Become more positive, less negative
- I plan to involve my son more in setting up his factor, hopefully letting him become more independent in the future
- Make my sons more responsible for infusion setup
- Change my attitude towards making my sons feel "different"
- Recognize bleeds
- Wants vs should – time management
- Connect with other families to share stories
- I need to reach out to other moms (this is very hard to do)
- Try to be more social and connect with other mothers
- Follow up and active role in my son's treatment found to be still important
- I am inspired to try to find ways we can encourage each other to be "exercise buddies". (Simple but beneficial stretching exercises that strengthen muscle tone.)
- Find out more about a general practitioner that addresses medical care unrelated to hematology
- Let him be responsible for ordering supplies and organizing
- Let him take ownership and plan his PT, exercise, schedule his prophy
- Continue on (sic) being there for my son
- Using different strategies to educate him
- Be more understanding on (sic) his decisions
- Show him the responsibilities of making appointments with his hematologist, make his factor order and ask questions to his doctor about him
- Getting involved in local NHF
- Becoming a stronger advocate in my personal life and in the hemophilia community
- Take more time for myself to avoid taking frustration out on everyone around me
- Try and be more supportive
- Take over more often and not wait for permission
- Do a little more research on surgery and insurance changes
- We will be getting a second opinion from another HTC
- Take what my son has by the "horns"
- Be patient and ask questions

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                    NNICID-0209897

- Discipline changes
- Time management – longer time to heal after a bleed
- School advocating
- Wife – Infuse, Father-in-law – babysitting, Me – infuse, care
- 504
- Balance use of NovoSeven vs. opportunities of Factor 2, 10, 13
- Understanding challenges of prophylaxis
- Understanding challenges of NovoSeven and FEIBA
- I learn something each time. At this Summit, I leaerned about AVM regarding stomach bleeds and feel my son is now suffering this
- I will now learn to make the most of an amazing day. I will be more assertive and delegate more within my family
- I know signs of bleeds due to these Summits
- I will get medic alert bracelets for my sons
- Continue to delay any type of surgery
- Aiding with his surgery while at the same time battling insurance issues and college enrollment
- Be more supportive of his mother and understanding the everyday stresses she deals with
- Educate my son to advocate for himself
- 20 minutes a day for me
- More optimistic
- Instead of emphatically denying my son's desire to challenge his limits, I'll be more open-minded to letting him learn more things via personal experience
- Carrier testing for my daughter
- Learn more about the combination of FEIBA and rFVIIa and the need for factor XIII
- Positive discipline
- Using some of the tips and tricks for parents
- Lobbying my local reps regarding laws
- Continue to be very active in our son's treatment  and keep up to date with latest improvements as we still drive his care despite his passing into adulthood
- Talk more to my son – prepare him for pain time – enjoy time together
- Get more involved in the NHF to help with more resources in the New Jersey area
- Give more input for care of my son to physician
- Good school information if 504/IEP is needed
- Positive role model
- Make him more responsible
- Will try different methods for pain management – touch/massage therapy
- I have to have my son learn Veneous access
- Become more involved with the condition and the way it effects our lives – with my work schedule much of the stress and caregiving responsibilities falls on my wife
- Be stronger

- We are establishing a relationship with another HTC. Our current HTC does not have a hematologist specializing in hemophilia
- Consider ankle fusion, different ankle supports
- Encourage contact with peers (specific people I meet)
- Continue my HTC instructions and extent any time of invasive surgery
- More prepared with travelling arrangements
- How to better manage things in our life that aren't so important, dealing with tantrums and better educating our community.
- To let them make choices in their care and exercise more
- Keep in touch with families I met at the Summit
- Do my daily review
- I will take more time for myself so I can be a better care provider
- Work with the kids behavior
- Use new information to make better decisions in treatment
- A change in my daily life with more optimal approach – trust, patience, knowledge, hope
- How bleeding destroyed joints
- Better treatment for bleeds
- Perhaps provide support (babysitting, encouragement) to local families with hemophilia
- Go do my own thing. Let them go.
- Encourage my son to start taking care of himself
- Get a 504
- Learn how to infuse
- Try to be more patient
- Be more understanding and patient
- More involvement in our local hemophilia association
- Being more prepared to care for my son by being more educated on issues from having an inhibitor
- Take part in infusing more than I do
- Emergency procedures
- Managing time
- Insurance issues
- Genetic Testing

**Person with hemophilia with Inhibitors**

**Please list the challenges you face as a person with hemophilia with inhibitors:**

- Missing school/work
- Pain management
- Not going able to walk without crutches
- Everyday life – patient care at hospitals

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE     NNICID-0209899

- Work – finding the right job
- Stress
- Relationships – "personal"
- Lack of knowledge
- Control pain in joint, specially (sic) at ankles
- Stop taking pain killers. I feel bad if I don't take them
- Spontaneous bleeds, limited range in motion, knees and elbow
- Surgery options and finding HTCs/ortho docs who will work with me
- Treating effectively spontaneous bleeds
- Staying mobile and incorporating diet and exercise toward bleed prevention
- Really? I feel as a person with hemophilia I've spent my entire life living as normal as possible when you have issues you handle it and move on.
- When I have a bleed, infuse as soon as possible, rest in bed for a while
- Put ice in the joint that is bleeding
- Can't do thing that I want to do
- The unknown future
- Hearing the experiences from other families helps to prepare
- College and bleeding
- Keeping up with school work
- Controlling pain
- Getting to do the things I want
- Main personal challenge is not being able to exercise to improve the health and physical strength in fear of bleeding
- Playing violin/viola
- Exercise – body/target joints (elbows) – supination/pronation
- Lack of job opportunities because of bleeds
- Controlling bleeding
- Absences from school/work
- Simple movement
- Nose bleeds
- Arthritis
- Employment
- Surgery possibilities
- Insurance
- How my hemophilia affects my children
- I face constant bleeding in my knee and elbow. I have trouble standing and doing certain things for myself
- Daily infusions become a hassle
- I'm very new to hemophilia

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209900

**Please list all the personal changes that you are planning to make as a result of this summit**

- Keep exercising
- Relaxation techniques
- Connecting with organizations for social help
- Change in diet and fitness
- Relaxing
- Search for surgical procedures for implant surgeries
- Engage in a better relationship with my doctor
- Control of pain and use of braces at my ankle
- Finish the treatment to stop taking pain killers
- Total knee replacement
- I think I have found an HTC and ortho doc who will work with me!
- Try to become more active in the community
- Ask additional questions regarding trials in progress
- Getting involved way more
- Learning to infuse myself
- Talk with my hematologist by myself
- Dieting and start exercising slowly
- Exercise
- Look for the prophylaxis treatment that better fits my budget and health
- Eat better
- Exercise more
- Learn and share knowledge
- Be more patient
- Knee surgery?
- I plan on exercising more, to try and take better care of my joints; I would like to decrease the amount of joint bleeds that I have
- Better safety precautions
- Relaxation
- More advocacy work

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209901

**NATIONAL HEMOPHILIA FOUNDATION**

*for all bleeding and clotting disorders*

## Faculty

The following reflects the participants' evaluation of the faculty who spoke at the 2011 Inhibitor Education Summit in San Francisco, CA. Participants were asked to rate the faculty based on the content of their presentation, with 5=Excellent and 1=Poor.

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

119

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209902



**Teaching Effectiveness**

| Name | Score |
|------|-------|
| Sherill Diller, PhD | 4.6 |
| Jennifer Donkin, RN, CPNP | 4.5 |
| Angela Forsyth, PT, DPT | 4.5 |
| Sue Geraghty, RN, MBA | 4.6 |
| Charles P. Gilbert, II, ACSW | 4.4 |
| Chris Guelcher, MS, PNP-BC | 4.7 |
| Heather Huszti, PhD | 4.5 |
| Janna M. Journeycake, MD, MSCS | 4.7 |
| Susan Knight, PT | 4.6 |
| Marion Koerper, MD | 4.1 |
| Heidi Lane, PT, DPT, PCS | 4.5 |
| Alice Ma, MD | 4.6 |
| Samir Mehta, MD | 4.7 |
| Georgia Panopoulos, PhD | 4.5 |
| Michelle Rice | 4.7 |
| Cathy Tiggs-Johnson, MSSA, LSW | 4.7 |
| Leonard Valentino, MD | 4.7 |
| Silvia Vega, BA, ACCW | 4.4 |
| Guy Young, MD | 4.6 |
| Nick Zourikian, PT | 4.5 |

NNICID-0209903

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE


**Teaching Effectiveness - Faculty Comments**

**Janet Brewer**
- Excellent – love the fact that she is very knowledgeable and she has 2 boys with hemophilia
- By far the best presenter, provide an actual 504 plan to take away. Invaluable and something that no other presentation has done

**Sherill Diller, PhD**
- Excellent speaker! Pity a lunch presentation
- Entertaining but better at another time, not during lunch
- Great!!
- Good speaker
- Very energetic and inspiring
- Very positive
- Very entertaining and informative
- Fantastic motivational speaker
- Wonderful, entertaining
- Great speaker
- Dynamic and entertaining
- Loved this session
- I always enjoy her
- Wonderful speaker, great format and presentation
- Great real life experiences/advice
- Love her learning style info! 7 minutes a day
- Very motivational and well informed about the challenges of school and college students; a motivational topic about procrastination and time managements for the hemophilia community – perhaps in the future
- Was extremely motivating
- Very good session
- Excellence in organization
- Would love to hear more of her seminars
- Teaching was very interactive, very upbeat
- Phenomenal!!
- Energetic

**Jennifer Donkin, RN, CPNP**
- Good info on new developments
- Thought a dietician would make a more appropriate presenter
- Great discussion with speaker and parents
- Questions asked were good

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                                  NNICID-0209904

- Good views and conservative

**Angela Forsyth, PT, DPT**
- Great!!
- Very good, talked professional at a layman's level
- Excellent
- Clear – good about answering questions asked!
- Willing to adjust format to audience
- Like knowing presentation changes
- Helpful therapy insight
- Availability and support
- Loved the information provided

**Sue Geraghty, RN, MBA**
- Very informative
- Informative
- Good advice on nutrition
- Excellent
- Loved her personality and ability to explain
- Excellent!!!
- Very knowledgeable and accessible!!
- Amazing advocate
- Enjoyed the group discussion – great presenter
- Exercise and nutrition session was pretty elementary (would appreciate more direction, less discussion)

**Charles P. Gilbert, II, ACSW**
- Wasn't informative as he could have been
- Good advice over growing children
- He was good keeping energy up
- Good
- Not suited well for the teen speaking role
- The best question ever asked in a meeting ever!
- This guy is great!!
- Presentation materials for "Behind the Bedroom Door" were not well coordinated with co-speaker but Charles was very adaptive and professional
- Sufficient
- Love the way he speaks
- Great guy, very nice
- Talked down to children

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209905

- Enjoyed the group discussion – great presenter
- Isn't a good match for educating kids

**Chris Guelcher, MS, PNP-BC**
- Always informative
- Spent too much time with hearing patients' problems so we didn't have enough time to address the issues
- She was very informative, session wasn't long enough
- Lots of new information re: ports and AVF! Loved it!
- Tailored information to those in attendance
- Informative, enthusiastic, polite
- Exceptional communicator and teacher
- Very knowledgeable and encouraging
- Very helpful
- Very interesting to see the actual ports, Broviacs, etc.
- Very informative

**Heather Huszti, PhD**
- 5+++ -- attended other topics she presented
- Never enough Mom to Mom time
- Really liked her
- More for little children and toddlers
- Would be better in a more interactive format
- More interactive
- Absolutely FANTASTIC!
- Helpful tips I can use daily in my home
- Teaching was very effective/understanding
- Extremely funny and keeps you paying attention
- Mom to Mom – Not well planned – her slides in the agenda looked wonderful! All we did was go around the room and introduce ourselves – room not set up for intimate conversation
- Made everyone get involved!
- Excellent informational resources
- Easy to talk to
- Needed more time to talk about transitions
- She gave some great practice advice. Very encouraging session!
- Learned a lot

**Janna Journeycake, MD, MSCS**
- Great information
- Explain the immunosuppression very good

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209906

- Enjoyable and informative, great session
- Best explanation of inhibitors ever!
- Relates so well to people
- Knows how to talk with you
- Clear simple definitions
- Liked having pro/con perspective with G. Young
- Discuss more options
- Good informer
- Great speaker – want to hear more
- Almost put me to sleep

**Susan Knight, PT**
- Engaged crowd, answered question
- Didn't know how to handle the teen group
- Great discussion with speaker and parents
- A picture catalog (CD) would be valuable

**Marion Koerper, MD**
- Clear and efficient
- Little too much Dr. language, audio not loud enough
- New drug explanations and sources to find
- Great info, but terminology still too technical
- Over my head, monotone
- So very knowledgeable and wonderful at explaining
- Wonderful source of information
- No informative or enjoyable
- This session could have been helpful to many. However with the speaker's low energy, too much information, boring speech, many were left with nothing. This speaker didn't help newly diagnosed or people who have been living with inhibitors. It was too much information for newly diagnosed and not enough details on important info.
- Poor delivery
- Just didn't speak clearly. Too monotone
- Read from slides
- Enjoyed this, needed more time
- Good, a lot of information
- Loved wealth of information
- Not well prepared
- Very knowledgeable

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                    NNICID-0209907

- Very dry presentation, hard to pay attention, too technical – not everyone is an MD. Very rude when a topic I mentioned to her she didn't include when I brought it up to make others and herself aware of it
- Insulting to explain bypassing agents to a room of people whose only choice for bleed treatment is bypass agents. Then to say it is a drain on nursing staff to give every 2 hours – what about us parents who are giving it around the clock every 2 hours??
- Presenter a little dull and dry and info not new. Looking for information on advances and some optimism – this presenter was not this
- Incredible!! Knowledgeable, personable, effective
- Really wanted to know information that is realistic, not science behind it – how close are we to something new?!?
- Very clinical approach to session
- I learned an incredible amount from her!!
- Slightly too medical
- Best doctor I've met in 3 years

**Heidi Lane, PT, DPT, PCS**
- Some good on exercise therapy
- Instructor great, but health and nutrition didn't provide any new information for me
- She is great
- Informative and enjoyable
- Excellent
- Super – 3 stars!
- Very good, very informative
- Creative ways to get my child to eat healthy
- Very informative, good explanation
- Got down to some great answers
- Enthusiastic
- I like her explanations and teaching
- Great
- Find different presentation methods
- Orthopedic session was great!

**Alice Ma, MD**
- Interesting
- Interesting
- To the point, clear speaker
- Best explanation I've ever had about pain meds and bleeding
- Excellent. Very informative
- Very informative and good presentation

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209908

**Samir Mehta, MD**
- Good info
- Great!!
- Very good, talked professional at a layman level
- Very informative
- Good – thank you
- Very informative
- Good info, very clear, to the point, open minded
- He explained his plan well
- Very straight forward and concise. Clear and thorough
- Very informative – actually saw prosthetics
- Lots of insight
- He has so much experience
- Gave great insight into orthopedics
- Best orator, personable, knowledgeable
- Great
- Good information
- Very funny – I like doctors with a good sense of humor
- Shows tools and explains well
- Loved to see the products of replacement surgery
- Up to date on new medical practices, learned a lot from presentation
- Very informative
- Very informative
- Loved that he was so knowledgeable and sense of humor

**Georgia Panopoulos, PhD**
- Enjoyed techniques
- Really enjoyed her talk
- I learned ways to relax through pain and anxiety techniques
- Enjoyed it!
- Good
- Clear
- Very knowledgeable but focused on slides too much
- Too much selling
- Very helpful
- Need more time for this session

**Michelle Rice**
- Lot of new information, liked the handouts

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209909

- Great advocate!
- Super helpful, knowledgeable, selfless
- Went above and beyond to help us

**Cathy Tiggs-Johnson, MSSA, LSW**
- Great session on caregivers
- Love a longer session
- Help out with dealing with stress
- Great personality, made talk enjoyable and informative
- The very best ever!!
- Very informative
- New and important subject
- Good at making me think of new questions to ask Dr.
- Her topic about "Disclosure" should be at the main conference
- Great and important subject
- Open and honest!
- Lots of fun and learning to take back home
- Very informative with discipline ideas (loved it!)
- Loved the lecture
- Amazing work with teen relationships
- It was great, but pretty emotional to sit through (not much for clear problem solving direction)

**Leonard Valentino, MD**
- Very informative, but too negative about ports
- New info
- He was abrasive – annoyed when asked a question, but very informative. Moved fast, lots of info
- Why all the sex talk? He brought it up in other sessions as well
- Great info on ITI
- Enjoyable, great questions and answers
- Seems arrogant, very knowledgeable
- He was very good at getting people to talk
- Most knowledgeable, wish I lived in Chicago
- Thinks out of the box
- A wise medical doctor
- Awesome doc!
- He and Dr. Journeycake ran a great session!
- So informative and patient with questions
- Very informative
- Got all involved

- Very frank and comfortable person to talk to
- Advance reasoning – great
- Great speaker and teacher, very easy to listen to
- Need to grab audience more in SAFARI
- Good interactive technique
- It didn't really address our issue of Factor IX with inhibitor deficiency
- Very informative

**Silvia Vega, BA, ACCW**
- Very informative
- Great information, learned new things
- Wonderful moderator and speaker, kept on track
- Extremely informative
- Very sweet, very nice
- No slides in book, but good info
- My son is only 1 now, so school accommodations are still a long way off
- This subject should be geared more to kids a little older
- Great
- Her general presence was that she didn't want to be there
- New info that is useful for my child
- More time on Mom to Mom session
- Great
- Too long spent on introductions, nerve wracking!
- Kind and takes time to answer questions
- Help us with questions
- Very kind
- Terrific person
- Mom to Mom – too many moms for good discussion
- Great Mom to Mom session
- Good moderator
- Excellent on explanation (Spanish)
- Need more mom-to-mom sessions – good choice!

**Guy Young, MD**
- Very informative
- Great information, learned new things
- Expressed general feeling and warmth in presentation
- Very good, informative speaker. Helpful with questions
- Clear, informative
- Plain spoken – very informative. Love to attend his session

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209911

- Always enjoy him
- He is always willing to answer your question
- Informative
- Doesn't budge from his opinion
- Don't need companion presentation
- Stubborn and unwilling to consider other opinions than his!
- Great content, new info
- Kept everything together and on time
- Respectful and empathetic
- Great activity
- Certain questions should be left for one-on-one discussion
- He is funny and teaching is effective
- Loved wealth of information, insight
- Excellent
- The best doctor with lots of knowledge
- Gives great advice
- Gave great answers and listened to my concerns
- Explains info concisely and clearly and detailed
- Enthusiastic, interesting
- Like his analogies and practical application style
- Very interesting and new information
- Some information difficult to process
- Got new knowledge from his immunosuppression session
- Really informative and easy to understand
- The best orator of the summit
- Awesome! Good with patient – talks at their level – not condescending
- Always learn something new – great information
- Very clear and informative

**Nick Zourikian, PT**
- Did not have time for his presentation
- Good range of ideas
- Good info – needed to speak more
- "Behind the Bedroom Door" presentation was primarily for younger patients not as appropriate for 20+
- Too formal. Asking questions to get a full understanding feels awkward
- Explains things in a way ANYONE can understand
- Always upbeat and fun to listen to
- Great
- Enjoyed the group discussions – great presentation

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                        NNICID-0209912

**General faculty comments:**

- Not a loafer in the bunch
- I would like to learn more and meet more people from out of town
- Everybody is great. I appreciate everything they talk about and that they take the time to come and educate us.
- Everyone was great! God bless everyone!
- Enjoyed all of them
- Open, easy to understand
- Friendly and heartfelt
- I found all of the facilitators to be extremely knowledgeable and kept the learning environment interactive. Learning came from leaders and participants! The booklets were great resources to refer back to later
- Sonji Wilkes is a great facilitator!
- Missed Dr. Steven Pike and Dr. Prasad Mathew
- I had a chance to meet all of them. Great experience

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209913

**NATIONAL HEMOPHILIA FOUNDATION**

*for all bleeding and clotting disorders*

## Summit Expectations

Participants were asked to provide feedback on the program logistics. The following are their responses.

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209914

## Which Summits have you previously attended?

| Summit | Value |
|--------|-------|
| 2005 | |
| Philadelphia, PA | 12 |
| 2006 | |
| Baltimore, MD | 8 |
| Dallas, TX | 9 |
| Chicago, IL | 13 |
| Anaheim, CA | 9 |
| 2007 | |
| Dallas, TX | 14 |
| Nashville, TN | 16 |
| San Diego, CA | 26 |
| 2008 | |
| Denver, CO | 33 |
| Birmingham, AL | 15 |
| Philadelphia, PA (adult) | |
| Chicago, IL (adult) | 3 |
| Dallas, TX (adult) | 5 |
| 2009 | |
| Hollywood, CA | 45 |
| Washington, DC | 32 |
| Indianapolis, IN (adult) | |
| Portland, OR (adult) | 3 |
| Atlanta, GA (adult) | 1 |
| 2010 | |
| Houston, TX | 18 |
| Boston, MA | 67 |
| Miami (Spanish) | 3 |
| First time attendee | 36 |

NNICID-0209915

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



**How did you hear about the summits?**

HTC or Healthcare Prof   NHF Web Site   NHF   NHF e-mail   Summit Web Site   Summit Flyer

27%

10%

8%

14%

5%

16%

NNICID-0209916

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209917

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209918

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

## Summit Effectiveness

Participants were asked to respond to a series of questions about their educational experience.

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                              NNICID-0209919



**I will change the way I treat my bleeds**

■ Yes ■ No

55%

45%

NNICID-0209920

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE



NNICID-0209921

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

**Summit Effectiveness**

**What I liked most about the Summits**

- Being involved with other families
- Everything
- Dad to Dad
- Mom to Mom
- Information
- Information
- Very well coordinated
- Learning new information to talk to my hematologist
- Very well coordinated
- Meeting new people
- The panel of patients
- New drug info
- Treatment info
- Orthopedic info
- Going to San Francisco
- Mom to Mom but all of it was helpful
- Gathering with other families that share the same diagnosis and being able to share
- The focus on joints and how to care for my hemophilia
- Topics discussed and ability to pick and choose what I want to hear
- The topics and the ability to choose what I want to hear
- Family interaction
- Question and answer sessions
- Pain management education and disclosure
- Talking and meeting new people
- I loved the Embracing Change session as well as the Mom to Mom luncheon. Wonderful to hear compelling and empowering session
- Loved everything! Thank you!
- The location
- Enthusiasm of speakers and staff
- The guests, patrons, faculty
- Meeting people, talking to professionals from other treatment centers
- That you gave us the opportunity to learn and enjoy the city (we have more fun)
- Everything was perfect – A++
- The new information and the last dinner showing us the city – time to relax!!
- Meet people with different experiences, learn from them
- Doctors listen to your questions
- Learn about new upcoming drugs

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209922

- Refresh ways to get on a diet
- Good advice
- Doctors willing to listen and answer questions
- Great info on treatment
- Drugs in the pipeline
- Dealing with schools
- The information
- Great new info on treating bleeds
- Great info on school issues
- I guess learning exactly how other physicians treat bleeds
- So much information.
- Was so good at explaining why activity factor VII is hard to measure
- Hearing other experiences
- Learn more about meds
- The cruise ship
- Just being here I'm grateful for the experience and the people
- Interaction with the community. And the sessions that were upbeat and informative helps you feel empowered.
- Enjoyed counterpoint with clinicians
- The communication with everyone, they made me feel like family
- The verbal access to docs, PTs, and nurses
- Getting to meet new friends and to share like experiences
- Networking with others in the community
- Large amount of teens
- Sibling session!!!!
- The people
- Everything
- Everything
- I loved everything
- Different topics than last Summit (school, parenting, port examples)
- The compassion demonstrated from the administration level to the families, a real sense of community and genuine caring and commitment to bettering the lives of those affected by this illness
- I liked the session "Different Approaches to Treating Bleeding" – Dr. G Young, and "Summit Safari" Dr. L Valentino, and the session "Taking Responsibilities and Control" S. Vega
- Friends
- The various topics and instructors taking time to teach, ask and relate to parents
- Meeting and talking to other parents and attending the sessions – I like everything
- Information
- Informal/comfortable format

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- I will not change the way I treat my bleeds, but I will have great questions about treating it and changes
- The conferences were very helpful
- Being able to get information from others
- Sessions that were interactive are the most enjoyable. Sitting all day gets boring so we need some interaction to keep up attention spans.
- One-on-one conversations with the experts
- Reconnecting with old friends
- The opportunity to fellowship with others like us
- The location – my family had never been to CA before
- I hear from doctors and nurses all the time. I love getting the opportunity to talk with other moms
- Meeting new parents
- Good reminders
- Seeing the nurse in a different setting (Chris Guelcher)
- Great location
- Warm and knowledgeable speakers
- Different disciplines were presented
- The way the staff will talk with you away from sessions
- Point/counterpoint – because it's a small group and personal questions can/were answered effectively
- The educational summit is so helpful. Having access to the professionals and other families gives us better perspective on our family situation and a brighter outlook. Tremendous help!
- Venous access
- Learning about other families
- Networking with other families
- Meeting and interacting with the community and educational sessions
- Just the right mix of topics
- Meeting new moms
- New content
- The info was great! This was way better than what we get back home
- This is a unique opportunity to meet with others in the inhibitor community. We each contribute and put in a little. The end result is we come away with such a lot!
- Discussions with doctors
- There was more variety of options to choose on topics – this is great
- I like the Mom to Mom topic – this is great
- I like the topic about schools – more info should be given
- Meeting new parents
- Parenting Tips and Tricks
- Mom to Mom set up and time to talk

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- All the sessions
- Talking with other families and practitioners
- Learning about new treatments and strategies
- The social aspect – everyone's the same
- I thought the plenary session was interesting – I learned a lot about what [Patient] does at clinic because I can't always go with him
- All the details thought of ahead of time
- New developments and reuniting with families
- Everyone shared their stories
- The information
- Mom to Mom
- I liked the table sessions
- Rich Pezzillo is very interesting to listen to
- I like the HTC meeting scenario and Turn the Tables
- The format and the location
- Meeting other kids with the same problem
- Learned so much – like the detail and currentness of information presented – new to me
- Liked panel of parents too
- Knowledge of various options that may be available in future plus dos and don'ts
- Love the Overcomers
- Each session I learned something new
- Informational
- The location (SF), the hotel
- The organization of the program
- Being around others who know what I go through, good info given
- School plan for my son
- Mom to Mom – conversation between moms
- Chance to speak with other parents and doctors to get multiple opinions
- Speakers and great topics
- The Mom to Mom session
- The opportunity to network with people, education
- The relationships with other families and getting to see them
- Opportunities to hear what is new – meeting new people
- Some new information
- Networking
- Cutting-edge information
- Financial support
- The dinner cruise
- Saturday's dinner
- Learning about the combination of FEIBA and NovoSeven

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Content was good
- New content
- Embracing change
- Hotel
- Speakers
- Group activities
- Field activities
- Interaction with everyone
- Sessions available
- Give and take with physicians
- Being with others who understand life and being able to share tips and tricks with each other in sessions
- Great organization!
- Being able to interact with and meet other parents
- The levity in sessions
- Having copies of the PowerPoints
- Open discussion sessions
- Everything was great this year!!
- Meeting friends
- The immunosuppression lecture
- Flow of all the topics
- Exercise and nutrition
- Plenary sessions
- Keynote lecture
- Mom to mom
- More interaction with faculty and other parents and patients
- A lot of information was shared – I've learned a lot about hemophilia that I didn't know
- Learning from other people
- I appreciated the question and answer formats
- The talk about sex
- Listening to the experiences of others
- New information
- Different perspectives – not every HTC has the same approach
- Meeting people in the same boat
- Prosthetic replacement
- Topics were relevant
- Most speakers were very good
- Excellent choice of topics
- Information
- I liked the open floor discussions with all the other parents

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Ask the experts was very informative
- S. Diller keynote speaker – want to attend more seminars where she speaks
- Being able to have doctors to talk to one-on-one
- That everyone was very open and respectful of my feelings and needs
- The schedule
- Information provided in sessions
- Knowledge I gained
- Location
- We get a lot of good information
- Personal information
- Meeting people to relate to our same situation
- Great opportunity for family time and culture of a different city
- Everyone was open and knowledgeable with the information
- Treatment options: Now and Future
- Interaction with others in same situation. Helpful advice.
- Support
- Networking
- Encouragement
- There were a lot of teens
- Talking to families about different experiences – meeting new people
- The education
- Ability to talk to other families experiencing similar problems
- The information
- The knowledge I gained
- Talking to other parents in my situation
- New information
- 2nd opinions
- Meeting other families and hearing their stories
- Reimbursement (we could not attend otherwise)

**What I liked least about the Summit**

- Food
- Definitely the food and [being] rushed constantly
- Food and being rushed
- Psychosocial info
- Opening "simulated" clinic visit
- Having to go to 8 [sessions] for the iPad
- Would like more group [team] building projects
- Much material is repetitive

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- The lunch speaker – boring. Speaker was excellent but need a break to regroup.
- Weather!
- The food, long walk from room to elevator
- Nothing – continue the good work
- The food was bad. I'd have rather ate the kids food, but couldn't.
- The food was BAD! I would have eaten the kids food, but I was told I couldn't, so I just left.
- Some of the information was redundant
- Wished the little guys in daycare had more room to run around in.
- Breakfast options not so great for vegetarians … Hmmm … toast or pancakes. Could have used something like fresh fruit or oatmeal options.
- Did not get to talk that long
- Location of the hotel – no more downtown anywhere
- The greet and transportation was not a positive way to start the Summit
- Not enough days to spend
- The fact that it seems that which each Summit the oldest generation of patients are being looked over
- My room being on the other side of the tower from the elevators
- The food
- Food
- Need longer women to women, Dad to Dad
- The session "Venous Access and Infusion" – I think it needs more time
- Food
- Too many sessions
- Maybe incorporate a little more down time for resting/treating
- Food not so good this year
- I honestly can't think of anything
- The weather. But not really that big of a deal. Overall the Summit was a success
- The only issue was getting a shuttle to hotel from airport – waited over 1 hour and then caught a cab
- Cramped childcare room for ages 0-3
- Mom to Mom needs to be more about answering each other's questions and less about introductions
- Everything was excellent1 If I had to nitpick, I would say that the breakfast eggs didn't taste like eggs
- Not enough space for childcare! It seemed very cramped with not enough physical activity as in Boston. Drumming for the little ones was enjoyed.
- Food was bland
- Need longer breaks
- Not enough break time for free-talking with other families
- The food

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                NNICID-0209928

- Hotel reservations were messed up
- Sessions needed better descriptions
- The first room was very small for all of us. They should have put us in a bigger room right away
- Opportunities to just talk in an unscheduled way are limited. "Caregiver" and "Men to Men" opened a door and brought up excellent sharing/talking opportunities, but was cut short. In Portland, we walked/talked, and it was great!)
- Sharing information, Parents to Parents – treatment centers differ
- Some topics were written different but class was same [so I] got a little confused
- Difficult to pick up kids and get everything together – often not enough transition time at the end of the day before dinner
- The opening session – the "patient" was not exactly what I wanted my son to hear (pushing the limit too far and being detrimental to his health; didn't like the message about tattoos)
- The luncheon presentation should have been the opening
- Not enough time
- Maybe more structured activities for school age kids, more activities to do
- Some sessions seemed a bit long
- Food
- Could have some of the breaks [be] a little longer
- Sometimes there was not gap between two sessions
- Food – but I am picky
- Long meetings
- Very little programs for siblings who do not have hemophilia
- Not enough interaction between parents/caregivers
- A lot of the information presented is the same every year – medical science is moving slowly
- Some topics needed more time
- Not a lot of new information
- The weather
- Not much to do with kids at locations
- More descriptions of sessions in advance was needed
- Food
- Long days
- Severe parents always dominate discussion time
- The sessions were mostly back-to-back – maybe a little more time in between sessions
- The dinner choices
- It would be nice to have more time to share stories and experiences with other families
- Long days
- Lots of hills
- Need more time between sessions to process information
- The schedule
- Food

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209929

- The length of some of the sessions was too long.
- No pens available at one session.
- Did not like the mom to mom session – they spent too much time having everyone introduce themselves and not enough time to allow mothers to problem solve other's problems
- The first dinner – I wondered whether we would have to go out for meals
- There were times when I wanted to go to 2 simultaneous sessions
- The long period of lectures
- The tracks were confusing and didn't make sense for so few people
- The back-to-back sessions – not much of a chance for breaks
- That there was not more time – there were a few topics I wish we would have had more time
- Limited lunch choices
- The food
- No time for family city adventure
- Would like a longer break to visit my kids at daycare
- Some of the Track 4 presentations I was unable to attend because they were offered only once and conflicted with other sessions
- Very short breaks (probably necessary though)
- You don't have anything for siblings
- The uncomfortable chairs
- Most of the food
- The food
- The days are long – it would have been nice to have a little more time to stretch or walk
- The timing between sessions
- Public speaking

**Please list 1-3 topics what provided new information to you**

- Venous access (ports, PICC line)
- Civil rights
- Make the patient comfortable
- Time management
- Discipline
- Exercise and Nutrition
- Venous Access and Infusion Techniques
- Parenting Tips and Tricks
- Exercise and Nutrition
- Venous Access and Infusion Techniques
- Parenting Tips and Tricks
- Emergency Plan
- Navigating School Issues
- Mom to Mom

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209930

- Treating Difficult Bleeds
- Point/Counterpoint with Clinicians
- Different Approaches to Treating Bleeding
- Prophylaxis
- Immunosuppression
- Treating Difficult Bleeds
- Point/Counterpoint with Clinicians
- Different Approaches to Treating Bleeding
- CAM talk
- Exercise/diet talk
- Caregiver talk
- New drug Info – Ataluren
- Immune tolerance – Rituxan relapse rates
- Aptamers
- Experimental drugs
- Early Treatment of Bleeding and Prevention of Joint Disease
- Navigating School Issues
- Orthopedic Show and Tell
- Motivational speaker
- Gadgets and Gizmos
- Innovations in Surgery
- Identifying and Managing Pain
- Complementary Medicine
- Hemophilia and Aging
- Treating Different Bleeds
- Hemophilia and Aging
- Treating Different Bleeds
- Living with Hemophilia: Men Talking to Men
- Making Sense of Insurance
- New Drugs in Development
- Bypassing prophylaxis
- Different approaches to treating bleeding
- Disclosure
- What is an inhibitor?
- How to help my brother better
- Team Building
- Factor 13 therapy
- IEP Plan
- Patients with inhibitors are more susceptible to intercranial bleeds
- Factor 13

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209931

- Immune tolerance treatment results, etc.
- ITI
- Early Treatment of Bleeding and Joint Disease
- Sex for 16-19
- New Drugs in Development
- Sex and bleeds
- Factor XIII
- New Drugs in Development
- Sports and exercise and nutrition
- How to protect your joints
- Caring for the Caregiver
- Immunosuppressants
- New drugs
- Immunosuppression
- Care for caregivers
- New Drugs in Development
- Different Approaches to Treating Bleeding (sequential combo therapy)
- Immunosuppression
- New drugs
- Different Approaches to Treating Bleeding
- Immunosuppression
- Treating Difficult Bleeds
- New developments
- Caring for the Caregiver
- Understanding how bypassing agents work and why. They are so hard to test/manage.
- Ports – hearing the preponderance of port infections/problems
- I need to talk to my [NHF] chapter and learn more about meds
- Immune Tolerance (because I just started)
- Mom to Mom (I love this class and wish it was longer)
- Emergency Plans (I like to know I always have a plan A& B)
- Ortho gizmos
- I liked the addition of Positive Discipline and the plenary session but think questions from the audience should have been allowed.
- Everything that was discussed I had heard before, but I hadn't gone deep into conversation about ankle, knee and shoulder replacements
- Ortho surgery
- Keynote lecture
- Relaxing techniques
- New Innovations in Surgery
- Factor 13

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0209932

- Orthopedic treatments
- Grand Rounds
- Dad to Dad
- Exercise and Nutrition
- Mom to Mom
- Plenary Session
- Orthopedic Show and Tell
- Different Approaches to Treating Bleeding
- Venous Access
- Exercise and Nutrition
- School (IEP and rights)
- Arthritis vs. bleeds
- Plan for emergency
- Better record keeping
- Immunosuppression
- Overcomers
- Prophylaxis with Bypassing Agents
- New Drugs in Development
- Making Sense of Insurance
- Lot of support
- Navigating School Issues
- Different Approaches to Treating Bleeding
- Mom to Mom
- Factor 13 (recombinant) info
- Conferences about ports
- How to address things with teachers
- New drugs
- School awareness
- Tips and tricks for parents
- Innovations in Surgery
- Complementary Medicine
- Point/counterpoint
- Immunosuppression
- Positive discipline
- Exercise and Nutrition
- Early Treatment of Bleeding and Prevention of Joint Disease
- IEP plan
- AVF
- Ankle and wrist, elbow preventive methods
- 504 and vocation rehab programs that could have paid son's college tuition

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209933

- Emergency Plans
- Mom to Mom
- Different Approaches to Treating Bleeding
- Venous Access and Infusion Techniques
- Ports
- Venous access
- Plenary session was excellent to compare to our clinic experience
- Point/Counterpoint with Clinicians was great to get a second set of opinions as well as it helped to reinforce our treatment
- Venous Access – different options will hopefully help
- Treating bleeds
- Orthopedics
- New Drugs in Development
- Elective Orthopedic Surgery
- Treating Difficulty Bleeds
- Insurance
- Complementary Medicine
- New Drugs in Development
- Alternative treatments approach
- Immunosuppression Pro/Con
- Immune Tolerance Induction
- Different Approaches to Treating Bleeds
- Disclosure
- Point/Counterpoint
- Early bleeding and prevention
- Exercise and Nutrition
- Mock clinic was very informative!
- Dr. Ma gave excellent description of COX-II pain meds. Fusing ankles can provide relief and eliminate bleeds/pain. (Example: Arizona brace)
- ITI
- Factor 13
- Information from other parents and ITI treatments
- New drugs
- Ports
- Teen Transitions
- Positive Discipline
- Orthopedic Show and Tell
- School Issues (IEP/504/IHP)
- Treating my hemophilia child like other children
- Possible medications in upcoming years

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE     NNICID-0209934

- Plenary session
- Exercise and Nutrition
- Innovations in Surgery
- Venous access techniques
- Orthopedic Show and Tell
- Point/Counterpoint with Clinicians
- How to cope
- The changes in insurance
- Relaxation techniques
- Knowing that ankle fusion can be reversed
- Bypassing agents
- Mom to Mom session – no new info but "eye opening"
- Immunosuppression
- New Drugs in Development
- Embracing Change
- I now know that you don't have to be a carrier to have a child with hemophilia
- Discipline
- Joint treatment
- School advocacy
- School transportation issues
- Potential new treatments
- Transition topics
- Insurance
- Complementary Medicine
- Joints
- Challenges of using combination of NovoSeven and FEIBA at the same time
- Grand Rounds – concerns of range of motion
- Immunosuppression
- Different Approaches to Treating Bleeding
- New Drugs in Development
- Treating Difficult Bleeds
- Innovations in Surgery
- New Drugs in Development
- Immunosuppression
- Orthopedic Show and Tell
- New Drugs in Development
- Point/Counterpoint with Clinicians
- Different Approaches to Treating Bleeding
- New Drugs in Development
- Immunosuppression Pro/Con

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- School issues
- Emergency plans and treatment
- Emergency plans
- Navigating School Issues
- Positive Discipline
- Treatment options
- Speech by Dr. Valentino and Dr. Journeycake
- Disclosure
- Insurance
- Prophylaxis with bypassing agents
- Nutrition and Exercise
- Different Approaches to Treating Bleeding
- Early Treatment of Bleeding and Prevention of Joint Disease
- Immunosuppressants Pro/Con
- Concomitant use of NovoSeven and FEIBA
- Factor XIII
- Simultaneous FEIBA and NovoSeven
- New meds
- Insurance
- Prophylaxis with Bypassing Agents
- The combination use of FEIBA and NovoSeven
- Parental tips and tricks
- Navigating school issues
- Venus access and infusion techniques
- Different approaches to treating bleeds
- Disclosure
- Point/counterpoint
- Treating difficult bleeds
- Splinting
- Surgery implants
- Infusion techniques
- Products available
- Details of how the factors work together
- School IEP/504
- New and upcoming treatments
- Ask the experts
- Plenary sessions
- Moms for moms
- Orthopedic topics
- Dad to dad

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209936

- New drugs
- Teen transitions
- Loved the plenary session
- Team building
- Sports and exercise
- Real issues
- Immunosuppression
- Orthopedic, innovations in surgery
- Prevention of joint disease
- Educational standpoints
- Fistula
- Point/counterpoint with clinician
- Exercise and nutrition
- Immunosuppression
- Immunosuppression
- AV fistulas
- Facts about inhibitors
- Treating joint bleeds
- Schools
- Insurance was great
- Joint replacement technology
- Orthopedic show and tell
- Teen transitions
- Immunosuppression
- Percent of hemophiliacs with inhibitors
- Immunosuppression
- Counterpoint with clinicians
- Positive discipline
- Different approach to treating bleeding. We have had some of these approaches but never had it explained to us.
- Surgical options
- Insurance
- Disclosure
- Invasive surgery
- Time frame between the change or application of FIBA and NovoSeven
- Novo XIII factor being used
- Disclosure was great
- Plenary session was brilliant
- Point/counterpoint was great – should do at annual meeting
- Insurance – excellent presentation

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0209937

- Venous access devices
- Devices and gadgets
- Teen transition
- Orthopedic show and tell
- Ask the experts format
- Immunosuppression
- Mom to mom
- What FEIBA stands for
- New FactorThirteen
- Having orthopedic surgeon explain and have props, procedures
- Bleeding that comes later in life from sexual activity
- That the cartilage medicine does not always work if your joint is bad
- Behind the bedroom door
- Ask the experts – turn the tables
- New ways of handling bleeds
- Pain
- Relaxation
- Exercising
- Parenting tips and tricks
- School
- Treating new bleeds
- Gadgets and gizmos
- Treating new bleeds
- Gadgets and gizmos
- Change
- Orthopedics
- Different approaches to bleeding
- Other medication beside Rituvimax
- New drugs
- Treading bleeds differently
- Immunosuppression
- New Drugs in Development
- Different Approaches to Bleeding
- Carriers affected with bleeding symptoms
- ITT
- Mom to mom on women and bleeding
- Immunosuppression
- Navigate school issues
- Grand Rounds
- Emergency plans

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Parenting tips and tricks
- Venous Access
- Infusion techniques
- Parenting Tips and Tricks
- Dads to dads
- Use of steroids to decrease pain with bleeds
- Use of Celebrex for pain
- FactorSeven and FEIBA combination therapy
- Baxter making rVIIa
- Early treatment of bleeding
- Prevention of Joint Disease
- Navigating School Issues
- Long term effects of NovoSeven
- How to discipline positively without punishment
- How a port actually looks
- New drugs in Development
- Insurance topics
- Emergency procedures (travel letters, yellow-dot program)

**What topics will you discuss with your physician after the summit?**

- Joint health
- Better caring for joints
- Venous access
- Venous access
- Better caring for joints and a PT plan
- Prophylaxis with NovoSeven
- Immunosuppression
- Radiosynovectomy
- Prophylaxis
- Immunosuppression
- Radiosynovectomy
- Prophylaxis with NovoSeven
- Immunosuppression
- Meeting with "regular" physician and dentist
- Facter XIII treatment
- Ritxuan follow up
- Genetic sequencing
- Experimental drugs
- Nothing new
- Surgery and complementary medicine

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Update inhibitor testing
- Medical pain management alternatives
- Prophylaxis with bypassing agent[s]
- Joint replacement
- Factor levels/carrier status
- Factor 13 med
- Advate vs. Helixate
- ICH!!!
- Port and infections vs. AVF
- [child's name] and sports
- Factor 13
- Half-life study
- Travel and emergency plans
- About Factor XIII
- The use of ankle supports
- Factor XIII
- Immune tolerance treatment
- New upcoming drugs
- Maybe new drugs in development
- Combination therapy (sequential) and immunosuppression (I'd like to avoid this if possible)
- Combo therapy
- Switching medications
- Options for port removal
- Treating difficult bleeds
- Prophylaxis with FEIBA if ITI doesn't work
- Factor XIII
- How our trip went. Because I am very pleased with our option with treating right now
- New products coming to market
- Fistula
- Ortho products for protection and pain management
- Prophylaxis with bypassing agents
- PT (when necessary)
- Using more CAM techniques to treat pain and discomfort
- Factor 13
- Different approaches to treating bleeds
- Plan for emergency – talking to my son's school (the HTC will)
- Having myself and my 2 sons tested
- Prophylaxis with bypassing agents
- Immune tolerance and changing factor medication
- Getting my son a medic alert bracelet

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209940

- Rituxan treatment
- Surgery options
- Different factor options
- New drugs
- Immunosuppression
- ITI regimen
- AV fistula
- Prophylaxis regimen
- Setting up routine visits with PT locally
- Regarding the placement of a port in my son and the advantages and disadvantages of AVF
- Ankle and elbow braces to prevent bleeds in target joints
- Venous access
- Immune tolerance – change
- Self-infusion
- Orthopedic procedures
- Venous access and infusion
- IEP
- Rituximab/cytoxin
- Vicodin for hemophilia or not?
- Treatment plans
- Immunosuppression Pro/Con
- Immune Tolerance Induction
- Different ways to help with chronic bleeds in his feet
- Is there a surgical option for knee replacement (PT)?
- Are there orthotics that can give relief to ankles?
- ITI
- No port
- No ITI
- New products for factor
- New ideas for my son to be more responsible
- My son's specific mutation
- Obtaining a letter of instruction for the car
- Speaking with preschool to assure he'll be treated like a normal child
- A lot of different topics
- Use of Factor 13 for difficult bleeding episodes
- Use of steroids for hemoturia
- Insurance issues
- ITI
- The plan for our immunosuppressant therapy (we've been without direction in the middle of our treatment)

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Should my son stay off longer to heal through a bleed, not just wait until he feels better and then have to deal with a recurring bleed or damage to occur
- New medicine being developed
- My joints and the possibilities of bone on bone
- Prophy if bleeds increase in frequency
- How to help son with range of motion issues
- Different approaches to treatment
- AVM, due to I feel my son is now suffering with it
- Factor XIII
- Orthopedic surgery
- Pain meds
- Transition challenges with insurance
- The use of FEIBA at home – why other doctors allow it and our HTC doesn't
- Education plan
- Prophylaxis with bypassing treatment
- Physical education
- Credit for PE when my son sees his physical therapist
- Venogram (port)
- Immune tolerance therapy and prophylaxis
- Bypassing agents for prophylaxis
- Concomitant use of NovoSeven and FEIBA
- Half-life and inversion test
- Venus access
- Splinting
- New advance products
- Implants
- Immune tolerance
- Transitioning from port to Venus access
- NovoSeven
- Factor Thirteen
- Insurance
- Exercise with my physical therapist
- Joint maintenance
- Nose bleeds
- I am going to have my son take more responsibility handling his hemophilia
- Immunosuppression
- My wife takes care of HTC but I would like for to inquire about experimental treatments
- Immunosuppression
- Point/Counterpoint
- Immune tolerance

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE       NNICID-0209942

- Joint replacement
- Hepatitis C therapy
- Physical therapy to improve overall health and fitness
- We will explain to our HTC that it is important to us to pursue a relationship with an HTC that has a hematologist that emphasizes practices with inhibitors and hemophilia.
- Different options for pain medicine
- Cons of Rituximab
- To get my factor level checked again due to carrier status
- Ask his doctor about his fibrogens and AV Fistulas
- Surgical options
- Physical therapy
- NovoThirteen
- Therapeutic benefits of swimming/water therapy
- Career counseling – career choices and how young adults or students with inhibitors may be targeted from Home Care companies to work for them as a representative. Trading an unsecure future due to possibility be terminated when unable to use Home Care Pharmacy. A realistic choice needs to be presented. Go to college, get a degree, become a pharmacist, a nurse and in you still want to work in Home Care industry it would be a better choice.
- Immunosuppression
- More physical therapy and possible synovectomy on ankles
- I will consider more physical activities and therapy for joints
- New treatment for my knee
- New trials for my husband
- New ways of handling bleeds
- Joint Damage prevention
- Behavior
- Ports, fistulas
- Questions about treatment and ways to reduce his inhibitor
- Different approaches to treating bleeding
- Treating bleeds differently
- FactorThirteen
- Genetic testing
- FactorThirteen
- Vascular Access
- Different pain medicines
- Immune tolerance
- About a needle to port placement tool
- Genetic testing
- "Half-life" testing

**NATIONAL HEMOPHILIA FOUNDATION**
*for all bleeding and clotting disorders*

## Future Educational Topics

The following reflects the educational content identified by participants that they would like to see included in future educational activities focusing on hemophilia with inhibitors.

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street • 11th Floor
New York, NY 10001
(800) 42-HANDI • (212) 328-3700 • fax (212) 328-3777
www.hemophilia.org • info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE          NNICID-0209944

**Future Educational Topics**

**Please list any other topics you would like to see in future educational activities**

- How to deal with the emotional side
- The emotional side of dealing with hemophilia
- The emotional side of dealing with hemophilia and how to better cope
- Basic hemophilia overview 101 for support systems (grandparents, etc)
- List of treatment centers offering orthopedic surgeries
- List of conferencing opportunity with clinical trial facilities/researchers
- Something for female carriers – future mothers of possible children with hemophilia
- Q & A with a panel of experienced men of different ages with hemophilia – more experiential sessions
- Teen support groups for carriers
- Panel – The Good, the Bad and The Ugly – Stories from the trenches and the actions taken
- Stress and coping skills with exercises
- Session with children – groups and exercises – talking about hemophilia with a moderator (different age groups)
- More involvement of industry insiders, eg, representatives from health insurance companies or government eg, medicare programs, etc.
- More time and education/discussion for carriers
- Sibling issues and moms
- Psychological help and depression
- Motivation
- How to stop the use of pain killers (rehab)
- Liver transplant
- Withdrawal symptoms for use of pain killers – how to control pain without falling
- Use of pain killers and the consequences
- Encourage live tweeting (provide guidelines)
- Social technologies available to bleeding disorder community – with a demo and Q & A about concerns, benefits …
- Add social media IDs to registration form and place them on our ID badge at conference so we can see our online friends
- Very fascinated with the medical advancements like porcine VIII, factor XIII, etc. Would love to hear more about new products which may not be available or well known to my HTC yet!
- It seems like more resources are available to overwhelmed caregivers of chronic illness (such as respite care). An expert on providing this social service would be very beneficial
- Insurance/health care
- More about how to treat
- Ports (and caring for them) – we have a lot of new people with ports. Anything with ports would be great

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE     NNICID-0209945

- A session on art and music therapy and how to use for different ages and the effects
- Elbow and ankle replacements
- How to become more involved politically in the hemophilia scene
- Using meditation in our lives better
- Panel of siblings
- Family – children who lived with parents of hemophilia over 18
- Possibly a separate meeting for older men and families
- More education for the dads
- More information about Factor 13
- Stretching class (specific to injuries)
- Mental stress class
- I would like a session about hemophilia with inhibitors with other disabilities (autism, etc)
- Dosage of factor – the right amount at the right time, meaning age and height and weight
- A session or two for pre-teens – my 12 year old son with hemophilia is open to learn right now (more than my 15 year old [with] attitude)
- Information for carriers of hemophilia. We have a 17 year old daughter and she needs guidance in her decisions on having children and how to be prepared for a son with hemophilia
- More discussion of current research
- Dealing with depression
- Now a service dog can benefit a person with hemophilia
- Techniques on how to make infusions easier and your child more comfortable
- Alcohol and drug experimentation of hemophilia patients – changes
- Anger issues in boys growing into responsible men
- I missed the session on Exercise and Nutrition and wish I had scheduled better, so that one is on me!
- Family planning
- Emotional process group regarding topics of normal childhood development and impact of medical issues of hemophilia
- Grieving and loss
- Perhaps a talk with the children. My son needs to be more comfortable speaking about his hemophilia. Although he is only 5, he doesn't like to talk about it
- For caregivers who aren't full-time, how to support
- More exercise time to all be involved
- Dealing with stress
- How to cope with a child with multiple health issues
- Travel with factor
- Disposal of waste, documents, emergencies
- Siblings – jealousy, plotting against each other
- Caregivers – couples taking time out, reconnecting

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Possible issue with "Acceptance" of the disabilities associated with hemophilia. When is it time to acknowledge that the damage of joint bleeds is irreversible and how to accept the limitations (emotionally and physically!)
- Insurance info for young adults with hemophilia
- Future insurance
- PT
- The importance of infusing
- Taking responsibility of your condition for teens
- How to deal with stress
- More info on immunology and relationship to inhibitors
- Would be nice to be able to access some of the research studies that were discussed during the Summit
- Exercise program (Tai chi)
- Programs for support – what will SevenSecure help with
- A session for children of men with hemophilia
- I would love the opportunity to present/facilitate a session that focuses on families with more than one child with a bleeding disorder. I have two boys with heomphilia, one tolerized, one with a high titer. I have a public speaking background and would appreciate speaking to someone about my idea
- Newest research studies on products and on treatments
- Having siblings that don't have hemophilia being able to tell their side of it
- Mom to Mom is longer this year, but do introductions faster so we can talk more to each other and discuss topics
- It seems like there is a lot of hope for Factor VIII treatment, but Factor IX discussion and treatment is limited
- New research and development to solve hemophilia problem
- New work towards longer lasting medicine
- Have a couple of younger kids – 6-8 or 9-10 come in and give their thoughts
- New topics in elbows
- How to apply and maneuver government programs (Medicaid/Social Security/disability/rehab services)
- Job/careers for men with hemophilia
- Continue to develop the teen/young adult programs
- College issues and hemophilia
- Herbal supplements and hemophilia – elaborate more
- Psychosocial issues and hemophilia
- Dealing with guilt
- Roles of mother and father in child's life
- Have more time for moms who want to share their experiences
- Further information on status of clinical trials and new products

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209947

- Dads with hemophilia and their kids
- Advances in the cure
- More sibling sessions
- More teen sessions
- Disclosure for female carriers – we focus so  much on boys with hemophilia and how difficult disclosure is but what about girls who are known carriers who date and ultimately find a spouse who will understand?
- Patient/public support programs, FLMA, health reform changes, states exchange programs, PSI
- Couples counseling – relationship issues
- Sibling issues
- More of the guided, open discussions for parents
- Education of next-in-line caregivers
- A more complex explanation of the use of bypassing agents to treat inhibitors
- Traveling with factor
- Advance in treatments
- New inhibitor products
- One inhibitor with your child is mild, not severe
- Tolerized – now what?
- Faith in the community
- Do overcomers again
- Mild hemophilia with inhibitors – more data and research
- College and scholarships for the teens
- Workshop to help teens make a smart choice in picking a sport they can play that is not high risk
- Different infusion options and the risks, i.e., pic line, broviac, port, fistula, IV, etc
- A topic for kids 12 years old that can explain that they have hemophilia as part of the lives – it's a challenge not an illness, that they are very special persons. Even having hemophilia they could live a normal life with other kids that don't have this condition
- More education for kids 12 years old in a day group
- Genetics
- Learning to help infuse family with hemophilia
- Employment issues
- Social Security Insurance
- More time for Dad to Dad conversation
- When your HTC isn't working for you
- The various roles family members play in managing a bleeding disorder
- Definitely the topic on future of hemophilia or new drugs in development
- Follow up on immunosuppression
- Do something with kids

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0209948

- How to get my HTC to allow my child to have pain relief other than Tylenol outside of a hospital setting. Doctors making my child feel like a drug abuse when asking for stronger pain relief in the hospital for his target joint
- Advances in elbow surgery and therapy
- Mom to mom
- Transitions
- Exercises
- Medicaid information – more information about how it differs per state, particularly waiver programs, like genetically handicapped, ill and handicapped, Silver Script, etc
- SSI/SSDI – any chance we can get numbers on how many people who receive it have hemophilia?
- A physical therapy session would have been helpful for me.
- Preparing for old age living as a senior hemophiliac
- A workshop that focuses on educating immediate family members living with a person that has it
- How to prevent bleeding
- Hospitalization and family effect
- Psychological treatment for family and patients
- How stress overtakes a family and how to help or where to look for help
- More sessions for caregivers
- How siblings of older (over 30) young adult men with hemophilia can cope. How to handle the "out of control" feeling as you watch your siblings struggle.
- Transition from child care to adult care. Total involvement in care – and family involvement to total-family out of the picture. This has affected not only me but my other siblings who have been supporters of him.
- Adult children/sibling relationship to hemophiliacs
- More topics for siblings and youth carriers
- Information for carriers
- How to keep your family/marriage intact with a child with hemophilia/inhibitor
- How to impact your local HF or HA to implement programs/activities/advocacy
- How to get kids involved in organized team activities
- Insurance issues – health and premiums
- Educating family members and friends
- More Q&A sessions

**Do you have any suggestions for improving this or future activities?**

- Better selection of food. Food made me very sick – what I could eat of it
- Better child care activities with better supervision
- Mom to Mom could be a little longer
- Better selection of food especially for children

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209949

- Have a session with adult children dealing with a father who has hemophilia
- More question and answer time after presentations
- An entertainment/video game room after activities are complete for later
- Many of the classes were at the same time and I couldn't get to all of them. (Great job overall) ☺
- Involve teenagers more in sessions/experiential sessions
- Do more fun things. More time to explore amazing city – early start, early let out.
- L. Valentino, MD is very knowledgeable, however he is against ports. We attended his session last year.  When our HTC recommend a port for ITI therapy we agonized and were quite frankly terrified after hearing his session. We talked about the fistula but [it] was a more costly and disfiguring procedure. We broke down persay (sic) and had a port implanted in order to start Immune Tolerance. Son's level is .2. No infections etc. in 9 mos.  Best decision! I would recommend the bias be avoided and give information.
- Marital counseling – hemophilia puts a huge stress on relationship
- More time for moms to break away in smaller groups to share/give supports, etc.
- Everything was spectacular!!
- Thanks!!
- Keep doing what you are doing. It gets better every year. I loved the different tracks, so we could learn things more appropriate to where we are in dealing with inhibitors. Ensure all meeting rooms have internet access. If a presenter has terms/info we don't understand, we can Google it without interrupting. Also, we can use social media to open further discussion.
- This is a great program and greatly appreciated!
- With anything, there are bumps in the road. I am just glad someone is doing their best to educate us! Thank you!
- Daycare for 0-3 year olds seemed too cooped up for the 3 year olds. Really kids this age need to be able to run around more or they will go crazy! These were a long 2 days for my little ones – just wish they'd been able to get out more.
- I think all of us would love to be part of an online forum or group mailing list to keep in contact with everyone/make it easier to meet others that we weren't able to meet at the conference.
- It seems like the conference was too short to really be able to meet everyone, so maybe more opportunities to promote interaction like having people rotate through tables and giving time to meet people.
- There could be a better way of categorizing what sessions apply to what people in what situations and then letting them optimize their tracks a bit better.
- Longer sessions and be able to finish the class
- I love the people and information
- I'd only change location. Other than that I've enjoyed everything
- The initial airport transportation has to be organized. People with children after a long trip should be greeted quickly with a positive greeter.
- Incorporate music activities or music therapist and art projects for children in daycare

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- Offer a panel of older men for the purpose of them being able to offer the experiences so that parents and/or younger men can learn from them
- More group activities. I'm shy and sometimes it's hard for me to meet new people unless I hear a little from them first.
- Slow down or increase the meeting by a day
- More group time
- Some of the sessions need more time for a better understanding
- One session with adults and teens together
- Just different sessions or choices for kids – I know you can't meet all needs – just my issue is two boys, brothers, do not want to be together in meetings. They are [both] affected so differently and they don't get along so they need more options so they can be in different rooms.
- Make sessions a little more interactive
- Mom to Mom session was wonderful, more time allotted to just letting moms (dads) speak, share their stories
- Better activities for childcare. Drumming, dancing, singing, sing alongs, etc instead of just a video. The Summit in Boston seemed to provide more space and activities.
- Better food – simpler is fine, but appeal to more taste buds. More kids food – for adults too – not being reprimanded for eating off kids table.
- More time to talk
- More time to explore city
- More breaks – networking time
- Protein/healthy snacks – not all carbs and junk food at break
- Loved the concept of tracks, but had a tough time deciding which of track (1 or 2) should I be attending
- More than half of the printed slides [were] not for the sessions we attended. Heavy stack to carry around and travel with. Consider a brief description of sessions and space for notes. Give the slides on a CD or online!
- Have interaction with people.  Break up everyone so they are forced to sit with people they don't know
- Longer sessions for breakout sessions that encourage discussion/sharing. Men to Men/Caregiver session could be expanded
- Introduction session in the beginning that introduces participants (ice breaking session). By Day 3/Day 4 we are beginning to "know" each other and then we are off, back to our lives. If there was a way to introduce participants early in the Summit, I believe "we" have much to share. (As the Summits grown, I'm not sure how feasible this is, though)
- Interaction with older people with hemophilia models for the younger (teens) – stories or activities
- Every topic I attended was educational and understandable for me. Thanks to all the staff who made this and all [the] events possible.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209951

- Mom to Mom should be set in a circular setting. To give more time, maybe split the moms by the child(rens) age. I've looked forward to this all year and it basically came down to our name and children's names, ages, and diagnosis.
- Have less tables set up in the banquet room for meals. We come to connect with parents like us and it's very hard/awkward to ask to sit with families when there are plenty of open tables.
- Might want to consider assigning mentor families/patient for newly diagnosed or younger (if they would want it) analogous to a First Steps but for inhibitor patients/families
- Maybe more time for presentations – a couple of ours were cut off. Not necessarily slides, but they didn't cover all topics they wanted to. Discussions were cut off.
- Mom to Mom longer!!
- Making the Mom to Mom and Dad to Dad sessions longer
- I liked the stress relieving session the year when we learned Tai Chi
- You all are doing a great job. I really love the incentive to get to classes
- Provide more programs for siblings
- Provide relaxation/anger management/frustration control techniques for caregivers
- Tell me about new/current developments in other countries that might one day be available in the US
- Medical research (stem cell, etc)
- Prevention of joint replacement – avoidance – keep that one, but make it less dreadful, help me stay optimistic!
- Dental procedures – caution for hemophilia with inhibitor patients – how can I help my son help his dentist understand and prevent possible complications
- Provide a session for seasoned parents teaching/guiding new parents – mentorship program
- Provide a session for young teens to guide and encourage and motivate the young children as well as the young parents (what worked, what didn't – how do you feel, etc)
- I would like to have my own session next year, a parent to parent confidence session. I have had a lot of parents come up to me and say I have really inspired them and gave them great info through my confidence and sense of security I displayed
- Better food (no fruit at breakfast)
- More sessions to ask about treatment options
- Although well meaning, the opening plenary session wasn't applicable to either myself or teenage sibling. We don't use an HTC by choice because we felt the HTC model was too invasive and ineffective and HTC clinic was too long of a day
- If sessions are required for all attendees (especially teenagers and siblings), the topic should be relevant to them
- For teenage siblings – an offsite "fun location" would be a great way for them to enhance their relationships and build a support network
- Consider giving the printed material in CD-ROM
- More sessions or different types of sessions for siblings from ages 6 and up
- Mom-to-moms
- Maybe roundtable topics – not all of us enjoy the huge group and will not share in that setting

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209952

- To have a session for the siblings that don't have hemophilia
- Parent social time
- Longer dad to dad/mom to mom sessions
- I think there needs to be something for sisters. My daughter is 12 and had a hard time fitting in.
- Smaller eating space to force more conversations and connections
- How to recognize bleeds when (A) your child is too young to express pain, and (B) your child is afraid to express pain out of fear of getting a needle
- An extended, in depth, Tai Chi class with and without exercise balls. Do it Thursday evening and then have a session each morning of the summit
- Perhaps some personal time with the experts to address some specific issues
- More interactive and fun dinners/evenings – Missed Dr. Bill
- Some talent show/music with dancing (we had this before)
- If a dr. can have an informal talk with the kids (like just one session) and also for the siblings that would be great
- Allowing contact information for the experts so we can contact them outside of the summit, ie: email address; or so we can ask our HTC to contact them about particular information provided. Our HTC does not look into or listen to our information we bring home but perhaps if we could have them contact the qualified person who presented it.
- Grieving – how to deal with loss
- Depression
- Novo Nordisk reps need to be marketing this summit more. I have known my rep for 3 years and he has never mentioned it to me.
- Maybe adding one more day or more time for sessions
- Incorporate more workshops and activities for the teen demographic area attending the workshop
- Get more involved with people and insurance effects
- Educate people around us about hemophilia
- Maybe have lunch with our kids, so family can get something to eat together and kids can see parents
- More time for questions
- Activities to interact with other participants
- The siblings should be able to go to things that actually have something to do with their life, not their brother/sister who has hemophilia.
- Have conversations on different experiences
- I thought the mom to mom session could have been more open
- Coordinate more interaction between different ages of patients with hemophilia/inhibitors
- Perhaps have an informal reception before dinner the first night so we can all meet each other
- The mom-to-mom class was the one I was most excited about, but almost all of the time was spent introducing ourselves and giving a few words to describe our families. I understand the concept behind it, but I would have preferred to have shared other information.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE     NNICID-0209953

**NATIONAL HEMOPHILIA FOUNDATION**

*for all bleeding and clotting disorders*

## Comments

The following reflects comments from participants about things they would like to see included in future educational activities focusing on hemophilia with inhibitors, as well as additional comments

Please note that all comments reported are taken verbatim from participant evaluation forms.

116 West 32nd Street · 11th Floor
New York, NY 10001
(800) 42-HANDI · (212) 328-3700 · fax (212) 328-3777
www.hemophilia.org · info@hemophilia.org

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                NNICID-0209954

**Additional Comments**

- Thank you and God Bless
- I want to thank everyone for all the great information and kindness
- Our family would like to say a big thank you to all the staff and everyone involved in helping us better our children and families lives! God Bless you all!
- Ask the Experts: Tables Turned – I enjoyed this session but the only person missing from the panel was a spouse of a hemophilia patient and a child of a hemophilia patient
- Involve carriers/future moms with hemophilia
- The conference was okay but it could have been better.
- Dr. Diller is an excellent, outgoing, energetic speaker. I had the pleasure of hearing her speak last year in Boston. What a shame it was a lunch presentation. I'm a meeting planner and I constantly discourage people from these. I have yet to hear one person say they enjoy these type of sessions. Clinking of plates, trying to eat and interact is next to impossible. Please next year no lunch speaker!
- The Mom to Mom was different because it was a round table like you were just having lunch with good friends.
- Thanks y'all!
- Good Summit. Much new information
- Why is Positive Discipline on Track 2? Shouldn't it be on Track 1? I wanted to go to that but I would have missed some other ones I didn't want to miss.
- Always enjoying hearing from Sonji. She is real and easy to relate to.
- Thank you to everyone who made this possible. I'd love to see future Summits available online, so others can benefit as much as attendees. I know presentations are property of the presenters, but can NHF ask each one if they'd consider publishing the presentations (live stream or online video) or at least the slides (to scribd)? All they can say is "no".
- So much information I am still processing.  Would have been worth it just to hear Dr. Koerper explain so much about the clotting cascade and inhibitors and bypassing agents, etc.
- Wish more information was given on support groups available to caregivers of chronic illness such as respite care. These resources are out there and are under used by the hemophilia community.
- Loved the conference and the amount of experience, expertise and information available.
- I would love to come back and learn more about my local [NHF] chapter
- Thank you everybody for this opportunity
- Was not met initially at the airport. Waited almost 2 hours. Did contact greeter and he sent me after waiting 1 hour to another area where I waited for an hour. Bus driver was not friendly, seemed annoyed, got phone calls from another greeter. I spoke to other people who got cabs because of no greeter. Would be helpful to have more greeters, less confusing and hectic for families.
- I enjoyed the handbook. It is nice to have handouts of all track sessions. I was able to see info from other tracks I was interested in but were at the same time.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0209955

- I'm interested in helping more at future summits. I would like to run a meditation/better health workshop. I also believe I can help more on alternative techniques for controlling pain.
- Not enough information for children of adults with bleeding disorders
- Enjoyed it very much – food was so so – location was great.
- Staff very, very helpful
- Classes getting over too quick sometimes
- It would be great to see a blog for the teens and kids where they can share safely their thoughts and feelings with our peers and siblings – just an ongoing outreach to keep them involved and heard.
- I would like to thank NHF for the opportunity to come to the Inhibitor Summit. It was very informative not only for myself and my husband but especially for my son and daughter.
- Thanks for everything – very informative
- Very informative! Thank you!
- I appreciate NHF giving my family this opportunity. This is an experience that my family would have otherwise not have been able to experience
- Thank you NHF and Novo Nordisk!
- Than k you especially to Z for providing us with the flexibility needed to adjust our travel plans. His understanding and assistance was greatly appreciated
- Thank you and I hope to attend a Summit next year
- This was great. This is our first time coming and my family loved it. We learned a lot more than I have at other conferences
- Great topics and presenters
- Great job!
- Keep up the great work!
- Than k you for a lovely weekend. I will carry this into the year ahead!
- This weekend has been very motivating and I am proud to be part of this caring, compassionate community.
- I am glad this Summit was scheduled in July (mid-summer). I have been unable to attend the last Summits that were scheduled in August/September because they conflict with school beginnings
- Thank you for everything. I will never forget my first Summit and I know it won't be our last
- My son told me for the first time in his life (age 17) he felt like he fit in
- I hope to become more involved with NHF in years to come
- Your incentive was a nice idea but unfair since there were a few people coming in the last 10-15 minutes and still getting their sheets signed.
- Book is still way too big for a world trying to go green. Why can't you give an NHF folder and then handouts in the specific class or to save more paper have the "wanted" material emailed
- Would be good if the meeting format was better explained at the plenary meeting the first day
- Incentive approach for meeting attendance much better than previous years
- Travel planning was easy but could have been done earlier

- In the past there was a caregiver support session just for spouses, great session without moderator so spouses could compare notes (how do you handle this or that). I would like to see a session for kids (teenage or adult) of patients
- Dr. Young was excellent but his presentation on "Different Approaches" was way too clinical (over the consumer's head). I was pretty disappointed
- I really liked hearing the patients/parents in the panels to answer questions
- Loved getting the book with notes ahead of time
- This Summit was wonderful. We enjoyed the courtesy, food and information.
- Thanks to Novo Nordisk for their patronage
- I appreciate that you have created a program for teens/young men that it has held their attention and motivated them to take hold of their condition to manage it better to gain a greater quality of life. Thank you Rich Pezzillo!
- NHF staff that I have interacted with a great people, I really enjoyed Z, Angie and Jonathan
- Workshop, sharing or discussion need more time, like 1 ½ hours or 1 ¾ hours
- My family loved this Summit so much. After the dinner, we have time as a family to walk around the city. Thank you so much for giving a wonderful opportunity to attend this Summit!
- Hemophilia was cured in mice roughly two weeks before this Summit, in a way that is radically different from any other method. I feel it's the Summit's responsibility to inform the community of this development
- Wish your evaluation instrument allowed us to rate each presenter with the topic they presented on and a way to evaluate what was good about the presentation, what wasn't, and how it could be improved
- Travel – airport pickup – would have been more helpful if the person holding the sign at baggage claim told us the name of the van company to look for and that they picked up on the half hour
- Really liked point/counterpoint session. Very nice to have two different approaches – much like having a second opinion. Helps to have as much info (pro and con) as possible
- Thank you for all of your hard work to put these Summits together. My family appreciates the opportunity to come and learn and reunite with friends
- Appreciated the take away from Navigating School Issues with Janet Brewer
- Overcomers was inspirational in that all of these individuals have turned a negative into such a positive
- I really liked the dinner cruise. I focus so much effort on getting the most of all the classes and often see little of the great cities hosting the event. This combined a sightseeing opportunity with the most important aspect of all – networking for answers/support!
- Thank you for everything!
- Excellent!!!!
- My information is below but I am the grandmother with two grandsons with hemophilia, one with an inhibitor. I am a caregiver and support my daughter, but medication is not my decision
- Great speakers and great organization; Always impressed with the information gleaned and the way we are treated. Thank you! Kids camp again was terrific – the boys loved it! Overcomers session was phenomenal! Very powerful!

- The overcomers session was awesome. I would love to have another next year
- I enjoyed the summit as usual. Very informative.
- I am grateful for the opportunity you gave me to learn a lot with all the excellent sessions and professionals that explain and teach us how we all could be living day by day dealing with different situations and bleeding disorders. Thank you.
- At the Great Lakes Inhibitor Summit I was asked to speak and I brought my best friend who gave his perspective as a "non-hemo" and how we grew up with hemophilia. It went well and people appreciated the insight.
- This has been an extremely informative meeting and inspiring
- Enjoyed the overcomers session
- Was very unhappy with the limitations for kids meals. They very reluctantly gave me a 3rd chicken finger
- Slightly poor child care. My son was accessed and he removed his shirt to get into the smock given and decorated by him which I think under good supervision should not have happened especially since they they could see the huge see the huge bandage/tape on his chest.
- Additionally: This is my 4th year attending the Inhibitor summit. I still remember the first one when I could not hold back my tears due to the overwhelming information I received and broke down before these great doctors who assured me that theings were not as bad. Now in my 4th year I feel like a veteran and look forward to attending this each year with a hope to gain more knowledge and experience and big thank you to NHF and all the wonderful doctors to contribute their time and knowledge with us.
- We would like breaks that are a little longer. Treating my son's bleed was difficult in the amount of time in the schedule so I missed some of the content.
- Thank you for all the info; the staff, doctors, nurses and therapists – the food was great and the support of patrons are second to none – thanks.
- I have seen too many young men with hemophilia and or hemophilia with inhibitor employed by a Home care Company and then terminated when unable to use the Home Care Company. Many are left with nothing – no skills, etc. Also presentations about social media and the pros and cons, ie, giving out health information, especially your children's (good or bad?) on Facebook. People who you friend on Facebook – verify who they are – i.e., Home Care Industry or Insurance Company Rep. Inhibitor patients can be targets for Insurance Companies or Home Care Rep. Insurance Company may be watching you to find something to use against you to drop you from the policy.
- I was very unhappy with my flight arrangements. I was called 2 weeks prior to the summit (I registered the 2nd day registrations were accepted) and told my options for my return were 5:20am or 11:55pm leaving San Francisco on Sunday. I was not bringing my children, but had I was I would have cancelled the whole trip. Getting my children up at 3am or keeping them on a 6 hour red eye flight at ages 4 and 5 is not reasonable. I was told the reason was due to staying within the budget. But when I looked at the flights, the other flight times were just $90 more than the one I was told I had to take. I honestly would have paid the extra $90 myself if I would have been given the option.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

- This was my first summit. My wife and I learned a lot from being here. We learned of things we could do to improve everyday life as well as on my overall quality of life.
- Enjoyed the bedroom discussion – suggestion is that this session is longer because this is a major topic that bother partners are unable to discuss
- Thank you for the opportunity of learning more and getting to meet people on the same situation that we are on in our life
- All great information
- Travel could have been better. The shuttle was not a great experience because there wasn't anyone there to tell us it was that shuttle. And when we did get on the bus, the driver was very rude.
- I would like to know more about all of the HTC in the country
- Our children are small and go to bed about 8pm. I would prefer group events in late afternoon one of the days.
- I appreciate these summits because I learn something new every time. I also get to interact and talk to other parents in my situation and I see all ages of hemophiliacs.
- Even though my son does not have an inhibitor, we are trying to educate ourselves in case he does develop one down the line, or in case our next son develops one. So I give thanks to NHF for allowing us the opportunity to attend this summit.
- I am so grateful for this summit. Being a grandma of a 9 inhibitor and 26-year-old son, sister of a hemophiliac, I am grateful that my daughters are included because their lives have been directed around hemophilia. The more we learn together the more sensitive we are to him. Wish he would be aware of how his hemophilia has affected the whole family – not all about him.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

# Exhibit 10

**From:** Liliana Mastrapa [lmastrapa@rxcrossroads.com]
**Sent:** Tuesday, May 13, 2014 10:45 AM
**To:** SCOD (Stacy O'Donnell)
**Subject:** RE: Lily Mastrapa coming to work in Southern California

Thank you so much, Stacy!

Liliana Mastrapa
Case Manager
**RxCrossroads**
**9960 Corporate Campus Dr., Ste 100**
**Louisville, KY 40223**
**Toll Free (877) 668-6777 option 3**
**Fax      (800) 826-6993**
lmastrapa@rxcrossroads.com

*This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact me and destroy the materials contained in this message.*

**From:** SCOD (Stacy O'Donnell) [mailto:scod@novonordisk.com]
**Sent:** Tuesday, May 13, 2014 10:40 AM
**To:** MYSW (Mary Shaw); Liliana Mastrapa; Luke Hemming
**Cc:** DGOO (Dan Goodwin); SGNN (Steve Gunner); JXRA (Jack Ratelle)
**Subject:** RE: Lily Mastrapa coming to work in Southern California

Approved!

Thank you Mary!
Stacy

**From:** MYSW (Mary Shaw)
**Sent:** Tuesday, May 13, 2014 10:35 AM
**To:** SCOD (Stacy O'Donnell); Liliana Mastrapa (lmastrapa@rxcrossroads.com)
**Cc:** DGOO (Dan Goodwin); SGNN (Steve Gunner); JXRA (Jack Ratelle)
**Subject:** Lily Mastrapa coming to work in Southern California

Hi Stacy,

I would like to have Lily come out to Southern California for 3 days (June 18th, 19th and 20th) in order to increase our relationships patients who are in Seven Secure and also those that are eligible for Seven Secure.

I would like to focus on our Spanish speaking patients but would not exclude any patients. Would you be able to approve this road trip for Lily?

Thank you for your consideration,

Mary

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                              NNICID-0008704

**Mary Shaw**
Executive HTSM
Novo Nordisk Inc.
24652 Avenida Riviera
Laguna Niguel, CA 92677
USA
949-212-5345 (direct)
mysw@novonordisk.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorized reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0008705

# Exhibit 11

**From:** MHFE (Michael Ferrara) [mhfe@novonordisk.com]
**Sent:** Thursday, February 27, 2014 10:45 AM
**To:** GYST (Gary Staudt)
**CC:** JSDR (Jim Snider); NNI BioPharm Hemophilia Southeast; SCOD (Stacy O'Donnell)
**Subject:** Re: SevenSECURE enrollment 2873344

Awesome!

Sent from my iPad

On Feb 25, 2014, at 8:38 AM, "GYST (Gary Staudt)" <gyst@novonordisk.com> wrote:

> First 2 enrollments from the SE counting yesterday's patient from Lois's territory! Congrats!
>
> ---
>
> **From:** AMIG (Amit Garg)
> **Sent:** Monday, February 24, 2014 5:32 PM
> **To:** GYST (Gary Staudt); HTSE (Heather Stewart)
> **Subject:** FW: SevenSECURE enrollment 2873344
>
> Way to go Heather!
>
> ---
>
> **From:** Liliana Mastrapa [mailto:lmastrapa@rxcrossroads.com]
> **Sent:** Monday, February 24, 2014 4:37 PM
> **To:** AMIG (Amit Garg)
> **Cc:** HTSE (Heather Stewart); Luke Hemming
> **Subject:** SevenSECURE enrollment 2873344
>
> Amit/Heather:
>
> We received a SevenSECURE® enrollment from Rudolph Roskos at Broward General Med. Ctr;
> enrollment # is 2873344.
>
> Thanks,
>
> Liliana Mastrapa
> **Case Manager**
> **RxCrossroads**
> **9960 Corporate Campus Dr., Ste 100**
> **Louisville, KY 40223**
> **Toll Free (877) 668-6777 option 3**
> **Fax     (800) 826-6993**
> lmastrapa@rxcrossroads.com
>
> *This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact me and destroy the materials contained in this message.*

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0032009

# Exhibit 12

**From:** Luke Hemming [lhemming@rxcrossroads.com]
**Sent:** Monday, December 09, 2013 3:35 PM
**To:** SCOD (Stacy O'Donnell)
**CC:** Nicholaus Lesher
**Subject:** RE: customer complaint - case # 264067

Stacy:

I just emailed the deidentified call recording; please let us know if you do not receive (the file was 20.3MB, and we may need to devise a different way to send if email transmission is impossible).

Thanks,

Luke Hemming
Associate Program Manager
RxCrossroads
9960 Corporate Campus Dr., Ste 100
Louisville, KY 40223
Toll Free (877) 668-6777 option 2
Fax      (800) 826-6993
lhemming@rxcrossroads.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact me and destroy the materials contained in this message.


-----Original Message-----
**From:** SCOD (Stacy O'Donnell) [mailto:scod@novonordisk.com]
**Sent:** Thursday, December 05, 2013 5:19 PM
**To:** Luke Hemming
**Cc:** Nicholaus Lesher
**Subject:** Re: customer complaint - case # 264067

I spoke with her as she sent me an email.

This is why we must find a way to strip all subjectivity out of the sop's. We should not be letting patients know that it is you and lily who are making the final decisions. If this is what is needed for the child, and according the school and htc, it is, and if she has bit reached her cap, then we should provide the funding.

Please contact the enrollee and inform her that her application has been approved.

We need to have a longer, more in-depth review of the policies to determine how we can remove the subjectivity moving forward as this is a complaint gay was heard loud and clear from several members. It must be addressed before it becomes an issue.


Many thanks,
Stacy

**Exhibit 66**

4/24/24
Reporter:
Teresa Beaver

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-0106177

Sent from my iPhone

On Dec 5, 2013, at 4:52 PM, "Luke Hemming"
<lhemming@rxcrossroads.com<mailto:lhemming@rxcrossroads.com>> wrote:

Stacy:

We received a customer complaint from an enrollee's mother. She had previously expressed frustration about not receiving mileage reimbursement (patient recently obtained Medicaid), but not so much that we felt that it warranted notifying you. We received today a reimbursement request for an $870 iPad Air to be used for schoolwork. I informed Lily that, in accordance with the reasonable funding level that had been provided in similar cases, we could reimburse $300-a Google search showed iPads available for less than this amount, and this is the amount provided to 2 other enrollees for purchase of a similar device without complaint.

When Lily explained the decision and the reason for it, the mother became irate and said that she doesn't care what standard we use for other families, she only cares about her case. She asked to have someone higher than her or me contact her and was told that Nick will contact her ASAP, and then proceeded to become abusive, stating that the program is bull**** and nothing ever gets approved (despite receiving ME and AEG funds totaling over $5000 since 2009), and questioned who Lily and I were to make determinations on the reasonable cost of a tablet when we don't even have hemophilia. She said that she is going to talk to everyone about how the program exists only to make NNI look good and doesn't actually help people, and that she doesn't want to have any other contact from us or NNI other than the call from Nick (by the end of the call, she had Lily so upset that she was crying and was worried about losing her job).

This mother has been on the Consumer Council and has been a brand ambassador (which is why I was surprised that she would treat Lily the way that she did even after asking to have a manager call her). I will pull the recording from the call. Please let us know how you want us to proceed.

Thanks,

Luke Hemming
Associate Program Manager
RxCrossroads
9960 Corporate Campus Dr., Ste 100
Louisville, KY 40223
Toll Free (877) 668-6777 option 2
Fax (800) 826-6993
lhemming@rxcrossroads.com<mailto:lhemming@rxcrossroads.com>

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact me and destroy the materials contained in this message.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                          NNICID-0106178

# Exhibit 13

**From:** SCOD (Stacy O'Donnell) [scod@novonordisk.com]
**Sent:** Monday, February 09, 2015 1:43 PM
**To:** MHFE (Michael Ferrara); MSLC (Melissa Leichter); AMGG (Monica Gonzalez)
**CC:** MRDJ (Marcia Diljak)
**Subject:** NovoSecure QA DRAFT 2-6-2015 (2).docx
**Attachments:** NovoSecure QA DRAFT 2-6-2015 (2).docx; SevenSECURE transitionv1.pptx


Mike, Melissa and Monica,
Please see the attached Q&A that Marcia has written, and I have approved, regarding the SevenSECURE transition. Also attached is the SevenSECURE transition plan that I will share with the team on Friday. Please let me know if there are any questions or concerns or if we are aligned. The FAQ will be provided to the field on February 23rd during the NovoSecure field call.


Many thanks,
Stacy

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                    NNICID-0027562

# Exhibit 14

Page 1

1                UNITED STATES DISTRICT COURT
2                WESTERN DISTRICT OF WASHINGTON
3                          AT SEATTLE
   _____
4
   UNITED STATES OF AMERICA, et  )
5  al.,                          )
                                 )
6           Plaintiff,           )
            ex rel.              )
7                                )
   JAMIE SIEGEL, M.D.,           )
8                                )
            Plaintiff-Relator,   )
9                                )
   vs.                           ) No. 3:23-cv-05459-BHS
10                               )
   NOVO NORDISK INC.,            )
11                               )
            Defendant.           )
12 _____
13          VIDEO-RECORDED 30(B)(6) DEPOSITION
14             UPON ORAL EXAMINATION OF
15          WASHINGTON HEALTH CARE AUTHORITY
16                JUDY ZERZAN-THUL, MD
   _____
17
18                     9:13 A.M.
19            WEDNESDAY, NOVEMBER 20, 2024
20            7141 CLEANWATER DRIVE SOUTHWEST
21                 TUMWATER, WASHINGTON
22
23
24 Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR
   WA CCR #2157; OR CSR #20-0477; CA CSR #14435
25 Job Number 7016130

1    Q.   Okay.  Could you please state your full name
2  for the record.
3    A.   Judy Zerzan-Thul.
4    Q.   And where do you live?
5    A.   In Tacoma.
6    Q.   And for the record, where are you presently
7  located today?
8    A.   In Tumwater.
9    Q.   Have you ever been deposed before?
10    A.   Yes.
11    Q.   When?
12    A.   When I worked for the State of Colorado.
13    Q.   And what was the testimony about?
14    A.   Hepatitis C drugs.
15    Q.   About when was that deposition?
16    A.   I really don't remember.
17    Q.   Have you been deposed any other time?
18    A.   No.
19    Q.   Were you deposed in the capacity of working as
20  a chief medical officer for Colorado?
21    A.   Yes.
22    Q.   Have you ever been a party to a civil lawsuit?
23    A.   No.
24    Q.   Have you ever given testimony for any purpose
25  in court?

1    A.   No.
2    Q.   Have you ever given testimony --
3    A.   Oh, actually, yes.  Sorry.
4    Q.   When was that?
5    A.   That was about ten years ago when we adopted
6  our kids.
7    Q.   What about in any other legislative -- in a
8  legislative setting?
9    A.   Do you mean testimony?
10    Q.   Yes.
11    A.   Yes.
12    Q.   When was that?
13    A.   Throughout my job in Colorado and at least
14  once a year since I've been here.
15    Q.   And what is the scope -- what has the scope of
16  your testimony been?
17    A.   I provide guidance, clinically, on a broad
18  basis, and so it could be on any number of topics
19  related to clinical benefits or access to care, topics
20  like that.
21    Q.   Has any of your testimony related to
22  prescription drugs?
23    A.   Yes.
24    Q.   What were -- what was the subject of that
25  testimony?

1    A.   There's been a number of topics that I can't
2  remember them all.  Hepatitis C is one.  High-cost drugs
3  in general is one.  Those were both more recent.
4    Q.   Have you ever been charged with a crime?
5    A.   No.
6    Q.   And what is your current job title?
7    A.   Chief medical officer.
8    Q.   And how long have you held that role?
9    A.   For six years.
10    Q.   So since 2016 -- or 2018?
11    A.   2018.  August 2018.
12    Q.   Okay.  And what are your job responsibilities
13  in this role?
14    A.   I'm the director for CQCT division, which is
15  Clinical Quality and Care Transformation.  I have a
16  staff of, I don't know, around 170 people, and we
17  broadly provide clinical guidance across the agency.  So
18  I have a data team, a Medicaid team, an employee and
19  retiree benefit team, a prior authorization unit, and
20  pharmacy.
21    Q.   Do you report to anyone?
22    A.   Yes.
23    Q.   Who do you report to?
24    A.   Sue Birch.
25    Q.   Is she the -- what's her role?

1    A.   She's the director of the HCA.
2    Q.   And do you have anyone who reports to you
3  directly?
4    A.   Yes.
5    Q.   Who is that?
6    A.   Chris Chen, Donna Sullivan, Heather Schultz,
7  JoEllen Colson, Barbara Manning, Vishal Chaudhry.
8    Q.   Are any of those individuals physicians as
9  well?
10    A.   Yes.
11    Q.   Which ones are physicians?
12    A.   Chris and Heather, and actually Beth Tinker
13  and Jessica are -- also report to me.
14    Q.   Have you held any prior positions at HCA?
15    A.   No.
16    Q.   And where were you -- strike that.
17         Where were you employed before you joined HCA?
18    A.   With the State of Colorado, the Department of
19  Health Care Policy and Financing.
20    Q.   And how long did you have that role?
21    A.   I was part time as a contractor and then full
22  time for probably eight years.  I think I worked there
23  in total about ten.
24    Q.   And what was your role when you left?
25    A.   Chief medical officer.

4 (Pages 10 - 13)

# Exhibit 15

Page 1

1                 UNITED STATES DISTRICT COURT

2               WESTERN DISTRICT OF WASHINGTON

3                         AT SEATTLE

4    ----------------------------  )

5    UNITED STATES OF AMERICA,       )

6    et al.,                         )

7              Plaintiffs,         )Case No.

8    EX REL. JAMIE SIEGEL, M.D.,     )3:23-cv-05459-BHS

9              Plaintiff-Relator,   )

10       vs.                         )

11   NOVO NORDISK, INC.,             )

12                 Defendant.        )

13   ----------------------------  )

14

15           DEPOSITION OF JAMIE SIEGEL, M.D.

16                    WASHINGTON, D.C.

17                     MAY 13, 2024

18

19

20

21

22   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

Page 26

1    Q.  More than ten times?

2    A.  No, probably not.

3    Q.  Okay.  Have you shared documents with

4  Mr. Levy?

5    A.  The first complaint.

6    Q.  When did you share the first complaint

7  with Mr. Levy?

8    A.  Whenever it was unsealed, the 2015

9  complaint.

10    Q.  Anyone else we haven't discussed that you

11  have talked about this case with?

12    A.  I don't believe so.

13    Q.  Okay.  Anyone else that you've shared the

14  original complaint in the case?

15    A.  I don't believe so.

16    Q.  Okay.  And for the record, Dr. Miller is

17  an advisor in your program at UMBC; is that

18  correct?

19    A.  Correct.

20    Q.  What's the basis for your allegation that

21  Novo Nordisk caused the submission of false claims

22  for NovoSeven?

Page 27

1        MS. BUSCHNER:  Objection to the extent it

2  calls for a legal conclusion.

3    A.  Ask me the question again, please.

4    Q.  Give me your best understanding of the

5  basis for your claim that Novo Nordisk caused the

6  submission of false claims for NovoSeven.

7    A.  Well, I cannot answer that as a lawyer or

8  the legal, but there was a vast extent of

9  activities that resulted in fraudulent use of the

10  product, there was a lot of kickbacks, it created

11  huge cost to the Government, and it created harm to

12  the patients.

13    Q.  Which patients were harmed by the use of

14  NovoSeven?

15    A.  The patients that had thrombotic events,

16  the patients that had septic events, the patients

17  that died.

18    Q.  Identify for me the patients you're aware

19  of who had thrombotic events as a result of using

20  NovoSeven?

21    A.  There's a number of patients that are in

22  the FDA adverse events database.  So I can't give

Page 28

1  you their names, but I can give you -- but there's

2  a listing of the FDA adverse events database of

3  patients, ages, and adverse outcomes.  So I have --

4  I've reviewed those.  So there's young children

5  that had myocardial infarctions, there's young

6  children that have had strokes.  There's relatively

7  young people, in their 30s, that have had

8  myocardial infarctions, strokes, thrombotic events,

9  subclavian thromboses, staph sepsis.

10        There's literature.  In the late '90s was

11  the first report of a myocardial infarction that

12  was in an older patient.  There was a young child

13  that had a stroke.  At the MASEC meeting right

14  after the drug was approved the medical director

15  presented to MASEC that there were two patients who

16  had had thrombotic events.  And then there's been

17  literature after that.

18    Q.  Okay.  Objection, move to strike,

19  nonresponsive.

20        Identify for me the patients by name who

21  you know were harmed by the use of NovoSeven.

22    A.  Having seen names -- I don't feel

Page 29

1  comfortable giving you specific patient names.  I

2  don't know if that -- if this is protected

3  information.

4        MS. BUSCHNER:  I think you can provide the

5  information and we can mark it confidential.

6        THE WITNESS:  So the patient that I

7  initially knew a name of was Alan Michael Gonzalez.

8  There's two Asuna brothers that had thrombotic

9  events, one is Victor, and I don't remember which

10  of the two -- if it's Estavan or Eduardo, but one

11  of them had a myocardial infarction either when he

12  was 12 or 15.  Victor Asuna in his autopsy report

13  had myocardial ischemia and that was found in his

14  autopsy, and it seems as if he died from

15  cardiopulmonary disease from what I can read of the

16  records.

17        There's other patients that I've read

18  about or heard about.  There's Steven Weiser from

19  Pennsylvania, he had a stroke.  There's a young

20  man, I don't know exactly what he died from, but

21  his last name is Fennix.

22    Q.  And did you become aware of all of these

8 (Pages 26 - 29)

Page 30

1 patients after you filed this lawsuit?
2     A.  No.  I knew that there were patients that
3 had thrombotic events before I filed the lawsuit.
4 I knew before I went to Novo Nordisk, it was in the
5 literature.
6     Q.  And it, in fact, was in the labeling for
7 NovoSeven, correct?
8     A.  No, not initially.  Initially they
9 insisted that it be for nonhemophilia patients, but
10 then the FDA asked them to revise the label.  So
11 they initially -- while I was at Novo Nordisk they
12 worked very, very hard to make the black box
13 warning specific to nonindicated disorders, and
14 then -- and then it was changed to off-label use.
15 So did I answer your question?
16     Q.  You didn't, but we'll come back.  We'll
17 look at the labeling for NovoSeven and FEIBA later.
18     A.  Absolutely.
19     Q.  But you acknowledge that before you got to
20 Novo Nordisk in 2008 the potential risk of
21 thrombosis with respect to use of NovoSeven and
22 FEIBA were well known in the medical community,

Page 31

1 correct?
2     A.  Yes.
3     Q.  Okay.  The individual patients you named
4 for me, Alan Michael Gonzalez, the Asuna brothers,
5 Steven Weiser, and Mr. Fennix, did you become aware
6 of those individuals specifically after you filed
7 this litigation?
8     A.  No.  I knew about Steve Weiser before.
9     Q.  Okay.  How did you know about him?
10     A.  His mother told me.
11     Q.  Okay.  When was that?
12     A.  In the early 2000s.  She and I were on a
13 panel at Drexel University for the students.  His
14 mother is an oncology nurse and she and I were on a
15 panel together and she talked to me about it.
16     Q.  What did she tell you specifically?
17     A.  She specifically said that her son had a
18 stroke and she thought it was from NovoSeven.
19     Q.  And that was while you were at Thomas
20 Jefferson?
21     A.  Yes.
22     Q.  Did you ever examine Mr. Weiser's medical

Page 32

1 records?
2     A.  No.  I had no access to his records.
3     Q.  Did you ever meet Mr. Weiser?
4     A.  Yes.
5     Q.  You did?  Did you speak to him about his
6 use of NovoSeven?
7     A.  I met him when he was a young man.  I met
8 him when I was a fellow at Jefferson in 1988 or '9.
9 He was in -- I took care of him as a fellow.
10 That's the only time I ever talked to him.
11     Q.  We'll come back to him and the other
12 patients you treated while you were a fellow in a
13 minute.
14         Which patients received kickbacks from
15 Novo Nordisk?
16     A.  Are you asking me specifically or in
17 general?
18     Q.  Specifically.  Which patients do you know
19 of who received kickbacks from Novo Nordisk?
20     A.  Any of the patients that were given money
21 through grants through Seven Secure.
22     Q.  Can you name any of them?

Page 33

1     A.  Alan Michael, Victor Asuna, Vladimir
2 something, Dancy, Larry Lenore.  I'm forgetting the
3 other names.
4     Q.  And you're aware of those names based on
5 the documents that Novo Nordisk produced in the
6 litigation reflecting the patients who received
7 Seven Secure benefits, correct?
8     A.  Correct.
9     Q.  Which key opinion leaders received
10 kickbacks from Novo?
11     A.  Pretty much everybody.
12     Q.  Okay.  Name them.
13     A.  Craig Kessler, Amy Shapiro, Guy Young,
14 Ellis Neufeld.
15     Q.  I'm sorry?
16     A.  Ellis Neufeld.  There's lots more.  Len
17 Valentino, Diane Nugent.  There's others.
18     Q.  Have you reviewed the anti-kickback
19 statute?
20     A.  Yes.
21     Q.  You have?
22     A.  Yes.

9 (Pages 30 - 33)

Page 118

1    Q. Okay. How many patients did you prescribe
2 NovoSeven to?
3    A. Oh, I forgot about -- so I treated that
4 one patient, that first patient on
5 compassionate-use basis, and then when I was an
6 attending I had another patient who I treated with
7 NovoSeven when he had a knee bleed and then I had
8 treated a patient on the surgical protocol. So I
9 had a patient who needed a knee replacement and I
10 treated him on the NovoSeven surgical protocol.
11    Q. The first patient you mentioned with the
12 knee bleed, why did you treat that patient with
13 NovoSeven?
14    A. Because he hadn't -- I don't think he'd
15 ever been treated with FEIBA. He actually was a
16 patient with moderate hemophilia who developed an
17 inhibitor. So he was a little bit different than
18 the severe patients with inhibitors. So he had
19 moderate hemophilia. I don't remember what his
20 titer was, but because he had never been treated
21 with a plasma-derived product, I treated him with
22 NovoSeven and because it was still in the 2000s

Page 119

1 since he was plasma naive I didn't want to give him
2 a plasma-derived product.
3    Q. Why?
4    A. And we were concerned about Jakob-
5 Creutzfeldt at the time.
6    THE REPORTER: And we were concerned
7 about --
8    THE WITNESS: Jakob-Creutzfeldt disease,
9 mad cow disease. I don't know I -- I'm not sure I
10 can spell Jakob-Creutzfeldt for you.
11    Q. Why did you not want to give FEIBA to a
12 plasma-naive patient at that time?
13    A. Actually I believe that any plasma-naive
14 patient shouldn't be given a plasma-derived
15 product. So if you had asked me what I would have
16 recommended for a child, I would have used
17 NovoSeven in a child as well. What I told you was
18 that in my patients that had been on FEIBA and it
19 worked, I used FEIBA. If it was a plasma-naive
20 patient I used NovoSeven and that was because we
21 were worried about mad cow disease at the time.
22    Q. For the patient with the knee bleed to

Page 120

1 whom you prescribed NovoSeven, what dosing did you
2 prescribe?
3    A. 90 micrograms per kilograms.
4    Q. Did you consider prescribing NovoSeven
5 prophylactically to any patient at any time?
6    A. No.
7    Q. Did you prescribe FEIBA prophylactically
8 to any patient at any time?
9    A. No.
10    Q. Did you prescribe NovoSeven in doses
11 greater than 90 micrograms per kilogram to any
12 patient?
13    A. No.
14    Q. And there's no way to monitor a patient
15 for an active joint bleed, is there?
16    A. Are you -- what are you talking about?
17    Q. If a patient comes to see you and they say
18 I can feel that I'm bleeding into my knee, what as
19 a physician do you do? Do you believe the patient
20 and treat them as if they have a knee bleed or do
21 you do something to monitor to confirm whether they
22 have a knee bleed?

Page 121

1    MS. BUSCHNER: Objection, compound
2 question.
3    A. If a patient comes and says that they have
4 a knee bleed at the time, you assume that they have
5 a knee bleed.
6    Q. And treat them accordingly?
7    A. Correct. However, in my patients with
8 chronic joint disease they would sometimes come in
9 and say they weren't sure if they had a bleed or
10 not, and together we would decide whether they got
11 treated or not.
12    Q. How would you decide?
13    A. Sometimes the patients would say let's
14 just wait it out, or they would call me and say
15 wait it out or we would try one treatment and see
16 if it controlled the bleed.
17    Q. And in your clinical experience physicians
18 rely on these patients to tell them when they're
19 experiencing a bleed and when the bleed has
20 stopped, correct?
21    MS. BUSCHNER: Objection, lacks
22 foundation.

31 (Pages 118 - 121)

1   A.  In my training and my experience that was
2  what was typically done, but it also became abused.
3  That practice became abused.
4   Q.  When?
5   A.  I'm not exactly sure.
6   Q.  By whom?
7   A.  Patients and doctors.
8   Q.  Do you know any specifically who began to
9  abuse that practice?
10   A.  I see it in the literature, I see it in
11  the records, and I had one patient who did that.
12   Q.  Which patient?
13   A.  I forget his name.
14   Q.  Do you remember anything about him?
15   A.  I do.
16   Q.  Okay.  Tell me.
17   A.  He had severe hemophilia A, he had a bad
18  joint, he was also getting paid money from his home
19  healthcare company.
20   Q.  Which home healthcare company?
21   A.  I think it was Matrix, but I'm not sure.
22   Q.  Okay.  And what did he tell you why he was

1  using --
2   A.  He didn't tell me.
3   Q.  Who told you?
4   A.  Other patients who worked for home care
5  companies.  So I knew --
6   Q.  Do you remember any of their names?
7   A.  I knew the practice that was going on.
8       Yes.  One was Ron Niederman and one was
9  William Peter Johnson.
10   Q.  And what did they tell you?
11   A.  They both told me when they were dying
12  that as home care reps they overprescribed
13  themselves and they pushed other people -- well,
14  William Peter told me that he pushed other people
15  to overprescribe because of the money they would
16  make.
17   Q.  And what were they pushing people to
18  overprescribe?
19   A.  Well, William Peter did it for the
20  patients -- I don't -- I don't know that he had any
21  inhibitor patients that were using his home care
22  company and I don't remember which home care

1  company he worked for.  Ron Niederman only told me
2  about his own use, and -- but it was -- it was a
3  pattern.  William Peter used to call me up and ask
4  me to increase the dosage of factor for some of my
5  patients as well.
6   Q.  Which product specifically?
7   A.  Whatever they were on.  Whatever they were
8  on when he was -- so I know that it was a
9  generalizable pattern because I heard about it from
10  specifically the names that I gave you, but I also
11  heard about it when I was at Hemophilia Federation
12  of America as the medical -- one of the medical
13  advisors.
14   Q.  When was that?
15   A.  I don't -- I think I became a medical
16  advisor when I was at Jefferson, after I left -- I
17  think it was sometime between Robert Wood Johnson
18  and Jefferson and then I was still a medical
19  advisor for a few years after I left Jefferson when
20  I was at Novo.
21   Q.  But by the time you got to Novo in 2008
22  you believed that patients were the best source of

1  information about when they were bleeding and when
2  they needed to be treated, correct?
3   A.  No.  I told you that I knew it from my own
4  patients when I was at Jefferson.  I knew how
5  patients were influenced, I knew how doctors were
6  influenced.
7       MS. JONES:  Mark that 118, please.
8           (Whereupon a discussion was had
9            off the record.)
10           (Defendants' Exhibit 118 was
11            marked for identification.)
12  BY MS. JONES:
13   Q.  We've marked this as Exhibit 118.  This is
14  an e-mail exchange.  Bottom of the first page you
15  wrote June 25th, 2008 to Klaus Bulow Davidsen.  Do
16  you see that at the bottom of the first page?
17   A.  Yes.
18   Q.  And you say in the first paragraph, fourth
19  line "There's no way to monitor the activity level
20  of a joint bleed in a patient with hemophilia."
21  You go down to the third paragraph, "Just so you
22  know, a patient will tell you that they can feel

32 (Pages 122 - 125)

Page 158

1 is that right?

2    A. Absolutely.

3    Q. Have you done anything to retract it?

4    A. No.

5    Q. Why not?

6    A. That's a good question, but instead I went

7 to Bayer so that I could run the study and come up

8 with the right answer.

9    Q. Just like you went to Novo, so you could

10 get to Novo and fix things there?

11        MS. BUSCHNER: Objection, mischaracterizes

12 her testimony.

13    A. No, I didn't need to fix anything at

14 Bayer. There was nothing to fix there. I was -- I

15 was happy to be in charge of this study, but I did

16 not need to fix anything at Bayer. There was

17 nothing that I experienced there that needed to be

18 fixed. I actually went to Bayer because they

19 did -- they seemed to be doing good clinical

20 work.

21    Q. On page 386 in the last paragraph before

22 the acknowledgement, second sentence, "In an effort

Page 159

1 to augment this information the adult prophylaxis

2 study group is planning a more extensive survey to

3 be distributed throughout several U.S. hemophilia

4 treat centers. We hope that our colleagues will

5 take the time to respond to the questions and share

6 their treatment experiences, insights, and

7 concerns. In this way the foundation can be laid

8 for the eventual creation of desperately needed

9 evidence-based guidelines for adult prophylaxis."

10 Did I read that correctly?

11    A. I suspect so.

12    Q. So this letter recognizes the importance

13 of physicians contributing their experience to the

14 treatment community, correct?

15    A. Well, I refused to be part of that survey.

16 I refused to participate in that. I was asked to

17 go along with that, but I was also -- and this was

18 Baxter. So Baxter did something that I don't agree

19 with and instead Bayer spent the money to do the

20 clinical trial to answer this question.

21    Q. Indeed the acknowledgement says that "The

22 opinions presented in the letter were expressed

Page 160

1 during a CME" -- continuing medical education --

2 "needs assessment forum sponsored by Scienta

3 Healthcare and an educational grant from Baxter

4 Healthcare Corporation." Baxter was, of course,

5 the manufacture of FEIBA at the time, correct, in

6 addition to other hemophilia treatments?

7        MS. BUSCHNER: Objection, compound

8 question.

9    A. And if you ask me how do I know how things

10 get promoted off-label and how physicians get

11 involved in this and enticed and induced and write

12 these kind of things, personal experience, which

13 I'm not -- I am not proud of.

14    Q. Because you believe Baxter's support of

15 this letter was a kickback?

16    A. Yeah.

17    Q. So Baxter also paying kickbacks?

18    A. Not quite to the same degree.

19    Q. Okay. And you accepted the kickback?

20    A. Well -- well, that's a good question

21 because I never started anybody on secondary

22 prophylaxis based on this.

Page 161

1    Q. When did you first have a concern about

2 Baxter's support of the discussion that led to this

3 letter?

4    A. When I was at the meeting.

5    Q. Did you express your concerns then?

6    A. Yeah. Actually to a couple of my

7 colleagues.

8    Q. To who?

9    A. I don't remember.

10    Q. But you went ahead and allowed this letter

11 with your name on it to be published, right?

12    A. I did.

13    Q. And to this day you've done nothing to

14 retract it?

15        MS. BUSCHNER: Objection, asked and

16 answered.

17    A. Retractions are usually when -- if you

18 look at what's going on in the literature now,

19 retractions are when you publish something that

20 gives scientific results based on research that's

21 done. So the retractions in the scientific

22 literature are usually based on people doing, you

41 (Pages 158 - 161)

Page 162

1 know, scientific experiments and modifying the
2 photos or modifying the data results. There was
3 nothing in this that needs to be retracted because
4 I wasn't misrepresenting any data. This was an
5 opinion piece. This is a letter to the editor.
6 This talks about something that needs to be done,
7 but there is nothing here that gives inaccurate
8 data.
9    Q. Did you sue Baxter?
10    A. There's no reason -- this is not
11 inaccurate -- this is not -- there is no lie in
12 this. This is not -- this is not data that was
13 manipulated.
14    Q. I thought you said that this was an
15 example of Baxter paying kickbacks?
16    A. Why would I sue them? This is -- why
17 would I sue them?
18    Q. In the disclosures you agree that every
19 author except for David Becton, including you
20 discloses that they have received funding from
21 various pharmaceutical companies, correct?
22    A. Yes.

Page 163

1    Q. In fact, you disclose that you served on
2 an advisory board for Octapharma and that you had
3 previously been a consultant for CSL Behring,
4 correct?
5    A. A researcher and sponsored Website for a
6 moderator. That's different.
7    Q. And, in fact, you were a consultant for
8 Octapharma, correct? It's misspelled here, but
9 it's Octapharma.
10    A. It says -- it says here I was a member of
11 an advisory board at Octapharma.
12    Q. Were you paid?
13    A. I was on the advisory board, yes.
14    Q. Were you paid?
15    A. Yes.
16    Q. Did you accept a kickback?
17    A. No.
18    Q. Why not?
19    A. Because I was on an advisory board and
20 Octapharma hadn't been approved yet.
21    Q. I see. So if Octapharma was paying people
22 to participate on an advisory board, as long as it

Page 164

1 didn't have any approved medications there could be
2 no kickback?
3        MS. BUSCHNER: Objection.
4    A. I was being -- I was -- being on an
5 advisory board is different than being on a
6 consulting or -- I was -- I was on the advisory
7 board because they were talking about laboratory
8 monitoring, there was laboratory studies, they were
9 trying to develop -- figure out the best way to
10 monitor the drug and which laboratory assays. So a
11 lot of my work on that advisory board was as a
12 laboratory clinician.
13    Q. And you signed an agreement to be part of
14 the advisory board, correct?
15    A. Yeah.
16    Q. That's how you got paid?
17    A. Yes, but that was --
18    Q. It was a consulting agreement, wasn't it?
19    A. But it's not a kickback because there was
20 no -- as far as I know since I'm not a lawyer, but
21 I wasn't asked to be on the advisory board so that
22 I would prescribe Octapharma products.

Page 165

1    Q. And so you agree that physicians can
2 participate in advisory boards without receiving
3 kickbacks, right?
4        MS. BUSCHNER: Objection, calls for
5 speculation, it's a hypothetical.
6    A. It depends. It depends what kind of
7 advisory board you're on.
8    Q. I see. Tell me the advisory board that
9 you're on that necessarily means you as an advisor
10 are receiving kickbacks.
11        MS. BUSCHNER: Objection, mischaracterizes
12 her testimony.
13    A. A lot of these consensus meetings were
14 supposedly consultant meetings where they would --
15 these publications would come out of where they
16 would advise how to treat patients.
17    Q. Give me a specific example of an advisory
18 board that you believe was a vehicle for kickbacks
19 to be paid.
20    A. There's a lot of consensus documents that
21 came out of the Novo Nordisk meetings. So I'd have
22 to look at the publications. I'm sure we're going

42 (Pages 162 - 165)

Page 246

1    A.  Yeah.
2    Q.  -- do you remember Dr. Shapiro -- other
3  than the one comment in New York about using a 270-
4  microgram dose, do you remember ever hearing
5  Dr. Shapiro express a view about the use of a
6  product that you believed was unsafe?
7    A.  No, but I read her articles where she
8  wrote it.
9    Q.  And you believe that Dr. Shapiro writes
10  articles that are tainted by kickbacks, right?
11    A.  Yes.
12    Q.  And worse, you believe that Dr. Shapiro
13  accepts kickbacks and in exchange for that she
14  promotes uses of drugs that put the lives of
15  children at risk?
16    MS. BUSCHNER:  Objection, mischaracterizes
17  her testimony.
18    A.  Yeah.  Let's break down your statement.
19  Worse yet, that's a judgment.  Okay.  Second, she
20  accepts -- well, it's hard to know exactly what
21  honorariums she actually accepted because up until
22  a certain point in time she never declared them

Page 247

1  because they always went to her treatment center
2  and she said that it wasn't money that went
3  directly to her.  So at all the MASAC meetings she
4  would take I don't need to disclose this because
5  the money didn't come directly to me, it all goes
6  to my treatment center.  So it's unclear exactly
7  what she got in kickbacks.
8    Q.  But you believe she got kickbacks?
9    A.  Well, I know that she spoke for Novo
10  Nordisk, I know that she wrote articles for Novo
11  Nordisk.
12    Q.  You allege in your complaint that she
13  received kickbacks?
14    A.  Yeah.
15    Q.  So you continue to agree with that or you
16  don't, yes or no?
17    A.  She got kickbacks.
18    Q.  Okay.  And in exchange for those kickbacks
19  you allege that she promoted the use of NovoSeven
20  in ways that put the lives of children at risk, yes
21  or no?
22    MS. BUSCHNER:  Mischaracterizes the

Page 248

1  testimony and the complaint, objection.
2    A.  I believe that she used NovoSeven
3  excessively and inappropriately and I believe that
4  it was tied to her relationship with Novo Nordisk
5  and I believe that they supported her use and she
6  also made -- her treatment center made money doing
7  that.  And further in the dose investigator meeting
8  minutes she said the reason we need studies like
9  this is so that I can show them -- something like
10  -- I'm paraphrasing, I'm paraphrasing.  Don't
11  take -- I need these like when I'm audited by
12  Medicare, I need these when -- you know, I need
13  these to support my use of NovoSeven.  It's in the
14  investigator meeting minutes.  And yes, Amy
15  Shapiro, she had the support of all of this
16  documentation supported by Novo Nordisk so that if
17  somebody questioned her use of high dose and/or
18  prophylaxis she could say this is the publication,
19  and Amy Shapiro's hemophilia treatment center
20  revenue went up in the same curve that Novo Nordisk
21  did.  They're parallel curves.
22    Q.  You believe that Novo Nordisk's

Page 249

1  profitability went up because of NovoSeven sales?
2    A.  Oh, yeah.
3    Q.  And you believe that Amy Shapiro infected
4  all the literature and all the studies to support
5  what she knew to be off-label and dangerous uses of
6  NovoSeven at her own HTC?
7    A.  I'm not sure --
8    MS. BUSCHNER:  Objection, mischaracterizes
9  the testimony, mischaracterizes the complaint.
10    THE WITNESS:  I wouldn't use the word
11  "infected."  I do believe that there was a
12  symbiotic relationship.  Novo Nordisk benefited and
13  so did Amy Shapiro and so did other physicians.
14    Q.  It's not possible in your view that
15  Dr. Shapiro in good faith believes that the
16  prophylactic use of NovoSeven is safe and
17  effective?
18    MS. BUSCHNER:  Objection, calls for
19  speculation.
20    A.  I believe that physicians can deceive
21  themselves into thinking they're doing the right
22  thing.

63 (Pages 246 - 249)

Page 258

1 convince physicians to do things because they
2 trusted me and valued my opinion. So there was no
3 way I was going to be trying to talk people into
4 doing things and abusing any kind of respect that
5 they had for me and I was not going to have it
6 touch my integrity.
7     Q. Which physician -- which physicians did
8 you believe respected you?
9         MS. BUSCHNER: Objection, vague.
10    A. Well, I would have -- I would have liked
11 to have believed that most physicians respected me
12 at least because they knew my honesty and
13 integrity. And so most physicians knew how I
14 practiced medicine and how I conducted myself in my
15 work either because I was on advisory boards with
16 them or consulting boards or interacting with them
17 at regional meetings or at other meetings.
18    Q. And on these advisory boards and
19 consulting boards you were accepting honoraria to
20 the same extent they were?
21        MS. BUSCHNER: Objection, lacks
22 foundation, speculation, assumes facts not in

Page 259

1 evidence, vague.
2        MS. JONES: If you know you can answer.
3    A. I was on a lot of advisory boards and at
4 all those advisory boards everyone that was at
5 those meetings knew that I was never reluctant to
6 challenge what people said if I thought it was a
7 safety issue or not good clinical care.
8    Q. Would it surprise you if physicians who
9 served on advisory boards with you, in fact, would
10 testify that you were primarily a wallflower at
11 those meetings?
12        MS. BUSCHNER: Objection, calls for
13 speculation, lacks foundation, no evidence in this
14 case.
15    A. Can you imagine me being a wallflower if I
16 didn't agree with something when I was -- maybe not
17 early in my career, but later in my career, can you
18 imagine? And I spoke out a lot. So I don't know
19 what meetings you're coming up with.
20    Q. I'll just have to imagine that you're the
21 only one telling the truth.
22    A. Excuse me.

Page 260

1    Q. I'll just have to imagine that you're the
2 only one telling the truth.
3        MS. BUSCHNER: Objection, argumentative,
4 testifying.
5    Q. Turn to paragraph 144.
6        MS. BUSCHNER: Unprofessional.
7        THE WITNESS: Very unprofessional.
8        MS. BUSCHNER: Bullying.
9        THE WITNESS: A little bit. I think -- I
10 think you would probably also agree that most
11 people are a little bit more tactical -- what's the
12 right word -- in how they answer questions.
13    Q. Honest?
14    A. No, no, no, no. Just a little bit more
15 diplomatic.
16    Q. Paragraph 144 you reference a
17 February 5th, 2008 --
18    A. Wait. What number are you on?
19    Q. Paragraph 144.
20    A. 134?
21    Q. 44.
22    A. 144. Okay.

Page 261

1    Q. You reference a February 5th, 2008
2 memorandum of a January 18th strategy meeting. Do
3 you remember anything about this meeting before we
4 look at the document?
5    A. Is this the meeting with Paul Huggins?
6    Q. Correct.
7    A. Yes, I remember the meeting.
8    Q. What do you remember about the meeting?
9    A. I remember it was my first meeting like
10 that. And Paul was running it. He had come in
11 from Switzerland. And Howard and I were there,
12 David Cooper was there, the marketing people were
13 there.
14        MS. JONES: We're going to mark this
15 together as 123, please.
16        THE WITNESS: And Paul was trying to come
17 up with the overall hemophilia portfolio for the
18 company. I think the company was deciding at the
19 time which of their clinical trials that they
20 wanted to go forward with, like Novoeight and some
21 of the other products.
22        MS. JONES: We'll mark this as 123.

66 (Pages 258 - 261)

Page 262

1    MS. BUSCHNER: This doesn't seem to have
2 any Bates labels on it. Does somebody know what
3 Bates label it's using?
4    THE WITNESS: Wait. This one doesn't have
5 a number on it.
6    MS. JONES: That's the attachment to that
7 one.
8    THE WITNESS: Okay.
9    MS. JONES: We'll get you the Bates
10 number.
11        (Defendants' Exhibit 123 was
12            marked for identification.)
13 BY MS. JONES:
14    Q. This is a -- the top e-mail is a
15 February 5, 2008 e-mail from Paul Huggins to a
16 number of people including you.
17    A. Did you ask me a question? I missed it.
18 I'm sorry. I was looking at this.
19    Q. Do you see that this is a February 5th,
20 2008 e-mail from Paul Huggins to a number of people
21 including you?
22    A. Yes.

Page 263

1    Q. And the attachment is a hemophilia
2 portfolio strategy U.S. workshop; do you see that?
3 That's the attachment.
4    A. Uh-huh.
5    THE REPORTER: Yes?
6    THE WITNESS: Yes. Sorry.
7    Q. Is this the summary memorandum that you
8 reference in paragraph 144?
9    A. Looks like it.
10    Q. At the top of the attachment it says "A
11 workshop with participation from IM and colleagues
12 from the NNI NovoSeven marketing, medical affairs,
13 and clinical research was held on January 18th,
14 2008 with an objective of securing NNI input into
15 the hemophilia portfolio strategy." What do you
16 understand a workshop to be?
17    MS. BUSCHNER: Objection.
18    A. It's used different ways, different -- I
19 had no idea what it was. I was new to industry.
20    Q. In the complaint at paragraph 144 you
21 focus on a section of the memo with the heading
22 "Identify opportunity spaces"; do you see that?

Page 264

1 It's on page 2 of the memorandum.
2    A. Yes.
3    Q. And you see there are five market segments
4 listed?
5    A. Yes. Sorry. Yes.
6    Q. These are all hemophilia market segments,
7 correct?
8    A. Yes.
9    Q. Are there any segments of the hemophilia
10 market that are not listed here?
11    A. Is this a trick question? I don't know.
12 I guess surgical. There's adults -- yeah. I think
13 what's missing here -- yeah. It's -- I don't know.
14    Q. And none of this is specific to NovoSeven,
15 right? This is just the hemophilia market,
16 correct?
17    A. Paul Huggins was trying to figure out how
18 Novo Nordisk should plan out their future
19 portfolio.
20    Q. Correct. Not specific to NovoSeven, but
21 the entire hemophilia portfolio, correct?
22    MS. BUSCHNER: Objection, lacks

Page 265

1 foundation.
2    A. It seemed to me that he was trying to
3 figure out which projects -- it seemed to me that
4 he was trying to figure out, you know, where they
5 should I guess divide their money into different
6 segments because he was -- I think he was -- I
7 think he was marketing. He was really smart,
8 though, and he was really good, but I think he was
9 marketing and I think marketing helped pay for the
10 clinical trial work at Novo. So he was trying to
11 sort of figure out where the best development
12 programs and projects should be.
13    Q. You think that or you know that?
14    A. That's my conclusion based on what he was
15 doing at the meeting and what I learned later about
16 how the clinical trials were being funded.
17    Q. And the very last page, "Understanding
18 opportunities and challenges," the following
19 opportunities were identified, launching a
20 long-acting factor VIII and launching Novo Nordisk
21 1731; do you see that?
22    A. Which -- which document? What page?

67 (Pages 262 - 265)

Page 266

1   Q. Still in the memo, last page.

2   A. Wait. This memo?

3   Q. Correct.

4   A. Okay.

5   Q. The one that says memo, last page under

6   "Opportunities," "The following opportunities were

7   identified," "Launching long-acting recombinant

8   factor VIII," "Launching NN1731"; do you see that?

9   A. Yeah.

10   Q. Doesn't say promote NovoSeven off-label,

11   does it?

12   MS. BUSCHNER: Objection, the document

13   speaks for itself.

14   A. Paul Huggins wrote this. This is what

15   he -- this was his objective. It was different

16   than Tanya's objective, and that's when I first

17   realized that there was conflict.

18   Q. You say that the memorandum discussed ways

19   to make prophylactic treatment more attractive and

20   that it was part of the overall scheme to promote

21   NovoSeven off-label. Where in this memorandum does

22   it suggest that the future strategy was around

Page 267

1   NovoSeven promotion off-label?

2   MS. BUSCHNER: Objection.

3   A. We might have -- what's it called? You

4   know, I was basically talking about Tanya's

5   interpretation of the memo.

6   Q. Okay.

7   A. What's it called?

8   Q. Conflating. Show me where in Tanya's

9   e-mail it suggests that the strategy for the

10   hemophilia franchise is to promote NovoSeven

11   off-label.

12   MS. BUSCHNER: Objection, mischaracterizes

13   the complaint.

14   MS. JONES: While she's reading can I

15   just -- for the record, the Bates numbers for these

16   documents that got cut off in the copying are

17   NNI-CID-1079610.

18   MS. BUSCHNER: Okay. Thanks.

19   MS. JONES: And then following.

20   (Witness reviewing document.)

21   A. She put some things in here that -- she

22   has prophylaxis children with inhibitors. Oh, they

Page 268

1   were also talking about using NovoSeven in patients

2   without inhibitors. Tried to figure out a way to

3   use NovoSeven in patients instead of factor VIII

4   and factor IX replacement. They were trying to

5   find other areas in which to increase the use of

6   NovoSeven.

7   Q. Where does it say they were trying to find

8   ways to increase the off-label use of NovoSeven for

9   patients without inhibitors?

10   A. Well, It says that here in that list that

11   has the dashes. Why would she be talking about

12   prophylaxis in adults without inhibitors when we're

13   talking about NovoSeven? Unless she was talking

14   about factor VIII.

15   Q. Right. There's nothing specific to

16   NovoSeven in that bullet, is there?

17   A. No. There was something in here that

18   caught my eye when she put it out and I'm not

19   finding it now, but I felt like it was different

20   than what we had discussed at the meeting.

21   MS. JONES: Can we mark this as 124,

22   please.

Page 269

1   THE WITNESS: And maybe by then I was

2   reading between the lines. I don't know.

3   THE REPORTER: Hold on, please.

4   (Defendants' Exhibit 124 was

5   marked for identification.)

6   BY MS. JONES:

7   Q. We've handed you what we've marked as

8   Exhibit 124. This is an August 17th, 2008 e-mail

9   from you to Henrik Rasmussen and others; do you see

10   that?

11   A. Yes.

12   Q. And you produced this document to us. Do

13   you see at the bottom Relator, leading zeros,

14   339?

15   A. I remember writing it, yes.

16   Q. Did you print this and take it before you

17   left Novo Nordisk?

18   A. I must have.

19   Q. How many documents did you print and take

20   with you when you left the company?

21   A. I don't remember.

22   Q. Is there a reason you printed certain

68 (Pages 266 - 269)

Page 270

1  documents and not others?
2      A.  Yes.
3      Q.  Why?
4      A.  Because I was having concerns and I was
5  concerned about -- I was concerned on -- probably
6  more on an integrity basis than a legal basis, but
7  there were things that I was extremely
8  uncomfortable about when I was at Novo and I wanted
9  to retain documents in case there was ever a
10  question about what I had done when I was there.
11      Q.  And you were already contemplating
12  bringing this lawsuit while you were there?
13      MS. BUSCHNER:  Objection.
14      A.  I don't think I understood the full extent
15  of what was happening.  So I would -- I was more
16  worried about other illegalities and other things
17  that were harmful to patients, including the
18  promotion of NovoSeven.  Did I specifically, no,
19  but I was concerned about a lot.
20      Q.  And were you specifically printing and
21  retaining documents because you were thinking about
22  bringing a whistleblower lawsuit?

Page 271

1      MS. BUSCHNER:  Objection to the extent
2  that it causes you to divulge any attorney-client
3  communications.
4      A.  I'm not a lawyer.  I was -- I was a doctor
5  and I am a doctor.  And I just had general concerns
6  about it.
7      Q.  Were you printing and retaining documents
8  because while you were an employee at Novo Nordisk
9  you were contemplating bringing a lawsuit?
10      MS. BUSCHNER:  Same objection.
11      A.  Yes, I think it -- I couldn't tell you
12  what I understood was legally bothersome.  I just
13  knew there was bothersome behavior.
14      Q.  When was the first time you contacted a
15  lawyer about your concerns about Novo's conduct?  I
16  don't want to know what you told a lawyer.  I just
17  want to know when approximately it was you first
18  contacted a lawyer.
19      MS. BUSCHNER:  Okay.  We object to the
20  question to the extent that it seeks content.
21      MS. JONES:  I'm asking for a date only, no
22  content.

Page 272

1      MR. GUTTMAN:  You've asked the question as
2  to when she contacted a lawyer with regard to suing
3  Novo.  That requires her to divulge content.
4      MS. JONES:  You're objecting on the basis
5  that the date when somebody a contacts a lawyer is
6  itself privileged information?
7      MR. GUTTMAN:  You're asking for the
8  purpose of.
9      MS. JONES:  When was the first time you
10  contacted a lawyer to discuss concerns about Novo
11  Nordisk?
12      MR. GUTTMAN:  To discuss concerns gets
13  into why she's contacting a lawyer, what she's
14  going to say, which is discussing the concerns.
15  Hence, it goes into the substance of
16  communications.
17      MS. JONES:  I'm not asking for the content
18  of the communication.  If you want to object and
19  instruct her not to answer the question of what
20  date she first contacted a lawyer, you can go ahead
21  and do that.
22      A.  I don't remember.  So -- I don't remember.

Page 273

1      Q.  I think I asked you this at the beginning.
2  But when did you contact -- when did you first
3  contact Mr. Guttman and Ms. Buschner?
4      A.  I don't remember.
5      Q.  Was it while you were still an employee at
6  Novo?
7      A.  No.
8      Q.  After?
9      A.  Yes.
10      Q.  While you were still at Bayer?
11      A.  No.
12      Q.  While you were at CSL Behring?
13      A.  No.
14      Q.  While you were at Eisai?
15      A.  No.
16      Q.  While you were at Catalyst?
17      A.  Oh, no, no.  It was before Eisai.
18      Q.  Between CSL Behring and Eisai?
19      A.  Uh-huh.
20      Q.  So we've given you what's been marked as
21  Exhibit 124.  Turn to page 4 of 6, Bates
22  RELATOR-000339.  This is an e-mail from Henrik to

69 (Pages 270 - 273)

Page 274

1 you and to Howard Levy. Henrik asks "Jamie,
2 Howard, how many patients with factor VIII
3 deficiency are there in the U.S.? Trish, how many
4 in Canada?" Do you see that question?
5    A. Yes.
6    Q. Okay. Let's look at your response. You
7 have to flip back four pages. Can you read the
8 first sentence for me.
9    A. I will answer your written as well as
10 unspoken question --
11    THE REPORTER: I'm sorry. I'm not
12 understanding you.
13    THE WITNESS: Sorry. I will -- I was
14 laughing. "I will answer your written as well as
15 unspoken questions."
16    Q. And your answer to the question of how
17 many factor VIII patients are there in the United
18 States goes on for three full pages. Do you recall
19 the feedback that you got from Eisai about not
20 being able to answer a direct question?
21    MS. BUSCHNER: Objection.
22    MS. JONES: Is this a good example of you

Page 275

1 not being able to answer a direct question?
2    MS. BUSCHNER: Argumentative, objection.
3    A. I would actually say it's an excellent
4 example of --
5    THE REPORTER: I'm sorry. I cannot hear
6 you.
7    MS. BUSCHNER: Sorry.
8    A. -- of answering a direct question
9 completely.
10    Q. The highlighting was produced to us in the
11 original. So I assume this is your highlighting at
12 the bottom of page 1?
13    A. I don't know.
14    Q. Do you know why No. 10 is highlighted?
15    A. Why I might have highlighted that?
16    Q. Do you know?
17    A. I would need to spend time reading the
18 whole thing, but I suspect I was trying to explain
19 to Henrik why we were having trouble enrolling
20 patients on the 1804 trial.
21    Q. That's why you printed this and
22 highlighted that sentence?

Page 276

1    A. I think so, but I can't vouch for that.
2    MS. JONES: Okay. Let's take a break.
3    THE VIDEOGRAPHER: The time -- sorry. The
4 time is 6:03 p.m. We are going off the record.
5        (A break was had.)
6    THE VIDEOGRAPHER: The time is 6:27 p.m.
7 We're going back on the record.
8    Please proceed, Counsel.
9    MS. JONES: What's our next number?
10    THE REPORTER: 125.
11 BY MS. JONES:
12    Q. Dr. Siegel, in the complaint you talk a
13 lot about the battle of the brands meeting. Do you
14 remember those allegations generally?
15    A. Yes.
16    Q. Were you at the meeting where the
17 marketing team discussed the battle of the brands?
18    MS. BUSCHNER: Objection. Can you point
19 her to a particular --
20    MS. JONES: Were you at any meeting in
21 which the battle of the brands was presented?
22    A. I believe that I was not at that meeting

Page 277

1 because it was already in 2009, but I was at a
2 meeting where -- that predated that meeting. I was
3 at a meeting in 2008 where they just had an
4 insignia for the military --
5    Q. You were at a meeting --
6    A. -- and it was a similar battle of the
7 brands and they talked about tactics and
8 strategy.
9    Q. You were at a meeting in 2008 where people
10 talked about something called the battle of the
11 brands?
12    A. It was the same general concept. It was a
13 progression of concepts.
14    Q. And who was at the meeting?
15    A. The meeting that I was at marketing was
16 there, sales was there, the woman that was in
17 charge of all the MSL's was there.
18    Q. Who specifically? Do you remember any
19 names?
20    A. Her initials were M -- it was Michelle
21 something. MWSO I think or MSWO, something like
22 that.

70 (Pages 274 - 277)

Page 278

1    Q. Do you remember anything about the
2  meeting?
3    A. Yeah. I remember that all -- the concepts
4  got better developed through those -- the
5  progression of those meetings because I think there
6  was also war games, but the one I was at was where
7  they were trying to figure out ways to promote
8  NovoSeven.
9    Q. What specifically was discussed about
10 promoting NovoSeven at the meeting you were at?
11   A. Well, if I may, I want to go back to this
12 because now I remember why we wrote this because
13 it's related.
14   Q. Sorry. Dr. Siegel, I need you to answer
15 my question, please. What specifically was
16 discussed about promoting NovoSeven at the meeting
17 you were at where you remember battle of the brands
18 being discussed?
19   A. No. I said battle of the brands was not
20 being discussed. I was at a meeting that predated
21 battle of the brands, but it was the same
22 progression of marketing messages.

Page 279

1    Q. How do you know it was the same
2  progression of marketing messages if you weren't at
3  the 2009 battle of the brands meeting?
4    MS. BUSCHNER: Objection.
5    A. Because I reviewed it, I saw the
6  document.
7    Q. So after the fact you reviewed a document
8  about a 2009 battle of the brands meeting that you
9  were not at and concluded that it was some natural
10 extension of an earlier meeting you were at in
11 2008?
12   MS. BUSCHNER: Objection, lacks
13 foundation.
14   A. It's a very logical conclusion because it
15 was the same -- it was the same concepts. It was
16 the same underlying I guess plan that they were
17 having to try to work with the sales
18 representatives to figure out ways to promote
19 NovoSeven.
20   Q. There was a specific discussion about
21 working with sales representatives to promote
22 NovoSeven at the meeting you were at in 2008?

Page 280

1    A. It was -- there was a lot of sales
2  representatives and we were coming up with messages
3  and market -- whatever. I would need to see it in
4  front of me to tell you the specifics, but it was
5  the same concepts about which patients to target or
6  how to present messages and things like that.
7    Q. At a meeting in 2008 you were present when
8  messages that sales reps were going to deliver in
9  the field were discussed about NovoSeven, yes?
10   A. No. It was one of those brainstorming
11 sessions to try to figure out ways -- so nothing
12 solid came out of it, but it was brainstorming
13 sessions to try to figure out ways to increase the
14 use of NovoSeven above and beyond what was being
15 used at the time.
16   Q. And you remember sales representatives
17 specifically being in this meeting?
18   A. Yeah.
19   Q. Who?
20   A. Rick Bedford and I were put into the same
21 group.
22   Q. Okay. And what was the output of the

Page 281

1  discussion that you and Rick Bedford were a part
2  of?
3    MS. BUSCHNER: Objection, lacks
4  foundation.
5    MS. JONES: Sorry. I'm asking her about a
6  discussion she just told me she participated in.
7    MS. BUSCHNER: You just said put into
8  the -- output that was -- what they did. She
9  talked about a discussion.
10   A. I'm not sure what the final document -- I
11 can't tell you which was the final document.
12   Q. What was discussed in this small group
13 that you and Rick Bedford were part of?
14   A. They were trying to figure out, as I said,
15 which segments of the population were not -- you
16 know, were using NovoSeven, who wasn't using
17 NovoSeven, how to approach the market to try and
18 enhance it, but I can't give you any better
19 specifics. I'm just not remembering.
20   Q. Do you remember at that meeting anybody
21 developing messages for the promotion of NovoSeven
22 that were to be used going forward by the sales

71 (Pages 278 - 281)

Page 282

1 reps?

2    A. As I said, it was a brainstorming session.
3 And so there were lots of -- you know, in the
4 brain -- they put up all those tags and stuff and
5 then somebody pulls them all together and comes up
6 with concepts.

7    Q. And you, in fact, never accompanied any
8 Novo Nordisk sales representative into the field to
9 speak with any clinician, did you?

10    A. No.

11    Can I go back and --

12    MS. BUSCHNER: I think she's just trying
13 to correct the record for you, but if you don't
14 want it then --

15    THE WITNESS: I remember the break gave me
16 the opportunity to be able to answer this question.
17 I knew the --

18    Q. Which question?

19    A. The one about the portfolio strategy.
20 So --

21    Q. So at the break you talked with your
22 counsel and now --

Page 283

1    A. No, I actually didn't. Whoops -- sorry.

2    Q. Go ahead.

3    A. I actually didn't talk to my counsel at
4 all. I actually went outside.

5    Q. Go ahead. What do you want to correct?

6    A. Well, the issue is is what Paul Huggins
7 put together was all of the possible markets where
8 Novo Nordisk might want to go into. So that
9 included the inhibitor market and the noninhibitor
10 market, and we also talked about the drugs that
11 were in development at the time. And as you can
12 see, some of it is discussed in Tanya's e-mail
13 where she's talking about this NN-1731, which was
14 supposed to be the super NovoSeven. It was
15 supposed to be faster acting and better acting, but
16 it was still in early development.

17    So a lot of what we discussed in Paul's
18 meeting was, you know, where there could be
19 improvements in care for patients and/or areas that
20 if Novo Nordisk was committed to the hemophilia
21 community where they should be putting their money
22 into clinical development. So we spoke a lot at

Page 284

1 that meeting, I spoke a lot about figuring out a
2 way to improve the prophylactic care of patients
3 with inhibitors and also how to protect these
4 children from developing early joint bleeds just
5 like we did with factor VIII and factor IX
6 prophylaxis so that if they managed to be tolerized
7 and go back on their product they would have joints
8 that were equivalent to the children who were now
9 exposed to prophylactic therapy.

10    So at the time there was a hope that there
11 would be a stronger-acting follow-on product for
12 NovoSeven that would, in fact, be able to be given
13 with one dose instead of three doses. I mean, the
14 point of not wanting to inject a child every two
15 hours is a good point, but just wishing that you
16 could have a better way to do it than actually
17 having it are two different things. So this new
18 product we were hoping with one dose would control
19 the bleed. So that would be great.

20    And then we were also talking about a
21 prophylaxis. And so there were different ways of
22 giving prophylaxis, but based on that discussion

Page 285

1 that Paul Huggins was leading, I spoke a lot about
2 what the needs were in the hemophilia community.
3 And so the reason I wrote this in the complaint was
4 because a lot of things that we talked about that
5 actually Novo Nordisk was never able to follow
6 through on because their agents weren't being
7 successful in the clinical trials, instead they
8 came -- they used those same hopes of helping
9 improve the care of the hemophilia patients with
10 inhibitors and developed marketing messages that
11 suggested that NovoSeven could do it even though it
12 couldn't.

13    Q. Nothing in this document talks about
14 developing a marketing message for NovoSeven, does
15 it, ma'am?

16    MS. BUSCHNER: Objection.

17    A. Somehow that's what I read in what she
18 wrote or maybe it was because a meeting in between
19 Paul's meeting and when this e-mail was written
20 discussed it.

21    MS. JONES: Mark this --

22    THE WITNESS: But there's no question that

72 (Pages 282 - 285)

Page 286

1  what we talked about at that meeting was later
2  used.
3      Q. How do you know that?
4      A. Because I did most of the talking at this
5  meeting and most of the suggestions and I talked
6  about what the hemophilia community needed and I
7  talked about camps and I talked about patients'
8  needs and I talked about parents' needs and I
9  talked about the community needs and I had had
10 patient -- I had that patient who died and I wanted
11 a -- I wanted there to be a better product for
12 somebody like him. That was my first month there.
13     Q. So you're alleging that it was your idea
14 to provide support to the hemophilia community.
15 You brought that idea to --
16     A. Not Novo secure.
17     MS. BUSCHNER: Objection, that
18 mischaracterizes her testimony.
19     THE WITNESS: No. I --
20     Q. I have no idea what it is you're trying to
21 testify to or what idea you're telling me right now
22 was taken from this meeting and turned in to a

Page 287

1  marketing message for NovoSeven, no idea.
2      A. Well, then you weren't -- then you were
3  not listening to me.
4      MS. JONES: Okay. Can we mark this,
5  please.
6      MS. BUSCHNER: Objection to testifying on
7  the record for your client.
8          (Defendants' Exhibit 125 was
9              marked for identification.)
10 BY MS. JONES:
11     Q. We've marked this as 125. This is an
12 e-mail string from October of 2008 from you to
13 Tanya Hill and then you forwarded it to yourself on
14 February 12th, 2009; do you see that?
15     A. Yes.
16     Q. Why did you forward it to yourself?
17     A. I was extraordinarily uncomfortable with
18 what I was being asked to do at this meeting and
19 what I witnessed at this meeting, and I didn't know
20 if -- what the ramifications would be of this
21 meeting and I certainly didn't want anybody in my
22 community at the time and my colleagues to ever

Page 288

1  think that I would do this. And so I wanted
2  documentation that I told Tanya that I would not do
3  this.
4      Q. Okay. And specifically what you say in
5  your e-mail to her is "Certainly I do not think I
6  should be with Ragni or Marilyn Manco-Johnson at
7  this time and Cindy Leissinger seems to be more
8  responsive to other's contacts than to mine,"
9  correct?
10     A. That's what I wrote, yes.
11     Q. Why did you not want to be with Dr. Ragni
12 and Dr. Manco-Johnson?
13     A. I'm first going to answer your question by
14 saying I was trying to be as diplomatic as I could
15 because I was still trying to be diplomatic in a
16 pharmaceutical industry. So Maggie Ragni had asked
17 me to leave Jefferson when I was a fellow and come
18 work with her at her center, and I said no and I
19 never had a good relationship with her after that.
20 Marilyn Manco-Johnson I had deep respect for and
21 there was no way I was ever going to be part of
22 this KOL engagement process and use my respect for

Page 289

1  her and her respect for me to try and get her to
2  comply with some of the things that they wanted her
3  to do.
4          As far as Cindy Leissinger went, when they
5  had that horrible flood in Louisiana, all of the
6  patients with hemophilia in Louisiana, nobody knew
7  where they were and I was -- I was the direct -- I
8  was an advisor to HFA and I got called because HFA
9  was stationed in Louisiana and they called -- Susan
10 Swindle called me and said how can we help these
11 patients, how can we find these patients. So I
12 called Cindy Leissinger and had a discussion with
13 her and she said she had things under control.
14 And -- I mean, we were -- HFA was offering to help
15 those patients or help find those patients or help
16 get factor to those patients. And so I just -- I
17 didn't want to share that information with Tanya.
18 So I just sort of tried to figure out a way to say
19 I didn't want to have to use my relationship with
20 her from that phone call in that time when
21 Louisiana was flooded to try and be part of this
22 engagement.

73 (Pages 286 - 289)

Page 290

1    Q. What specifically were you being asked to
2 do that made you so uncomfortable?
3    A. It was sort of this engagement process to
4 try and -- if you look at these baseball cards, you
5 know, these were all developed so that -- make the
6 doctors feel good because, you know, a person would
7 walk in and they would know all these details and
8 they would be able to schmooze them. Do you know
9 what schmooze means?
10    Q. They would know what their title is, when
11 they graduated from medical school, how long they'd
12 been practicing?
13    A. Birth dates, languages, publications, what
14 they were interested in. So these baseball cards
15 were developed to try and figure out ways to sort
16 of, you know, massage these doctors' egos and get
17 them to get involved in Novo Nordisk stuff.
18    Q. Show me in this document where it list one
19 KOL's birthday, areas of interest.
20    A. I don't know if it's on the other side of
21 the card. I have the cards at home.
22    Q. Did you produce them in the litigation?

Page 291

1    A. What?
2    Q. Did you produce them in the litigation?
3       MS. BUSCHNER: Yes, we did.
4       THE WITNESS: So we produced both sides.
5       MS. BUSCHNER: Yes, I think so. We
6 produced everything we had. I remember seeing the
7 baseball cards.
8 BY THE WITNESS:
9    A. I remember seeing -- well, maybe it was --
10 maybe it wasn't there are birth dates, but I saw it
11 in some of the documents. So you're right, I
12 should have looked at this, but there's another --
13 the baseball cards have other things on them.
14    Q. What specifically were you being asked to
15 do with these key opinion leaders that made you
16 uncomfortable?
17    A. I think I just told you.
18       MS. BUSCHNER: She did. Objection, asked
19 and answered.
20    Q. Your testimony is "It was sort of this
21 engagement process."
22    A. There were -- there were two -- there were

Page 292

1 two sides to the cards.
2       MS. BUSCHNER: Just answer the question.
3       THE WITNESS: Sorry. There were two sides
4 of the cards.
5    Q. What were you asked to do specifically
6 that made you uncomfortable? Look at the baseball
7 cards is what made you uncomfortable?
8    A. No. To use information to gain entrance
9 and relationship with people by (inaudible) things
10 about them.
11       THE REPORTER: By knowing --
12       THE WITNESS: Things about them.
13    Q. Tell me what Tanya Hill specifically asked
14 you to do with respect to, for example,
15 Dr. Manco-Johnson.
16    A. Dr. -- Tanya Hill did not -- this was all
17 the KOL project. Tanya Hill was the one I guess
18 orchestrating the project.
19    Q. Fine. Tell me what any single Novo
20 Nordisk employee told you specifically to do with
21 respect to Dr. Manco-Johnson.
22    A. Not specific to Dr. Manco-Johnson, but if

Page 293

1 you see there was this -- well, it's not on here,
2 but there was this whole database that we were
3 supposed to enter in information about these
4 doctors.
5    Q. Like what?
6    A. Personal information, private information,
7 information about activities that they were
8 involved in.
9    Q. So somebody asked -- somebody at Novo
10 Nordisk said Jamie Siegel, I want you to enter
11 information into this database about key opinion
12 leaders that you know?
13       MS. BUSCHNER: Objection.
14    A. No. We were assigned to specific ones.
15    Q. Who were you assigned to?
16    A. Well, if you see, I said I wouldn't be
17 assigned to anybody. I wrote that I -- I said
18 don't assign me to anybody.
19    Q. So you didn't do anything?
20    A. I did not do this.
21    Q. Other than put stuff into a database, did
22 anybody tell you to do anything else with respect

74 (Pages 290 - 293)

Page 294

1 to any key opinion leader?
2      MS. BUSCHNER: Objection, vague.
3      A. The specific words I can't remember. The
4 implication was that we were supposed to buddy
5 up -- each of us was supposed to be assigned to a
6 few people and buddy up and get all kinds of
7 information and figure out ways to engage them.
8      Do you need something to drink?
9      Q. The implication from what words that
10 somebody said to you?
11     A. It was the whole KOL plan.
12     Q. What did you think somebody was asking you
13 to do that was improper?
14     A. Use a relationship to -- use a
15 relationship to sort of maneuver somebody into
16 doing something beneficial to the company.
17     Q. Did anybody ask you to deliver any
18 particular message about NovoSeven to any one of
19 these key opinion leaders?
20     MS. BUSCHNER: Objection, lacks
21 foundation.
22     MS. JONES: I'm asking you if something

Page 295

1 happened.
2      A. I also objected to all the private
3 information that was -- there's two sides to these
4 cards.
5      MS. JONES: Objection, nonresponsive.
6 BY MS. JONES:
7      Q. I'm asking you if anybody at Novo Nordisk
8 asked you to deliver any particular message about
9 NovoSeven to any key opinion leader?
10     MS. BUSCHNER: Objection, time. When?
11 Where? What?
12     MS. JONES: In the year and a half that
13 she worked at the company.
14     A. I was involved in marketing meetings where
15 these messages were being developed. I was asked
16 for my input. I would say that those marketing
17 messages were inappropriate, incorrect, the data
18 wasn't strong enough. So they didn't ask me
19 because I said the information is not strong.
20     Q. Do you know if any information that was in
21 your view inaccurate was, in fact, provided by Novo
22 Nordisk to any of these key opinion leaders?

Page 296

1      MS. BUSCHNER: Objection, vague.
2      A. By inference and assumption providing
3 these publications to the physicians and then
4 asking them if they wanted to put their names on
5 the publications and endorse the concepts within
6 the publications, yes.
7      Q. So let's talk about some of the
8 publications, then. Let's look at the complaint,
9 paragraph 185. And you're not listed as an author
10 or co-author on any of these studies, correct?
11     A. Correct.
12     Q. So you list ten articles on page 58,
13 correct?
14     A. Looks like it.
15     Q. And these were all published before you
16 joined Novo Nordisk, correct?
17     A. Yep.
18     Q. As was the first article published by
19 Dr. Konkle on the top of page 59, correct?
20     A. Yes.
21     Q. So for those 11 articles you have no
22 information about Novo Nordisk's decision to

Page 297

1 support any of these studies, do you?
2      MS. BUSCHNER: Objection, lacks
3 foundation.
4      A. Actually I think we answered that by
5 inference because you can see from the bottom
6 disclosures and also -- excuse me -- there were
7 already messages that started in some of these
8 early articles that got continued through like --
9      Q. But your allegation about these articles
10 is that the physicians who put their names on them
11 did not contribute to the content, right?
12     A. No, I didn't say that. I said that they
13 didn't write them.
14     Q. You say in footnote 40 on page 59 "Relator
15 recalls that Dr. DiMichele actually took a very
16 active role in writing and editing this manuscript
17 so that it met her own personal standards of
18 authorship. The resulting comments and background
19 information presented in the manuscript are
20 supported appropriately. This article is an
21 outlier in that respect from the others mentioned
22 above," meaning with respect to the others the

75 (Pages 294 - 297)

Page 298

1  authors listed did not take an active role in
2  writing or editing the manuscripts, right?
3      A.  Please give me the page and the number.
4      Q.  It's page 59, footnote 40.
5      A.  And that was for which article?  Oh, that
6  was -- well, that was an HTRS article.
7      Q.  Your allegation is that of all of the
8  authors connected with all 40 articles in your
9  complaint it was only Dr. DiMichele that took an
10  active role in authoring and editing a manuscript,
11  correct?
12      MS. BUSCHNER:  Objection.  I think it
13  mischaracterizes the complaint.
14      A.  We were -- I was referring to the articles
15  based on HTRS, but it does refer to some of the
16  other ones, like the Abshire article in 2004.
17      Q.  How do you know that Dr. Abshire didn't
18  actively participate in the writing or editing of
19  that article in 2004 long before you joined the
20  company?
21      MS. BUSCHNER:  Objection.
22      A.  Because of the 2008 article that he was

Page 299

1  also on.
2      Q.  And based on whatever you believe you know
3  related to a 2008 article, you're assuming that he
4  had no active involvement in the writing or editing
5  of the 2004 article?
6      MS. BUSCHNER:  Objection.
7      A.  My assumption is based on later
8  literature.  So --
9      Q.  But with respect to the 11 articles listed
10  in this paragraph, all of which predate your time
11  with Novo Nordisk, you don't have any actual
12  firsthand knowledge whether any of those physicians
13  actively participated in the authoring and editing
14  of those manuscripts, do you?
15      A.  Did I -- wait.
16      MS. BUSCHNER:  Objection to form.
17      THE WITNESS:  Okay.  As I said, that
18  reference on 40 actually was -- excuse me.  I am
19  correcting.  What I was talking about was all of
20  the articles that were published based on HTRS.  I
21  am inferring that some of these other articles
22  based on the messages that are in those manuscripts

Page 300

1  and the way the articles are written.  So you're
2  correct, some of that was inference.
3      Q.  Okay.  And --
4      A.  And, in fact, the Meta article was not
5  even a Novo Nordisk article.
6      Q.  And --
7      A.  I don't know if you picked that up yet.
8      Q.  The last two articles on page 59 were
9  published after you left the company, correct?
10      A.  You mean Maahs and Recht?
11      Q.  The last two articles --
12      A.  On what page?
13      Q.  On page 59.
14      A.  Oh.  Well, the Nakar article with Donna
15  DiMichele was in preparation when I was there, and
16  the next one, the Neufeld article, I believe they
17  were already starting to say who wrote the article
18  at the bottom of the publication.  Do you have
19  that --
20      Q.  You believe or do you know?
21      A.  Do you have the publication?
22      Q.  You believe or you know?

Page 301

1      A.  I'm pretty sure.
2      MS. BUSCHNER:  Objection.  You
3  mischaracterized the complaint.  She didn't --
4      Q.  You believe or you know what you just
5  testified to?
6      A.  If you can provide me the article, I'll
7  show it to you.
8      Q.  Do you have any actual firsthand knowledge
9  whether the physicians listed in any of these
10  articles actively participated in the drafting and
11  editing of these manuscripts?
12      MS. BUSCHNER:  Objection, you've asked and
13  answered this question several times and you've
14  also mischaracterized the complaint.
15      MS. JONES:  I haven't, Traci.
16      MS. BUSCHNER:  Yes, you have
17      MS. JONES:  I asked a specific question
18  about the first 11 articles, and now I'm asking
19  about the rest of them.
20      Do you have any firsthand knowledge
21  whether the authors listed connected to all of
22  these articles in paragraph 185 actively

76 (Pages 298 - 301)

Page 306

1 during the AIDS epidemic. It's the same thing.
2 People closing their eyes, turning their heads, and
3 not doing what's right.
4     Q. All 65 of these clinicians closed their
5 eyes, didn't do what was right, and patients were
6 harmed, right?
7     A. I believe that everybody hoped that they
8 were doing the right thing, thought they were doing
9 the right thing. I suspect Uri Martinowitz
10 probably regrets some of what he wrote about. I
11 don't know about Gil Kenet. I don't know about
12 some of the other people. I think Donna DiMichele
13 probably has questions about it. I suspect even
14 Keith Hoots and Barbara Konkle.
15     Q. Have you talked --
16     A. I think that -- I think that all these
17 people meant to do the right thing, thought they
18 were doing the right thing. I think they all -- a
19 lot of them were good clinicians and cared deeply
20 about their patients, but when you get caught up in
21 something and don't realize what's happening, bad
22 things happen.

Page 307

1     Q. Is it possible, is it possible that, in
2 fact, these 65 clinicians are right and NovoSeven
3 used prophylactically to treat inhibitor patients
4 is, in fact, safe and effective?
5     MS. BUSCHNER: Objection.
6     MS. JONES: Is it possible?
7     MS. BUSCHNER: Calls for speculation.
8     A. No, I don't think so.
9     Q. Okay.
10     A. And in fact -- in fact, even internally
11 Novo Nordisk knew that it wasn't -- that
12 prophylaxis was not effective, and, in fact, there
13 are later meeting minutes where physicians said the
14 data was not strong enough. There are people that
15 did not go along with this.
16     MS. JONES: Can we mark this as 126,
17 please.
18     THE WITNESS: I can't imagine anybody --
19 sorry.
20     MS. BUSCHNER: There's no question
21 pending.
22

Page 308

1         (Defendants' Exhibit 126 was
2             marked for identification.)
3 BY MS. JONES:
4     Q. We've marked as 126 Dr. Shapiro's article
5 "Inhibitor treatment state-of-the-art" from 2001.
6 Are you familiar with this article?
7     A. Yes.
8     Q. Was this published in a reputable journal?
9     A. It's a supplement. Seminars in Hematology
10 was a nice journal, it provided good reviews.
11 Supplements were paid for by the pharmaceutical
12 companies.
13     Q. Do you know what process the journal
14 undertook to review this before publishing it?
15     A. Well, they have Harold Roberts as their
16 guest editor. He was a respected clinician. He
17 also was highly and closely involved with Novo
18 Nordisk.
19     Q. You discuss this article at page 189 of
20 your complaint and you say that "This is an article
21 rife with vague phrases such as 'might, 'may,' 'it
22 has been suggested and others not used in

Page 309

1 legitimate scientific journal articles."
2     A. I'm sorry. Where are you in the
3 complaint?
4     Q. Page 189 -- paragraph 189 on page 62.
5     THE REPORTER: We've got to go one at a
6 time.
7     MS. JONES: Is it your contention that
8 because Dr. Shapiro uses the phrase "it has been
9 suggested" in this article that it is not a
10 legitimate scientific article?
11     A. Absolutely.
12     Q. You claim that the phrase "optimization of
13 dosing regimens may be achieved by considering"
14 appears in this article and that this is a "key
15 Novo marketing message," right?
16     A. Correct.
17     Q. So you believe that Dr. Shapiro took that
18 phrase from Novo and put it in this article, right?
19     A. No. I think this is -- these are phrases
20 that the medical writers used over and over again
21 in the articles.
22     Q. So your contention is Dr. Shapiro did not

78 (Pages 306 - 309)

Page 310

1 substantially contribute to the development or
2 editing of this article?
3     MS. BUSCHNER: Objection, mischaracterizes
4 her testimony.
5     A. I'm assuming she didn't, especially
6 because when -- because she didn't provide us her
7 document with the edits, but I'm presuming that a
8 lot of this was written by the medical writers.
9 She probably reviewed it, made some edits.
10     Q. But you don't know?
11     A. I think it's a pretty good assumption.
12     Q. But you don't know?
13     MS. BUSCHNER: Objection.
14     MS. JONES: I have no firsthand knowledge
15 of whether Dr. Shapiro wrote this article or not,
16 do you?
17     MS. BUSCHNER: Objection to form.
18     A. I'm comfortable saying that I doubt she
19 wrote most of it.
20     Q. You allege that the quality of the article
21 is poor and that it poses a significant health
22 threat.

Page 311

1     A. Poses a significant what?
2     Q. Health threat.
3     A. Yes.
4     Q. "The information is not truthful and not
5 misleading and it poses a significant health
6 threat," correct?
7     A. Yes.
8     Q. How does it pose a significant health
9 threat?
10     A. She was considered to be one of the
11 experts in the care of these patients. She was a
12 pediatrician and people would use this article to
13 say, oh, this is the right treatment because this
14 is what Amy Shapiro is recommending, which would
15 mean that people that were not at large hemophilia
16 treatment centers or not KOL's would read this and
17 think it was the right thing to do even though
18 there was no data to support it because it was full
19 of "might" and "may" and "optimization of dosing
20 regimens" which had never -- which had not been
21 conducted.
22     Q. Does this article actually recommend that

Page 312

1 anyone do anything?
2     A. State-of-the-art. State-of-the-art high
3 dose NovoSeven bolus, state-of-the-art prophylaxis
4 for bleed prevention. State-of-the-art. It's not
5 based on data.
6     Q. If you turn to page 33, last paragraph,
7 "The ability to choose rationally and monitor
8 dosing and treatment regimens would be improved by
9 the development of a laboratory parameter that
10 correlated with clinical efficacy. The development
11 of such tests to be utilized with NovoSeven is
12 clearly necessary to advance both development of
13 rational dosing guidelines and our understanding of
14 why some patients fail and to limit cost while
15 maximizing efficacy. Increased knowledge of the
16 parameters that impact the pharmacokinetics of
17 NovoSeven in individual patients would also be of
18 benefit to the clinician. Expanded pharmacokinetic
19 studies, particularly in the pediatric population,
20 would be useful in the development of optimal
21 treatment guidelines." Did I read that accurately?
22     A. I suspect so.

Page 313

1     Q. Does that constitute a recommendation in
2 your mind to use NovoSeven in any particular way?
3     A. It's suggesting that this is what would be
4 necessary to properly dose NovoSeven. You would
5 expect that either she would develop those or she
6 would advocate strongly for these to be developed,
7 but it never happened. And in addition, you could
8 take advantage of the fact that there was no way to
9 monitor it the way we can monitor factor VIII and
10 factor IX and you could say give as much as you
11 want, it's not going to hurt anybody, and there was
12 no way to test whether or not it was too much or
13 when it was dangerous. So she is recommending all
14 of these things, but nothing was ever done about it
15 and she never said because we don't -- we don't
16 have the right monitoring there is a risk of giving
17 too much.
18     Q. Clinicians are capable of reading the
19 product labeling and understanding the risk of
20 giving too much themselves, aren't they?
21     MS. BUSCHNER: Objection, calls for
22 speculation.

79 (Pages 310 - 313)

Page 322

1 up not doing, I think there was an on-demand arm
2 and then three dose levels. I think that's what
3 I'm remembering. So this --
4    Q. That's what you understand today. You're
5 not actually remembering because those discussions
6 were had before you joined Novo Nordisk, correct?
7    A. Absolutely. I was never -- it was never
8 shared with me when I was there.
9    Q. So you actually have no idea what FDA said
10 to Novo or why Novo made the decision not to go
11 forward with whatever it is FDA proposed?
12    MS. BUSCHNER: Objection.
13    A. Not from when I was at Novo, but I've seen
14 the documents.
15    Q. You've seen some documents that Novo
16 produced, but you have no firsthand knowledge of
17 any discussions between FDA and Novo Nordisk, do
18 you?
19    MS. BUSCHNER: Objection to form.
20    MS. JONES: You have no firsthand
21 knowledge of any discussion between FDA and Novo
22 Nordisk, do you?

Page 323

1    A. Let me think about that. That's correct.
2 It was not shared with me at all.
3    Q. Okay. And is it your position that if a
4 company elects not to proceed with a phase 3 trial
5 that the indication contemplated for study is
6 necessarily unsafe and ineffective?
7    MS. BUSCHNER: Objection.
8    A. Excuse me?
9    Q. Is it your contention that if FDA told
10 Novo that if it wanted the prophylaxis indication
11 it needed to do a four-arm study and Novo made a
12 decision not to go forward with that study, that
13 the prophylactic use of NovoSeven is inherently,
14 then, unsafe and ineffective?
15    MS. BUSCHNER: Objection.
16    A. What I know is that it was not adequately
17 shown to be safe and effective.
18    Q. What is false and misleading about the
19 study that was published?
20    MS. BUSCHNER: Objection, form.
21    MS. JONES: The Dr. Konkle study, what's
22 false and misleading about it?

Page 324

1    A. I'm not a statistician, but the way they
2 presented the data and then their conclusions
3 because they presented these terrific P values but
4 they didn't provide standard deviations, they
5 didn't provide confidence intervals. So -- and if
6 you look at the numbers and you look at the charts,
7 I was shocked that they even suggested that this
8 study showed that there was benefits of prophylaxis
9 and obviously the FDA agreed with -- when I read
10 what the FDA said it confirmed my own impression,
11 but I remember reading this article and thinking
12 this doesn't show anything. And, in fact, if you
13 read their last paragraph in this, it says "The
14 results of this trial provide evidence for the
15 concept." So it's not even providing enough to
16 support -- it's evidence of the concept and you
17 have to have a concept and then you have to show
18 the benefit.
19    Q. Exactly right. Exactly right. Turn to
20 page 1911.
21    A. Yes.
22    Q. First full paragraph on this page, "This

Page 325

1 trial was designed as a clinical proof of concept
2 trial and was not powered to detect either
3 clinically significant or clinically relevant
4 differences between the dose levels. The observed
5 reduction from five or six bleeds per month in the
6 pre-prophylaxis period to two or three per month
7 after three months of prophylaxis is not clinically
8 optimal by any means. Nevertheless, it does
9 represent a clinically relevant and promising
10 improvement. A detailed evaluation of individual
11 profiles revealed that three patients in the
12 90 micrograms per kilogram treatment group failed
13 to show a significant reduction in bleeding
14 episodes during the prophylaxis period. No firm
15 conclusions concerning the most appropriate dosing
16 level or dosing regimen can be drawn on the basis
17 of this trial."
18    A. Yes.
19    Q. Doesn't that say right there in black and
20 white that this is not making any recommendations
21 about dosing or dosing regimens?
22    MS. BUSCHNER: Objection.

82 (Pages 322 - 325)

Page 338

1 stop the bleeding.
2    Q. And why does that make no sense?
3    A. Well, you were talking about using it
4 prophylactically in a diverticulitis patient. You
5 don't know when that patient is going to start
6 bleeding. So you could give it for a year and the
7 patient never bleeds. So that's why the FDA
8 requires long periods of time to see what the
9 patient's bleeding pattern is.
10    Q. What about bleeding from the urinary --
11 the bladder from an interstitial cytitis [sic],
12 would you use Amicar then?
13    A. Are you talking about interstitial
14 cystitis?
15    Q. Yeah. Would you use Amicar then?
16    A. I believe it's contraindicated in --
17    Q. So what would you use? To prevent
18 bleeding in that situation in an inhibitor patient
19 where the only drug you've been able to cite to me
20 so far is contraindicated, what would you use?
21    A. You're mixing --
22       MS. BUSCHNER: Objection --

Page 339

1       THE WITNESS: You are mixing --
2       MS. BUSCHNER: -- calls for speculation.
3       THE REPORTER: Okay, guys. Come on.
4       THE WITNESS: You are mixing up prevention
5 and treatment of bleeding episodes.
6    Q. I'm asking you what you would use to
7 prevent the bleeding.
8    A. And I'm telling you you can't -- there's
9 no answer to that because you don't -- you treat
10 bleeding, you don't prevent bleeding that may
11 happen.
12    Q. So you just run the risk that that
13 inhibitor patient experiences uncontrolled
14 bleeding --
15    A. No.
16    Q. -- from the bladder, in the GI, and you do
17 nothing? That's your solution, you do nothing?
18       MS. BUSCHNER: Objection.
19    A. No. You asked me preventing versus
20 treating bleeding. Those are different. Either
21 they're bleeding or they're not bleeding.
22 Prevention is to prevent them from bleeding. If

Page 340

1 they're bleeding, you have to figure out how to
2 control the bleeding.
3    Q. I'm asking you how to prevent the
4 bleeding.
5       MS. BUSCHNER: You've asked -- she's
6 answered the question.
7    A. I'll answer it again. Almost every
8 hemophilia patient has hematuria at some point in
9 their life. You treat -- almost every single
10 whether they've got inhibitors or not. There is no
11 way to predict when somebody is going to have an
12 episode of hematuria to be able to prevent it.
13    Q. But you know the risk of recurrence is so
14 great --
15    A. No.
16    Q. -- that you need to act?
17       MS. BUSCHNER: Objection, lacks
18 foundation.
19    A. What do you mean I know that? Where is
20 that -- what -- where is that coming from? No, you
21 don't know that.
22       MS. JONES: Okay. Can we mark this --

Page 341

1       THE WITNESS: If they have a kidney stone
2 and they've had three episodes of kidney stone and
3 hematuria, then you fix the kidney stone, but who
4 knows when somebody is going to develop
5 interstitial cystitis. I mean, you can't predict
6 that.
7       MS. JONES: Can we mark this as 129,
8 please.
9          (Defendants' Exhibit 129 was
10          marked for identification.)
11 BY MS. JONES:
12    Q. Exhibit 21 is the 2013 -- sorry.
13 Exhibit 129 is the 2013 MASAC recommendation
14 regarding prophylaxis with bypassing agents in
15 patients with hemophilia and high titer inhibitors.
16 This says that they were approved by the MASAC on
17 October 5th, 2013 and adopted by the NHF board of
18 directors on October 6th, 2013. Do you know what
19 the process is for MASAC to approve
20 recommendations?
21    A. I believe that proposals are made, people
22 write these recommendations, they get reviewed, and

86 (Pages 338 - 341)

1 MASAC votes to approve or not approve.

2     Q. And do you know what the process for NHF

3 to adopt the recommendations of MASAC is?

4     A. I assume they will adopt if MASAC

5 approves.

6     Q. And in the complaint you allege that

7 Dr. Kessler accepted kickbacks from Novo Nordisk

8 and one of the things that resulted from that is he

9 secured the recommendation from MASAC for these

10 guidelines, right?

11     A. That's what's written in the complaint.

12     Q. Do you know whether Dr. Kessler even got a

13 vote in whether MASAC would recommend these

14 guidelines?

15     A. No. Is -- are you suggesting that

16 MASAC -- I assumed he voted, but I have no idea

17 because I've never been on MASAC.

18     Q. Okay. And the recommendations discuss

19 three clinical trials, correct?

20     A. Yes.

21     Q. Two FEIBA trials?

22     A. Uh-huh.

1     Q. And one NovoSeven trial, right? And it

2 concludes --

3     A. Yes.

4     Q. It concludes "In light of these studies,

5 MASAC recommends that prophylaxis with bypassing

6 agents should be considered in patients with

7 inhibitors. There are no clear-cut guidelines as

8 when to stop prophylaxis. Joint bleeds with

9 subsequent joint destruction are a lifelong problem

10 for these individuals. Therefore they may continue

11 to benefit from prophylaxis throughout their life.

12 MASAC encourages further surveillance and research

13 on this topic," right?

14     If these guidelines were tainted by

15 kickbacks from Novo Nordisk, why do they equally

16 recommend FEIBA and NovoSeven?

17     MS. BUSCHNER: Objection.

18     A. Are you asking me why they recommended it

19 for FEIBA or are you asking me why they recommended

20 it for NovoSeven?

21     Q. Your allegation is that kickbacks paid to

22 Dr. Kessler tainted these recommendations.

1     A. Yes.

2     Q. Yet this recommendation does not favor

3 NovoSeven over FEIBA. Why?

4     MS. BUSCHNER: Objection, that

5 mischaracterizes the document.

6     A. Well, there were two studies that were

7 conducted for FEIBA and then they used the Konkle

8 study to add in the recommendation for NovoSeven.

9 However, the MASAC minutes about this, Roshni

10 Kulkarni was the one that recommended that this be

11 written and she talked about the treatment of

12 patients with inhibitors. To be honest, the data

13 for the FEIBA studies was not great either, but is

14 was definitely better than NovoSeven and it was a

15 larger study and it could be justified and the FDA

16 approved it. I was surprised that they would --

17 MASAC would allow the Konkle study to be put in

18 there, but I would assume that there was some

19 influences that ended up with NovoSeven also being

20 a MASAC recommendation.

21     And, in fact, whether or not Craig Kessler

22 voted or not, there's e-mails in the documents

1 between Craig Kessler, David Cooper, Marion

2 Koerper, and Roshni Kulkarni about this.

3 Interestingly, they were cut off so it was really

4 hard to follow the conversation. It took a while.

5 There was obviously external influences on these

6 recommendations.

7     MS. JONES: Objection, move to strike,

8 nonresponsive. Let's take a five-minute break.

9     THE VIDEOGRAPHER: The time is 7:50 p.m.

10 We are going off the record.

11     (A break was had.)

12     THE VIDEOGRAPHER: The time is 8:11 p.m.

13 We are going back on the record.

14     Please proceed, Counsel.

15 BY MS. JONES:

16     Q. You indicated that you've reviewed the

17 treatment records for Alan Michael Harlan Gonzalez?

18     A. Yeah. The initial set, yes.

19     Q. And do you know his primary treating

20 physician, Dr. Ronald Louie?

21     A. I don't -- I don't remember ever meeting

22 him.

# Exhibit 16

| From: | JDH (Jerry Hanson) |
|---|---|
| To: | MYSW (Mary Shaw); PHE (Per Preuss Helbo); NFIT (Neal Fitzpatrick) |
| Sent: | 9/12/2008 2:31:00 AM |
| Subject: | FW: BioPharm Field Coaching ReportJHanson.doc |
| Attachments: | BioPharm Field Coaching ReportJHanson.doc |

Hi everyone!! Its late on Thursday evening and I always check my E-Mail before I go to bed and I finally got to see Mary's field coaching report. I had heard about it before from Per but after seeing it I have to share some comments. Mary and I rode together for one call last Wednesday at 4:00PM. we checked Mary in at the hotel before we made our call. We talked for a while and proceeded to leave for the call. On the way I told Mary that I would not be able to work with her the next day because she said that she had a conference call to conduct and she was leaving for home at 1:30PM. I mentioned to her that I had to leave early to go Stanford and other accounts south. She seemed very upset and a bit indignant. From that point on I was very upset with Mary. When she called and said she wanted to work with me I suggested that we meet in Oakland on Tuesday noon and we could work together through Thursday. She said great but then got back to me and said that she had to conduct two conference calls on Tuesday and we could meet on Wednesday. I agreed and said I would pick her up on Wednesday. She got back to me and said that she would have another conference call on Thursday at 10:30 AM but at least we could go on the Oakland Kaiser call together. Then when I got the cold shoulder about not working with her on Thursday I simply lost it. Relative to the call I was somewhat late getting there because the GPS that I had used before went out and I had a new one with me that wasn't functioning well. I had seen Dr. Campbell two times before and the first time we met in the hospital And the second time in her office. Her staff told I could check in to materials management in her building which was not correct. They said don't worry about it so I met with them anyway. I did check on another floor on the way out and they said that materials management was in the main hospital so I made a note to make sure I checked in with them the next time. We did so and we came out of the hospital via a different entrance and I started walking in the wrong direction. I quickly noticed this and we walked to the right building. Dr. Cambell was late and we waited for about 10 minutes. My main goal which I did not share with Mary is that I wanted to go over all the RT materials because Dr. Campbell could not see me when We were going though the in-service cycle. Even though we had discussed it previously and I had sent all the appropriate materials to her and followed up I wanted to make sure she had all of her questions resolved. That is the reason I shared all of those materials with Dr. Campbell. My secondary objective was to make sure Dr. Campbell was moving forward with putting her two patients on Seven Secure. She uses Novo Seven exclusively and is very happy with our product and me. She rarely sees reps at all but she sees me. I agree with Mary I should set up a worksheet before I go on any call and I do sometimes get excited and talk more than I listen. I will set up a call sheet on every call with her in the future so we are both on the same page. I resent the comments about being late and I should know where everything is before I go to the call. I am never late for anything and I didn't like her comments in that regard. She makes me sound like some rookie salesman. After our call she stated that she would like me to use more probing questions. I did not want to hear it but based upon our call she was right. We also discussed the patient she mentioned. We did find out why the young man in question wasn't set up for surgery. He is simply not compliant because his parents can't get him into the clinic or physical therapy because the middle eastern father will not allow his wife to ride in a taxi with a male taxi driver. I was very upset about this and the situation can't be resolved currently. I made a comment that I could not understand why middle eastern men behave the way they do. Its almost like they don't have any faith in their own manliness. I also commented that I did not understand they do things like sewing up their own daughters private parts. I did not realize that this hurt Mary's feelings and I formally apologize to her and to each of you. I do not curse and I wish on all of her comments she could have simply given me feedback right on the spot rather than take things out of context and put those comments in her coaching document.

After our call we went to a nice place for dinner where she quickly ate her food and asked for the check. She said are you ready to go and got up and walked out with me holding an almost full glass of wine. When we got back to the hotel I thanked her for coming up to work with me and we parted ways. I was so upset that I did not sleep all night and I got up early the next morning and got the first flight back to Seattle. I simply could not meet with customers the way I was feeling. I am not used to be treated like that. I did not discuss this with anyone because I needed to calm down and I am of a mind that if there is an issue with someone you work it out between the two of you. I did call Jim and Dan on Friday and simply asked if she had ever treated them in this fashion and they said no. I commented it must be me and some how we needed to work this out. Then Per called me and asked how the my calls with Mary went and I told him. Per and I discussed the situation fully

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE                                      NNICID-1122454

and I agreed to call Mary which I did at 2:53PM this afternoon. The bottom line here is that I feel that Mary has never given me any respect and I believe I have earned it. I get very up tight when she suggests we work together. Based upon Mary's actions I must have done something to upset her as well because I don't think this is the way Mary works with people. If I have done or said something to upset her I am very sorry. I respect Mary very much and I would like to sit down with her and resolve this situation but I do hope that in the future that if she is upset with something that we could discuss it in person. I have a lot of other comments about situations when Mary and I haved worked together but I would like to discuss them with her directly. I will be leaving in the morning to go to Orange County to meet with Per and the region and My flight back is not until 6:00PM. I would glad to meet with Mary with a completely open mind and go over these issues. I intend to be here for a long time and I know Mary can help me meet my goals. Again I apologize to Mary if any of my comments offended her. I am very easy to work with and I still don't know why this could not be discussed with me in person.

Sincerely,

Jerry Hanson

_____

**From:** MYSW (Mary Shaw)
**Sent:** Thursday, September 11, 2008 8:19 PM
**To:** JDH (Jerry Hanson)
**Subject:** BioPharm Field Coaching ReportJHanson.doc



BioPharm Field Coaching ReportJHanson.doc

Hi Jerry,

Attached please find the field coaching report from our ride along last week.

Would you please get back to me to me today and let me know when we can discuss our field ride? Today or tomorrow would work for me.

Thank you,

Ma

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-1122455


novo nordisk®

# BioPharm Field Coaching Report

| Territory Manager Name | Jerry Hanson | BRD: | Mary Shaw | Date: | Sept. 3, 2008 |
|---|---|---|---|---|---|
| Territory Name | | | | Number of Field Days: | 1 |
| | | | | Ride Alongs YTD: | |

| Objectives from Last Visit: | | | As of: | Date | COE Rank T1: | |
|---|---|---|---|---|---|---|
| | | Average Calls per Day YTD: | | | COE Rank T2: | |
| | | YTD Reach to Top 50 Targets: | | | COE Rank T3: | |

Calls per Day source: Monthly BSM/GHTM Activity Report

| Competencies and Behaviors | Rating | Comments from Work session |
|---|---|---|
| **Product Knowledge:** Applies in-depth knowledge of Biopharmaceutical products, understands implications of market developments, competitive actions and market changes | | Jerry has a good knowledge of hemophiliacs with inhibitors and is getting more familiar with the Northern California territory. Jerry brought many "value" added pieces to the sales call, such as the hemophilia textbook, WLF approved studies, etc. I would like to see Jerry limit the number of "value added" pieces that are used on a single call and review one piece, using CCV questions, etc. so that he knows whether or not the piece brings value to the physician and gets him closer to his objective. |
| • Understands the disease state, seeks out and shares knowledge with customers and peers. Demonstrates broad based knowledge of clinical studies. | | |
| • Demonstrates comprehensive knowledge of the market, product and changes to that environment. Uses this knowledge to adjust sales tactics. | | |
| • Uses in-depth knowledge of the market and competitive strategies to effectively position Biopharmaceutical products. | | |
| • Demonstrates a thorough understanding and expertise for package inserts for products (NovoSeven or Norditropin), and can utilize this information to help distinguish from the competition. | | |

| Competencies and Behaviors | Rating | Comments from Work session |
|---|---|---|
| **Selling Skills:** Creates customer value and demonstrates strong selling skills that adapts to customer needs and elicit a call to action by the customer | | Jerry set up the meeting w/Dr. Campbell by way of e-mail, and, unfortunately, was not clear on exactly where to sign in at Kaiser Oakland as well as exactly where the building was that the physician's office was located in. As a result, we were late getting to the 4:00 pm appt. In the future, I would suggest more complete communication with the physician in order to be at the call "on time" and well prepared mentally to make the call. Jerry's main objective for the meeting seemed to be getting Dr. Campbell's patients enrolled in Seven Secure. Jerry is a big proponent of Seven Secure and has tried in the past to get Dr. Campbell's two patients enrolled. Though enrollment of patients in Seven Secure is important, when the conversation was steered towards Dr. Campbell's use of NovoSeven RT in her inhibitor patients, Jerry missed the opportunity to position NovoSeven RT as the product of choice. He wasn't listening to the concerns that Dr. Campbell voiced. This was particularly evident when Dr. Campbell was discussing her 17 year old patient that is a candidate for knee replacement. At the end of the call, while walking back to the elevator, Jerry was unable to tell me why that patient, who has been seen by 2 surgeons, will not be having EOS at this time. |
| • **Sales Call Objective**<br>*Sets up a primary objective for this call.<br>*Has created alternate objectives for this call.<br>*Uses physician analysis and pre-call planning to set call objectives and anticipate customer needs and objections. | | |
| • **Position The Meeting:**<br>*Has briefly described the purpose of this meeting in a manner likely to capture the doctor's attention.<br>*Has considered alternate ways to position this meeting if it's necessary to switch to an alternate objective. | | |
| • **Stage 2 Questions:**<br>*Has crafted Stage 2 Questions that are likely to be effective with this healthcare provider.<br>*Is fully prepared with good questions and the necessary knowledge to follow up effectively.<br>*With only limited time with the healthcare provider, the manager asked a Stage 2 question that created an opportunity to discuss the answer at a later date. | | |
| • **Shape The Value/Framing:**<br>*Determines how to best frame "value-adds" to this healthcare provider.<br>*Commitment Drivers: Has thought through how to use one or more Commitment Drivers to create even more motivation for this healthcare provider to take action. | | |
| • **Accelerate Closure/Expectations:**<br>*Has communicated clearly the expectations to the healthcare provider.<br>*Uses words and non-verbals (i.e., tone, posture and facial expression, etc.) to reflect an appropriate level of confidence and assertiveness.] | | |

| Competencies and Behaviors | Rating | Comments from Work session |
|---|---|---|
| **Sets Strategy & Direction (Business Management):** Develops and implements revenue-driven business plans that incorporate short and long term Territory/Region/Company goals. Develops and adapts tactics to increase customer commitment and employs creative problem-solving approaches. | | Jerry would like to gain access to Dr. Fogarty and would like to see if bringing Jim Redquest up to make a call with him would help him gain access. |
| • Develops comprehensive territory business plans - sets appropriate goals and prioritizes accounts and activities to achieve short and long term goals. Regularly updates plan and identifies tactics to increase customer commitment. | | |
| • Aligns internal and external resources to maximize revenue impact | | |
| • Leverages managed care resources to create pull through - works with HCPs to | | |

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE

NNICID-1122456

| Competencies and Behaviors | Rating | Comments from Work session |
|---|---|---|
| solve managed care issues • Open to new approaches, uses market knowledge to identify novel access or revenue-generating activities for territory/region • Protects business, creates growth opportunities, and strives to recapture lost business to meet territory objectives | | |
| **Other Core Competency(s) Displayed:** | | |
| | | |

**Rating Scale - Definitions**

**O** Outstanding
Always delivers substantially beyond expectations on all dimensions of the competency and is beginning to meet some of the expectations for the next level

**A** Approaches Expectations
Falls short of expectations most of the time or performs unsatisfactorily on many dimensions of the competency

**E** Exceeds Expected Results
Meets expectations in all interactions and often delivers more than is required

**D** Does Not Meet Expected Results
Falls significantly short of business and/or competency expectations most or all of the time

**M** Meets Expected Results
Generally meets expectations, performing satisfactorily overall on most dimensions of the competency

**N/A** No Opportunity or Not Observed
There was no opportunity to observe / rate this competency in the course of the day

**Training and Development Plan:  Comments on Plans/Progress**
> 

Performance/Sales Results:
> 

Challenges:
> Jerry has some difficult to see physicians in Northern California.

**Overall/ Additional Comments:**
> I was offended by Jerry's language, use of curse words, and disparaging remarks made about racial groups during our ride along. I would like to remind Jerry that Novo Nordisk does expect the workplace to be remain respectable at all times.

**Objectives/Action Plans:**

Objective: Complete a call application worksheet prior to each call so that the primary objectives, secondary objectives, stage 2 questions, and closing are followed as closely as possible during the sales call.

Action: I would suggest that Jerry complete the aforementioned worksheet and share it with the FTM and BRD prior to each call.

Objective: Be on time for an appointment.

Action: I would suggest that when Jerry books an appointment with a treater, that he take the time to determine exactly where he needs to go to sign in, which is particularly important at Kaiser, as well as he verify exactly where the physician's office is.

Objective: Become a better listener.

Action: I would suggest that Jerry use techniques that develop his listening skills so that during a sales call, the customer is doing more if not most of the talking.

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-1122457

# Exhibit 17

Jerry Hanson  Confidential
May 01, 2024

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA


UNITED STATES OF AMERICA, et al.,    )
                                     )
      Plaintiffs,                    )    Case Number:
                                     )
            Ex rel.                  )    3:23-cv-05459-BHS
                                     )
JAMIE SIEGEL, M.D.,                  )
                                     )
            Plaintiff-Relator        )
                                     )
            v.                       )
                                     )
NOVO NORDISK, INC.,                  )
                                     )
            Defendant.               )
_____)




                    CONFIDENTIAL
      VIDEO-RECORDED DEPOSITION OF JERRY HANSON

               Phoenix, Arizona
            Wednesday, May 1, 2024
                  9:10 a.m.




Reported by:

MELISSA GONSALVES, RMR, CRR
Arizona Certified Reporter
Certificate No. 50070

Page 282

1  wanted -- she was going to be a hero out of this.
2              She was grilled by Jim Snider, by Neal
3  Fitzpatrick and going, What are you doing?  I mean, she
4  had no business being somebody working with other people
5  because all she did was upset me.  And she made these
6  allegations, some of them very serious, about me, you
7  know.
8              And if some of these were true, just based
9  on the way that Novo Nordisk would work, I mean, I should
10 have been gone the next day.
11 BY MR. GUTTMAN:
12     Q.   Like what?
13     A.   I should have been fired.
14     Q.   Like what are you talking about?
15     A.   Let's see.
16         MR. GUERRERA:  I'm just going to state an
17 objection to the record to this exhibit and to testimony
18 and questions about it.  It's outside of the scope of the
19 protective order.
20 BY MR. GUTTMAN:
21     Q.   Okay.  All right.
22              Keep going.
23     A.   Let's see, where was it?  I remember briefly that
24 somebody mentioned it.  Okay.
25              (The reporter interrupted.)

Page 283

1         THE WITNESS:  I'm sorry.  Sorry.  I'll stop
2  mumbling.
3              We were late getting to that appointment
4  because, again, we couldn't find the entrance because the
5  whole thing had been turned upside down with the major
6  construction process.  I don't know.
7              "I would suggest more complete
8  communication...."
9              I guess it's over all -- all of that stuff,
10 that just -- I mean, if that was true, I would be a very
11 poor salesperson, and -- which was not the case.
12              And, again, she was -- she got in all kinds
13 of trouble, and she almost got fired.  And so I was -- I
14 mean, I've asked them if they wanted to fire me, then let
15 me go.
16 BY MR. GUTTMAN:
17     Q.   You write here, "My secondary objective was to
18 make sure Dr. Campbell was moving forward with putting her
19 two patients on SevenSECURE.  She uses NovoSeven
20 exclusively and is very happy with our product and me."
21              Why was that an objective to get
22 Dr. Campbell's patients --
23     A.   Because --
24     Q.   -- on SevenSECURE?
25     A.   -- to my estimation, anybody that was -- any

Page 284

1  inhibitor patient, regardless of what product they were
2  using, should have knowledge of and have access to
3  SevenSECURE, whether it's -- I mean, it's a no-brainer not
4  to use it.
5      Q.   So this was part of you promoting SevenSECURE?
6         MR. GUERRERA:  Objection.
7         THE WITNESS:  I mean, I don't really promote
8  SevenSECURE.  I'm sharing SevenSECURE with these people,
9  educating them, letting them know all of the facets, and
10 there may be one facet they could utilize and be a benefit
11 to the family.
12              I mean, I didn't get any noogies for -- you
13 know, for -- you know, the family switching to
14 SevenSECURE.
15 BY MR. GUTTMAN:
16     Q.   Then you write, "We did find out why the young
17 man in question wasn't set up for surgery.  He is simply
18 not compliant because his parents can't get him to the
19 clinic or physical therapy because the Middle Eastern
20 father will not allow his wife to ride in a taxi with a
21 male driver."
22     A.   That's right.
23     Q.   Okay.  "I was very upset about this, and the
24 situation can't be resolved currently."
25              Why were you upset that the patient wasn't

Page 285

1  having surgery?
2         MR. GUERRERA:  Objection.
3         THE WITNESS:  I wasn't -- I wasn't upset about
4  the patient not having surgery.  I was upset by -- I
5  don't -- they were talking about -- I can't remember what
6  the deal was.  But, again, it was the mom who had to go
7  and, you know, go in, and she couldn't go in because dad
8  wouldn't let her ride in a cab with a male guy.  And I
9  found that rather disconcerting, understandable but
10 disconcerting.  This patient needed surgery, and so --
11 according to the physician, and so I was upset.  I mean,
12 my God, we were back in the stone ages here.  What can we
13 do?
14              I even was trying to do something where we
15 set up a cab appointment and made sure it was a woman
16 driving it to make sure that this mother got to the clinic
17 and -- you know, and whatever else.
18              So bottom -- bottom line is that medicine
19 wasn't going forward and helping this family as it should
20 have because dad was all bent out of shape because mom
21 couldn't ride in the car with a male person.
22 BY MR. GUTTMAN:
23     Q.   Why was this -- why was this within the orbit of
24 your area of endeavor as a sales representative for Novo
25 Nordisk?

Jerry Hanson   Confidential
May 01, 2024

Page 286

1        MR. GUERRERA:  Objection.
2        THE WITNESS:  Because I'm an advocate.  Again,
3  I'm an advocate.  I'm trying to help the situation, make
4  it so it's happy -- dad's happy; everybody's happy -- to
5  get this mom and whatever -- I think it was a mom and the
6  kid, I think, you know -- and so that this kid could have
7  surgery, which I was told was necessary by the clinician
8  involved.
9        So, again, as an advocate, yeah, you're
10  right.  I mean, if I'm just a sales guy, why should I be
11  involved in this?  It's very obvious why.
12  BY MR. GUTTMAN:
13     Q.   Did you facilitate or help facilitate
14  transportation for the kid to get the surgery?
15     A.   No.
16        MR. GUERRERA:  Objection.
17        THE WITNESS:  -- didn't happen.
18  BY MR. GUTTMAN:
19     Q.   But you understood that if this patient had
20  surgery, NovoSeven would have to be used on the patient;
21  right?
22        MR. GUERRERA:  Objection.
23        THE WITNESS:  That's not why I did it.
24  BY MR. GUTTMAN:
25     Q.   But you -- if NovoSeven was used --

Page 287

1        MR. MARTIN:  Calls for speculation.
2  BY MR. GUTTMAN:
3     Q.   If the NovoSeven was used on the patient, and
4  there was money paid for the NovoSeven, it would factor
5  into your bonus?
6        MR. GUERRERA:  Objection.
7        THE WITNESS:  No, not at all.  Never, never.
8  Never went down that deal.
9        First off, it wasn't going to be a lot of
10  money.  And it was all about getting -- the physician told
11  me -- totally on label -- This kid needs this surgery.
12        And so me, Jerry Hanson, I'm going to try to
13  somehow figure out a way to get this thing going forward
14  so this kid can have surgery.
15  BY MR. GUTTMAN:
16     Q.   No --
17     A.   And make his life better.
18     Q.   I don't really --
19     A.   It's real simple.
20     Q.   I'm not sure I understand the -- the --
21     A.   You haven't understood the entire time here --
22     Q.   Okay.  Well --
23     A.   -- of what I did and what I do.
24     Q.   That's why we're here --
25     A.   Yes, sir.

Page 288

1     Q.   -- so I can understand.
2        The father wouldn't let the mom ride in a
3  taxi with a --
4     A.   Muslim family.
5     Q.   A Muslim family?
6     A.   Uh-huh.
7     Q.   How did you know it was a Muslim family?
8     A.   I think the doctor -- the doctor told me.
9     Q.   The doctor?
10     A.   He says, I'm trying to get them there, and I
11  can't do it because the dad is a -- I don't know,
12  whatever.  I'm not against -- I'm not anti-Muslim or
13  whatever, but I am anti this kid not getting the treatment
14  that he needs to become healthy.  And I don't care if it's
15  a Muslim or who the hell they are.  Let's get the kid in
16  and let's -- you know, let's make this happen.
17     Q.   Well, why were you getting that kind of granular
18  patient information from the doctor?
19        MR. GUERRERA:  Objection.
20        THE WITNESS:  I don't understand your use of the
21  term "granular."
22        The patient -- again, because they knew who
23  Jerry Hanson was.  And I came up with all kinds of
24  miracles of bad situations and -- again, if it was
25  appropriate, tell me:  Here's the deal.  What can you do?

Page 289

1        It was like the patient at Oregon Health
2  Sciences University that was on Medicaid.  How in the heck
3  are we going to get free product to this patient?
4        Well, most people would have just laid down
5  and died.  I didn't.  And we got the patient -- we got the
6  product -- free product for that patient.
7        In this case, I'm somehow trying to get the
8  mother and the kid to the treatment center without
9  upsetting dad; all right?
10  BY MR. GUTTMAN:
11     Q.   Did you ever see the movie Michael Clayton?
12     A.   No, sir.
13        And so I have -- I mean, I just -- I don't
14  know.  I won't get into that.
15     Q.   Did you -- when you talked to Ms. Shaw; all
16  right?
17     A.   I don't call her "Miss."
18     Q.   She with you; right?
19     A.   When she was with me when?
20     Q.   Well, when she reviewed you, did you explain to
21  her this situation about the Muslim family and their
22  concerns?
23     A.   Oh, this was -- no, this was just -- this was
24  just taken out of context.
25        Let's see, (Reading:) Bottom line, Mary has

Jerry Hanson   Confidential
May 01, 2024

Page 290

1  never given...

2          Yeah, I don't know.

3    Q.  Were you ever disciplined as a result of this?

4    A.  No, I was given accolades.

5          She was disciplined.

6    Q.  They gave you accolades?

7    A.  Absolutely.

8    Q.  Novo Nordisk gave you accolades?

9    A.  Absolutely.

10         They called me up and wanted to say -- Neal
11  Fitzpatrick called me up and said, Do you think she was
12  trying to throw you to the curb?

13         And I went: Yes, sir.

14         And I asked him, Do you think there is any
15  reason why she might want to do that or is there any
16  credibility to what she's saying?

17         He says, Absolutely not.

18   Q.  And did they do any investigation of what she
19  said?

20         MR. GUERRERA:  Objection.

21  BY MR. GUTTMAN:

22   Q.  Did Novo Nordisk --

23   A.  I don't know if they did or not.

24   Q.  Okay.  Well, on page 1122457, she writes,
25  "Overall additional comments: I was offended by Jerry's

Page 291

1  language, use of curse words..."

2    A.  Yeah, I did that --

3    Q.  Let me finish this.

4    A.  Yeah.

5    Q.  "I was offended by Jerry's language, use of curse
6  words, and disparaging remarks made about racial groups
7  during our ride-along.  I would like to remind Jerry that
8  Novo Nordisk does expect the workplace to remain
9  respectable at all times."

10         What's she referring to?

11         MR. GUERRERA:  Objection.

12         THE WITNESS:  That I used the term "clitoris" in
13  that report.  Because I mentioned to her that -- again, I
14  was upset about what was happening here, that this kid
15  wasn't gonna go forward.  And I mentioned that I had a
16  friend in Minnesota State University who was a black
17  Muslim.  And her father and uncle held her down and cut
18  out her clitoris.  And she would share this with me.  And
19  she was my friend, and I just actually started crying.  I
20  thought, whoa, this is really cool.  And so I was just
21  relating that as another kind of situation where this kind
22  of behavior didn't help anybody.  And it was really
23  hurting their own folks.  And so I -- my cursing was I
24  used the word "clitoris," and she found that -- I don't
25  know.

Page 292

1  BY MR. GUTTMAN:

2    Q.  What -- why -- in what context did you relate
3  that story to her?

4    A.  I was just relating to her -- she was saying --
5  you know, we were talking about this mom couldn't go
6  because of the dad.

7          And I said, Yeah, I really take issue with
8  some of the males in the Muslim society, that they just
9  are 3,000 years ago.  And an example of this, let me tell
10  you about my friend, my good friend that I went to school
11  with, and what happened to her.  And again, I was cursing
12  because I used the term "clitoris."  I don't know if she
13  knew what that was.  I'm not sure.  But the bottom line
14  is, that's why.  And so did I -- I didn't get in any
15  trouble.  I wasn't cursing.

16   Q.  Did anybody from Novo Nordisk ever ask you why
17  she -- the question I'm asking you is what was she
18  referencing when she wrote this?

19         MR. GUERRERA:  Objection.

20         THE WITNESS:  No.  No, I mean, again, I really
21  proactively answered all of these questions with my
22  document, and pretty straightforward.  And, again, I
23  didn't kick dirt on Mary or anything about it.  I just
24  said, Here's what's going on, and this is just all
25  ridiculous.  'Cause she's trying to submarine me, and I'm

Page 293

1  not really happy about that.  Left it at that.

2          And then a couple days later they just said,
3  Jerry, we -- you know, We want to apologize.  This wasn't
4  appropriate.

5          And I got them to say that I never had to
6  work with her ever, ever, ever again.

7          MR. GUTTMAN:  Okay.  Do you guys want to take a
8  five-minute break?

9          THE VIDEOGRAPHER:  Off the record at 4:06 p.m.

10         (Recessed: 4:07 p.m. - 4:31 p.m.)

11         THE VIDEOGRAPHER:  On the record at 4:31 p.m.

12         MR. GUTTMAN:  Mark this as an exhibit.

13         (Exhibit 93 marked for identification.)

14  BY MR. GUTTMAN:

15   Q.  Exhibit 93 is Bates Number 1103153, and it's an
16  email chain.

17         On 1103154, it says, "Team, another great
18  month for SevenSECURE enrollment.  We have seven new
19  enrollments for these past two weeks!

20         "We are halfway there.  Those in the lead:
21  Jerry with 5, Ellene with 4, Sonya, Tim, Derek and Dan all
22  tied with three."

23         Do you see this?

24   A.  Yes.

25   Q.  And I gather there was a contest to enroll --

# Exhibit 18

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

UNITED STATES OF AMERICA, *et al.*

           Plaintiffs,

      *Ex rel.,*

JAMIE SIEGEL, M.D.,

           Plaintiff-Relator

    v.

NOVO NORDISK, INC.,

           Defendant.

NO.  3:23-cv-05459-BHS

## PLAINTIFFS' PRE-TRIAL STATEMENT

### I.      FEDERAL JURISDICTION

Plaintiff-Relator Jamie Siegel M.D. ("Relator") brought this action on behalf of herself and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 and on behalf of herself, the States, and the City of Chicago for violations of the State False Claims Acts. Relator also brought this action pursuant to Cal. Ins. Code § 1871.7, the California Insurance Fraud Prevention Act.

The State of Washington ("State" and, together with Relator, "Plaintiffs") brought this action on behalf of the State's Medicaid program for violations of the State's Medicaid Fraud False Claims Act, RCW 74.66 *et seq*., and Fraudulent Practices Act, RCW 74.09.210.

PLAINTIFFS' JOINT PRETRIAL
STATEMENT -- NO. 3:23-CV-05459-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

226

75.     All physicians as defined by section 1848(k)(3)(B) of the Social Security Act must complete Medicare Enrollment Application CMS-855I to enroll in the Medicare program and receive a Medicare billing number. Without enrolling in Medicare, physicians cannot bill for treating Medicare patients.

76.     Among other things, physicians must certify in writing in CMS-855i that they will abide by Medicare laws, regulations and program instructions.

77.     Moreover the CMS-855i requires physicians to certify in writing, *inter alia*, that they "understand that payment of claim is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute)."

## IV.     ISSUES OF LAW

The issues of law are those raised at the August 26, 2025 status conference and those that will be raised by the Parties' motions *in limine*.

## V.     PLAINTIFFS' WITNESSES

A.     **State of Washington**

1.     **Dr. Jeffery Thompson – Will Testify**
8215 NE 115th Place
Kirkland, WA 98034

Dr. Thompson is the Former Medical Director of Washington Medicaid. He is expected to testify about Washington Medicaid coverage and reimbursement policies, procedures, considerations regarding hemophilia treatment for inhibitor patients in the Washington Medicaid program as well as the State's investigation of NovoSeven prescriptions submitted on behalf of various Washington Medicaid patients specifically between 2002 to 2014 and other matters pertinent to this action and discussed in his deposition.

2.     **Dr. Judy Zerzan-Thul – Will Testify**
Washington State Health Care Authority

PLAINTIFFS' JOINT PRETRIAL
STATEMENT -- NO. 3:23-CV-05459-BHS                    14                    ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

227

Cherry Street Plaza
626 8th Avenue SE
Olympia WA, 98501

Dr. Zerzan-Thul is the current Medical Director of Washington Medicaid. She is expected to testify on behalf of Washington Medicaid regarding Medicaid's role/function, determinations of medical necessity, and whether or when procedures indicate suspicion of Medicaid Fraud. She is also expected to other information pertinent to this action, including matters discussed in her deposition.

**3.** **Scott Best – Will Testify**
Washington State Health Care Authority
Cherry Street Plaza
626 8th Avenue SE
Olympia WA, 98501

Mr. Best is an HCA employee who is expected to testify to regarding data, tracking and analysis of claims data during the period of the case.

**4.** **Daniel Hughes, HCA – Will Testify**
Washington State Health Care Authority
Cherry Street Plaza
626 8th Avenue SE
Olympia WA, 98501

Mr. Hughes is HCA representative that certified the Medicaid data supplied and used in this case. He is expected to testify about the above.

**5.** **Hue Le, MFCD – Will Testify**
Medicaid Fraud Control Division
P.O. Box 40114
Olympia, WA 98504

Mr. Le is a data scientist who analyzed and compiled claims data pertaining to Washington Medicaid's damages. He is expected to testify about the above matters.

PLAINTIFFS' JOINT PRETRIAL
STATEMENT -- NO. 3:23-CV-05459-BHS                15

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

228

# Exhibit 19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,
*et al.*

Plaintiffs,

*Ex rel.*

JAMIE SIEGEL, M.D.,

Plaintiff-Relator,

v.

NOVO NORDISK, INC.,

Defendant.

Case No. CIV-15-114-PRW

## PLAINTIFFS' RULE 26(a)(l) DISCLOSURES

Pursuant to Fed. R. Civ. P. 26(a)(l) and the local rules of this Court, the Relator and the State of Washington (Plaintiffs) through the undersigned attorneys, make the following disclosures:

These disclosure statements are made based upon information presently known to the Plaintiffs and are made without relying on information or documents that are subsequently discovered, subsequently determined to be relevant for any purpose, or subsequently determined to have been omitted from these disclosures.

These disclosures do not include any individuals or materials that may be used solely for impeachment. Further, by making these disclosures, the Plaintiffs do not waive, and hereby expressly reserve, the right to assert any privilege or objection under applicable statute, regulation, law or rule, including, but not limited to, the attorney-client, work product, joint prosecution privilege and deliberative process privileges. In addition, as the Plaintiffs' investigation of Defendant's conduct is continuing, these disclosures are based

on information now reasonably available; and the Plaintiffs expressly reserve the right to supplement, clarify, revise, or correct any or all of disclosures herein at any time. Moreover, this information is provided in one document to facilitate the efficient exchange of information.

By referring to or producing any documents as part of the initial disclosure process, the Plaintiffs make no representations or concessions regarding the relevance or admissibility of any particular information or document, and expressly reserve the right to object on any appropriate grounds, including but not limited to relevance, over-breadth, burden, attorney-client privilege and attorney work product protection.

The Plaintiffs make these disclosures relative only to complaint against NovoNordisk ("NNI" or "Novo").

## I.     INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

Subject to the foregoing and based on information currently known to the Plaintiffs, the following individuals may have discoverable information that the Plaintiffs may use in support of their claims:

| Name | Contact Information | Subject Matter |
|------|---------------------|----------------|
| Jerry Hanson[1] Former Novo Sales Representative | Novo Nordisk, Inc. Executive BioPharmaceutical Sales Manager Snohomish, Washington | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to |

[1] Additional Novo sales representatives selling NovoSeven® are identified herein, but all of NovoSeven®'s salesforce are likely to have information pertaining to Novo's nationwide efforts to promote NovoSeven® off-label and pay unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor.

2

| | | health care providers, patients, other individuals and parties in a position to steer use of the factor. |
|---|---|---|
| Monica Singhee Executive Director, Rare Disease Marketing, Novo Nordisk | 800 Scudders Mill Road Plainsboro, NJ 08536 Tel: 1-609-987-5800 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Steve Gosselin Former Business Development Director, Novo Nordisk | Email: Sgosselin007@gmail.com Phone: 480-440-9183 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Mark Hunter Former Sr. BioPharm Sales Manager, Novo Nordisk | Eli Lilly and Company Executive Business Director Eli Lilly and Company Lilly Corporate Center Indianapolis, IN 46285 +1-317-276-2000 Email: mehunter1863@gmail.com | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Derek Nelson Novo Employee (or former) | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties |

3

| | | |
|---|---|---|
| | | in a position to steer use of the factor. |
| Jesper Ostergaard<br>Former Sales Director, Novo Nordisk | TruMed Systems, Inc<br>Chief Executive Officer and President<br>4370 La Jolla Village Dr, Ste 200<br>San Diego, CA 92122<br>Phone: (844) 878-6331 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Dawn Bina<br>Former Regional Account Manager, Novo Nordisk | GE HealthCare<br>Market Access Account Executive<br>GE HealthCare<br>500 W. Monroe St., 16th Floor<br>Chicago, IL 60661 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Cynthia Trevino<br>Novo Employee (or former) | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Anna Sogard<br>Novo Employee (or former) | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Nikki Goff | Unknown | Novo's nationwide |

4

| | | |
|---|---|---|
| Former Executive Growth Hormone Therapy Manager, Novo Nordisk | | efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Rick Bedford Former Novo Executive Hemophilia Therapy Manager New England; Former Sr. Hemophilia Therapy Manager NorthEast Region | Senior Account Manager BioMarin Pharmaceutical Inc. Hillsdale, New Jersey | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Anton Titus Former Novo BioPharm Sales Manager, Former Novo Senior BioPharm Sales Manager; Former Novo Executive Hemophilia Sales Manager, Former Novo Exec. Hospital Institutional Account Manager | Regional Account Manager Alexion Pharmaceuticals, Inc. Indianapolis, Indiana | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Toby Silverman Former FDA Deputy Associate Director for Medical Affairs, Office of Blood Research and Review | Manager TA Silver Consulting LLC Bethesda, MD | FDA approval process and label changes for NovoSeven®, including package insert changes/updates related to thrombosis. |
| Charlie Maplethorpe Medical Officer at FDA | FDA Washington, D.C. | FDA approval process and label changes for NovoSeven®, including package insert changes/updates. |
| Laureen Kelley | LA Kelley Communications, Inc. | Novo's nationwide |

| | | efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
|---|---|---|
| Matthew Compton Former Board President of Hemophilia Federation of America | Simi Valley, California | Novo's nationwide efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| ZS Associates | 1560 Sherman Avenue Evanston, IL | Novo's marketing of NovoSeven® |
| Mary Dugan Former Hemophilia Senior Sales Director for Northeast Region, Novo Nordisk | Sanofi Senior Director and National Lead 55 Corporate Drive Bridgewater, NJ 08807 Phone: 800-981-2491 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Lois Geer Hemophilia Therapy Sales Manager, Novo Nordisk | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Linda Fenlin (believed to be Linda Pinto now) | Alexion Pharmaceuticals Regional Account Manager | Novo's nationwide efforts to promote |

6

| | | |
|---|---|---|
| Former Account Manager, Novo Nordisk | 121 Seaport Blvd Boston, MA 02210 Phone: 475-230-2596 Fax: 203-271-8198 | NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Elizabeth Tawill Former Sales Manager, Novo Nordisk | Alexion Pharmaceuticals Regional Account Manager 121 Seaport Blvd Boston, MA 02210 Phone: 475-230-2596 Fax: 203-271-8198 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Rob McGillen Former District Business Manager, Novo Nordisk | Vifor Pharma Division Sales Manager 200 Cardinal Way Redwood City CA 94063 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Allenmykael H. Gonzalez | Last Known Address: 2304 Brookdale Road, R. H102 Parkland, WA 98445 | NovoSeven® off-label promotion and payment of kickbacks |
| Joanie L. Gonzalez | Last Known Address: 2304 Brookdale Road, R. H102 Parkland, WA 98445 | NovoSeven® off-label promotion and payment of kickbacks |
| Carnell Chappelle | Last Known Address: 203 Cottonwood Court NW Albuquerque, NM 87107 | NovoSeven®  Home Health Care/Distribution |
| Johanna Chappelle | Last Known Address: 203 Cottonwood Court NW Albuquerque, NM 87107 | NovoSeven®  Home Health Care/Distribution |
| James Dawdy | Last Known Address: | Novo's nationwide |

7

| | 2315 NW Overton Street, Apt. 402<br>Portland, OR 97210 | efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
|---|---|---|
| Steven Gunner<br>Former Regional Sales Director, Novo Nordisk | Sanofi<br>Regional Sales Director<br>55 Corporate Drive<br>Bridgewater, NJ 08807<br>Phone: 800-981-2491 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Dr. Prasad Mathew | 2211 Lomas Blvd NE #3<br>Albuquerque, NM 87106 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Tanya Hill[2]<br>Former Novo Senior Director NovoSeven® RT; Former Novo VP, Hemophilia Marketing; Former Vice President, Hemophilia Sales | Mallinckrodt Pharmaceuticals<br>VP Immunology Sales<br>Philadelphia, PA (Greater Metro) | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, false certifications related to |

---

[2] All Novo employees working under Ms. Hill will likely have similar information.

8

| | | Novo's Corporate Integrity Agreement. Ms. Hill also has information pertaining to Novo's Consumer Council meetings. |
|---|---|---|
| Stacy O'Donnell[3] Former Novo SevenSECURE Brand Manager; Former Senior Brand Manager and Former Associate Director – Patient Support | Sandoz Inc. Director, Patient Support Services-Program Management 100 College Rd W, Princeton, NJ 08540 Phone: 609-627-8500 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. She also has information pertaining to Novo's Consumer Council meetings. |
| Luke Hemming RxCrossroads | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Liliana Mastrapa RxCrossroads | CarelonRX Business Info Consultant 450 Headquarters Plaza, 7th Floor East Tower Morristown, NJ 07960 | Novo's nationwide efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Jennifer Pate Omnicare | RxCrossroads Sr. Manager, Nursing Louisville Metro Area | Novo's nationwide efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Heather Rose Former Senior Vice President Brand Support Services, Omnicare | P3 Technology, LLC Chief Executive Officer Louisville, KY Phone: 502-396-5943 | Novo's nationwide efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Nicholaus Lesher | Unknown | Novo's nationwide |

---

[3] All Novo employees working under Ms. O'Donnell will likely have similar information.

9

| | | |
|---|---|---|
| Program Manager, Omnicare | | efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Lily Mastrapa Case Manager, Omnicare | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay kickbacks to patients. |
| Leonard Valentino, M.D. Novo Nordisk Key Opinion Leader ("KOL") | National Hemophilia Foundation President and CEO 7 Penn Plaza Suite 1204 New York, New York 10001 Lvalentino@hemophilia.org | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Guy Young, M.D. Novo Key Opinion Leader ("KOL") | Children's Hospital Los Angeles 4650 Sunset Blvd. MS #54 Los Angeles, CA 90254 Phone: 323-361-4624 <br><br> CHLA South Bay Outpatient Center 3440 Torrance Blvd. Suite #100 Torrance, CA 90503 Phone: 310-303-3890 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Gar Park Former Novo Marketing employee | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |

10

| | | |
|---|---|---|
| Janet Brewer<br>Founder, Comprehensive Health Education Services, L.L.P. ("CHES");<br>Novo Consumer Council (Former Member) | CHES<br>84 Beach Street<br>Middleboro, MA 02346<br>Email: Jbrewer@ches.education | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Eric Lowe<br>Founder, Comprehensive Health Education Services, L.L.P. ("CHES") | CHES<br>84 Beach Street<br>Middleboro, MA 02346<br>Email: Elowe@ches.education | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Paul Huggins<br>Novo Corp. V.P. International Operations – Rare Disease;<br>Former Novo Senior Director, International Marketing | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Klaus Davidsen<br>Former Novo Director and VP | VaekestPartner Kapital<br>Interim CEO-Playable<br>Ry, Middle Jutland, Denmark<br>Klaus@vpkapital.dk | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Howard Levy<br>Former Novo Executive Director of CMR | Ampio Pharmaceuticals Inc<br>373 Inverness Parkway, Suite 200<br>Englewood, CO 80112 | Novo's nationwide efforts to promote NovoSeven® off-label |

11

| | | |
|---|---|---|
| | | and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Michael Ferrara[4]<br>Former Novo Brand Director, Hemophilia; Former Novo Director of Marketing; Former Novo Region Director | Sanofi<br>Head, US Thought Leader Liaisons – Specialty Care Cambridge, MA | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, false certifications related to Novo's Corporate Integrity Agreement. |
| Michael LaMotta<br>Former Novo Director, Market Access Strategy & Innovation; Former Novo Senior Brand Manager, NovoSeven RT; Former Novo Associate Director, Trade Operations & In-pharmacy Marketing; Former Novo Director, Market Access Strategy & Innovation | Tarsus Pharmaceuticals, Inc.<br>Director, Access Marketing Hillsborough, New Jersey | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| David Cooper<br>Former Novo Senior Director, Medical Affairs | Chief Medical Officer AviadoBio<br>Livingston, New Jersey | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to |

---

[4] The SCC at ¶¶ 197-201 identifies other Novo officials, managers and employees who falsely certified compliance with the Corporate Integrity Agreement. These individuals are identified herein and others may be identified through discovery.

12

| | | |
|---|---|---|
| | | health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®.  He also has information concerning Novo's Consumer Council meetings. |
| Kate Owen<br>Former Novo Director, Clinical Trial Operations | Bristol Myers Squibb<br>3401 Princeton Pike, Lawrence Township, NJ 08648<br>Phone: 609-302-7630<br><br>Bristol Myers Squibb<br>100 Naussau Park Blvd #300<br>Princeton, NJ 08540<br>Phone: 609-419-5501<br><br>Bristol Myers Squibb<br>3551 Lawrence Rd.<br>Lawrence Township, NJ 08648<br>Phone: 800-332-2056 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Pedro Pina, M.D.<br>Former Novo Senior Global Medical Manager | PQMD<br>326 First Street, Suite 32<br>Annapolis, MD 21403 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Dr. Craig Kessler<br>Novo Nordisk Key Opinion Leader ("KOL");<br>Professor, Georgetown University Medical | Lombardi Cancer Center<br>3800 Reservoir Road N.W.<br>Washington, DC 20007<br>Phone: 202-444-2223 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, |

13

| | | |
|---|---|---|
| Center;<br>Chair, Medical and<br>Scientific Advisory<br>Council for the National<br>Hemophilia Foundation | | patients, other<br>individuals and parties<br>in a position to steer<br>use of the factor, as<br>well as, Novo's off-<br>label publication<br>strategy for<br>NovoSeven®. |
| Dr. Amy Shapiro<br>Novo Nordisk Key<br>Opinion Leader<br>("KOL") | 8326 Naab Road<br>Indianapolis, IN 46260<br>Phone: 317-871-0000 | Novo's nationwide<br>efforts to promote<br>NovoSeven® off-label<br>and pay or provide<br>unlawful kickbacks to<br>health care providers,<br>patients, other<br>individuals and parties<br>in a position to steer<br>use of the factor,<br>including but not<br>limited to, information<br>concerning<br>NovoSeven® clinical<br>trials, Novo's off-label<br>publication strategy for<br>NovoSeven® and<br>kickbacks associated<br>with 340B revenue. |
| Dr. Gilit Kenet | Tel Aviv University –<br>Hematology Department<br>Phone: 03-5307341<br>Email:<br>Gili.kenet@sheba.health.gov.il | Novo's nationwide<br>efforts to promote<br>NovoSeven® off-label<br>and pay or provide<br>unlawful kickbacks to<br>health care providers,<br>patients, other<br>individuals and parties<br>in a position to steer<br>use of the factor, as<br>well as, Novo's off-<br>label publication<br>strategy for<br>NovoSeven®. |
| Dr. Steven Pipe<br>Chair, Medical and | Hemophilia & Coagulation<br>Disorders Clinic | Novo's nationwide<br>efforts to promote |

14

| | | |
|---|---|---|
| Scientific Advisory Council for the National Hemophilia Foundation | 1540 E Hospital Dr Floor 7 Reception C Ann Arbor, MI 48109 Phone: 734-647-8902 | NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Dr. Keith Hoots Novo Nordisk Key Opinion Leader ("KOL"); Chair, Medical and Scientific Advisory Council for the National Hemophilia Foundation | National Heart, Lung and Blood Institute of U.S. National Institutes of Health (NIH) Director, Div. of Blood Diseases and Resources | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Jerzy Gruhn Former Novo President, North America | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, false certifications related to Novo's Corporate Integrity Agreement. |
| Edward Williams Former Novo Corporate Vice President, | Philadelphia, PA (Metro) | Novo's nationwide efforts to promote NovoSeven® off-label |

15

| | | |
|---|---|---|
| Biopharmaceuticals | | and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, false certifications related to Novo's Corporate Integrity Agreement. |
| Gary Grote Former Novo Vice President, Market Access, Biopharmaceuticals | Halozyme, Inc. V.P. Market Access, Trade & Reimbursement Dublin, OH | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, false certifications related to Novo's Corporate Integrity Agreement. |
| Dr. Barbara Konkle | Washington Institute for Coagulation d/b/a WACBD 701 Pike Street, Suite 1900 Seattle, WA 98101 Barbara.Konkle@WACBD.org Phone: (206) 614-1200 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, including but not limited to, information concerning NovoSeven® clinical trials, Novo's off-label publication strategy for NovoSeven® and kickbacks associated |

16

| | | with 340B revenue. |
|---|---|---|
| Liselotte S. Ebbesen<br>Novo Employee (or former) | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Elizabeth Eehardtson<br>Novo Employee (or former) | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| David So<br>Former Novo Nordisk Senior Manager, Business Insights | CSL Behring<br>Senior Manager, Commercial Data & CRM Operations<br>King of Prussia, PA | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor.<br>Novo's Bleed Level Report. |
| Melissa Leichter | Novo Nordisk<br>Vice President & Commercial | Novo's nationwide efforts to promote |

| | Lead, Rare Disease | NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. Novo's Bleed Level Report. |
|---|---|---|
| Mary Schwab Former New Product Commercialization Biopharmaceuticals, Novo Nordisk | PharmaScore President 42 S Main St Allentown, NJ 08501 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. Novo's Bleed Level Report. |
| Michal Silverberg Former Senior Director Business Development and New Product Commercialization, Novo Nordisk | Novartis Venture Fund Managing Director Info.us@nvfund.com | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. Novo's Bleed Level Report. |
| Andy Feinstein Former Associate Director, Novo Nordisk | Karuna Therapeutics Senior Director, Insights and Analytics 99 High St. Floor 26 Boston, MA 02110 (857) 449-2244 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer |

18

| | | use of the factor. Novo's Bleed Level Report. |
|---|---|---|
| Pete Irizarry Former EVP, Growth Officer, McCann Health | Fingerpaint Group EVP, Client Service Director Lead 395 Broadway Saratoga Springs, NY 12866 Phone: 518-693-6960 | Promotion of NovoSeven® |
| Diann Hamilton Former SVP, Co-Director, Account Planning, Cline Davis Mann | Digitas Health EVP, Head of Brand Strategy and Account Planning 100 E. Penn Square Philadelphia, PA 19107 Phone: (215) 545-4444 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Dr. Thomas C. Abshire | Blood Center of Wisconsin 638 N 18th Street Milwaukee, WI 53233 414-933-5000 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Dr. Donna DiMichele | Weill Cornell Medical College, Department of Pediatrics, Division of Pediatric Hematology Oncology Payson Pavilion, 695, 525 East 68th Street, New York, NY 10065 Phone: 212-746-3418 dmdimich@med.cornell.edu | Novo's off-label publication strategy for NovoSeven®. |
| Tammuella E. | 2053 Gause Blvd Suite 200, | Novo's nationwide |

| | | |
|---|---|---|
| Chrisentery-Singleton, MD<br>Novo Nordisk Key Opinion Leader ("KOL") | Slidell, LA 70461<br>Phone: (985) 259-8045 | efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Miguel A. Escobar, MD<br>Novo Nordisk Key Opinion Leader ("KOL") | Gulf States Hemophilia and Thrombophilia Center – Texas Medical Center<br>7000 Fannin Street, Suite 750<br>Houston, TX 77030<br>Phone: (713) 500-8360 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Doris Quon, MD<br>Novo Nordisk Key Opinion Leader ("KOL") | Cedars-Sinai Medical Center<br>403 W. Adams Blvd<br>Los Angeles, CA | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Diane Nugent, MD<br>Novo Nordisk Key Opinion Leader ("KOL") | 1201 W. La Veta Ave.<br>Building: CHOC Clinic<br>Orange, CA 92868<br>Phone: 888-483-5670 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Roshni Kulkarni, MD<br>Novo Nordisk Key Opinion Leader ("KOL") | MSU Health Care Pediatrics – Specialty Clinic<br>1200 East Michigan Avenue<br>Suite 145 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide |

20

| | Lansing, MI 48912<br>Email: roshni@msu.edu | unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
|---|---|---|
| Claudio Sandoval, MD<br>Novo Nordisk Key<br>Opinion Leader<br>("KOL") | Maria Fareri Children's Hospital<br>100 Woods Rd<br>Valhalla, NY 10595<br>Phone: (914) 493-7997 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Alice Ma, MD<br>Novo Nordisk Key<br>Opinion Leader<br>("KOL") | UNC Hospitals Outpatient Center at Eastowne<br>100 Eastowne Drive<br>Chapel Hill, NC 27514 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Dr. Jerome Teitel | St. Michael's Hospital<br>30 Bond Street, Toronto m5b 1w8<br>Email: jerry.teitel@unityhealth.to<br>Phone: (416) 864-5128 | NovoSeven® safety study |
| Dr. Man-Chiu Poon | University of Calgary<br>2500 University Drive NW<br>Calgary Alberta T2N 1N4<br>Canada<br>Email: mcpoon@ucalgary.ca<br>Phone: 403-944-1564 | NovoSeven® safety study |
| Dr. Victor Blanchette | The Hospital for Sick Children<br>555 University Avenue<br>Toronto, Ontario<br>Canada<br>M5G 1X8<br>Phone: 416-813-5852 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, |

21

| | Email: victor.blanchette@sickkids.ca | patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
|---|---|---|
| Dr. Stephanie Seremetis CVP and Chief Medical Officer for Haemophilia at Novo Nordisk | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Dr. R. Parameswaran | Unknown | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Dr. A. Lubetsky | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. J. Luboshitz | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. U. Martinowitz | Unknown | Novo's off-label |

22

| | | publication strategy for NovoSeven®. |
|---|---|---|
| Dr. Joan Cox Gill | Unknown, possibly deceased | Novo's off-label publication strategy for NovoSeven®. |
| Dr. R. Mehta | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. M.E. Mancuso | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Angela Rocino | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. G. Mancuso | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. F. Scaraggi | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Pier Mannuccio | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Kaan Kavakli | Erzene Mahallesi Ege Üniversitesi Merkez Yerleşkesi, 35040 Bornova/İzmir, Turkey +90 232 311 10 10 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Michael Makris | Sheffield Haemophilia & Thrombosis Centre Sheffield, UK Phone: 0114 2713211 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Bulent Zulfikar | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Elizabeth Erhardtsen | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Zvi S. Abrams | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Raul Perez Bianco | Email: saludpublicamisiones@gmail.com | Novo's off-label publication strategy for |

23

| | | NovoSeven®. |
|---|---|---|
| Dr. T. Lissitchkov | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. L. Rusen | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Margit A. Serban | Victor Babes University of Medicine and Pharmacy of Timisoara<br>Piata Eftimie Murgu 2, 300041, Timişoara, Romania | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Harold R. Roberts | Unknown, possibly deceased | Novo's off-label publication strategy for NovoSeven®. |
| Dr. James Weatherall | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. J.M. Ferran | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Rolf C.R. Ljung | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Charles Nakar | Indiana Hemophilia & Thrombosis Center<br>8326 Naab Rd<br>Indianapolis, IN 46260<br>Phone: 317-871-000 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Ellis J. Neufeld | Administration<br>MS 282, Room C7046A<br>St. Jude Children's Research Hospital<br>262 Danny Thomas Place<br>Memphis, TN 38105-3678<br>Email: ellis.neufeld@stjude.org<br>Phone: (901) 595-7509 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for |

24

| | | |
|---|---|---|
| | | NovoSeven®. |
| Dr. C.T. Wilke | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Frederica Cassis | Email: Frederica.cassis@gmail.com | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Felipe Querol | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Angela Forsyth | Optum Health 100 E Penn Square #400 Philadelphia, PA 19107 Phone: (800) 842-1311 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Alfonso Iorio | Phone: 905-525-9140 ext. 20152 Email: iorioa@mcmaster.ca | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Christopher E. Walsh | Department of Medicine – Hematology 5 East 98th Street, 12th Floor New York, NY 10029 Phone: 212-241-8303 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, as well as, Novo's off-label publication strategy for NovoSeven®. |
| Dr. Ralph A. Gruppo | Cincinnati Children's Hospital Medical Center 3333 Burney Ave Cincinnati, Ohio 45229 Phone: (513) 636-4269 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Robert Z. Gut | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Kapil Saxena | 300 Longwood Ave Boston, MA 02115 | Novo's off-label publication strategy for NovoSeven®. |

25

| Dr. Peter Salaj | Email: Peter.Salaj@uhkt.cz | Novo's off-label publication strategy for NovoSeven®. |
|---|---|---|
| Dr. Steven R. Lentz | 200 Hawkins Drive Iowa City, IA 52242 Phone: (319) 356-4200 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Anand Tadra | 8402 Harcourt Rd Indianapolis, IN 46260 Phone: (317) 871-0000 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Jennifer Maahs | Indiana Hemophilia & Thrombosis Center 8326 Naab Rd Indianapolis, IN 46260 Phone: 317-871-000 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Jennifer Donkin | Children's Hospital of Los Angeles 4650 W Sunset Blvd Box 54 Los Angeles, CA 90027 Phone: (323) 669-5476 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Michael Recht | 700 S.W. Campus Drive Portland, Oregon 97239 Phone: (503) 346-0640 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Vivek R. Sharma | 529 S Jackson St Louisville, KY 40202 Phone: (502) 562-4370 | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Caitlyn T. Soloem | Unknown | Novo's off-label publication strategy for NovoSeven®. |
| Dr. A. Simon Pickard | 833 South Wood Street Chicago, IL 60612 Phone: (312) 413-3357 Email: pickard@uic.edu | Novo's off-label publication strategy for NovoSeven®. |
| Dr. Mary Lou Schmidt | Outpatient Care Center, Suite 2E 1801 West Taylor Street Chicago, IL 60612 Phone: (312) 996-7416 | Co-authored, *Recombinant activated factor VII (rFVIIa) therapy for intracranial hemorrage in hemophilia A patients with inhibitors* Am. J. Hematol. 1994 Sep;47(1):36-40) |

26

| Dr. S. Gamerman | Unknown | Co-authored, *Recombinant activated factor VII (rFVIIa) therapy for intracranial hemorrhage in hemophilia A patients with inhibitors* Am. J. Hematol. 1994 Sep;47(1):36-40 |
| Dr. H.E. Smith | Unknown | Co-authored, *Recombinant activated factor VII (rFVIIa) therapy for intracranial hemorrhage in hemophilia A patients with inhibitors* Am. J. Hematol. 1994 Sep;47(1):36-40 |
| Dr. J.P. Scott | Unknown | Co-authored, *Recombinant activated factor VII (rFVIIa) therapy for intracranial hemorrhage in hemophilia A patients with inhibitors* Am. J. Hematol. 1994 Sep;47(1):36-40 |
| Dr. I. Scharrer | Unknown | Co-authored, *Recombinant factor VIIa for patients with inhibitors to factor VIII or IX or factor VII deficiency,* Haemophilia (1999), 5, 253-259). |
| Dr. Kathryn A. O'Connell | Email: oconnellk@cber.fda.gov | Co-uthored the article titled, *Thromboembolic Adverse Events After Use of Recombinant Human Coagulation Factor VIIa, JAMA,* January 18, 2006 - Vol. 295, No. 3. 83 |

27

| Dr. C. Negrier | Unknown | Authored the safety review, *Recombinant activated factor VII in approved indications: Update on safety,* Haemophilia, 2018;1-3 |
| Dr. S. Benchikh el Fegoun | Unknown | Authored the safety review, *Recombinant activated factor VII in approved indications: Update on safety,* Haemophilia, 2018;1-3 |
| Dr. A. Rojas-Rios | Unknown | Authored the safety review, *Recombinant activated factor VII in approved indications: Update on safety,* Haemophilia, 2018;1-3 |
| Dr. Judith R. Baker | Email: jbaker@c3dlbd.org<br>Phone: 818-538-4686 | Authored *Insurance, Home Therapy, and Prophylaxis in US. Youth with Severe Hemophilia,* Am. J. Prev. Med. 2001; 41 (6S4) |
| Baxter International | 1 Baxter Pkwy<br>Deerfield, IL<br>60015 | Benefits of FEIBA v. NovoSeven®. |
| RxCrossroads (now CoverMyMeds) | 22901 Millcreek Blvd., Suite 240<br>Highland Hills, Ohio 44122<br><br>2 Miranova Pl.,<br>Columbus, Ohio 43215 | SevenSECURE program, Novo's nationwide efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor |
| Omnicare<br>Parent of RxCrossroads | Omnicare, Inc.<br>900 Omnicare Center<br>201 East Fourth Street<br>Cincinnati, Ohio 45202<br>Phone: 1-888-545-6664 | SevenSECURE program; Novo's nationwide efforts to pay or provide unlawful kickbacks to |

28

| | | health care providers, patients, other individuals and parties in a position to steer use of the factor. |
|---|---|---|
| McKesson Acquired RxCrossroads | 6555 State Hwy 161 Irving, TX 75039 Phone: (972) 446-4800 | SevenSECURE program; Novo's nationwide efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Hemostasis and Thrombosis Research Society ("HTRS") | 8733 Watertown Plank Road Milwaukee, WI 53226-3548 Email: Admin@htrs.org | Novo's nationwide efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. Novo's use of HTRS data to promote off-label use of NovoSeven®, including through a off-label publication strategy. |
| Cline Davis & Mann | 200 Varick St New York, NY 10014 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| Ink Factory Studio | 3638 W Belmont Ave. STE 1 | Attended Novo's Consumer  Council |

29

| | Chicago, IL 60618<br>Phone: 312-428-4558<br>Email:<br>hello@inkfactorystudio.com | meetings and documented discussions. |
|---|---|---|
| Robert Wood Johnson Center | On information and belief:<br><br>100 Kirkpatrick St #201<br>New Brunswick, NJ 08901<br>Phone: 732-873-1222<br><br>1044 U.S. 9<br>Parlin, NJ 08859<br>Phone: 732-525-2900 | Novo's nationwide efforts to pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor. |
| American Society of Hematology | 2021 L Street NW, Suite 900, Washington, DC 20036<br>Phone: 202-776-0544 | Novo's nationwide efforts to promote NovoSeven® off-label. |
| Medical and Scientific Advisory Council ("MASAC") for the National Hemophilia Foundation | 7 Penn Plaza Suite 1204<br>New York, NY 10001<br>Phone: 212-328-3700 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor; MASAC's development of off-label prophylaxis guidelines for bypassing agents. |
| National Hemophilia Foundation | 7 Penn Plaza Suite 1204<br>New York, NY 10001<br>Phone: 212-328-3700 | Novo's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to health care providers, patients, other individuals and parties in a position to steer use of the factor, including but not |

30

| | | |
|---|---|---|
| | | limited to patient summits and camps. |
| Children's Mercy Hospital, K.C. | 2401 Gillham Rd, Kansas City, MO 64108 | Hemophilia health care provider |
| St. Louis University, Barnes-Jewish S.L. | One Barnes-Jewish Plaza St. Louis, MO 63110 | Hemophilia health care provider |
| Tulane University, N.O. | 6823 St Charles Ave New Orleans, LA 70118 | Hemophilia health care provider |
| Wesley Hospital, Wichita | 550 N Hillside St Wichita, KS 67214 | Hemophilia health care provider |
| Arkansas Children's Hospital, Little Rock | 1 Children's Way Little Rock, AR 72202 | Hemophilia health care provider |
| University of Missouri Hospital, Columbia | 1 Hospital Dr Columbia, MO 65212 | Hemophilia health care provider |
| Children's Hospital, N.O. | 200 Henry Clay Ave New Orleans, LA 70118 | Hemophilia health care provider |
| United Blood Systems (now Vitalant) | 6220 E Oak St Scottsdale, AZ 85257 | NovoSeven® distributor |
| BioCare | 60 Berry Dr Pacheco, CA 94553 | NovoSeven® distributor |
| Morris & Dickson | Morris & Dickson Co., LLC 410 Kay Lane Shreveport, LA 71115 (800) 388-3833 | NovoSeven® distributor |
| BioPartners in Care/HHS (now Accredo) | Unknown | NovoSeven® distributor |
| ASD Healthcare (now AmerisourceBergen) | AmerisourceBergen 1 West First Avenue Conshohocken, PA 19428 | NovoSeven® distributor |
| CVS Caremark | One CVS Drive Woonsocket, Rhode Island 02895 | NovoSeven® Home health care provider |
| ARJ Infusion Services | 7930 Marshall Drive Lenexa, KS 66214 | NovoSeven® Home health care provider |
| Critical Care Systems (now Critical Healthcare) | 251 Oakland Ave, Suite 1B Port Jefferson, NY 11777 | NovoSeven® Home health care provider |
| Coram | Coram CVS Specialty Infusion Services 2211 Sanders Road NBT-6 Northbrook, IL 60062 | NovoSeven® Home health care provider |

31

| | | |
|---|---|---|
| Walgreens Option Care | 844-624-4584 | NovoSeven® Home health care provider |
| Midwest Hemophilia Association – Kansas City, MO | Midwest Hemophilia P.O. Box 412866 Kansas City, MO 64141 | Hemophilia Patient Association |
| Gateway Hemophilia Association – St Louis, MO | 4976 Eichelberger Street St. Louis, MO 63109 314-482-5973 | Hemophilia Patient Association |
| Louisiana Hemophilia Foundation – Baton Rouge, LA | 3084 Westfork Dr #A Baton Rouge, LA 70816 | Hemophilia Patient Association |
| Hemophilia Foundation of Arkansas – Little Rock, AR | 17200 Chenal Pkwy Little Rock, AR 72223 | Hemophilia Patient Association |
| Blood Center of Wisconsin | Unknown | NovoSeven® Home Health Care/Distributor |
| Cardinal Health | 7000 Cardinal Place Dublin, Ohio 43017 | NovoSeven® Home Health Care/Distributor |
| Accredo Health Group, Inc. | 1640 Century Center Parkway Memphis, TN 38134 | NovoSeven® Home Health Care/Distributor |
| U.S. Department of Health & Human Services, OIG | 330 Independence Avenue, SW Washington, DC 20201 | Claims submitted to government payers for NovoSeven®. |
| U.S. Food and Drug Administration | 10903 New Hampshire Ave Silver Spring, MD 20993-0002 | NovoSeven® clinical trials, FDA approval, prophylaxis submission(s), post-marketing studies, mandatory black box warning, communications re: same. |
| Centers for Medicare and Medicaid Services | 7500 Security Boulevard, Baltimore, MD 21244 Phone: 410-786-3000 | False claims submitted to government payers for coverage of NovoSeven®. |
| TRICARE | 7700 Arlington Boulevard Suite 5101 Falls Church, VA 22042-5101 | False claims submitted to TRICARE for coverage of NovoSeven®. |
| U.S. Dept. of Veterans Affairs ("VA") | 810 Vermont Avenue, N.W. Washington, D.C. 20420 | False claims submitted to the VA for coverage |

32

|  |  | of NovoSeven®. |
|---|---|---|
| Federal Employee Health Benefits Program ("FEHBP") | 1900 E. Street, N.W. Washington, D.C. 20415 | False claims submitted to the FEHBP for coverage of NovoSeven®. |

| WA State Health Care Authority (HCA) Individuals | Contact Information | Subject Matter |
|---|---|---|
| Davis, Myra Former Manager Pharmacy Rates, HCA | Olympia, WA Myras.Davis@comcast.net | Referral to Medicaid Fraud Control Division (MFC) regarding concerns about Medicaid client usage of Novo Nordisk products, possible kickbacks, and other concerns. |
| Sullivan, Donna HCA Chief Pharmacy Officer | Through State's Counsel | Knowledge of Medicaid pharmacy rules and regulations relating to hemophilia products |
| Kreiger, Gail Former Chief, Office of Medical Benefits & Clinical Review, HCA | Olympia, WA kreiger@comcast.net | Knowledge of Centers of Excellence requirement for managing care of WA Medicaid hemophilia beneficiaries, and rules and regulations regarding such care |
| MD Thompson, Jeffery Former HCA Medical Director | unknown | Knowledge of usage of NovoSeven by Medicaid clients |
|  |  |  |
| Medicaid Claims Data Custodian(s) | TBD | Knowledge of Medicaid claims and payment data |
| Community Health Plan of WA (CHPW) Individuals | Contact Information | Subject Matter |
| Dr. Ricord Winstead Former Asst. Medical Dir. | 828 Hiawatha Pl S Seattle, WA 98144 206-399-2413 | Knowledge about the overuse of NovoSeven |
|  |  |  |
| Puget Sound Blood Center Individuals | Contact Information | Subject Matter |
| Dr. Neil Josephson | Puget Sound Blood Center 921 Terry Ave #212 | Knowledge about the overuse of NovoSeven |

33

| | Seattle, WA 98104<br>206-292-6570 | |
|---|---|---|

## II. DOCUMENTS IN PLAINTIFFS' POSSESSION, CUSTODY, OR CONTROL THAT MAY BE USED TO SUPPORT THEIR CLAIMS OR DEFENSES

### A. Relator

Most of the documents and tangible things that Plaintiffs may use to support her claims in this proceeding are within the knowledge, possession, custody, or control of the Defendant, other entities, third parties, the federal government, and/or the State Medicaid programs.

Subject to and without waiver of any applicable objection or privilege, including but not limited to the attorney-client privilege, the attorney work-product doctrine, and/or the joint prosecution privilege, Relator has in her possession, custody, or control the following documents, data, and other tangible things that may support her claims:

(a) Written communications to/from Relator and officials, managers, and employees of Defendant and/or its agents pertaining to the company's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to patients, healthcare providers, and other individuals and parties in a position to steer use of the factor;

(b) Novo documents pertaining to the company's nationwide efforts to promote NovoSeven® off-label and pay or provide unlawful kickbacks to patients, healthcare providers, and other individuals and parties in a position to steer use of the factor; and

34

(c) Journal articles pertaining to NovoSeven ®, including for off-label uses.

## B.  State of Washington

The Plaintiff State notes that investigation in this matter is ongoing and reserves the right to supplement this disclosure with additional documents as may be required by further developments.  The State further notes that some of the materials described herein are subject to protection from discovery on the grounds of attorney-client privilege, attorney work product privilege, or other applicable privilege.

**1.** The following are in the possession, custody and control of the Plaintiff State of Washington, and may be used to support one or more claims:

| Document | Source | Date | Page # |
|---|---|---|---|
| Medicaid claims data for Novo Nordisk hemophilia products | HCA | multiple | |
| HCA documents, including but not limited to, regulatory filings, policies, billing instructions, relating to treatment and management of hemophilia patients, billing instructions | HCA | multiple | |
| Fraud Referral to the Medicaid Fraud Control Division, WA AGO | MFCD | 4-30-2014 | |
| PDR-2016-462 1st | HCA | 1st Intstall | |
| PDR-2016-462.2nd | HCA | 2nd Install | |
| PDR 2016-462-3rd | HCA | 3rd Install | |
| PDR 2016-462 4th | HCA | 4th Install | |
| PDR 2016-462 5th | HCA | 5th Install | |

35

| Accredo | WA CID | multiple | |
|---|---|---|---|
| BioRX LLC | WA CID | multiple | |
| Community Health Plan of WA | WA CID | multiple | |
| Carnell Chappelle | WA CID | multiple | |
| Critical Care Systems | WA CID | multiple | |
| CuraScript | WA CID | multiple | |
| Hemophilia.org | WA CID | multiple | |
| National Hemophilia Foundation | WA CID | multiple | |
| NovoNordisk | WA CID | multiple | |
| Oregon Health Sciences | WA CID | multiple | |
| Patient Services Inc. | WA CID | multiple | |

36

| Ronald Louie, M.D. | WA CID | multiple | |
| Scholarships Managers Inc. | WA CID | multiple | |

C.      The following are in the possession, custody and control of entities other than Plaintiffs and may be used by the Plaintiffs to support one or more claims:

1. Documents and data related to NNI's and NNI subcontractors, partners and/or affiliates marketing and promotion of NovoSeven, and tangible items provided to Medicaid clients.

## III. DAMAGES

Novo tracked individual patients who used NovoSeven® and their physicians, including those patients on off-label prophylaxis regimens, patients using dose regimens that exceed the recommended dosing, and patients and physicians to whom the company paid or provided kickbacks. Further, the Defendant paid contract pharmacies to obtain confidential patient protected information in order to enhance their tracking efforts. Therefore, along with government claims data, Plaintiffs expect – at the very least – to be able to quantify the damages on a patient-by-patient basis as to when Novo paid or provided them and their physicians directly with kickbacks. Even if a patient did not receive direct kickbacks, damages arise from false claims for prescriptions of NovoSeven® submitted to government payers for reimbursement that were tainted by the payment or provision of kickbacks to doctors and others with the ability to influence the use of NovoSeven®.

37

Moreover, damages arise from Novo's off-label promotion of NovoSeven®. Government claims data and other discovery from Defendant – and those acting in concert with Defendant – could identify the individual patients and the number of false claims resulting from the company's off-label marketing pursuits.

At trial, in a False Claims Act case, the number of false claims (*i.e.*, the number of prescriptions caused by the scheme) as well as the dollar value of each false claim are calculated by the jury. The amount of damages for each false claim is multiplied by three and a statutory civil penalty of between $5,500 and $25,064 for each false claim is assessed by the Court.

The schemes alleged by the Plaintiff State and the Relator led to Washington State's Medicaid program spending NovoSeven.  As spending influenced by kickbacks, all of this spending would be part of potential damages against the defendant.  The full scope of damages and penalties that the Plaintiffs are entitled to recover will be established through discovery.  Pursuant to RCW 74.66 et seq. and RCW 74.09.210(2)) Washington is entitled to treble damages and a per claim penalty between $5,500 and $11,000.  The State of Washington seeks generally to recover full restitution of all funds or payments received in violation of the law ("damages") plus interest, investigative and litigation costs, and attorneys' fees. The State reserves the right to alter, amend, and lengthen the applicable timeframe for statutory recoveries as the case progresses. The State further reserves the right to modify the damages calculation and to seek damages under alternative and/or different theories, as appropriate and as discovery progresses in this case.

### IV.  INSURANCE AGREEMENTS

38

Plaintiffs are unaware of any insurance agreements that may be applicable to the claims asserted in the Second Consolidated Complaint. To the extent such agreements exist, they are in the custody and control of Defendant.

Dated:  January 13, 2023                         Respectfully submitted,


                                                s/*Michael Burrage*
                                                Michael Burrage, Bar No. 1350
                                                Patti Sawyer, Bar No. 30712
                                                **Whitten Burrage Law Firm**
                                                512 North Broadway Ave
                                                Suite 300
                                                Oklahoma City, OK 73102
                                                Tel.: (405) 516-7800
                                                Fax: (405) 516-7859

                                                Reuben A. Guttman (*pro hac vice*)
                                                Traci L. Buschner (*pro hac vice*)
                                                Nancy Gertner (*pro hac vice*)
                                                Elizabeth H. Shofner (*pro hac vice*)
                                                Paul Zwier (*pro hac vice*)
                                                Dan Guttman (*pro hac vice* to be filed)
                                                **Guttman, Buschner & Brooks PLLC**
                                                1509 22nd St N.W.
                                                Washington, DC 20037
                                                Tel.: 202-800-3001

                                                Justin S. Brooks (*pro hac vice*)
                                                **Guttman, Buschner & Brooks PLLC**
                                                450 N. Narberth Avenue
                                                Suite 102
                                                Narberth, PA 19072
                                                Tel.: 610-547-9556


                                                *Counsel for Relator Jamie Siegel*


39

<u>s/ Matthew T. Kuehn</u>
Matthew T. Kuehn (*pro hac vice*)
Carrie L. Bashaw (*pro hac vice*)
State of Washington
Office of the Attorney General
Medicaid Fraud Control Division
P.O. Box 40114
Olympia, WA 98504
Tel: (360) 586-8888

***Counsel for State of Washington***

40

## CERTIFICATE OF SERVICE

I hereby certify that on this date, January 13, 2023, I served the foregoing PLAINTIFFS' RULE 26(A)(1) DISCLOSURES on the following counsel via Email Attachment.

*s/Carrie L. Bashaw*
Carrie L. Bashaw

**COUNSEL FOR DEFENDANT:**

| | |
|---|---|
| Larry D. Ottaway OBA No. 6816<br>Amy Sherry Fischer, OBA No. 16651<br>**Foliart, Huff, Ottaway & Bottom**<br>201 Robert S. Kerr Avenue, 12th Floor<br>Oklahoma City, Oklahoma 73102<br>Telephone: (405) 232-4633<br>Fax: (405 232-3462<br>larryottaway@oklahomacounsel.com<br>amyfischer@oklahomacounsel.com | |
| Jaime L.M. Jones (*pro hac vice*)<br>Matthew Bergs (*pro hac vice*)<br>**Sidley Austin LLP**<br>One South Dearborn Street<br>Chicago, IL 60603<br>Telephone: (312) 853-7000<br>jaime.jones@sidley.com<br>mbergs@sidley.com | |
| Paul E. Kalb (*pro hac vice*)<br>**Sidley Austin LLP**<br>1501 K. Street NW<br>Washington, DC 20005<br>Telephone: (202) 736-8000<br>pkalb@sidley.com | |

41

# Exhibit 20

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| *Ex rel.* | Case No. 3:23-cv05459-BHS |
| JAMIE SIEGEL, M.D., | |
| Plaintiff-Relator, | |
| v. | |
| NOVO NORDISK, INC., | |
| Defendant. | |

**PLAINTIFFS' SUPPLEMENT TO THEIR  RULE 26(a)(1) DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(a)(1) and the local rules of this Court, the Relator and the State of Washington ("Plaintiffs") through the undersigned attorneys, hereby supplement their initial Plaintiffs' Rule 26(a)(1) Disclosures ("Initial Disclosures") served on January 13, 2023 with regard to their damages.  Specifically, Plaintiffs' Supplement to Their Rule 26(a)(1) Disclosures ("Supplement") will provide, *inter alia*, the measure of damages caused by the submission of false claims for NovoSeven® to the Washington Medicaid program and Medicare for Washington by applying claims data already provided to the Defendant in discovery[1] to the methodology for calculating the damages set forth in Plaintiffs' Initial Disclosures.

**III. DAMAGES**

<u>Initial Response</u>:  Novo tracked individual patients who used NovoSeven® and their

---

[1] Including, WA_NNI_116440, WA_NNI_226624, NHS_0000021, and "Noridian Request 20155 10012024 Claims Analysis.xlsx."

1

physicians, including those patients on off-label prophylaxis regiments, patients using dose regiments that exceed the recommended dosing, and patients and physicians to whom the company paid or provided kickbacks. Further, the Defendant paid contract pharmacies to obtain confidential patient protected information in order to enhance their tracking efforts. Therefore, along with government claims data, Plaintiffs expect – at the very least – to be able to quantify the damages on a patient-by-patient basis as to when Novo paid or provided them and their physicians directly with kickbacks. Even if a patient did not receive direct kickbacks, damages arise from false claims for prescriptions of NovoSeven® submitted to government payers for reimbursement that were tainted by the payment or provision of kickbacks to doctors and others with the ability to influence the use of NovoSeven®. Moreover, damages arise from Novo's off-label promotion of NovoSeven®. Government claims data and other discovery from Defendant – and those acting in concert with Defendant – could identify the individual patients and the number of false claims resulting from the company's off-label marketing pursuits.

At trial, in a False Claims Act case, the number of false claims (*i.e.*, the number of prescriptions caused by the scheme) as well as the dollar value of each false claim are calculated by the jury. The amount of damages for each false claim is multiplied by three and a statutory civil penalty of between $5,500 and $25,064 for each false claim is assessed by the Court.

The schemes alleged by the Plaintiff State and the Relator led to Washington State's Medicaid program spending on NovoSeven.  As spending influenced by kickbacks, all of this spending would be part of potential damages against the defendant. The full scope of damages and penalties that the Plaintiffs are entitled to recover will be established through discovery. Pursuant to RCW 74.66 et seq. and RCW 74.09.210(2)) Washington is entitled to treble damages and a per

claim penalty between $5,500 and $11,000.[2] The State of Washington seeks generally to recover full restitution of all funds or payments received in violation of the law ("damages") plus interest, investigative and litigation costs, and attorneys' fees.  The State reserves the right to alter, amend, and lengthen the applicable timeframe for statutory recoveries as the case progresses. The State further reserves the right to modify the damages calculation and to seek damages under alternative and/or different theories, as appropriate and as discovery progresses in this case.

Response Supplement:

A.  Washington Medicaid Claims Calculation

In the Initial Disclosure, the amount of damages for each false claim was a multiplier of three and a statutory civil penalty of between $5,500 and $25,064 for each false claim that is assessed by the Court.  The applicable civil penalties have increased periodically since the Initial Disclosure to the current range of $13,946 to $27,894.[3] The damages to the State of Washington (i.e., the Medicaid program) for Washington patients caused by submission of false claims for NovoSeven® alleged in this action are as follows:

| Claim Source | Total Payments | Total Claim Count | Triple Damages | Civil Penalties |
|---|---|---|---|---|
| Claims w Novo | $119,380,320.16 | 3,535 | $358,140,960.48 | $38,813,942.00 |

The total damages to date are $396,954,902.48 (not including interest).  The chart above detailing the damages, and the associated data for each claim is contained in an Excel Workbook produced on October 31, 2024. See, WA_NNI_2527812.

---

[2] Supplement October 31, 2024: These Medicaid claims also implicate federal funds thus a penalty for the State and the Federal government should be applied.

[3] Washington State amended RCW 76.66.020 on 6/7/2018 to incorporate the minimum and maximum civil penalty amounts provided by 31 U.S.C. Sec. 3729(a).

3

B. Relator - Washington Medicare Claims Calculation

As an initial matter, since the service of the Initial Disclosures, the range of federal civil penalties to be applied has increased from $5,500 and $25,064 to $13,946 and $27,894[4] for each false claim assessed by the Court, therefore, Relator's damage calculation applied the highest rate ($27,894) for each false claim.

The damages to the federal government (i.e., the Medicare program) for Washington patients caused by submission of false claims for NovoSeven® alleged in this action are as follows:

| Claim Source | Total Payments | Total Claim Count | Triple Damages | Civil Penalties |
|---|---|---|---|---|
| Claims w Hemo DX | $623,912.57 | 261 | $1,871,737.71 | $7,280,334.00 |
| Claims w.o. Hemo DX | $33,116.58 | 58 | $99,349.74 | $1,617,852.00 |
| Medicare XO Claims | $5,043,655.21 | 388 | $25,130,965.63 | $10,822,872.00[5] |

The total damages are $36,823,111.08 (not including interest). The above chart detailing the measure of damages and the associated data (for each claim) is presented in an Excel Workbook provided by Relator's Counsel produced on October 31, 2024. See, Damage Model_Relator_Confidential.xlsx (hereafter "Medicare Excel Workbook"). As noted above in the introduction, the Medicare damages detail provided above (and the Medicare Excel Workbook) was derived from data sets already provided in discovery from the State of Washington (WA_NNI_116440) and Noridian (Noridian Request 20155 10012024 Claims Analysis.xlsx). Another spreadsheet derived from data included in WA_NNI_116440 (specific to the Medicare Cross Over claims) is also being produced contemporaneously with this submission. See,

---

[4] *Civil Monetary Penalties Inflation Adjustments for 2024*, 89 FR 9764, 9766 (DOJ Feb. 12, 2024).
[5] A claim present in both the Washington data and the Noridian data was only counted once.

4

WA_NNI_2527811. It was used to create the Tab of the Medicare Excel Workbook entitled "Medicare XO Claims."

Dated: October 31, 2024                              Respectfully submitted,

*s/ Traci L. Buschner*
Reuben A. Guttman (*pro hac vice*)
Traci L. Buschner (*pro hac vice*)
Justin S. Brooks (*pro hac vice*)
Nancy Gertner *(pro hac vice*)
Elizabeth H. Schofner (*pro hac vice*)
Guttman Buschner & Brooks PLLC
1509 22nd Street, N.W.
Washington, DC 20037
Tel: (202) 800-3001
Fax: (202) 827-0041
rguttman@gbblegal.com
tbuschner@gbblegal.com
jbrooks@gbblegal.com
ngertner@gbblegal.com
lschofner@gbblegal.com

Douglas C. McDermott, WSBA #31500
McDermott Asan, PLLC
Logan Building
500 Union Street, Suite 909
Seattle, WA 98101
Telephone: 206-949-3252
doug@mcdermottasan.com

Michael Burrage (*pro hac vice*)
Patricia Sawyer (*pro hac vice*)
Whitten Burrage Law Firm
512 North Broadway Ave. Suite 300
Oklahoma City, OK 73102
Tel: (405) 516-7800
Fax: (405) 516-7859
mburrage@whittenburrage.com
psawyer@whittenburrage.com

*Attorneys for Relator Jamie Siegel, M.D.*

5

*s/ Matthew T. Kuehn*
Matthew T. Kuehn, WSBA #30419
Karl F. Sloan, WSBA #27217
Naomi Smith, WSBA #49995
Assistant Attorneys General
Medicaid Fraud Control Division
PO Box40114
Olympia, WA 98502
Tel: (360) 586-8888
Fax: (360) 586-8877
Matthew.Kuehn@atg.wa.gov
Karl.Sloan@atg.wa.gov
Naomi.Smith@atg.wa.gov

*Counsel for Plaintiff State of Washington*

6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, October 31, 2024, I served the foregoing PLAINTIFF'S SUPPLEMENTAL RULE(a)(1) DISCLOSURES on the following counsel via Email Attachment.


/s/*Traci L. Buschner*
Traci L. Buschner


| | |
|---|---|
| Jaime L.M. Jones (*pro hac vice*)<br>Matthew Bergs (*pro hac vice*)<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>Telephone: (312) 853-7000<br>jaime.jones@sidley.com<br>mbergs@sidley.com | John Wolfe<br>Aaron Brecher<br>Orrick, Herrington & Sutcliffe LLP<br>401 Union Street, Suite 330<br>Seattle, WA 98104-7094<br>Telephone: 206-839-4332<br>wolfe@orrick.com<br>abrecher@orrick.com |
| Mark P. Guerrera (*pro hac vice*)<br>Benna E. Jenny (*pro hac vice*)<br>Sidley Austin LLP<br>1501 K Street, N.W. Washington, D.C. 20005<br>Telephone: 202-736-8000<br>mguerrera@sidley.com<br>bjenny@sidley.com | Matthew T. Kuehn<br>Karl F. Sloan<br>Naomi Smith<br>Assistant Attorneys General<br>Medicaid Fraud Control Division<br>PO Box 40114<br>Olympia, WA 98502<br>Telephone: 360-586-8888<br>Matthew.Kuehn@atg.wa.gov<br>Karl.Sloan@atg.wa.gov<br>Naomi.Smith@atg.wa.gov |

7

# Exhibit 21

**From:** TYHI (Tanya Hill)
**Sent:** Wednesday, May 01, 2013 12:41 PM
**To:** SCOD (Stacy O'Donnell)
**Subject:** FW: new SevenSECURE enrollment # 2271576


FYI...

**From:** MDGA (Mary Dugan)
**Sent:** Wednesday, May 01, 2013 10:43 AM
**To:** JSDR (Jim Snider)
**Cc:** TYHI (Tanya Hill)
**Subject:** FW: new SevenSECURE enrollment # 2271576

Good Morning Jim!!

This Seven Secure enrollment is for a feiba patient that Linda has been looking to convert as part of her BP2 action plan.
Linda has been working in lock step with her Coram home advocate and has been able to get the patient signed up for Seven Secure.

This is a step in the right direction!!

Mary


**From:** LINF (Linda Fenlin)
**Sent:** Tuesday, April 30, 2013 9:13 AM
**To:** MDGA (Mary Dugan)
**Cc:** EZTA (Elizabeth Tawil); LGEE (Lois Geer); AYKC (Amy Kerico)
**Subject:** FW: new SevenSECURE enrollment # 2271576

Her is a new Sevensecure enrollment from a patient that uses feiba and goes to PENN.
This is important because I have been working with the Coram Consumer advocate to get this guy converted.  I am hoping this is the first step!!
Linda

**From:** Luke Hemming [mailto:lhemming@rxcrossroads.com]
**Sent:** Tuesday, April 30, 2013 9:08 AM
**To:** LINF (Linda Fenlin)
**Subject:** new SevenSECURE enrollment # 2271576

Linda:

We received a new SevenSECURE® enrollment from Elaine Chiang at Penn Comprehensive Hemophilia Program; enrollment # is 2271576.

Thanks,

**Luke Hemming**

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE    NNICID-0012807

Project Coordinator
**RxCrossroads**
**9960 Corporate Campus Dr., Ste 100**
**Louisville, KY 40223**
**Toll Free (877) 668-6777 option 2**
**Fax      (800) 826-6993**
lhemming@rxcrossroads.com

*This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact me and destroy the materials contained in this message.*

CONFIDENTIAL NOT SUBJECT TO DISCLOSURE
NNICID-0012808