1

2

3

4

5

6                                                    The Honorable Benjamin H. Settle

7

8                   **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF WASHINGTON**
9                                **AT TACOMA**

10

11
     UNITED STATES OF AMERICA, *et al.*
12                                               **NO.  3:23-cv-05459-BHS**
                              Plaintiffs,
13            *Ex rel.,*

14   JAMIE SIEGEL, M.D.,                         **PLAINTIFFS' TRIAL BRIEF**
                              Plaintiff-Relator
15            v.

16   NOVO NORDISK, INC.,

17                            Defendant.

18

19

20

21

22

23

24

25

26

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     ELEMENTS OF CLAIMS ............................................................................ 1

III.    LEGAL ISSUES ........................................................................................... 2

        A.  Remuneration and Scienter Under the AKS and the WA AKS ................. 2

        B.  Plaintiffs Only Need to Show that at Least One Purpose of Defendant's
            Payments to Patients and Physicians was to Induce or Reward Prescriptions ......... 4

        C.  Plaintiffs Will Establish Liability and Causation by Showing that Defendant
            Made Payments to Doctors and to Patients which Resulted in NovoSeven
            Prescriptions ........................................................................................... 6

        D.  Remuneration may be Unlawful Even if it Reflects Fair Market Value ................ 10

        E.  The Off-Label Claims for NovoSeven Prescriptions were False ........................... 11

        F.  The Off-Label Claims were False Because They were Statutorily Ineligible
            for Reimbursement ................................................................................... 12

        G.  Plaintiffs Will Prove that All of the Off-Label Claims were False Based on the
            Express False Certification Theory ............................................................. 13

        H.  Plaintiffs Will Establish Causation by Showing that Defendant's Conduct was
            a Substantial Factor in Causing Physicians to Prescribe NovoSeven Off-Label,
            and it was Foreseeable that False Claims would Result .................................. 14

        I.  Plaintiffs Will Prove that Defendant's Illegal Conduct could have Impacted
            the Government's Payment Decisions, and thus, was Material ......................... 16

IV.     EVIDENCE ................................................................................................... 17

        A.  Admissibility of Documents ...................................................................... 17

            1.   Self-Authenticating Records ............................................................ 17

            2.   Documents Produced by Defendant .................................................. 18

            3.   Rule 1006 Summaries ...................................................................... 18

        B.  Admissions by Employees/Agents/Functional Employees Who Acted within
            the Scope of Their Employment/Agency ..................................................... 19

        C.  Evidence of Activities Outside the State of Washington .................................. 20

        D.  Evidence of Notice to Defendant ................................................................ 21

1

V.      CONCLUSION ........................................................................................... 22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1   Plaintiff State of Washington ("Washington" or "the State") and Plaintiff-Relator Jamie

2   Siegel, M.D. (collectively, "Plaintiffs") respectfully submit their Plaintiffs' Trial Brief in this

3   action brought under the Washington Medicaid Fraud False Claims Act, RCW §§ 74.66, *et seq.*

4   ("WA FCA"),[1] the Washington Fraudulent Practices Act, RCW 74.09.210 ("WA FPA"),[2] and

5   the federal False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) (the "FCA").[3]

## I.      INTRODUCTION

7   Since the Court is familiar with the factual context of this case,[4] Plaintiffs will not repeat

8   the lengthy factual history here. This Trial Brief addresses some of the issues Plaintiffs'

9   anticipate may arise at trial.

## II.      ELEMENTS OF CLAIMS

11  To establish a claim under the FCA and the WA FCA, Plaintiffs must prove by a

12  preponderance of the evidence:

13      (1)    A false statement or fraudulent course of conduct;

14      (2)    Made with scienter;

15      (3)    That was material;

16      (4)    Causing the government to pay out money.

17  *United States v. MultiCare Health System*, Case No. 2:22-CV-00068-SAB, 2025 WL 924027

18  (E.D. Wash. Mar. 26, 2025), citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d

19  1166, 1170 (9th Cir. 2006).

21  Washington's Fraudulent Practices Act ("WA FPA"), RCW Chapter 74.09, prohibits, in

22  part, the receipt of Medicaid "benefits or payments … in a greater amount than that to which

23  entitled by means of … [a] fraudulent scheme or device." RCW 74.09.210(1)(c). Knowing

---

[1] Third Consolidated Complaint, Dkt. 301 at 112-113, Count Thirty-One.
[2] *Id.* at 113-114, Count Thirty-Two.
[3] *Id.* at 87-89, Counts One and Two.
[4] Order, Dkt. 509 at 2.

1  violators of this prohibition "shall be liable for repayment of any excess benefits or payments
2  received, plus interest [and] shall further, in addition to any other penalties provided by law, be
3  subject to civil penalties … not to exceed three times the amount of such excess benefits or
4  payments."

5        RCW 74.09.210(1)(c) prohibits fraudulent schemes that seek excess Medicaid payments.
6  This encompasses kickbacks prohibited by RCW 74.09.240 and subjects such violations to the
7  civil penalties set forth in RCW 74.09.210(2) ("WA AKS"). The WA AKS makes a company
8  liable for paying remuneration directly or indirectly to any person to induce such person … to
9  purchase … or recommend purchasing" any good payable by Washington Medicaid. RCW
10 74.09.240(2). To prevail on its kickback claims under the WA FPA, Plaintiffs must establish that
11 Defendant, on behalf of itself or others, 1) knowingly obtained or attempted to obtain Medicaid
12 payments to which it was not entitled: 2) by offering or paying remuneration to physicians and/or
13 Washington Medicaid patients/families, 3) to induce them to purchase or recommend
14 NovoSeven, which was payable under Medicaid. See RCW 74.09.210(1); RCW 74.09210(2);
15 RCW 74.09.240(2).

16             **III.    LEGAL ISSUES**

17       Plaintiffs will prove that Defendant used its Patient Assistance Program, which it called
18 SevenSECURE, to pay kickbacks to dozens of patients and its Key Opinion Leader ("KOL")
19 program to pay kickbacks to dozens of physicians to induce the prescribing of NovoSeven in
20 violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320(a)-7b(b)(2)(B), the WA AKS,
21 the FCA, the WA FCA, and the WA FPA.

22     **A.    Remuneration and Scienter Under the AKS and the WA AKS**

23       For purposes of the AKS and the WA AKS, "remuneration" includes the transfer of
24 anything of value "directly or indirectly, overtly or covertly, in cash or in kind to any person."
25 42 U.S.C. § 1320a-7b(b)(2); *Pharm. Coalition for Patient Access v. United States*, 126 F.4th
26 947, 961 (4th Cir. 2025).

PLAINTIFFS' PRE-TRIAL BRIEF        2         ATTORNEY GENERAL OF WASHINGTON
NO. 3:23-CV-05459-BHS                                    Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

The WA AKS is modeled on its federal counterpart but differs in one significant way: it does not incorporate the federal AKS's scienter requirement that the defendant act "knowingly and willfully" in offering or paying remuneration. Compare 42 U.S.C. § 1320a-7b(b)(2) ("[w]hoever knowingly and willfully offers or pays any remuneration … to any person to induce such person … to purchase … or recommend … any good … for which payment may be made … under a Federal health care program") to RCW 74.09.240(1) ("[a]ny person … that offers or pays any remuneration … to any person to induce such person … to purchase, lease, order, or arrange for or recommend purchasing … any goods … for which payment may be made in whole or in part under" Medicaid). Washington certainly could have included and applied "willfully" to either RCW 74.09.210(2) or 74.09.240 but did not. See *State v. Dennis*, 191 Wash. 2d 169, 173, 421 P.3d 944, 947 (2018) (It is a well-established principle of statutory interpretation that we may not add words to an unambiguous statute when the legislature has chosen not to include that language).

Instead, the scienter applicable to civil enforcement of the WA AKS is found under the WA FPA's civil enforcement provision, which requires only that the defendant "knowingly violat[e]" the WA FPA provisions. RCW 74.09.210(2) ("Any person or entity knowingly violating any of the provisions of subsection (1).") Although "knowingly" is not defined in in the WA FPA, the Washington Medicaid Fraud False Claims Act, RCW 74.66.005, et. seq. ("WA FCA"), another Washington fraud statute, this one modeled after the federal False Claims Act, 31 U.S.C. § 3729, defines "knowing" and "knowingly" [to] mean that a person, with respect to information:

(i) Has actual knowledge of the information;

(ii) Acts in deliberate ignorance of the truth or falsity of the information; or

(iii) Acts in reckless disregard of the truth or falsity of the information.

(b) "Knowing" and "knowingly" do not require proof of specific intent to defraud.

RCW 74.66.010(7); see also 31 U.S.C. § 3729(b)(1) (same).

1
2
**B.    Plaintiffs Only Need to Show that at Least One Purpose of Defendant's Payments to Patients and Physicians was to Induce or Reward Prescriptions**

3    Plaintiffs will prove that Defendant paid illegal kickbacks to dozens of physicians,

4    primarily under the guise of its KOL programs, Advisory Board meetings, and publication

5    strategy, to induce them to prescribe NovoSeven and/or to reward them for doing so, in violation

6    of the AKS, the FCA, the WA AKS, the WA FCA, and the WA FPA. In addition, Defendant

7    paid illegal kickbacks to dozens of patients and/or their families to induce them to cause their

8    physicians to prescribe NovoSeven and/or to reward them for doing so, in violation of these

9    laws. Defendant created, funded, and controlled SevenSECURE to provide benefits to

10   patients/families, including Washington Medicaid beneficiaries, to induce their purchase or

11   recommendation of the drug, in violation of the AKS and the WA AKS. Those violations

12   rendered it ineligible to receive payments from Washington Medicaid and Medicare. This case

13   is not the first time that Defendant has faced allegations that it paid kickbacks to increase sales

14   of its products, having agreed to pay settlements in connection with kickback allegations at least

15   three times before. Defendant resolved similar kickback issues in connection with its Changing

16   Life with Diabetes program. Defendant's continued receipt of NovoSeven payments from

17   Washington Medicaid violated the WA FPA and subjects them to damages and penalties under

18   the WA FPA, RCW 74.09.210(c).

19   To prove their kickback claims, Plaintiffs need not prove that inducing or rewarding

20   prescriptions was the sole or primary reason for Defendant's payments to physicians and/or

21   patients/families. Rather, Defendant's payments violate the AKS and the WA AKS if at least

22   "one purpose" of the payments was to induce or reward prescriptions. *United States v. Kats*,

23   871 F.2d 105, 108 (9th Cir. 1989) ("Medicare fraud statute is violated if 'one purpose of the

24   payment was to induce future referrals…even if the payments were also intended to compensate

25   for professional services.'") quoting *United States v. Greber*, 760 F.2d 68, 69, 72 (3d Cir.1985).

26

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS                    4                    ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1    In other words, the "one purpose" test focuses on Defendant's reasons for providing

2    remuneration to prescribers and/or patients/families.

3         The evidence will include numerous documents showing that at least *one purpose* of the

4    SevenSECURE program and the benefits Defendant provided to patients/families – whom it

5    knew to have much greater control over their treatment than do patients with other conditions –

6    was to induce them to recommend, encourage, and pressure their medical providers to convert

7    them to NovoSeven from competitor products and/or prescribe them for up to three times the

8    FDA-approved dose, and for off label prophylaxis.

9         The Washington Medicaid patients/families who received such benefits included Patient

10   A and his mother. Defendant marketed NovoSeven and suggested uses directly to Patient A, his

11   parent, and several other Washington Medicaid patients, while simultaneously paying

12   remuneration to those patients and/or their family members. By doing so Defendant categorically

13   violated the provisions of the AKS and the WA AKS.

14        Although Defendant developed SevenSECURE and later contracted with RxCrossroads,

15   a third-party specialty pharmacy, Defendant cannot insulate its fraudulent actions and schemes

16   from liability under the AKS and the WA AKS. Defendant continued to finance and control the

17   benefits which were paid from Defendant's marketing budget. The AKS and the WA AKS are

18   violated when a Defendant pays remuneration "*directly or indirectly*, *overtly or covertly*" to

19   induce any person to purchase, or recommend a good paid in whole or in part by Medicaid and/or

20   Medicare. 42 U.S.C. § 1320a-7b(b)(2) and RCW 74.09.240(2) (emphasis added). Indeed,

21   Defendant has asserted in its filings to this Court that RxCrossroads was the "functional

22   equivalent" of an employee. As such, Defendant cannot dispute that it had direct knowledge of

23   and authorized the fraudulent schemes that RxCrossroads undertook on its behalf. The evidence

24   will show that Defendant's SevenSECURE program was by no means a charitable patient

25   assistance program funded by independent entities.

26

1    **C.    Plaintiffs Will Establish Liability and Causation by Showing that
2    Defendant Made Payments to Doctors and to Patients which Resulted
     in NovoSeven Prescriptions**

3    "(C)ompliance with the AKS is a precondition to the payment of Medicare and Medicaid

4    claims." *United States ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 330–31

5    (S.D.N.Y. 2014) (collecting cases). "The AKS's plain language makes it unlawful for a

6    defendant to pay a kickback with the intent to induce a referral, whether or not a particular

7    referral results." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664–

8    65 (S.D. Tex. 2013).

9            To establish Defendant's AKS and WA AKS liability and causation, Plaintiffs only need

10   to show that: (1) Defendant knowingly[5] offered or paid remuneration to prescribers, one purpose

11   of which was to induce them to prescribe NovoSeven, or to patients and their families, one

12   purpose of which was to induce them to request NovoSeven prescriptions, (2) the prescribers

13   thereafter prescribed those drugs, and (3) claims for payment for those prescriptions were

14   submitted to a government health care program. *See United States ex rel. Greenfield v. Medco*

15   *Health Solutions, Inc.*, 880 F.3d 89, 96–100 (3d Cir. 2018) (holding the Government need only

16   show a "link"— not but for causation—between the individual or entity receiving a kickback and

17   the submission of a claim for reimbursement to a federal health care program).[6]

18           Government programs "clearly would not pay for claims tainted by kickbacks. The

19   integrity of such claims [is] undermined by the possibility that the drugs were prescribed to

20   benefit the provider financially, not because they were 'reasonable and necessary' for treatment."

21   *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165-GHK SSX, 2014 WL 3605896,

22   at *7 (C.D. Cal. July 10, 2014). The AKS does not require proof of a *quid pro quo* or that any

23   ---
     [5] And "willfully" for purposes of the federal AKS violation only.
24   [6] *United States ex rel. Bawduniak v. Biogen Indec, Inc.*, 12-CV-10601-IT, 2018 WL 1996829, at *3 (D. Mass. Apr.
     27, 2018) ("It is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the
25   physician to prescribe specific drugs, and that the physician then prescribed those drugs, *even if* the physician would
     have prescribed those drugs absent the kickback"); *see also Kuzma v. Northern Arizona Healthcare Corp.*, 607 F. Supp.
26   3d 942, 957 (D. Ariz. 2022) (holding that evidence that physicians who allegedly received kickbacks used Defendants facilities
     was sufficient for jury to find causal link between kickbacks and claims later submitted).

1  payment or referral was made. *See United States v. Teva Pharms. USA, Inc.*, No. 13 CIV. 3702

2  (CM), 2019 WL 1245656, at *10 (S.D.N.Y. Feb. 27, 2019). As the district court explained in

3  *Teva Pharmaceuticals*, although the AKS requires that the offer or payment be made "to induce"

4  a person, courts consistently treat the AKS's inducement element as an intent requirement.

5  Because intent is all that is required, it does not matter whether a particular referral results. Thus,

6  the statute does not require evidence of a "quid pro quo" in the sense that each bribe must

7  successfully generate referrals. Rather, the payor must offer or pay with the intent to gain

8  influence over the reason or judgment of a person making referral decisions. *Id*.

9          Defendant may argue that Plaintiffs must prove that the remuneration that it provided to

10  physicians and/or patients/families directly caused those physicians and the physicians of those

11  patients to write prescriptions for NovoSeven that they otherwise would not have written, that

12  the physicians and/or patients/families had a *quid pro quo* arrangement with Defendant to

13  prescribe NovoSeven, and/or that the physicians and the physicians/families themselves broke

14  the law. Such arguments are contrary to established law.

15          Plaintiffs will prove that Defendant directly targeted patients for the payment of

16  kickbacks for the purpose of inducing them to purchase or recommend NovoSeven because it

17  believed that the patient is a key decision maker when it comes to treatment selection. It is well-

18  settled, and this Court has already held that, to prove liability under the AKS, Plaintiffs are not

19  required to show that a kickback affected a doctor's prescribing decisions, or that there was any

20  *quid pro quo* arrangement between the kickback provider and recipient. *United States v. Novo*

21  *Nordisk, Inc.*, No. C23-5459 (BHS), 2025 WL 2223439, at *8-9 (W.D. Wash. Aug. 5, 2025)

22  (Settle, J.); *See also Greenfield*, 880 F.3d at 96-100 (rejecting an argument that the FCA requires

23  a plaintiff "to prove a kickback actually influenced a patient's or medical professional's

24

25

26

1  judgment").[7] Instead, Plaintiffs must identify a link between the alleged kickbacks and the false

2  claims, which is established by showing that a doctor who received a kickback or the doctor of a

3  patient/family that received a kickback thereafter wrote prescriptions for the relevant drugs for

4  which a claim was submitted to a government health care program. *See Greenfield*, 880 F.3d at

5  99–100.

6        The Third Circuit's decision in *Greenfield* is instructive here. That case involved

7  allegations that Accredo, a specialty pharmacy, paid kickbacks to two charities, "HSI" and

8  "HANJ," to induce the charities to refer their members to Accredo. *Id*. at 91–92. To survive

9  summary judgment, the Third Circuit held that the relator had to "point to at least one claim

10  [submitted to a federal health care program] that covered a patient who was recommended or

11  referred to Accredo by HSI/HANJ." *Id*. at 99. The relator did not, however, have to show that the

12  patient would not have been recommended or referred to Accredo absent the kickbacks or that the

13  kickbacks otherwise caused the recommendation or referral. *Id*., at 99–100. Similarly, here,

14  Plaintiffs will show that doctors who received kickbacks and doctors of patients/families who

15  received kickbacks thereafter wrote prescriptions for NovoSeven for which claims were

16  submitted to a government health care program, but Plaintiffs need not show that the kickbacks

17  actually affected the doctors' prescribing decisions.

18        The Court's ruling in *United States ex rel. Arnstein v. Teva Pharmaceuticals USA, Inc.*,

19  another *qui tam* action involving alleged kickbacks to doctors through speaker programs, is

20

21  [7] *See also Bawduniak*, 2018 WL 1996829, at *3, 6 (liability can be established "regardless of whether the claim
   was the result of a quid-pro-quo exchange or would have been submitted even absent the kickback"); *United*

22  *States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc*., No. 13-CV-3003 (WMW/DTS), 2021 WL 101193, at
   *12, 15 (D. Minn. Jan. 12, 2021) ("[A]n increase in the purchase or utilization of Defendant's products after a

23  kickback was paid is not relevant to causation, nor is but-for causation an element of Plaintiffs' claim.").
   "Notably, the AKS does not require a kick-back scheme to succeed in generating new business (*i.e.*, new patient

24  prescriptions) in order for a violation to have occurred.'" *United States ex rel. Kester v. Novartis Pharm. Corp.*,
   23 F. Supp. 3d 242, 263 (S.D.N.Y. 2014); *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc*., 500 F. Supp. 3d

25  345, 366–367 (E.D. Pa. 2020) (quoting *Greenfield* and holding that relator "does not need to prove a kickback
   'actually influenced a patient's or medical professional's judgment'"); *Kuzma*., 607 F. Supp. 3d at 953–957

26  (following *Greenfield*, *Teva*, and *Bawduniak*).

1  directly on point. No. 13 CIV. 3702 (CM), 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019). In *Teva*,

2  the defendant drug manufacturer argued on summary judgment that, to prevail, the relators

3  must prove that a *quid pro quo* arrangement or kickback caused a doctor to write additional

4  prescriptions. *Teva*, 2019 WL 1245656, at *23-27. The Court rejected this argument, explaining

5  that plaintiffs need only show that the defendant provided a kickback to a doctor and that the

6  doctor subsequently wrote one or more prescriptions for that company's drugs:

7        Relators need not show that a quid pro quo exchange occurred, or that the
         physicians would not have prescribed Defendant's medication but for the
8        kickbacks. It is sufficient to show that Defendant paid kickbacks to a
         physician for the purpose of inducing the physician to prescribe specific
9        drugs, and that the physician then prescribed those drugs, even if the
         physician would have prescribed those drugs absent the kickback.
10

11 *Id*. at *24 (*quoting Bawduniak*, 2018 WL 1996829, at *3). The Court should apply the same

12 standard here.

13        Finally, Plaintiffs need not prove that the physicians and/or patients/families knowingly

14 and willfully accepted bribes or otherwise broke the law. While the AKS permits the

15 Government to pursue those, like the doctors or patients who "solicit[] or receive[]" kickbacks,

16 42 U.S.C. § 1320-7b(b)(1), Plaintiffs have sued Defendant. Thus, the operative AKS provision

17 here is subsection (b)(2), which addresses those who "offer[] or pay[]" kickbacks, 42 U.S.C. §

18 1320-7b(b)(2). Defendant's payment of such kickbacks itself constituted a violation of the AKS

19 under subsection (b)(2), regardless of whether the doctors' and/or patients/families' acceptance

20 of the kickbacks constituted a separate violation of the AKS under subsection (b)(1).

21 Accordingly, to establish Defendant's liability, Plaintiffs need not prove that any particular

22 doctor violated the AKS or WA AKS or acted with any particular mental state.

23        Plaintiffs need not show that a patient was prescribed NovoSeven because the patient

24 received a kickback. Liability attaches where "a particular patient is exposed to an illegal

25 recommendation or referral [or remuneration] and a provider submits a claim for reimbursement

26 pertaining to that patient." *United States ex rel. Greenfield*, 880 F.3d at 100. Nor does it matter

whether pharmacies or providers who submitted claims for NovoSeven, knew of Defendant's kickbacks to patients. *See, e.g.*, *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 393 (1st Cir. 2011) ("…AKS compliance is a precondition of Medicare payment and makes no exceptions for violations caused by third parties….").

As a factual matter, in this case, the evidence, including CMS and Washington Medicaid claims data, clearly demonstrates that the paid physicians and the doctors of paid patients/families continued to prescribe NovoSeven after Defendant paid them.[8] Some of these doctors and patients/families received thousands of dollars from Defendant, and Defendant monitored the NovoSeven prescription activity of prescribers and the NovoSeven use of patients. The question for the jury, then, is whether one purpose of the remuneration provided to prescribers and/or patients/families was to increase prescriptions for NovoSeven.

### D.    Remuneration may be Unlawful Even if it Reflects Fair Market Value

For Plaintiffs' kickback claims, the illegal remuneration at issue is primarily the money Defendant paid to physicians in honoraria, publishing services, fees and expenses (in addition to paid trips, hotel stays, dinners, and similar remuneration) in order to induce them to prescribe NovoSeven or to reward them for doing so, and payments to patients/families in the form of medical expense assistance, educational grants, computers (in addition to paid trips, hotel stays, dinners, and similar remuneration) to induce them to request that their physicians prescribe NovoSeven or to reward them for doing so. Courts have construed the term "remuneration" to mean "anything of value—and in any form—which is given in return for, or to induce, a referral for federal healthcare services." *United States ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 677-678 (W.D. Pa. 2014); *see also United States v. Health All. of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *6–7 (S.D. Ohio Dec. 18, 2008).

---

[8] By "pay" Plaintiffs mean "anything of value."

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS

10

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1    Even if the amounts of the speakers' fees reflect fair market value, they may still

2    constitute illegal remuneration under the law.[9] If the remuneration is intended to induce referrals,

3    it is unlawful—even where the remuneration is fair market value. *Ashcroft*, 39 F. Supp. 3d, at

4    677.[10]

5    When Defendant engaged in the fraudulent scheme of offering or paying remuneration

6    to physicians and patients/families to induce them to use NovoSeven, it violated the AKS and

7    the WA AKS. Defendant is therefore liable for repayment of any excess payments received on

8    behalf of those patients and also subject to civil penalties up to three times the amount of the

9    excess payments. *See* RCW 74.09.210(2).

10   **E.    The Off-Label Claims for NovoSeven Prescriptions were False**

11   At trial, Plaintiffs will prove that Defendant improperly promoted NovoSeven as safe and

12   effective for prophylaxis in hemophilia patients with deficient or absent factor VIII or IX and in

13   270 mcg/kg doses ("high dose"), substantially in excess of the 90mg/kg provided for in the FDA-

14   approved label. Plaintiffs' evidence will establish that these marketing claims are "false" or

15   "fraudulent" under the FCA and the analogous WA FCA.

16   "A claim is 'legally false' when the claimant misrepresents that he or she has complied

17   with 'statutory, regulatory, or contractual requirement[s].'" *United States ex rel. Penelow v.*

18   _____

19   [9] Defendant has raised a fair market value claim in its pretrial pleadings. Dkt. 321 at 30. While the phrase "fair market value" arises in a few safe harbors to the AKS, *United States ex rel. Perri v. Novartis Pharm. Corp.*, No. CV 15-

20   6547, 2019 WL 6880006, at *13 (D.N.J. Feb. 21, 2019), Defendant would bear the burden of establishing the applicability of any safe harbor. *Id* at * 14. Moreover. the "personal services" safe harbor NNI briefed in its Motion for Summary Judgment has no applicability to the Washington Medicaid claims, as the State of

21   Washington does not have similar safe harbor rules.

22   [10] *See Novartis Pharm. Corp.*, 2019 WL 6880006, at *13 n.14 (acknowledging "there may be situations where an exchange is an illegal 'remuneration' within the meaning of AKS, even though the exchange itself is for 'fair

23   market value'"); *United States ex rel. Patel v. Cath. Health Initiatives*, 312 F. Supp. 3d 584, 596 (S.D. Tex. 2018) ("The presence of a legitimate business purpose for the arrangement or a fair market value payment will

24   not legitimize a payment if there is also an illegal purpose"); *United States ex rel. Boise v. Cephalon, Inc.*, No. CIV.A. 08-827, 2015 WL 1724572, at *10 (E.D. Pa. April 15, 2015) ("[R]elators need not allege that speaker

25   fees were provided at higher than market rates for similar speaking engagements in order to constitute kickbacks underlying a theory of FCA liability."); *United States ex rel. Health Dimensions Rehab., Inc. v. Rehabcare*

26   *Group, Inc.,* No. 4:12CV00848 AGF, 2013 WL 4666338, at *5 (E.D. Mo. Aug. 30, 2013) ("Lack of fair market value, per se, is not an element the Government must provide").

1  *Janssen Products, LP*, No. CV127758ZNGLHG, 2021 WL 6052425, *7 (D.N.J. Dec. 21, 2021)

2  (citation omitted). The falsity requirement can be satisfied by alleging implied false certifications

3  or express false certifications. *United States ex rel. Campie v. Gilead Sciences, Inc.* 862 F.3d

4  890, 900-901 (9th Cir. 2017); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659

5  F.3d 295, 305-306 (3d Cir. 2011). Here, Plaintiffs will present evidence proving both theories of

6  falsity: (1) Defendant caused the submission of claims for NovoSeven to the government that

7  impliedly certified eligibility for payment when, in fact, the claims were statutorily

8  ineligible for payment; and (2) Defendant made express false certifications that the claims

9  submitted to the government for NovoSeven complied with the law, when in fact they did not.[11]

10
11  **F.     The Off-Label Claims were False Because They were Statutorily Ineligible for Reimbursement**

12  It is not disputed that, under the FCA, a claim is "false" if it is statutorily ineligible for

13  reimbursement.[12] As discussed more fully below, Defendant's off-label claims were statutorily

14  ineligible for reimbursement because they were not prescribed for a medically accepted

15  indication and medically necessary, as required under the law governing government health care

16  program reimbursement, and they were statutorily ineligible for reimbursement as they were not

17  reasonable and necessary for prophylaxis or 270 mcg/kg doses.[13]

18  Government health care programs will only cover and pay for a drug that is used for a

19  "medically accepted indication," which means any FDA-approved use that is reasonable and

20  necessary for the diagnosis or treatment of an illness or injury.[14] As Plaintiffs will prove at trial,

21  NovoSeven prescriptions written for prophylaxis and for high dose (270 mcg/kg) were not FDA-

22

23  [11] Dkt. 174 at 19.

24  [12] This is based on the implied certification theory of falsity that "anyone who submits a claim to the government impliedly certifies compliance with all the conditions of payment." *United States ex rel. Brown v. Celgene*, 226 F. Supp. 3d 1032, 1044 (C.D. Cal. 2016) (citation omitted).

25  [13] To be clear, whether a use is medically accepted and necessary are not factors in determining liability under, for example, a kickback theory.

26  [14] *See* 42 U.S.C. § 1395w-102(e)(1); 42 U.S.C. § 1395y(a)(l)(A); 42 U.S.C. §§ 1396r-8(d)(1)(B)(i), (g)(1)(B)(i) and (k)(6).

1    approved uses or indications and are not reasonable and necessary. Accordingly, these claims

2    are legally false.

3    Medicare and Medicaid only cover and pay for a drug that is "reasonable and necessary

4    for the diagnosis or treatment of illness or injury." *See ex rel. Penelow*, 2021 WL 6052425, at *7

5    (citing 42 U.S.C. §1395w-102(e)(3); 42 U.S.C. § 1395y(a)(I)(A)); *United States v. Johnson &*

6    *Johnson, et al.*, 2017 WL 2367050, *4 (D.N.J. May 31, 2017); *see also* 42 U.S.C. §§ 1395w-

7    102(e)(1), (e)(3); 42 U.S.C. § 1395y(a)(l)(A); 42 C.F.R. § 411.15(k)(1). Thus, a claim that is

8    not medically reasonable or necessary is ineligible for reimbursement by the government and,

9    therefore, false under the FCA.[15]

10    The evidence shows that, because of Defendant's false and misleading off-label

11    marketing, NovoSeven claims were submitted to the government for prescriptions for

12    prophylaxis. These claims were medically unreasonable and unnecessary because NovoSeven

13    was generally not appropriate for this use. Further there was an alternative drug from a different

14    manufacturer that was approved for prophylaxis.

15    **G.    Plaintiffs Will Prove that All of the Off-Label Claims were False Based on the**
       **Express False Certification Theory**

16

17    Plaintiffs will also prove falsity of all the off-label claims through an express false

18    certification theory. The evidence shows that Defendant made false certifications that it was in

19    compliance "with all applicable federal healthcare program requirements, FDA requirements,

20    obligations of the Corporate Integrity Agreement and [Defendant's] policies," when in fact it was

21    not in compliance because it paid kickbacks to physicians and/or patients/families, and promoted

22

23    ---
      [15] *See United States ex rel. Bergman v. Abbott Labs.*, 995 F. Supp. 2d 357, 367 (E.D. Pa. 2014)(prescriptions for uses
      that are "'not reasonable and necessary for treatment,' makes those uses ineligible for reimbursement under
24    Medicare and Medicaid regulations."); *United States ex rel. Strom v. Scios, Inc.*, 676 F. Supp. 2d 884, 891 (N.D.
      Cal. 2009) (Because CMS "permits reimbursement only for 'reasonable and necessary' treatments, a prescription
25    of [a drug] in a context where it is not 'reasonable' or 'necessary' would be statutorily ineligible for
      reimbursement."); *see also United States ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 742 (10th Cir. 2018)
26    (in an FCA case involving eligibility for payment under Medicare, "a claim is false if it is not reimbursable, and a
      Medicare claim is not reimbursable if the services provided were not medically necessary").

NovoSeven for uses that were not for medically accepted indications and/or not for a reasonable or necessary use. Specifically, as a result of a settlement agreement with the United States, and a CIA entered into pursuant to that settlement agreement, Defendant's employees and executives who were involved in the marketing and promotion of NovoSeven, among others, were required to sign annual certifications of compliance with laws (including the AKS, the FDCA, and the FCA), regulations, and policy, and provide them to the government as a condition of payments.

The evidence that Defendant violated the AKS, the FDCA, and the FCA establishes that these certifications were false and is a separate basis for Defendant's liability under the FCA.

**H.    Plaintiffs Will Establish Causation by Showing that Defendant's Conduct was a Substantial Factor in Causing Physicians to Prescribe NovoSeven Off-Label, and it was Foreseeable that False Claims would Result**

Causation is satisfied under the FCA if the defendant's conduct was a "substantial factor" in producing the false claims and it was "foreseeable" that false claims would result. *United States ex rel. Schmidt v. Zimmer*, 386 F.3d 235, 244 (3d Cir. 2004).

Courts have consistently held that evidence of direct causation at a physician-by-physician or claim-by-claim level is not required to satisfy the substantial factor test to prove causation in an FCA case.[16]  In one of the first opinions discussing causation under the FCA at the summary judgment phase with respect to off-label marketing, *United States ex rel. Franklin v. Parke-Davis,* No. CIV.A. 96-11651PBS, 2003 WL 22048255 (D. Mass. Aug. 22, 2003) ("*Franklin II*"), the court held that because the "FCA does not provide a special definition for causation," it would apply "common-law tort causation concepts." *Id.* at *4.[17] Hence, Plaintiffs must prove that "the defendant's conduct was a 'substantial factor' in producing the harm" and that the harm was foreseeable. *Id.* at *4–5.

---

[16] *See United States ex rel. Colquitt v. Abbott Labs,* No. 3:06-CV-1769-M, 2016 WL 80000, at *7 (N.D. Tex. Jan. 7, 2016) (denying summary judgment on causation without requiring evidence that any provider ever relied on information or advice provided by defendants)*; Franklin II,* 2003 WL 22048255, at *5 (D. Mass. Aug. 22, 2003) (holding causation established in an off-label marketing case without requiring proof that individual doctors relied on false statements by sales representatives).

[17] *See also Schmidt,* 386 F.3d at 244; *United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999) (applying tort law causation standard to find causation element established under the FCA).

Another FCA case addressing off-label marketing also makes clear that proof of the defendant's systematic off-label campaign will suffice to establish causation, and individualized proof on a doctor-by-doctor or patient-by-patient basis is not required for claims to go to a jury. In *United States ex rel. Brown v. Celgene Corporation,* 226 F. Supp. 3d 1032, 1040-1041 (C.D. Cal. 2016), the court denied summary judgment to Celgene, finding that the relator was "not required to identify a particular false claim caused by [the defendant's] off-label promotion." The evidence in *Celgene* showed that the defendant had "engaged in a systematic campaign to promote off-label prescriptions of its drugs, that physicians who received more promotional contacts prescribed at a higher rate than those who received fewer contacts, and that claims for off-label prescriptions were presented to the government in the hundreds of thousands following Celgene's promotional activities." *Id.* at 1041. The court deemed this evidence sufficient for causation and denied summary judgment. Plaintiffs will present similar evidence at trial here.

Defendant may argue that a causal connection between its off-label marketing campaign and doctors' decisions to prescribe NovoSeven cannot be established because of the intervening decision-making of doctors when prescribing the drugs. To the contrary, under the law, the fact that Defendant marketed NovoSeven off-label to prescribers who wrote the prescriptions does not defeat a showing of causation, particularly since the goal of Defendant's nationwide off-label marketing campaign was to influence doctor's prescribing behavior (that is, to increase total prescriptions written by prescribers).[18]

In *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013), the court rejected defendants' argument that "because doctors exercise independent medical judgment in making decisions about prescriptions, the actions of these doctors are independent intervening causes." *Id.* at 39. The court explained that "'[o]nce a plaintiff presents evidence that

---

[18] *See United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 52–53 (D. Mass. 2001) ("*Franklin I*") (finding that the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of defendant's off-label marketing scheme); *see also Franklin II,* 2003 WL 22048255 at *4–5; *see also In re Avandia Marketing, Sales Practices and Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015).

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct,' the burden shifts to the defendant to rebut this causal inference." *Id.* at 45. Thus, even if Defendant presents testimony of doctors saying that their decisions to prescribe NovoSeven were not influenced by Defendant's fraudulent marketing, the jury could reject those contentions and weigh the evidence as it deems appropriate.

Plaintiffs intend to prove that Defendant's widespread off-label marketing campaign was a substantial factor in causing physicians to prescribe NovoSeven off-label, and it was reasonably foreseeable that this would result in the submission of off-label claims for reimbursement to the government. Indeed, the evidence establishes that Defendant intended this very result. Accordingly, under the established precedent such proof establishes FCA causation. *See United States ex rel. Siegel*, 2025 WL 2223439, at *7 ("The Court agrees that a jury could reasonably conclude that [Defendant's] conduct caused physicians to prescribe NovoSeven and that it was foreseeable that that would result in the submission of claims for payment for off label NovoSeven uses.").

### I.    Plaintiffs Will Prove that Defendant's Illegal Conduct could have Impacted the Government's Payment Decisions, and thus, was Material

Under the holistic approach for determining materiality in FCA cases, embraced by the Supreme Court in *Escobar*, Plaintiffs will satisfy the materiality element by proving that: (1) Defendant's conduct violated an express condition of payment; the violations go to the "essence of the bargain" for reimbursement by Medicare and Medicaid; (2) the government routinely devotes significant efforts to fighting and preventing fraud stemming from pharmaceutical manufacturers' off-label marketing; and (3) Defendant was aware that the government attaches

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1    importance to addressing such fraud. *Universal Health Services, Inc. v. United States ex rel.*

2    *Escobar*, 579 U.S. 176, 192–96 (2016). [19]

3        Also, to show materiality, Plaintiffs need not adduce evidence directly from a

4    government official saying that if the government had known the various ways in which

5    Defendant promoted NovoSeven off-label, then the government would *have made* different

6    payment decisions. Such evidence is not required by law. *See* 31 U.S.C. § 3729(b)(4)

7    (definition of "material"). Also, Plaintiffs need not show that the government *would have made*

8    different payment decisions, as such requirement conflicts with the FCA's materiality standard

9    (*i.e.,* "natural tendency to influence") and has been rejected by courts.[20]

10                        **IV.    EVIDENCE**

11    **A.    Admissibility of Documents**

12        **1.    Self-Authenticating Records**

13        Plaintiffs expect to introduce certain records, including Medicare and Washington

14    Medicaid claims data, obtained from electronic data maintained by authorities or contractors

15    charged with administering those programs and records. These records were produced with a

16    certificate of authenticity. Defendant indicates it will object to the admission of these records on

17    grounds that include lack of foundation and hearsay. However, these objections must be denied

18    because the records are self-authenticating under Fed. R. Evid. 902(11) and admissible under

19    Fed. R. Evid. 803(6).

20

21

---

22    [19] In *Escobar*, the Supreme Court reaffirmed that the proper test for determining materiality in FCA cases is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or

23    receipt of money or property." 579 U.S. at 182 (*citing* 31 U.S.C. § 3729(b)(4)). The test is an objective one, but subjective understandings may be relevant to what a reasonable person would consider material. Thus, the

24    materiality test is satisfied either if a "reasonable man would attach importance" to the misrepresentation or the "defendant knew or had reason to know that the recipient of the representation attached importance to it." *Id.* at 193.

25    [20] *See also* United States' SOI Regarding Defendant's Motion to Dismiss, *United States ex rel. Gardner v. Vanda Pharm., Inc.*, ECF # 58, Civ. No. 17-cv-00464, at p. 3 (D.D.C. December 1, 2020) ("*Escobar* therefore does not

26    require a showing that the government 'would' have denied payment, which is tantamount to an outcome standard of materiality at odds with the text of the FCA.").

1    Plaintiffs also expect to introduce records of certain third-party businesses. Defendant

2    does not contest authenticity but indicates it will object to these records on foundational and

3    hearsay grounds. Accordingly, Plaintiffs expect to obtain certifications under Fed. R. Evid.

4    902(11) and 803(6) or alternatively present the live testimony of subpoenaed records custodians.

5    ### 2.    Documents Produced by Defendant

6    Plaintiffs expect to introduce many relevant records, including documents and electronic

7    mail, made by Defendant's employees and agents, and which Defendant produced in discovery.

8    For most of these documents, Defendant, while not contesting authenticity, indicates that its

9    objections will include lack of foundation and hearsay.[21] Plaintiffs, understanding that the Court

10   may need to address these objections on a document-by-document basis during trial, respectfully

11   submit that these records are admissible under Fed. R. Evid. 801(d)(2). In addition, Plaintiffs

12   submit that these are records of the Defendant's regularly conducted activity, admissible under

13   Fed. R. Evid. 803(6), and, out of an abundance of caution, will subpoena any necessary records

14   custodians.

15   ### 3.    Rule 1006 Summaries

16   Plaintiffs expect to introduce summaries of voluminous materials pursuant to Fed. R.

17   Evid. 1006. For example, the Medicare and Washington Medicaid claims data contain large

18   amounts of materials that cannot reasonably be examined in court. Accordingly, Plaintiffs have

19   prepared summaries of this data and have previously provided the underlying data and the

20   summaries to Defendant well in advance of trial. Defendant indicates that it will object to the

21   summaries on foundational, hearsay, Fed. R. Evid. 403, and "improper 1006" grounds.

22   Defendant has not specified how these summaries are prejudicial or improper, nor have they

23   stated that they are in any way inaccurate. Specifically, at September 16, 2025 conference of

24

---

25   [21] Notably, while Defendant objects to the admissibility of most of the records listed on Plaintiffs' exhibit list, it
specifically identifies 37 of these "objectionable" records as well as all "Exhibits included on Plaintiffs' Exhibit

26   List" on its own exhibit list, effectively proposing the *admission* of all of Plaintiffs' exhibits.

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS
18
ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1   counsel Plaintiffs' counsel sought discussion about Defendant's objections to Plaintiffs 1006

2   summaries were told specific objections would be provided at a later time. As of the filing of

3   this Trial Brief, Plaintiffs have received no feedback. Plaintiffs submit that admission of these

4   summaries is proper and appropriate.

5          By contrast, Defendant has included Fed. R. Evid. 1006 summaries on its proposed

6   exhibit list but have failed to provide copies of the summaries despite Plaintiffs' counsel's

7   request for them in writing on September 9, 2025. Because Plaintiffs have not been afforded a

8   reasonable opportunity to examine the summaries and compare them to the underlying materials;

9   they should not be admitted as exhibits at trial.

10      **B.      Admissions by Employees/Agents/Functional Employees Who Acted within
            the Scope of Their Employment/Agency**
11

12         Plaintiffs expect to introduce testimony and correspondence reflecting statements by

13  Defendant's agents and/or functional employees who acted as Defendant's agents and/or

14  functional employees.

15         For example, the evidence will show that Defendant created SevenSECURE and branded

16  it with its logo to increase NovoSeven sales by providing patients with financial benefits. After

17  Defendant operated the program for two years, it later contracted with RxCrossroads to operate

18  SevenSECURE on its behalf. The evidence will show that although RxCrossroads administered

19  the program, Defendant continued to fund the benefits paid to patients and provided direction

20  and retained final decision-making authority over the administration of the program.

21  Accordingly, actions and statements by RxCrossroads employees for the purposes of

22  administering SevenSECURE are admissible under Fed. R. Evid. 801(d)(2).

23         Another example relates to Dr. Craig Kessler, Editor of *Haemophilia* journal and Chair

24  of the Medical and Scientific Advisory Council ("MASAC"). Plaintiffs will present evidence

25  that Dr. Kessler worked closely with Defendant, who paid him substantial sums in expenses,

26  honoraria, and other remuneration, as well as providing substantial financial and other support

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

for *Haemophilia.* The evidence will show that Dr. Kessler and other MASAC members collaborated closely with Dr. David Cooper, Defendant's Director, and later Senior Director of Medical Affairs, to cause MASAC to endorse the off-label use of NovoSeven for prophylaxis. Statements and correspondence by Dr. Kessler and other MASAC members to assist Defendant to increase NovoSeven sales are similarly admissible under Fed. R. Evid. 801(d)(2).[22]

### C.    Evidence of Activities Outside the State of Washington

The evidence will show that Defendant's payments to patients and prescribers to increase NovoSeven sales, to include the off-label use of the medication for prophylaxis and doses higher than provided for on the FDA-approved label, were national in scope and enlisted physician-prescribers and patients across the country, including in Washington. Plaintiffs will offer evidence that Defendant's employees who operated in Washington reported to and collaborated with supervisors and other employees across the United States, including employees and supervisors at its headquarters in Princeton, New Jersey. In addition, Defendant used SevenSECURE to pay for the travel of Washington patients, families, and caregivers to various meetings throughout the United States that included attendees, presenters, and Defendant's employees from all over the United States. Defendant's payments to patients in Washington were a part of the SevenSECURE program which operated nationally, such that the payments to Washington patients are inextricably intertwined with payments throughout the United States, administered by Kentucky-based RxCrossroads.[23]

Similarly, the evidence will show that Defendant sought to influence, through payments and benefits, various physician-prescribers, who it identified as "key opinion leaders" (KOLs), to prescribe and promote the prescribing of NovoSeven, including off-label prophylaxis and high doses. These KOLs, mostly located outside of Washington, were paid to promote NovoSeven throughout the United States. Thus, payments to physicians outside of Washington are

---

[22] Plaintiffs filed a motion in limine on this issue. Dkt. 523 pp. 24-25

[23] SevenSECURE payments included medical expenses, expenses for travel to hemophilia conventions, laptops, medical equipment (including wheelchair lifts), and educational grants.

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1    inextricably intertwined with payments to Washington prescribers because those payments were

2    part of a program to influence NovoSeven throughout the United States.[24]

3        **D.    Evidence of Notice to Defendant**

4        Plaintiffs propose to introduce evidence of settlement agreements that Defendant entered

5    into in May 2011 and May 2009.[25] The May 2011 settlement is particularly relevant because it

6    resolved claims similar to those at issue in this case—the promotion of NovoSeven for off-label

7    use and providing benefits to or on behalf of physicians for prescribing NovoSeven. Moreover,

8    as a part of this settlement Defendant signed the CIA which required that its sales and marketing

9    employees, among others, sign annual certifications of compliance with all laws and regulations,

10   including those proscribing off-label promotion, kickbacks, and false claims. In addition, the

11   CIA required Defendant to maintain its Code of Conduct and that its employees certify

12   compliance with it. Both the settlement agreement and the CIA are inextricably intertwined with

13   the certifications and the Code of Conduct which will be offered in evidence.

14       The 2009 agreement resolved kickback violations in which Defendant agreed that it

15   unlawfully paid kickbacks for sales of medicine, including NovoSeven, that were paid through

16   an intermediary and disguised as business expenses. This case similarly involves the payment of

17   kickbacks, to patients that were disguised as patient assistance and to prescribers that were

18   disguised as honoraria, travel expenses, and publication assistance.

19       Both settlements put Defendant on notice that its business practice of paying kickbacks

20   to increase sales and disguising those kickbacks by paying them through intermediaries to

21   categorizing them as business expenses was unlawful. And the 2011 settlement is directly tied

22   to the evidence in this case.

23

24

25

26

---

[24] Plaintiffs briefed this issue in their Opposition to Defendant's Omnibus Motions in Limine, Dkt. 532 at pp. 10-12.

[25] Plaintiff has proposed a reasonable stipulation of the notice provided by these settlements in place the underlying documents.

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS

21

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

## V.    CONCLUSION

The Plaintiffs respectfully submit this Trial Brief in support of their positions on the substantive issues of law that may arise during the trial of this case and respectfully request an opportunity to respond to any new issues that may arise.

DATED this 26th day of September, 2025.

Nicholas W. Brown
Attorney General

*s/Matthew T. Kuehn*
MATTHEW T. KUEHN, WSBA #30419
Senior Counsel
KARL F. SLOAN, WSBA #27217
NAOMI SMITH, WSBA # 49995
FERDINAND LUGO ORTIZ, WSBA #56806
Assistant Attorneys General
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98502
Telephone: 360-586-8888
Facsimile: 360-586-8877
Matthew.Kuehn@atg.wa.gov
Karl.Sloan@atg.wa.gov
Naomi.Smith@atg.wa.gov
Ferdinand.LugoOrtiz@atg.wa.gov

*Counsel for Plaintiff State of Washington*

*/s/ Douglas C. McDermott*
Douglas C. McDermott, WSBA #31500
doug@mcdermottasan.com
Logan Building
500 Union Street, Suite 909
Seattle, Washington 98101
Telephone: 206-949-3252

Reuben A. Guttman (*pro hac vice*)
Traci L. Buschner (*pro hac vice*)
Nancy Gertner (*pro hac vice*)
Elizabeth H. Shofner (*pro hac vice*)
Rick Mountcastle (*pro hac vice*)

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS

22

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1 | Guttman Buschner PLLC
2 | 1509 22nd St., NW
    | Telephone: 202-800-3001
3 | Facsimile: 202-827-0041
    | rguttman@gbblegal.com
4 | tbuschner@gbblegal.com
    | ngertner@gbblegal.com
5 | lshofner@gbblegal.com
    | rmountcastle@gbblegal.com
6 |
7 | Michael Burrage (*pro hac vice*)
    | Patricia Sawyer, (*pro hac vice*)
8 | Whitten Burrage Law Firm
    | 512 North Broadway Ave., Suite 300
9 | Oklahoma City, OK 73102
    | Telephone: 405-516-7800
10 | Facsimile: 405-516-7859
    | mburrage@whittenburragelaw.com
11 | psawyer@whittenburragelaw.com
12 |
13 | *Counsel for Plaintiff-Relator Jamie Siegel, M.D.*
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS

23

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26th, 2025, a true and correct copy of the foregoing document was filed with the clerk of the Court using the CM/ECF System, which will send notification to all counsel of record.

DATED this 26th day of September, 2025.


_/s/ Jacob Giem_
JACOB GIEM
Paralegal

PLAINTIFFS' PRE-TRIAL BRIEF
NO. 3:23-CV-05459-BHS

24

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

ATTORNEY GENERAL OF WASHINGTON
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98504-0114
360-586-8888